CLOSED

# U.S. District Court
## Eastern District of Missouri (LIVE) (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:06-cv-00637-SNL
### Internal Use Only

**☞ 0 7 ‾ 9 7 ☜**

Quick et al v. Viziqor Solutions, Inc.` et al
Assigned to: Honorable Stephen N. Limbaugh
Case in other court: St. Louis County Circuit Court, 06CC-000915
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 04/14/2006
Jury Demand: Defendant
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

### Plaintiff

**Gordon Quick**

represented by **Martin M. Green**
GREEN AND JACOBSON, P.C.
7733 Forsyth Boulevard
Suite 700
St. Louis, MO 63105
314-862-6800
Fax: 314-862-1606
Email: mann@stlouislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fernando Bermudez**
GREEN AND JACOBSON, P.C.
7733 Forsytb Boulevard
Suite 700
St. Louis, MO 63105
314-862-6800
Fax: 314-862-1606
Email: bermudez@stlouislaw.com
*ATTORNEY TO BE NOTICED*

### Plaintiff

**William McCausland**

represented by **Martin M. Green**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fernando Bermudez**
(See above for address)
*ATTORNEY TO BE NOTICED*

JAMES G. WOODWARD, CLERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
BY: *Andrea Lussette*
DEPUTY CLERK

### Plaintiff

**John Trecker**

represented by **Martin M. Green**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fernando Bermudez**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Viziqor Solutions, Inc.`**                    represented by **Michael A. Clithero**
BLACKWELL SANDERS PEPER
MARTIN LLP
720 Olive Street
24th Floor
St. Louis, MO 63101
314-345-6000
Fax: 314-345-6060
Email:
mclithero@blackwellsanders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher A. Perrin**
BLACKWELL SANDERS PEPER
MARTIN LLP
720 Olive Street
24th Floor
St. Louis, MO 63101
314-345-6244
Fax: 314-345-6060
Email: cperrin@blackwellsanders.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Woodmont Holdings, Inc.**                    represented by **John T. Carroll, III**
*TERMINATED: 04/24/2006*                       Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, DE 19801
US
*LEAD ATTORNEY*

**Defendant**

**Michael Huber**                              represented by **Charles A. Weiss**
BRYAN CAVE LLP
211 N. Broadway
Suite 3600
St. Louis, MO 63102-2750

314-259-2000
Fax: 314-259-2020
Email: caweiss@bryancave.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy C. Mooney, Jr.**
BRYAN CAVE LLP
211 N. Broadway
Suite 3600
St. Louis, MO 63102-2750
314-259-2000
Fax: 314-259-2020
Email: tcmooney@bryancave.com
*TERMINATED: 09/15/2006*

**Defendant**

**Quadrangle Group, LLC**                  represented by **Charles A. Weiss**
                                           (See above for address)
                                           *LEAD ATTORNEY*
                                           *ATTORNEY TO BE NOTICED*

                                           **Timothy C. Mooney, Jr.**
                                           (See above for address)
                                           *TERMINATED: 09/15/2006*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/05/2006 | 🔗 | SUMMONS Returned Executed : Viziqor Solutions, Inc. served on 3/21/2006. (CDD, ) (Entered: 04/17/2006) |
| 04/05/2006 | 🔗 | SUMMONS Returned Executed: Quadrangle Group, LLC served on 3/27/2006. (CDD, ) (Entered: 04/17/2006) |
| 04/05/2006 | 🔗 | SUMMONS Returned Executed: Michael Huber served on 3/27/2006. (CDD, ) (Entered: 04/17/2006) |
| 04/07/2006 | 🔗 | NOTICE filed by Defendant Woodmont Holdings, Inc. : Suggestion of Bankruptcy and Notice of Automatic Stay. (See Exhibit B attached to the Notice of Removal) (CDD, ) (Entered: 04/17/2006) |
| 04/12/2006 | 🔗 | MOTION to Dismiss Party Woodmont Holdings, Inc. filed by Plaintiffs Gordon Quick, William McCausland and John Trecker. (See Exhibit C attached to the Notice of Removal) (CDD, ) (Entered: 04/17/2006) |
| 04/14/2006 | 🔗1 | NOTICE OF REMOVAL from St. Louis County Circuit Court, case number 06CC-000915 filed by Michael Huber and Quadrangle Group, LLC. with Jury Demand. Filing fee $350.00 paid. (Attachments: #.1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Civil Cover Sheet # 8 Original Filing Form)(CDD, ) (Entered: 04/17/2006) |

| 04/14/2006 | ᠑2 | DISCLOSURE OF CORPORATION INTERESTS CERTIFICATE filed by Defendant Quadrangle Group, LLC. (CDD, ) (Entered: 04/17/2006) |
| 04/14/2006 | ᠑3 | Consent to Removal filed by Defendant Woodmont Holdings, Inc.. (CDD, ) (Entered: 04/17/2006) |
| 04/14/2006 | ᠑4 | Consent to Removal filed by Defendant Viziqor Solutions, Inc.. (CDD, ) (Entered: 04/17/2006) |
| 04/14/2006 | ᠑ | Receipt # S2006-006255 in the amount of $350.00 for CIVIL FILING FEE, CIVIL FILING FEE-PART 2, CIVIL FILING FEE-PART 3 on behalf of BRYAN CAVE LLP. (CSW,) (Entered: 04/17/2006) |
| 04/17/2006 | ᠑5 | Letter to attorney John T. Carroll, III from Deputy Clerk. Re: Motion Pro Hac Vice requirements. (CDD, ) (Entered: 04/17/2006) |
| 04/19/2006 | ᠑6 | MOTION for Extension of Time to File Answer by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) (Entered: 04/19/2006) |
| 04/20/2006 | ᠑ | Docket Text ORDER re 6 MOTION for Extension of Time to File Answer by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) filed by Michael Huber, Quadrangle Group, LLC ; EXTENSION TO 4/28/06 GRANTED. Signed by Judge Stephen N. Limbaugh on 4/20/06. (ARL) (Entered: 04/20/2006) |
| 04/20/2006 | ᠑ | ORDER RECEIPT: (see receipt) Thu Apr 20 11:48:26 CDT 2006 (ARL, ) (Entered: 04/20/2006) |
| 04/21/2006 | ᠑7 | ENTRY of Appearance by Michael A. Clithero for Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 04/21/2006) |
| 04/21/2006 | ᠑8 | DISCLOSURE OF CORPORATION INTERESTS CERTIFICATE by Defendant Viziqor Solutions, Inc.`Parent companies: Formula Telecom Solutions, Ltd., Subsidiaries: None, Publicly held company: Formual Telecom Solutions, Ltd.,. (Clithero, Michael) (Entered: 04/21/2006) |
| 04/21/2006 | ᠑9 | MOTION for Extension of Time to File Answer *to Complaint* by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 04/21/2006) |
| 04/24/2006 | ᠑10 | **ORDER OF DISMISSAL;** IT IS HEREBY ORDERED that leave is GRANTED to plaintiffs to dismiss defendant Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc. without prejudice; Signed by Judge Stephen N. Limbaugh on 04/24/2006;(DJO) (Entered: 04/24/2006) |
| 04/24/2006 | | *** Party Woodmont Holdings, Inc., defendant terminated; (DJO) (Entered: 04/24/2006) |
| 04/24/2006 | ᠑ | Docket Text ORDER re 9 MOTION for Extension of Time to File Answer to Complaint by Defendant Viziqor Solutions, Inc.; ORDERED GRANTED; extension to 04/28/2006; Signed by Judge Stephen N. Limbaugh on 04/24/2006;(DJO) (Entered: 04/24/2006) |
| 04/26/2006 | ᠑11 | Consent MOTION for Extension of Time to File Answer by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) (Entered: |

| | | |
|---|---|---|
| | | 04/26/2006) |
| 04/26/2006 | ◑12 | MOTION for Extension of Time to File Answer *to Complaint* by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 04/26/2006) |
| 04/27/2006 | ◑ | Docket Text ORDER re 11 Consent MOTION for Extension of Time to File Answer Up to and Including 5/3/06 by Defendants Michael Huber, Quadrangle Group, LLC; ORDERED Granted - SNL; Signed by Judge Stephen N. Limbaugh on 4/27/06 (CMA) (Entered: 04/27/2006) |
| 05/02/2006 | ◑13 | ENTRY of Appearance by Christopher A. Perrin for Defendant Viziqor Solutions, Inc.`. (Perrin, Christopher) (Entered: 05/02/2006) |
| 05/03/2006 | ◑14 | MOTION to Dismiss Case *for Failure to Join Parties Needed for Just Adjudication* by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 05/03/2006) |
| 05/03/2006 | ◑15 | MEMORANDUM in Support of Motion re 14 MOTION to Dismiss Case *for Failure to Join Parties Needed for Just Adjudication* filed by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 05/03/2006) |
| 05/03/2006 | ◑16 | MOTION to Dismiss Case *Pursuant to Rule 12(b)(7) or, Alternatively, to Transfer or Stay* by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) (Entered: 05/03/2006) |
| 05/03/2006 | ◑17 | MEMORANDUM in Support of Motion re 16 MOTION to Dismiss Case *Pursuant to Rule 12(b)(7) or, Alternatively, to Transfer or Stay* filed by Defendants Michael Huber, Quadrangle Group, LLC. (Attachments: # 1 Exhibit # 2 Exhibit)(Weiss, Charles) (Entered: 05/03/2006) |
| 05/10/2006 | ◑18 | MOTION for Extension of Time to File Response/Reply *Opposing Defendants' Motion to Dismiss and for Transfer or Stay* by Plaintiffs Gordon Quick, William McCausland, John Trecker. (Attachments: # 1 Text of Proposed Order)(Bermudez, Fernando) (Entered: 05/10/2006) |
| 05/11/2006 | ◑ | Docket Text ORDER re 18 MOTION for Extension of Time to File Response/Reply *Opposing Defendants' Motion to Dismiss and for Transfer or Stay* Up to and Including 5/22/06 by Plaintiffs Gordon Quick, William McCausland, John Trecker; ORDERED Granted - Extension to 5/22/06 Granted - SNL; Signed by Judge Stephen N. Limbaugh on 5/11/06 (CMA) (Entered: 05/11/2006) |
| 05/22/2006 | ◑19 | MEMORANDUM in Opposition re 16 MOTION to Dismiss Case *Pursuant to Rule 12(b)(7) or, Alternatively, to Transfer or Stay*, 14 MOTION to Dismiss Case *for Failure to Join Parties Needed for Just Adjudication* filed by Plaintiffs Gordon Quick, William McCausland, John Trecker. (Bermudez, Fernando) (Entered: 05/22/2006) |
| 05/30/2006 | ◑20 | MOTION for Extension of Time to File Response/Reply *Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(7) Or, Alternatively, to Transfer or Stay* by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) (Entered: 05/30/2006) |

| 05/30/2006 | ❂21 | NOTICE by Plaintiffs Gordon Quick, William McCausland, John Trecker *of* Law Firm's Name Change: (Bermudez, Fernando) (Entered: 05/30/2006) |
|---|---|---|
| 05/31/2006 | ❂22 | MOTION for Extension of Time to File Response/Reply *Memorandum in Further Support of Motion to Dismiss* by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 05/31/2006) |
| 05/31/2006 | ❂ | Docket Text ORDER re 22 MOTION for Extension of Time to File Response/Reply Memorandum in Further Support of Motion to Dismiss by Defendant Viziqor Solutions, Inc.(Clithero, Michael) filed by Viziqor Solutions, Inc., GRANTED Signed by Judge Stephen N. Limbaugh on 5/31/06. (LAH, ) (Entered: 05/31/2006) |
| 06/02/2006 | ❂23 | ENTRY of Appearance by Timothy C. Mooney, Jr for Defendants Michael Huber, Quadrangle Group, LLC. (Mooney, Timothy) (Entered: 06/02/2006) |
| 06/08/2006 | ❂24 | REPLY to Response to Motion re 14 MOTION to Dismiss Case *for Failure to Join Parties Needed for Just Adjudication* filed by Defendant Viziqor Solutions, Inc.`. (Perrin, Christopher) (Entered: 06/08/2006) |
| 06/08/2006 | ❂25 | REPLY to Response to Motion re 16 MOTION to Dismiss Case *Pursuant to Rule 12(b)(7) or, Alternatively, to Transfer or Stay* filed by Defendants Michael Huber, Quadrangle Group, LLC. (Weiss, Charles) (Entered: 06/08/2006) |
| 06/16/2006 | ❂26 | MEMORANDUM re 25 Reply to Response to Motion by Defendants Michael Huber, Quadrangle Group, LLC. (Attachments: # 1)(Mooney, Timothy) (Entered: 06/16/2006) |
| 06/21/2006 | | ***Motions previously terminated: 12 MOTION for Extension of Time to File Answer *to Complaint* filed by Viziqor Solutions, Inc.` 20 MOTION for Extension of Time to File Response/Reply *Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(7) Or, Alternatively, to Transfer or Stay* filed by Michael Huber, Quadrangle Group, LLC,. (ARL) (Entered: 06/21/2006) |
| 07/05/2006 | ❂27 | MEMORANDUM TO COURT *correcting factual discrepancy in memorandum in opposition to motion to dismiss* by Plaintiffs Gordon Quick, William McCausland, John Trecker re 19 Memorandum in Opposition to 16 MOTION to Dismiss Case *Pursuant to Rule 12(b)(7) or, Alternatively, to Transfer or Stay* (Attachments: # 1 Exhibit 1) (Bermudez, Fernando) (Modified on 7/6/2006 to Edit Docket Text - CMA) (Entered: 07/05/2006) |
| 07/13/2006 | ❂28 | MEMORANDUM re 27 Notice (Other) *Response to Plaintiffs' Memorandum to Court (Docket #27)* by Defendants Michael Huber, Quadrangle Group, LLC. (Mooney, Timothy) (Entered: 07/13/2006) |
| 08/14/2006 | ❂29 | MEMORANDUM re 16 MOTION to Dismiss Case *Pursuant to Rule 12 (b)(7) or, Alternatively, to Transfer or Stay* by Defendants Michael Huber, Quadrangle Group, LLC. (Attachments: # 1 # 2 # 3 # 4 # 5) |

| | | (Mooney, Timothy) (Entered: 08/14/2006) |
|---|---|---|
| 08/18/2006 | ❤30 | MEMORANDUM re 29 Memorandum *To Court* by Plaintiffs Gordon Quick, William McCausland, John Trecker. (Bermudez, Fernando) (Entered: 08/18/2006) |
| 09/08/2006 | ❤31 | MOTION to Withdraw as Attorney ;attorney/firm Timothy C. Mooney, Jr. by Defendants Michael Huber, Quadrangle Group, LLC. (Mooney, Timothy) (Entered: 09/08/2006) |
| 09/15/2006 | ❤ | Docket Text ORDER re 31 MOTION to Withdraw as Attorney (attorney/firm Timothy C. Mooney, Jr.) by Defendants Michael Huber, Quadrangle Group, LLC; ORDERED Granted - SNL; Signed by Judge Stephen N. Limbaugh on 9/15/06 (CMA) (Entered: 09/15/2006) |
| 09/15/2006 | | ***Attorney Timothy C. Mooney, Jr terminated Pursuant to the Docket Text Order Dated 9/15/06 (CMA) (Entered: 09/15/2006) |
| 01/30/2007 | ❤32 | MEMORANDUM *re Supplement to Defendant Formula Telecom Solutions, Inc.'s Reply Memorandum in Further Support of Motion to Dismiss* by Defendant Viziqor Solutions, Inc.`. (Perrin, Christopher) (Entered: 01/30/2007) |
| 02/02/2007 | ❤33 | MOTION to Strike 32 Memorandum *of Formula Telecom* by Plaintiffs Gordon Quick, William McCausland, John Trecker. (Bermudez, Fernando) (Entered: 02/02/2007) |
| 02/06/2007 | ❤34 | MOTION for Leave to File Supplement to Reply Memorandum in Further Support of Motion to Dismiss and Opposition to Motion to Strike by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) (Entered: 02/06/2007) |
| 02/07/2007 | ❤ | Docket Text ORDER: Re: 34 MOTION for Leave to File Supplement to Reply Memorandum in Further Support of Motion to Dismiss and Opposition to Motion to Strike by Defendant Viziqor Solutions, Inc.`. (Clithero, Michael) filed by Viziqor Solutions, Inc., LEAVE TO FILE DENIED; THE COURT IS READY TO RULE ON EXISTING MOTIONS Signed by Judge Stephen N. Limbaugh on 2/7/07. (LAH, ) (Entered: 02/07/2007) |
| 02/12/2007 | ❤35 | ORDER - IT IS HEREBY ORDERED that defendants Huber and Quadrangle Group's motion to dismiss 16 be and is DENIED.IT IS FURTHER ORDERED that defendants Huber and Quadrangle Group's motion to transfer venue or stay 16 be and is GRANTED.IT IS FURTHER ORDERED that defendant Formula Telecom Solutions f/k/a ViziqorSolutions' motion to dismiss 14 be and is DENIED.IT IS FINALLY ORDERED that this cause of action, in its entirety, shall be transferred to the United States District Court for the District of Delaware for reference to the DelawareBankruptcy Court for further adjudication. No more action shall be taken in this case. Signed by Judge Stephen N. Limbaugh on 2/12/07. (ARL) (Entered: 02/12/2007) |
| 02/12/2007 | ❤36 | MEMORANDUM - After careful consideration of the matter, the Court |

| | | |
|---|---|---|
| | | determines that in the interest of justice, this cause of action will be transferred to the United States District Court for the District of Delaware for reference to the Delaware Bankruptcy Court. In light of the above findings, the Court sees no reason to address the "convenience of parties" prong of 1412, nor address the parties' briefs as to Rule 19 application or application of the bankruptcy stay provision. Signed by Judge Stephen N. Limbaugh on 2/12/07. (ARL) (Entered: 02/12/2007) |
| 02/12/2007 | | ***Civil Case Terminated. Case transferred electronically this date to the USDC for the District of Delaware. (ARL) (Entered: 02/12/2007) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM
MCCAUSLAND and JOHN
TRECKER,

      Plaintiffs,

v.

VIZIQOR SOLUTIONS, INC.,
WOODMONT HOLDINGS, INC.,
MICHAEL HUBER, and
QUADRANGLE GROUP, LLC.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

**FILED**

APR 1 4 2006

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO

**4  06CV00637SNL**

*Jury Trial Demanded*

## DEFENDANTS QUADRANGLE GROUP, LLC.'S AND MICHAEL HUBER'S NOTICE OF REMOVAL

Separate Defendants Quadrangle Group, LLC ("Quadrangle") and Michael Huber

("Huber"), pursuant to 28 U.S.C. §1446(a), hereby give notice of removal of Plaintiffs' State action

to this Court. In support of removal, separate defendants Quadrangle and Huber state that:

    1.     On or about March 3, 2006, Plaintiffs Gordon Quick, William McCausland and John

Trecker commenced an action for alleged breach of contract and common law fraud in the Circuit

Court of St. Louis County, State of Missouri, Case No. 06CC-000915.

    2.     On or about March 27, 2006, separate Defendants Quadrangle and Huber each were

served with a Summons and Petition in that action.

    3.     Pursuant to 28 U.S.C. §1446(b), a copy of all process and pleadings served on

separate Defendants Quadrangle and Huber is attached as Exhibit A, and a certified copy of the

Court file from the Clerk of the Circuit Court of St. Louis County is attached as Exhibit B.

Attached as Exhibit C is a Memo received in the mail on April 13, 2006, from Plaintiffs' attorney

purporting "by leave of court" to dismiss the Petition against Defendant Woodmont Holdings, Inc.

without prejudice. No other papers, pleadings, process, or orders have been served on separate Defendants Quadrangle and Huber in connection with that action, and no proceedings have been conducted in that action as of the filing of this Notice of Removal.

4.     Neither Defendants Quadrangle and Huber nor their attorneys have entered an appearance, filed any responsive pleadings, or filed any papers responding to that action.

5.     Pursuant to 28 U.S.C. §1446(b), this Notice of Removal is timely filed because it is being filed within thirty (30) days after separate Defendants Quadrangle and Huber were served with process in the State Court action.

6.     This action may be removed to this Court pursuant to 28 U.S.C. §1441(b) if it is one "of which the district courts have original jurisdiction" and "if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. §1441(b).

7.     The action is a civil action under which this Court has original jurisdiction under 28 U.S.C. §1332(a) and is one which Defendants are entitled to remove to this Court pursuant to 28 U.S.C. §1441 on the following grounds:

       (a)     The matter in controversy exceeds the sum of $75,000 exclusive of interest and costs. Plaintiffs have alleged in their Petition and seek to recover in excess of $1,600,000, with each Plaintiff alleging damages exclusive of interests and costs in excess of $75,000.

       (b)     This action is between citizens of different States thereby giving rise to diversity jurisdiction. Specifically:

              (i)     Plaintiff's Petition states that each of Plaintiffs' Gordon Quick, William McCausland, and John Tracker reside in St. Louis County Missouri.

              (ii)    The Petition states that Defendant Viziqor Solutions, Inc. is a Delaware Corporation. It is now known as Formula Telecom Solutions, Inc. which has its principal

place of business in Florida. The Petition further states that Defendant Quadrangle is a limited liability company with its principal offices at 375 Park Avenue, New York, New York, and that Defendant Michael Hubert is a resident of the State of New York. The Petition further alleges that Defendant Woodmont Holdings, Inc. is a Delaware corporation with its principal place of business in Bethesda Maryland.

8.      Defendant Woodmont Holdings, Inc. filed for bankruptcy under Chapter 7 of the Bankruptcy Act on March 13, 2006 in the District of Delaware. Plaintiffs filed a memo in St. Louis County Circuit on April 12, 2006 purporting by leave of court to dismiss their Petition against Woodmont Holdings, Inc. without prejudice. Although Defendants submit that it is unnecessary to obtain Woodmont Holdings' consent to this Removal, they have obtained the consent for Removal of the Trustee of the Bankruptcy Estate of Woodmont Holdings, Inc. A copy of the consent is attached as Exhibit D.

9.      Upon information and belief, defendants file this Notice of Removal with all requisite conditions to establish removal jurisdiction in this Court.

10.     Defendant Viziqor Solutions, Inc., now known as Formula Telecom Solutions, Inc., has consented to removal. A copy of its consent is attached as Exhibit E.

11.     Pursuant to 28 U.S.C. §1446(d), a copy of this Notice of Removal and a Notice to St. Louis County Circuit Clerk of Removal is being filed with the State Court. A copy of the Notice to St. Louis County Circuit Court is attached as Exhibit F.

Respectfully submitted this 14th day of April 2006.

BRYAN CAVE LLP

By: _____

Charles A. Weiss  #4674
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000
(314) 259-2020 (Facsimile)

Weil, Gotshal & Manges
James L. Messenger
100 Federal Street, Floor 34
Boston, Massachusetts 02110
Of Counsel
Attorney for Quadrangle Group LLC
and Michael Huber

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)
Attorney for Plaintiffs

Michael A. Clithero
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6060 (Facsimile)
Attorney for Viziqor Solutions, Inc.

John T. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)
Attorney for Trustee of Bankruptcy
Estate of Woodmont Holdings, Inc.

# Exhibit A

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL.
------------------------------------------
        PLAINTIFF

        VS

VIZIQOR SOLUTIONS INC ETAL
------------------------------------------
        DEFENDANT

O6CC-000915 K CV
------------------------------------------
        CASE NUMBER

S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:  DEFENDANT  (4)

        QUADRANGLE GROUP LLC
        375 PARK AVENUE
        NEW YORK NY 10152


        YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS*******
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567


        DATE ISSUED: MARCH 10, 2006
        -------------------------------------------
        ATTORNEY:

        MARTIN M GREEN
        GREEN SCHAAF AND JACOBSON
        SUITE 700
        7733 FORSYTH BLVD
        CLAYTON MO 63105
        (314) 862-6800



**JOAN M. GILMER,** Circuit Clerk

By _____
   Deputy Clerk

**SPECIAL NEEDS:** If you have special needs addressed by the Americans With Disabilities Act, please notify the
Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days
in advance of the court proceeding.

WHITE - Sheriff's Return          YELLOW - Service Copy          PINK - Court File

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

GORDON QUICK, WILLIAM          )
MCCAUSLAND and JOHN            )
TRECKER,                       )
                               )
            Plaintiffs,        )     Cause No.
                               )
v.                             )     Division
                               )
VIZIQOR SOLUTIONS, INC.,       )
Serve: CT Corporation System, Reg.   )
        Agent                  )
        1200 South Pine Island Road  )
        Plantation, Florida 33324    )
        (Broward County)       )
                               )
WOODMONT HOLDINGS, INC.,       )
f/k/a Viziqor Holdings, Inc.,  )
Serve: 2 Bethesda Metro Center )
        Bethesda, MD 20854     )
        (Montgomery County)    )
                               )
MICHAEL HUBER,                 )
Serve: 375 Park Avenue         )
        New York, NY 10152     )
        (New York County)      )
                               )
and                            )
                               )
QUADRANGLE GROUP, LLC,         )
Serve: 375 Park Avenue         )
        New York, NY 10152     )
        (New York County)      )
                               )
            Defendants.        )

## PETITION

### GENERAL ALLEGATIONS

1.    Plaintiff Gordon Quick ("Quick") is an individual who resides in St. Louis County, Missouri. Quick was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on November 15, 2005.

2.    Plaintiff William McCausland ("McCausland") is an individual who resides in St. Louis County, Missouri. McCausland was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

3.    Plaintiff John Trecker ("Trecker") is an individual who resides in St. Louis County, Missouri. Trecker was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

4.    Defendant Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc. ("Holdings"), is a Delaware corporation, with its principal place of business in Bethesda, Maryland. At all material times, Holdings was the alter ego of Solutions.

5.    Defendant Viziqor Solutions, Inc. ("Solutions") is a Delaware corporation. Holdings owned all of the capital stock of Solutions consisting of 100 shares of common stock until December 2005, when it sold Solutions to Formula Telecom Solutions, Ltd. ("Telecom").

6.    Defendant Michael Huber is a resident of New York, New York. He is employed by Defendant Quadrangle Group, LLC. At all material times, he was the representative of Quadrangle, the controlling shareholder of Holdings and a member

of its Board of Directors. Until Solutions was sold to Telecom, he always acted in the capacity of Chief Executive Officer of Solutions and was a member of its Board of Directors.

7.      Defendant Quadrangle Group, LLC ("Quadrangle") is a limited liability company engaged in the investment banking business. Its principal offices are at 375 Park Avenue, New York, New York. At all material times, Quadrangle was the owner of approximately 56% of the capital stock of Holdings. Quadrangle was paid a management fee for its "services" to Holdings. As Huber's employer, Quadrangle is vicariously liable for the conduct of Huber, as hereafter set forth.

8.      The Court has personal jurisdiction over Defendants under § 506.500, R.S.Mo. because Plaintiffs' claims arise from the Defendants' transaction of business within Missouri, the Defendants' making of contracts within Missouri and the Defendants' commission of tortious acts within Missouri.

9.      Venue in the St. Louis County Circuit Court is proper under §508.010(4), R.S.Mo.   Since all Defendants are non-residents of Missouri, venue is proper in any Missouri county.

10.     Holdings entered into employment agreements and retention bonus agreements with each Plaintiff. Although Holdings executed the agreements with each Plaintiff and was the named employer therein, Holdings was nothing more than the alter ego of Solutions:

-3-

(A)     All of the obligations and responsibilities of Holdings to Plaintiffs under the Employment Agreements and Retention Bonus Agreements were assumed and carried out by Solutions.

(B)     Plaintiffs were employed by and worked for Solutions.

(C)     Holdings had no business operations and was not adequately financed. Its only function was to hold the capital stock of several subsidiaries, including Solutions.

(D)     Holdings and Solutions had common interlocking directors and officers.

(E)     Holdings' revenues and income were derived primarily from its wholly owned subsidiary, Solutions.

(F)     Solutions paid virtually all expenses and obligations of Holdings.

(G)     Both Holdings and Solutions occupied the same offices. The only listing in the telephone directories was for "Viziqor Solutions".

(H)     All correspondence for both Holdings and Solutions utilized letterheads and bill heads bearing the name "Viziqor Solutions."

(I)     Quadrangle's management fees were paid by Solutions.

(J)     Plaintiff's salary and other benefits were paid by Solutions. Plaintiffs' W-2 statements showed Solutions, not Holdings, as their employer.

(K)     Other terminated executives who had Employment Agreements signed by Holdings were paid their severance compensation by Solutions.

-4-

11.    Solutions completely dominated all policy and business practices relating to the employment of Plaintiffs. Holdings had no separate mind, will or existence of its own with respect to Plaintiffs' employment and retention bonus agreements. The exercise of control by Solutions was done by Holdings and Solutions for the improper and wrongful purpose of insuring that Holdings would not have the financial wherewithal to compensate Plaintiffs under their employment agreements. Such reckless disregard for the rights of Plaintiffs on the part of Holdings and Solutions was dishonest and in contravention of Plaintiffs' legal rights. Unless the Court disregards the corporate form of Holdings, and holds Solutions equally responsible to Plaintiffs under the employment and retention bonus agreements, the result would constitute an injustice to Plaintiffs.

12.    As a direct and proximate result of Solutions' use of Holdings as its alter ego, Plaintiffs have sustained injuries and losses as hereinafter set forth.

<u>COUNT I</u>
**(Breach of Contract against Solutions and Holdings)**

For their first and separate causes of action against Solutions and Holdings, Plaintiffs state:

13.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 12 as if more fully set forth herein.

14.    In or about October, 2004, Quick entered into an Employment Agreement with Holdings (f/k/a Daleen Holdings, Inc.). At all times material to this Petition,

-5-

Holdings was the alter ego of Solutions who was the *de facto* employer of Quick. Solutions assumed all obligations to Quick under the Agreement.

15.    On or about August, 2005, Quick entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Quick and obligated to Quick under the terms of the Retention Bonus Agreement.

16.    On or about October 15, 2004, McCausland entered into an Employment Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of McCausland. Solutions assumed all obligations to McCausland under the Agreement.

17.    On or about August 29, 2005, McCausland entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of McCausland and obligated to McCausland under the terms of the Retention Bonus Agreement.

18.    In or about October, 2004, Trecker entered into an Employment Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Trecker. Solutions assumed all obligations to Trecker under the Agreement.

19.    On or about August 29, 2005, Trecker entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Trecker and obligated to Trecker under the terms of the Retention Bonus Agreement.

-6-

20.    Holdings and Solutions have breached the Employment Agreements and Retention Bonus Agreements of each Plaintiff by failing, refusing and neglecting to compensate Plaintiffs under their Employment Agreements and Retention Bonus Agreements.

21.    As a direct and proximate result of the breach of Plaintiffs' employment and retention bonus agreements, Plaintiffs have sustained the following losses:

      (A)    Gordon Quick - $1,110,410.38;

      (B)    William McCausland - $290,036.97;

      (C)    John Trecker - $266,083.00.

WHEREFORE, in Count I, Plaintiffs pray judgment against Defendants Woodmont Holdings, Inc. and Viziqor Solutions, Inc., jointly and severally, in the following amounts, together with interest at the rate of 9% per annum on all amounts due as of the dates of termination:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

## COUNT II
### (Breach of Contract against Quadrangle)

For their separate causes of action against Defendant Quadrangle, Plaintiffs state:

22.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 21 as if more fully set forth herein.

-7-

23.    On or about May 19, 2005, Quadrangle, by and through its agent, servant and employee Huber, made a definite and unambiguous offer to Plaintiffs that if they would continue working for Solutions until it could be sold, Quadrangle would pay Plaintiffs all of their severance benefits and retention bonuses in the event that the Plaintiffs were discharged as employees of Solutions without being paid their benefits and bonuses

24.    As consideration for Quadrangle's agreement, Plaintiffs agreed to continue as employees of Solutions and did continue as employees of Solutions until they were subsequently discharged without cause. In reaching agreement, the parties anticipated that the sale of Solutions could and would be completed within one (1) year. In fact, the sale was completed within one (1) year. Following the sale, Holdings and Solutions failed to compensate Plaintiffs under their contracts.

25.    The agreement was fair to all parties; Plaintiffs fully performed their obligations under the contract. Plaintiffs' performance in remaining employed was pursuant to and in reliance upon Huber's specific offers, as aforesaid.

26.    At all material times Huber was the agent, servant and employee of Quadrangle and authorized to make such offers to Plaintiffs.

27.    At all material times, Huber was acting in the course and scope of his employment with Quadrangle. All of his conduct took place in furtherance of the business and interests of Quadrangle.

28.    Quadrangle has breached its contract with Plaintiffs by failing, refusing and neglecting to pay them their severance payments and their retention bonuses.

-8-

29.    As a direct and proximate result of the breach of the foregoing agreement,

Plaintiffs have sustained the following losses:

      (A)   Gordon Quick - $1,110,410.38;

      (B)   William McCausland - $290,036.97;

      (C)   John Trecker - $266,083.00.

WHEREFORE, in Count II, Plaintiffs pray judgment against Defendant

Quadrangle as follows, together with interest at the rate of 9% per annum on all

amounts due as of the dates of termination:

| (A) | Gordon Quick | $1,110,410.38 |
|-----|--------------|---------------|
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

## COUNT III
### (Common Law Fraud Against Huber and Quadrangle)

For their separate and alternative cause of action against Defendant Quadrangle

and their separate cause of action against Defendant Huber, Plaintiffs state:

30.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 29

as if more fully set forth herein.

31.    At all material times Huber was the agent, servant and employee of

Quadrangle and authorized to make such representations to the Plaintiffs.

32.    The conduct and acts of Huber took place while he was acting in the

course and scope of his employment with Quadrangle. His conduct and acts were done

in furtherance of the business and interests of Quadrangle.

-9-

33. At the time the offers and representations, as aforesaid, were made, Huber and Quadrangle knew they were false.

34. The representations were material to Plaintiffs' decisions to remain employees of Solutions. Plaintiffs did in fact honor their commitments to remain employees of Solutions until they were terminated without cause just prior to the sale of Solutions some seven (7) months later.

35. Plaintiffs were ignorant of the fact that the representations and promises being made to them were false.

36. In making the representations, said Defendants intended that Plaintiffs should rely thereon. Plaintiffs did rely thereon and their reliance was reasonable and well-founded.

37. In making the false representations, said Defendants intended to defraud Plaintiffs.

38. As a direct and proximate result of the fraudulent conduct by Quadrangle and Huber, as aforesaid, Plaintiffs sustained the following damages:

    (A)    Gordon Quick - $1,110,410.38;

    (B)    William McCausland - $290,036.97;

    (C)    John Trecker - $266,083.00.

39. Said Defendants' conduct, as aforesaid, was willful, intentional, malicious, outrageous and dishonest. Accordingly, Plaintiff is entitled to an award of punitive damages.

-10-

WHEREFORE, in Count III, Plaintiffs pray judgment for actual damages against Defendants Quadrangle and Huber, as follows:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

together with interest at the rate of 9% per annum on all amounts due as of the date of termination, punitive damages against each such Defendant in the amount of $10 million for each Plaintiff, and whatever additional relief the Court deems appropriate under the circumstances.

GREEN, SCHAAF & JACOBSON, P.C.

By: _____

Martin M. Green #16465
James J. Simeri #52506
Attorneys for Plaintiff
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
314-862-6800
FAX: 314-862-1606
green@stlouislaw.com
simeri@stlouislaw.com

-11-

## THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the partes. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

CCADM73

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐
PLAINTIFF

VS

VIZIGOR SOLUTIONS INC ETAL
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐
DEFENDANT

06CC-000915 K CV
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐
CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:  DEFENDANT  (3)

MICHAEL HUBER
375 PARK AVENUE
NEW YORK NY 10152

YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS*******
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED: MARCH 10, 2006
‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐
ATTORNEY

MARTIN M GREEN
GREEN SCHAAF AND JACOBSON
SUITE 700
7733 FORSYTH BLVD
CLAYTON MO 63105
(314) 862-6800



**JOAN M. GILMER**, Circuit Clerk

By _____
Deputy Clerk

**SPECIAL NEEDS:** If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.

WHITE - Sheriff's Return                    YELLOW - Service Copy                    PINK - Court File

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

GORDON QUICK, WILLIAM        )
MCCAUSLAND and JOHN          )
TRECKER,                     )
                             )
            Plaintiffs,      )         Cause No.
                             )
v.                           )         Division
                             )
VIZIQOR SOLUTIONS, INC.,     )
Serve: CT Corporation System, Reg.  )
      Agent                  )
      1200 South Pine Island Road  )
      Plantation, Florida 33324   )
      (Broward County)       )
                             )
WOODMONT HOLDINGS, INC.,     )
f/k/a Viziqor Holdings, Inc.,  )
Serve: 2 Bethesda Metro Center  )
      Bethesda, MD 20854     )
      (Montgomery County)    )
                             )
MICHAEL HUBER,               )
Serve: 375 Park Avenue       )
      New York, NY 10152     )
      (New York County)      )
                             )
and                          )
                             )
QUADRANGLE GROUP, LLC,       )
Serve: 375 Park Avenue       )
      New York, NY 10152     )
      (New York County)      )
                             )
            Defendants.      )

## PETITION

### GENERAL ALLEGATIONS

1.     Plaintiff Gordon Quick ("Quick") is an individual who resides in St. Louis County, Missouri. Quick was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on November 15, 2005.

2.     Plaintiff William McCausland ("McCausland") is an individual who resides in St. Louis County, Missouri. McCausland was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

3.     Plaintiff John Trecker ("Trecker") is an individual who resides in St. Louis County, Missouri. Trecker was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

4.     Defendant Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc. ("Holdings"), is a Delaware corporation, with its principal place of business in Bethesda, Maryland. At all material times, Holdings was the alter ego of Solutions.

5.     Defendant Viziqor Solutions, Inc. ("Solutions") is a Delaware corporation. Holdings owned all of the capital stock of Solutions consisting of 100 shares of common stock until December 2005, when it sold Solutions to Formula Telecom Solutions, Ltd. ("Telecom").

6.     Defendant Michael Huber is a resident of New York, New York. He is employed by Defendant Quadrangle Group, LLC. At all material times, he was the representative of Quadrangle, the controlling shareholder of Holdings and a member

-2-

of its Board of Directors. Until Solutions was sold to Telecom, he always acted in the capacity of Chief Executive Officer of Solutions and was a member of its Board of Directors.

7.    Defendant Quadrangle Group, LLC ("Quadrangle") is a limited liability company engaged in the investment banking business. Its principal offices are at 375 Park Avenue, New York, New York. At all material times, Quadrangle was the owner of approximately 56% of the capital stock of Holdings. Quadrangle was paid a management fee for its "services" to Holdings. As Huber's employer, Quadrangle is vicariously liable for the conduct of Huber, as hereafter set forth.

8.    The Court has personal jurisdiction over Defendants under § 506.500, R.S.Mo. because Plaintiffs' claims arise from the Defendants' transaction of business within Missouri, the Defendants' making of contracts within Missouri and the Defendants' commission of tortious acts within Missouri.

9.    Venue in the St. Louis County Circuit Court is proper under §508.010(4), R.S.Mo. Since all Defendants are non-residents of Missouri, venue is proper in any Missouri county.

10.    Holdings entered into employment agreements and retention bonus agreements with each Plaintiff. Although Holdings executed the agreements with each Plaintiff and was the named employer therein, Holdings was nothing more than the alter ego of Solutions:

-3-

(A)     All of the obligations and responsibilities of Holdings to Plaintiffs under the Employment Agreements and Retention Bonus Agreements were assumed and carried out by Solutions.

(B)     Plaintiffs were employed by and worked for Solutions.

(C)     Holdings had no business operations and was not adequately financed.  Its only function was to hold the capital stock of several subsidiaries, including Solutions.

(D)     Holdings and Solutions had common interlocking directors and officers.

(E)     Holdings' revenues and income were derived primarily from its wholly owned subsidiary, Solutions.

(F)     Solutions paid virtually all expenses and obligations of Holdings.

(G)     Both Holdings and Solutions occupied the same offices. The only listing in the telephone directories was for "Viziqor Solutions".

(H)     All correspondence for both Holdings and Solutions utilized letterheads and bill heads bearing the name "Viziqor Solutions."

(I)     Quadrangle's management fees were paid by Solutions.

(J)     Plaintiff's salary and other benefits were paid by Solutions. Plaintiffs' W-2 statements showed Solutions, not Holdings, as their employer.

(K)     Other terminated executives who had Employment Agreements signed by Holdings were paid their severance compensation by Solutions.

-4-

11.    Solutions completely dominated all policy and business practices relating to the employment of Plaintiffs. Holdings had no separate mind, will or existence of its own with respect to Plaintiffs' employment and retention bonus agreements. The exercise of control by Solutions was done by Holdings and Solutions for the improper and wrongful purpose of insuring that Holdings would not have the financial wherewithal to compensate Plaintiffs under their employment agreements. Such reckless disregard for the rights of Plaintiffs on the part of Holdings and Solutions was dishonest and in contravention of Plaintiffs' legal rights. Unless the Court disregards the corporate form of Holdings, and holds Solutions equally responsible to Plaintiffs under the employment and retention bonus agreements, the result would constitute an injustice to Plaintiffs.

12.    As a direct and proximate result of Solutions' use of Holdings as its alter ego, Plaintiffs have sustained injuries and losses as hereinafter set forth.

## COUNT I
### (Breach of Contract against Solutions and Holdings)

For their first and separate causes of action against Solutions and Holdings, Plaintiffs state:

13.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 12 as if more fully set forth herein.

14.    In or about October, 2004, Quick entered into an Employment Agreement with Holdings (f/k/a Daleen Holdings, Inc.). At all times material to this Petition,

Holdings was the alter ego of Solutions who was the *de facto* employer of Quick.

Solutions assumed all obligations to Quick under the Agreement.

15.   On or about August, 2005, Quick entered into a Retention Bonus
Agreement with Holdings.  At all times material to this Petition, Holdings was the
alter ego of Solutions who was the *de facto* employer of Quick and obligated to Quick
under the terms of the Retention Bonus Agreement.

16.   On or about October 15, 2004, McCausland entered into an Employment
Agreement with Holdings.  At all times material to this Petition, Holdings was the
alter ego of Solutions who was the *de facto* employer of McCausland.   Solutions
assumed all obligations to McCausland under the Agreement.

17.   On or about August 29, 2005, McCausland entered into a Retention Bonus
Agreement with Holdings.  At all times material to this Petition, Holdings was the
alter ego of Solutions who was the *de facto* employer of McCausland and obligated to
McCausland under the terms of the Retention Bonus Agreement.

18.   In or about October, 2004, Trecker entered into an Employment
Agreement with Holdings.  At all times material to this Petition, Holdings was the
alter ego of Solutions who was the *de facto* employer of Trecker. Solutions assumed all
obligations to Trecker under the Agreement.

19.   On or about August 29, 2005, Trecker entered into a Retention Bonus
Agreement with Holdings.  At all times material to this Petition, Holdings was the
alter ego of Solutions who was the *de facto* employer of Trecker and obligated to
Trecker under the terms of the Retention Bonus Agreement.

-6-

20.    Holdings and Solutions have breached the Employment Agreements and Retention Bonus Agreements of each Plaintiff by failing, refusing and neglecting to compensate Plaintiffs under their Employment Agreements and Retention Bonus Agreements.

21.    As a direct and proximate result of the breach of Plaintiffs' employment and retention bonus agreements, Plaintiffs have sustained the following losses:

    (A)    Gordon Quick - $1,110,410.38;

    (B)    William McCausland - $290,036.97;

    (C)    John Trecker - $266,083.00.

WHEREFORE, in Count I, Plaintiffs pray judgment against Defendants Woodmont Holdings, Inc. and Viziqor Solutions, Inc., jointly and severally, in the following amounts, together with interest at the rate of 9% per annum on all amounts due as of the dates of termination:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

## COUNT II
### (Breach of Contract against Quadrangle)

For their separate causes of action against Defendant Quadrangle, Plaintiffs state:

22.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 21 as if more fully set forth herein.

-7-

23.    On or about May 19, 2005, Quadrangle, by and through its agent, servant and employee Huber, made a definite and unambiguous offer to Plaintiffs that if they would continue working for Solutions until it could be sold, Quadrangle would pay Plaintiffs all of their severance benefits and retention bonuses in the event that the Plaintiffs were discharged as employees of Solutions without being paid their benefits and bonuses

24.    As consideration for Quadrangle's agreement, Plaintiffs agreed to continue as employees of Solutions and did continue as employees of Solutions until they were subsequently discharged without cause. In reaching agreement, the parties anticipated that the sale of Solutions could and would be completed within one (1) year. In fact, the sale was completed within one (1) year. Following the sale, Holdings and Solutions failed to compensate Plaintiffs under their contracts.

25.    The agreement was fair to all parties; Plaintiffs fully performed their obligations under the contract. Plaintiffs' performance in remaining employed was pursuant to and in reliance upon Huber's specific offers, as aforesaid.

26.    At all material times Huber was the agent, servant and employee of Quadrangle and authorized to make such offers to Plaintiffs.

27.    At all material times, Huber was acting in the course and scope of his employment with Quadrangle. All of his conduct took place in furtherance of the business and interests of Quadrangle.

28.    Quadrangle has breached its contract with Plaintiffs by failing, refusing and neglecting to pay them their severance payments and their retention bonuses.

-8-

29.    As a direct and proximate result of the breach of the foregoing agreement, Plaintiffs have sustained the following losses:

    (A)    Gordon Quick - $1,110,410.38;

    (B)    William McCausland - $290,036.97;

    (C)    John Trecker - $266,083.00.

WHEREFORE, in Count II, Plaintiffs pray judgment against Defendant Quadrangle as follows, together with interest at the rate of 9% per annum on all amounts due as of the dates of termination:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

### COUNT III
### (Common Law Fraud Against Huber and Quadrangle)

For their separate and alternative cause of action against Defendant Quadrangle and their separate cause of action against Defendant Huber, Plaintiffs state:

30.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 29 as if more fully set forth herein.

31.    At all material times Huber was the agent, servant and employee of Quadrangle and authorized to make such representations to the Plaintiffs.

32.    The conduct and acts of Huber took place while he was acting in the course and scope of his employment with Quadrangle. His conduct and acts were done in furtherance of the business and interests of Quadrangle.

-9-

33.    At the time the offers and representations, as aforesaid, were made, Huber and Quadrangle knew they were false.

34.    The representations were material to Plaintiffs' decisions to remain employees of Solutions. Plaintiffs did in fact honor their commitments to remain employees of Solutions until they were terminated without cause just prior to the sale of Solutions some seven (7) months later.

35.    Plaintiffs were ignorant of the fact that the representations and promises being made to them were false.

36.    In making the representations, said Defendants intended that Plaintiffs should rely thereon. Plaintiffs did rely thereon and their reliance was reasonable and well-founded.

37.    In making the false representations, said Defendants intended to defraud Plaintiffs.

38.    As a direct and proximate result of the fraudulent conduct by Quadrangle and Huber, as aforesaid, Plaintiffs sustained the following damages:

    (A)    Gordon Quick - $1,110,410.38;

    (B)    William McCausland - $290,036.97;

    (C)    John Trecker - $266,083.00.

39.    Said Defendants' conduct, as aforesaid, was willful, intentional, malicious, outrageous and dishonest. Accordingly, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, in Count III, Plaintiffs pray judgment for actual damages against Defendants Quadrangle and Huber, as follows:

| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

together with interest at the rate of 9% per annum on all amounts due as of the date of termination, punitive damages against each such Defendant in the amount of $10 million for each Plaintiff, and whatever additional relief the Court deems appropriate under the circumstances.

GREEN, SCHAAF & JACOBSON, P.C.

By: *Martin M. Green*

Martin M. Green #16465
James J. Simeri #52506
Attorneys for Plaintiff
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
314-862-6800
FAX: 314-862-1606
green@stlouislaw.com
simeri@stlouislaw.com

-11-

# Exhibit B

PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
LAS VEGAS
LONDON
LOS ANGELES



**COZEN**
**O'CONNOR**
ATTORNEYS

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON, DC
WEST CONSHOHOCKEN
WILMINGTON

A PROFESSIONAL CORPORATION

SUITE 1400    CHASE MANHATTAN CENTRE    1201 NORTH MARKET STREET    WILMINGTON, DE 19801-1147
302.295.2000    888.207.2440    302.295.2013 FAX    www.cozen.com

April 6, 2006

**VIA FEDERAL EXPRESS**

**RECEIVED**

APR 0 7 2006

**JOAN M. GILMER**
**CIRCUIT CLERK, ST. LOUIS COUNTY**

**John T. Carroll, III**
Direct Phone 302.295.2028
Direct Fax    302.295.2013
jcarroll@cozen.com

Clerk's Office
St. Louis County Circuit Court
7900 Carondelet Avenue
Clayton, Missouri 63105

> **Re:    Gordon Quick et al v. Viziqor Solutions, Inc. et al**
> **Case No. 06-CC-000915-K-CV**
>
> **Subject matter:**
> **Woodmont Holdings, Inc., Case No. 06-10236 (MFW), U.S.B.C. Delaware**

Dear Sir/Madam:

Enclosed please find for filing an original and two (2) copies of a Suggestion of Bankruptcy and Notice of Automatic Stay for filing in the above matter. Kindly file same and return a time-stamped copy as proof of filing to me in the enclosed self-addressed stamped envelope.

If you have any questions, please don't hesitate in contacting me. Thank you.

Very truly yours,

COZEN O'CONNOR

By:    John P. Carroll, III

JTC/jld
Enclosure

cc:    Martin M. Green, Esquire (w/enc.)
       Alfred T. Giuliano, Trustee (w/enc.)
       Jeffrey L. Taylor, Esquire (w/enc.)
       Robert N. Michaelson, Esquire (w/enc.)
       Dawn Landry, Esquire (w/enc.)

WILM1\34232\1185132.000

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| GORDON QUICK, | : CASE NO. 06-CC-915-K-CV |
| WILLIAM MCCAUSLAND and | : |
| JOHN TRECKER, | : |
| | : |
| Plaintiff | : |
| v. | : |
| | : |
| VIZIQOR SOLUTIONS, INC., | : |
| WOODMONT HOLDINGS, INC., | : |
| MICHAEL HUBER, and | : |
| QUADRANGLE GROUP, LLC | : |
| | : |
| Defendants | : |

## SUGGESTION OF BANKRUPTCY AND NOTICE OF AUTOMATIC STAY

TO THE CLERK OF THE COURT:

Woodmont Holdings, Inc., (the "Debtor") a named Defendant in the above matter, filed a

Voluntary Petition ("Petition") pursuant to Chapter 7 of Title 11 of the United States Code ("11

U.S.C.") on March 13, 2006 in the United States Bankruptcy Court for the District of Delaware,

Bankruptcy No. 06-10236 (MFW) and Alfred T. Giuliano has been appointed as the Chapter 7

Trustee (the "Trustee") for the estate of the Debtor. A true and correct copy of the Petition is

attached hereto, incorporated herein and marked as Exhibit "A".

Pursuant to 11 U.S.C. §362, any executions, judgments and all manner of actions of any

kind against the above-captioned Debtor/Defendant are automatically stayed.

COZEN O'CONNOR

BY:

John T. Carroll, III
1201 North Market Street
Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2028
Facsimile: (302) 295-2013

Counsel to Alfred T. Giuliano,
Chapter 7 Trustee for the Estate of
Woodmont Holdings, Inc. a/k/a
Viziqor Holdings, Inc.

Dated:  April 5, 2006

# EXHIBIT "A"

*CASE NO. 06-10236*

(Official Form 1) (10/05)

| United States Bankruptcy Court<br>District of __Delaware__ | | Voluntary Petition |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>Woodmont Holdings, Inc. | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br><br>Viziqor Holdings, Inc. and Daleen Holdings,<br>Inc. | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more<br>than one, state all): 05-0606004 | Last four digits of Soc. Sec./Complete EIN or other Tax I.D. No. (if more than<br>one, state all): |
| Street Address of Debtor (No. & Street, City, and State):<br><br>2 Bethesda Metro Center<br>Suite 777<br>Bethesda, MD ___ ZIPCODE 20854 | Street Address of Joint Debtor (No. & Street, City, and State):<br><br>ZIPCODE |
| County of Residence or of the Principal Place of Business:<br><br>Montgomery | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br><br>ZIPCODE | Mailing Address of Joint Debtor (if different from street address):<br><br>ZIPCODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br><br>ZIPCODE | |

| Type of Debtor (Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check all applicable boxes.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and provide the information requested below.)<br><br>State type of entity: _____ | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Nonprofit Organization qualified under 26 U.S.C. § 501(c)(3) | ☑ Chapter 7      ☐ Chapter 11     ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding<br>☐ Chapter 9      ☐ Chapter 12<br>☐ Chapter 13     ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding |

| | Nature of Debts (Check one box) |
|---|---|
| | ☐ Consumer/Non-Business      ☑ Business |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ☑ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (Applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☐ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts owed to non-insiders or affiliates are less than $2 million. |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

| Estimated Number of<br>Creditors | 1-<br>49 | 50-<br>99 | 100-<br>199 | 200-<br>999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | OVER<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

| Estimated Debts | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

DOCKET NO. _____

DATE  3/13/06

(Official Form 1) (10/05)                                                                                    FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | **Name of Debtor(s):**<br>Woodmont Holdings, Inc. | | |
|---|---|---|---|
| **Prior Bankruptcy Case Filed Within Last 8 Years** (If more than one, attach additional sheet) | | | |
| **Location**<br>**Where Filed:** | **Case Number:** | | **Date Filed:** |
| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet) | | | |
| **Name of Debtor:** | **Case Number:** | | **Date Filed:** |
| **District:** | **Relationship:** | | **Judge:** |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.) | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br>I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code. |
| ☐  Exhibit A is attached and made a part of this petition. | X _____<br>  Signature of Attorney for Debtor(s)         Date |

| **Exhibit C** | **Certification Concerning Debt Counseling**<br>**by Individual/Joint Debtor(s)** |
|---|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br><br>☐  Yes, and Exhibit C is attached and made a part of this petition.<br><br>☑  No | ☐  I/we have received approved budget and credit counseling during the 180-day period preceding the filing of this petition.<br><br>☐  I/we request a waiver of the requirement to obtain budget and credit counseling prior to filing based on exigent circumstances. (Must attach certification describing.) |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue (Check any applicable box)**

☑  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of Residential Property**
*Check all applicable boxes.*

☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

(Official Form 1) (10/05)

FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | Woodmont Holdings, Inc. |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code.<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached.<br><br>☐ Pursuant to § 1511 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
| X_____<br>Signature of Debtor<br><br>X_____<br>Signature of Joint Debtor<br><br>_____<br>Telephone Number (if not represented by attorney)<br><br>_____<br>Date | X_____<br>(Signature of Foreign Representative)<br><br>_____<br>(Printed Name of Foreign Representative)<br><br>_____<br>Date |
| **Signature of Attorney**<br><br>X _Laura Davis Jones_<br>Signature of Attorney for Debtor(s)<br>Laura Davis Jones (DE Bar No. 2436)<br><br>Printed Name of Attorney for Debtor(s)<br>Pachulski, Stang, Ziehl, Young, Jones & Weintraub LLP<br><br>Firm Name 919 North Market Street, 17th Floor<br><br>Address Wilmington, DE 19899-8705<br><br>(302) 652-4100<br>Telephone Number<br><br>3|13|06<br>Date | **Signature of Non-Attorney Bankruptcy Petition Preparer**<br><br>I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.<br><br>_____<br>Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>Social Security number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.)(Required by 11 U.S.C. § 110.)<br><br>Address<br><br>X_____<br><br>_____<br>Date |
| **Signature of Debtor (Corporation/Partnership)**<br><br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _signature_<br>Signature of Authorized Individual<br>Michael Gottdenker<br>Printed Name of Authorized Individual<br>CEO<br>Title of Authorized Individual<br>2|13|06<br>Date | Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above.<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156.* |

## UNANIMOUS RESOLUTIONS OF THE BOARD OF DIRECTORS OF WOODMONT HOLDINGS, INC.

At a special telephonic meeting of the Board of Directors of Woodmont Holdings, Inc., a Delaware corporation (the "Company"), held on February 2, 2006, the Board of Directors unanimously adopted the following resolutions:

WHEREAS, the Board of Directors has considered the financial and operational aspects of the Company's business including, in particular, that the Company no longer conducts operations and lacks sufficient assets to satisfy its obligations to its creditors:

NOW, THEREFORE, BE IT RESOLVED: That in the judgment of the Board of Directors, it is desirable and in the best interests of the Company, its creditors, stockholders and other interested parties, that a voluntary petition be filed by the Company under the provisions of chapter 7, title 11 of the United States Code.

BE IT FURTHER RESOLVED: That the officers of the Company be, and hereby are, authorized to execute and file on behalf of the Company all petitions, schedules, exhibits, lists and other papers or documents and to take any and all actions which they deem necessary or proper to obtain such relief under the provisions of title 11 of the United States Code.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and directed to employ the law firm of Kirkpatrick & Lockhart Nicholson Graham LLP ("KLNG") as general bankruptcy counsel to represent and assist the Company in carrying out its duties under chapter 7, title 11 of the United States Code, and to take any and all actions to advance the Company's rights and, in connection therewith, the officers of the Company are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Company's chapter 7 petition.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and directed to employ a Delaware law firm acceptable to KLNG and the Chief Executive Officer of the Company as bankruptcy co-counsel to KLNG to represent and assist the Company in carrying out its duties under chapter 7, title 11 of the United States Code, and to take any and all actions to advance the Company's rights and, in connection therewith, the officers of the Company are hereby authorized and

directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Company's chapter 7 petition.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing.

BE IT FURTHER RESOLVED: That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Board of Directors, in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before this resolution was certified, are hereby in all respects approved, ratified and confirmed.

This consent shall be filed with the minutes of the proceedings of the Company.

Dated:  February 2, 2006

| | |
|---|---|
| _____ | _____ |
| Amanda Siegel | Dennis Sisco |
| Director | Director |
| | |
| _____ | _____ |
| Michael Huber | Michael I. Gottdenker |
| Director | Director |

2

directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Company's chapter 7 petition.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing.

BE IT FURTHER RESOLVED: That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Board of Directors, in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before this resolution was certified, are hereby in all respects approved, ratified and confirmed.

This consent shall be filed with the minutes of the proceedings of the Company.

Dated: February 2, 2006

_____
Amanda Siegel
Director

_____
Michael Huber
Director

_____
Dennis Sisco
Director

_____
Michael L Gottdenker
Director

2

directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Company's chapter 7 petition.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing.

BE IT FURTHER RESOLVED: That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Board of Directors, in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before this resolution was certified, are hereby in all respects approved, ratified and confirmed.

This consent shall be filed with the minutes of the proceedings of the Company.

Dated: February 2, 2006

_____
Amanda Siegel
Director

_____
Michael Huber
Director

_____
Dennis Sisco
Director

_____
Michael I. Gottdenker
Director

2

directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Company's chapter 7 petition.

BE IT FURTHER RESOLVED: That the officers of the Company be, and they hereby are, authorized and empowered for, in the name of, and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his discretion, may deem necessary or advisable in order to carry out the purpose and intent of the foregoing.

BE IT FURTHER RESOLVED: That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Board of Directors, in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before this resolution was certified, are hereby in all respects approved, ratified and confirmed.

This consent shall be filed with the minutes of the proceedings of the Company.

Dated: February 2, 2006

_____
Amanda Siegel
Director

_____
Dennis Sisco
Director

_____
Michael Huber
Director

_____
Michael I. Gottdenker
Director

2

## CERTIFICATE

The undersigned, Michael I. Gottdenker, Chief Executive Officer of Woodmont Holdings, Inc., a Delaware corporation (the "Company"), hereby certifies as follows:

1.    I am the Chief Executive Officer of the Company and, as such, am familiar with the facts herein certified and am duly authorized to certify same on behalf of the Company.

2.    Attached hereto is a true, complete and correct copy of the resolutions of the Board of Directors of the Company, unanimously adopted, in accordance with the By-Laws of the Company.

3.    Such resolutions have not been amended, altered, annulled, rescinded or revoked and are in full force and effect as of the date hereof. There exist no other subsequent resolutions of the Board of Directors of the Company relating to the matters set forth in the resolutions attached hereto.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the ___ day of February 2006.

Michael I. Gottdenker
Chief Executive Officer

NY-222205 v4 03071710100

## CERTIFICATE

The undersigned, Michael I. Gottdenker, Chief Executive Officer of Woodmont Holdings, Inc., a Delaware corporation (the "Company"), hereby certifies as follows:

1.    I am the Chief Executive Officer of the Company and, as such, am familiar with the facts herein certified and am duly authorized to certify same on behalf of the Company.

2.    Attached hereto is a true, complete and correct copy of the resolutions of the Board of Directors of the Company, unanimously adopted, in accordance with the By-Laws of the Company.

3.    Such resolutions have not been amended, altered, annulled, rescinded or revoked and are in full force and effect as of the date hereof. There exist no other subsequent resolutions of the Board of Directors of the Company relating to the matters set forth in the resolutions attached hereto.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the ___ day of February 2006.

Michael I. Gottdenker
Chief Executive Officer

NY-222208 v4 0307171-0100

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| GORDON QUICK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 06CC-000915 |
| | ) | |
| v. | ) | |
| | ) | Division 3 |
| VIZIQOR SOLUTIONS, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **M E M O**

Plaintiffs file Returns of Service of Summons on Defendants Viziqor Solutions, Inc., Michael Huber and Quadrangle Group, LLC.

GREEN, SCHAAF & JACOBSON, P.C.

By: _Martin M. Green_

Martin M. Green #16465
James J. Simeri #52506
Attorneys for Plaintiffs
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
314-862-6800
FAX: 314-862-1606
green@stlouislaw.com
simeri@stlouislaw.com

## BROWARD COUNTY SHERIFF'S OFFICE
P.O. BOX 9507  FORT LAUDERDALE, FLORIDA 33310

**RETURN OF SERVICE**

24

| igment: | **10090** | Service Sheet # | | 06-019308 |
|---|---|---|---|---|

| | GUICK, GORDON vs. VIZIGOR SOLUTIONS INC, ETAL | | | 06-CC-915-K-C |
|---|---|---|---|---|

**PLAINTIFF** SUM/PETITION/OS       VS.   **DEFENDANT**   **CASE**

CIRCUIT/

**TYPE OF WRIT**   **COURT**   **HEARING DATE**

VIZIGOR SOLUTIONS INC.            1200 S PINE ISLAND ROAD
                    **SERVE**      PLANTATION, FL 33324
C.T CORP SYSTEM, REG. AGENT

Received this process on

3/20/2006

3152.32                                  Date
GREEN, SCHAFF & JACOBSON PC
7733 FORSYTH BLVD.          ☒   Served
CLAYTON , MO  63105
                  ☐   Not Served — see comments

                      03-21-06   at   0950
                      Date        Time

2059  Attorney

VIZIGOR SOLUTIONS INC.C.T CORP SYSTEM, REG. AGENT

in Broward County, Florida, by serving the within named person a true copy of the writ, with the date and
ne of service endorsed thereon by me, and a copy of the complaint, petition, or initial pleading, by the following method:

☐  **INDIVIDUAL SERVICE**

**SUBSTITUTE SERVICE:**
☐  At the defendant's usual place of abode on "any person residing therein who is 15 years of age or older", to wit:

_____, in accordance with F.S. 48.031(1)(a)

☐  To _____, the defendant's spouse, at _____ in accordance with F.S. 48.031(2)(a)

☐  To _____, the person in charge of the defendant's business in accordance with F.S. 48.031(2)(b), after two or more attempts to
    serve the defendant have been made at the place of business

**CORPORATE SERVICE:**

☐  To _____, holding the following position of said corporation _____ in the absence of any superior officer in
    accordance with F.S. 48.081

☐  To _____, an employee of defendant corporation in accordance with F.S. 48.081(3)

☒  To CT Corp System _____, as resident agent of said corporation in accordance with F.S. 48.091

☐  **PARTNERSHIP SERVICE:** To _____, partner, or to _____, designated employee or person in charge
    of partnership, in accordance with F.S. 48.061(1)

☐  **POSTED RESIDENTIAL:** By attaching a true copy to a conspicuous place on the property described in the complaint or summons. Neither the tenant nor a person
    residing therein 15 years of age or older could be found at the defendant's usual place of abode in accordance with F.S. 48.183

FILED
APR 5 2006
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL

PLAINTIFF

VS

VIZIGOR SOLUTIONS INC ETAL

DEFENDANT

06CC-000915 KCDV

CASE NUMBER

S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:   DEFENDANT   (1)

    VIZIGOR SOLUTIONS INC
    CT CORPORATION SYSTEM - REG
    1200 SOUTH PINE ISLAND RD
    PLANTATION FL 33024

      YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

\*\*\*\*\*\*SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS\*\*\*\*\*\*\*
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED: MARCH 10, 2006
---------------------------------------
ATTORNEY:

MARTIN M GREEN
GREEN SCHAAF AND JACOBSON
SUITE 700
7733 FORSYTH BLVD
CLAYTON MO 63105
(314) 862-6800



**JOAN M. GILMER,** Circuit Clerk

By ⟨signature⟩
Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.**

CIRCUIT COURT, ST. LOUIS COUNTY, STATE OF MISSOURI.

Quick, Gordon Et al

*Plaintiff/Petitioner*

Vs

Vizigor Solutions Inc Et al

*Defendant/Respondent*

**FILED**

APR 0 5 2006

**AFFIDAVIT OF SERVICE**

Sheriff's Case No. M06-0737

JOAN M. GILMER

CIRCUIT CLERK, ST. LOUIS COUNTY No. 06CC-000915 KCV

**STATE OF NEW YORK** }

**COUNTY OF NEW YORK** } SS:

Wayne Price being duly sworn, affirms that he/she is a Deputy Sheriff of the City of New York, being over the age of eighteen years, is not a party to this action or proceeding, and served the annexed, _Summons and Petition_ in the above titled action or proceeding on the _27_ day of _March_, 20 _06_, at approximately _12:50_ a.m. p.m., at _375 Park Ave_, in the borough of Manhattan, County of New York, service was made upon _Quadrangle Group LLC_, the defendant/respondent, in the following manner:

| | | |
|---|---|---|
| **PERSONAL SERVICE** | [ ] | By delivering to and leaving with the above named defendant/respondent personally a true copy thereof, said person being known as the person mentioned and described herein. |
| **ALTERNATE PERSON** | [ ] | By delivering to and leaving a true copy thereof with, _____, a person of suitable age and discretion, who is _____ to the defendant/respondent. Said address is the dwelling place/place of business of the party served. |
| **AFFIXED TO PREMISES** | [ ] | By affixing a true copy thereof to the door of the above mentioned address, said address being the [ ] dwelling place [ ] place of business of the defendant/respondent. |
| **MAILED** | [ ] | On _____ I mailed the _____ by first class mail to the defendant/respondent at his/her last known residence/actual place of business in an envelope bearing the legend "**PERSONAL AND CONFIDENTIAL**" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the defendant/respondent. |
| **CORPORATION** | [X] | By delivering to and leaving with, _Jessica Mijaro_, a true copy thereof. Said person stated he/she is the _____, an agent authorized to accept service of legal process. |
| **STATUTORY FEE** | [ ] | At the time of service, a statutory fee of $_____ was also left with the person mentioned and described herein. |
| **OTHER:** | [ ] | _____ |
| **DESCRIPTION** | [X] | The person served is a [ ] Male [X] Female and approximately: Age _27_ Height: _5'5"_ Weight: _160_ Skin: _Light_ Hair: _Brown_ |

**NOTARY**

Sworn to (affirmed) before me this _30_ day of _March_, 20 _06_

**DEPUTY SHERIFF**

8/29/98

Notary ... ... New York
No. ...
Qualified ... ...nty
Commi... 2 ... 10

Casc 10
CB
3-21-06

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL

PLAINTIFF

VS

VIZIQOR SOLUTIONS INC ETAL

DEFENDANT

06CC-000915 X CV

CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:   DEFENDANT   (4)

QUADRANGLE GROUP LLC
375 PARK AVENUE
NEW YORK NY 10152

YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE.   IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

\*\*\*\*\*\*SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS\*\*\*\*\*\*\*\*
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED: MARCH 10, 2006

ATTORNEY:

MARTIN M GREEN
GREEN SCHAAF AND JACOBSON
SUITE 700
7733 FORSYTH BLVD
CLAYTON MO 63105
(314) 862-6800

**JOAN M. GILMER,** Circuit Clerk

By _Karen Matteson_
Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.**

WHITE - Sheriff's Return                     YELLOW - Service Copy                     PINK - Court File

_Circuit_ COURT, _St. Louis_ COUNTY, STATE OF _Missouri_.

Quick, Gordon ET AL
_____
Plaintiff/Petitioner

Vs

VIZIGor SOLUTIONS INC ETAL
_____
Defendant/Respondent

**AFFIDAVIT OF SERVICE**

Sheriffs Case No. M06 - 0737

Index No. 06CC-000915-KCV

FILED
APR 0 5 2006
JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

STATE OF NEW YORK }
COUNTY OF NEW YORK } SS:

Wayne Price being duly sworn, affirms that he/she is a Deputy Sheriff of the City of New York, being over the age of eighteen years, is not a party to this action or proceeding, and served the annexed, _Summons and Petition_ in the above titled action or proceeding on the _27_ day of _March_, 20 _06_, at approximately _12:50_ a.m./p.m., at _375 Park ave_, in the borough of Manhattan, County of New York, service was made upon _Michael Huber_, the defendant/respondent, in the following manner:

PERSONAL SERVICE [ ] By delivering to and leaving with the above named defendant/respondent personally a true copy thereof, said person being known as the person mentioned and described herein.

ALTERNATE PERSON [X] By delivering to and leaving a true copy thereof with, _Jessica Mijaro_, a person of suitable age and discretion, who is _Co-worker_ to the defendant/respondent. Said address is the dwelling place/place of business of the party served.

AFFIXED TO PREMISES [ ] By affixing a true copy thereof to the door of the above mentioned address, said address being the [ ] dwelling place [ ] place of business of the defendant/respondent.

MAILED [X] On _3/27/06_ I mailed the _Summons Petition_ by first class mail to the defendant/respondent at his/her last known residence/actual place of business in an envelope bearing the legend "PERSONAL AND CONFIDENTIAL" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the defendant/respondent.

CORPORATION [ ] By delivering to and leaving with, _____, a true copy thereof. Said person stated he/she is the _____, an agent authorized to accept service of legal process.

STATUTORY FEE [ ] At the time of service, a statutory fee of $_____ was also left with the person mentioned and described herein.

OTHER: [ ]

DESCRIPTION [X] The person served is a [ ] Male [X] Female and approximately:
Age _27_   Height _5'5"_   Weight _160lb_   Skin: _Light_   Hair: _Brown_

NOTARY

Sworn to (affirmed) before me this
_30_ day of _MARCH_, 20 _06_

_____

**DEPUTY SHERIFF**

LUIS ⸱ ⸱ ⸱ ⸱ CIANO
Notary Public, State ⸱ ⸱ New York
No. ⸱ ⸱ ⸱ ⸱
Qualified ⸱ Bronx ⸱ nty
Commi⸱ ⸱ ⸱ ⸱ 2 ⸱ 2/0

8/29/98

Caslio
CR
3-21-06

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL

PLAINTIFF

VS

VIZIGOR SOLUTIONS INC ETAL

DEFENDANT

0600-000915 K CV

CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO.  DEFENDANT  (S)

MICHAEL HUBER
375 PARK AVENUE
NEW YORK NY 10152

YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION. COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS*******
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED: MARCH 10, 2006

ATTORNEY:

MARTIN M GREEN
GREEN SCHAAF AND JACOBSON
SUITE 700
7733 FORSYTH BLVD
CLAYTON MO 63105
(314) 862-6800



**JOAN M. GILMER,** Circuit Clerk

By _Karen Matteson_

Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the
Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days
in advance of the court proceeding.**

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL
--------------------------------------------

PLAINTIFF

VS

VIZIBOR SOLUTIONS INC ETAL
--------------------------------------------

DEFENDANT

0600-000915 K CV
-------------------

CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:   DEFENDANT   (1)

    VIZIBOR SOLUTIONS INC
    CT CORPORATION SYSTEM - REG
    1200 SOUTH PINE ISLAND RD
    PLANTATION FL 33324

        YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE.   IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS******
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

    DATE ISSUED: MARCH 10, 2006
    ----------------------------------

    ATTORNEY:

    MARTIN M GREEN
    GREEN SCHAAF AND JACOBSON
    SUITE 700
    7733 FORSYTH BLVD
    CLAYTON MO 63105
    (314) 862-6800



**JOAN M. GILMER,** Circuit Clerk

By _Karen Matteson_

Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the
Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days
in advance of the court proceeding.**

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL

------------------------------------------------

      PLAINTIFF

        VS

VIZIGOR SOLUTIONS INC ETAL

------------------------------------------------

      DEFENDANT

06CC-000915 M CV

------------------------------

    CASE NUMBER

## S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:  DEFENDANT  (2)

      WOODMONT HOLDINGS INC
      FKA - VIZIGOR HOLDINGS INC
      2 BETHESDA METRO CENTER
      BETHESDA MD 20854

      YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

\*\*\*\*\*\*SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS\*\*\*\*\*\*
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

DATE ISSUED: MARCH 10, 2006

------------------------------------------------

ATTORNEY:

MARTIN M GREEN
GREEN SCHAAF AND JACOBSON
SUITE 700
7733 FORSYTH BLVD
CLAYTON MO 63105
(314) 862-6800

**JOAN M. GILMER,** Circuit Clerk

By _____
    Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.**

WHITE - Sheriff's Return           YELLOW - Service Copy           PINK - Court File

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

QUICK, GORDON ETAL
------------------------------------------------
      PLAINTIFF

      VS

VIZIQOR SOLUTIONS INC ETAL
------------------------------------------------
      DEFENDANT

0600-000915 M CV
------------------------
CASE NUMBER

## S U M M O N S  F O R  S E R V I C E  O U T S I D E  T H E  S T A T E

THE STATE OF MISSOURI TO:   DEFENDANT  (3)

      MICHAEL HUBER
      375 PARK AVENUE
      NEW YORK NY 10152

      YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN 30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF SERVICE.  IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

\*\*\*\*\*\*SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS\*\*\*\*\*\*\*
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

      DATE ISSUED: MARCH 10, 2006
      -----------------------------------
      ATTORNEY:

      MARTIN M GREEN
      GREEN SCHAAF AND JACOBSON
      SUITE 700
      7733 FORSYTH BLVD
      CLAYTON MO 63105
      (314) 862-6800



**JOAN M. GILMER**, Circuit Clerk

By          
Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days in advance of the court proceeding.**

WHITE - Sheriff's Return          YELLOW - Service Copy          PINK - Court File

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

GUICK, GORDON ETAL
------------------------------------------------
              PLAINTIFF

                  VS

VIZIQOR SOLUTIONS INC ETAL
------------------------------------------------
              DEFENDANT

06CC-000913 K CV
------------------
   CASE NUMBER

S U M M O N S   F O R   S E R V I C E   O U T S I D E   T H E   S T A T E

THE STATE OF MISSOURI TO:  DEFENDANT  (4)

        QUADRANGLE GROUP LLC
        375 PARK AVENUE
        NEW YORK NY 10152

        YOU ARE SUMMONED TO APPEAR BEFORE THIS COURT AND TO FILE YOUR PLEADING TO
THE PETITION, COPY OF WHICH IS ATTACHED, AND TO SERVE A COPY OF YOUR PLEADING
UPON THE ATTORNEY OR PARTY WHOSE NAME AND ADDRESS IS LISTED BELOW ALL WITHIN
30 DAYS AFTER SERVICE OF THIS SUMMONS UPON YOU, EXCLUSIVE OF THE DAY OF
SERVICE.   IF YOU FAIL TO FILE YOUR PLEADING, JUDGMENT BY DEFAULT MAY BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITON.

******SPECIAL NEEDS PHONE NUMBERS CHANGE EFFECTIVE 9-13-99 AS FOLLOWS*******
CIRCUIT CLERK'S OFFICE 314/615-8029; FAX 314/615-8739; TTY 314/615-4567

        DATE ISSUED: MARCH 10, 2006
        --------------------------------
        ATTORNEY:

        MARTIN M GREEN
        GREEN SCHAAF AND JACOBSON
        SUITE 700
        7733 FORSYTH BLVD
        CLAYTON MO 63105
        (314) 862-6800



**JOAN M. GILMER,** Circuit Clerk

By _Karen Matteson_
Deputy Clerk

**SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the
Office of the Circuit Clerk at 314/615-8029, FAX 314/615-8739, or TTY at 314/615-4567, at least three business days
in advance of the court proceeding.**

# In the
# CIRCUIT COURT
## of St. Louis County, Missouri

This Circuit Civil/Equity Cover Sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is require by the Clerk of this Court for the purpose of initiating case processing. (See instructions below.)

**06CC-000915**

Case Number

Division

For File Stamp Only

2006 MAY -3 Pi 4: 14

CIRCUIT CLERK

## Circuit Civil/Equity Cover Sheet

| 1. PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| GORDON QUICK, WILLIAM McCAUSLAND and JOHN TRECKER | VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER and QUADRANGLE GROUP, LLC |

| First Plaintiff's: | First Defendant's: |
|---|---|
| (b) Address  800 South Hanley Road, 4E  Clayton, MO 63105 | (b) Address  14500 South Outer Forty, #300  Chesterfield, MO 63017 |
| Telephone  314-721-4440 | Telephone  314-628-2700 |
| (c) Attorney  Martin M. Green | (c) Attorney _____ |
| Bar #  16465 | Bar # _____ |
| Firm  Green, Schaaf & Jacobson, P.C. | Firm _____ |
| Address  7733 Forsyth Blvd., Suite 700  Clayton, MO 63105 | Address _____ |
| Telephone  314-862-6800 | Telephone _____ |
| Fax #  314-862-1606 | Fax # _____ |

## 2. NATURE OF ACTION CODE (PLACE AN "X" IN ONLY ONE BOX)

**CIVIL**
- ☐ 10100 PERSONAL INJURY VEHICULAR
- ☐ 10200 PERSONAL INJURY PRODUCT LIA.
- ☐ 10300 PERSONAL INJURY MALPRACTICE
- ☐ 10400 PERSONAL INJURY OTHER
- ☐ 11000 PROPERTY DAMAGE
- ☐ 11100 WRONGFUL DEATH
- ☐ 11900 TORT – OTHER
- ☐ 11910 INTENTIONAL TORT
- ☒ 20100 SUIT ON CONTRACT
- ☐ 20101 AGREEMENT
- ☐ 20105 ACCOUNT
- ☐ 20110 NOTE

- ☐ 40100 SUIT- ENFORCE MECHANIC'S LIEN
- ☐ 40200 EMINENT DOMAIN – STATE
- ☐ 40210 EMINENT DOMAIN – COUNTY
- ☐ 40220 EMINENT DOMAIN – OTHER
- ☐ 40230 EXCEPTION
- ☐ 70100 REG OF FOREIGN JUDGMENT–CV
- ☐ 70200 TAX ACTION
- ☐ 70400 SMALL CLAIMS TRIAL DE NOVO
- ☐ 70500 POST-CONV RELIEF –RULE 24.035
- ☐ 70505 POST-CONV RELIEF–RULE 29.15
- ☐ 71900 MISC. – CV
- ☐ 71920 REPLEVIN
- ☐ 71925 WILL CONTEST
- ☐ 71935 PRO FORMA DECREE
- ☐ 71971 TRIAL DE NOVO FROM ASSOC DIV
- ☐ 71999 MISC CV–SUBPOENA/FOREIGN JUR

**EQUITY**
- ☐ 31900 OTHER ADMINISTRATIVE REVIEW
- ☐ 41900 OTHER REAL ESTATE
- ☐ 41910 FORECLOSURE
- ☐ 41920 QUIET TITLE
- ☐ 41930 EJECTMENT
- ☐ 41940 PARTITION
- ☐ 50100 HABEAS CORPUS
- ☐ 50120 MANDAMUS
- ☐ 50200 INJUNCTION
- ☐ 50210 TEMPORARY RESTRAINING ORDER

- ☐ 50300 DECLARATORY JUDGMENT
- ☐ 51900 OTHER EXTRAORDINARY REMEDY
- ☐ 51910 PROHIBITION
- ☐ 70600 EXPUNGEMENT- ARREST RECORD
- ☐ 71910 FORFEITURE
- ☐ 71915 INTERNAL AFFAIRS  OF TRUST (PROBATE - DIV)
- ☐ 71930 SPECIFIC PERFORMANCE
- ☐ 71940 MISC – EQ
- ☐ 71950 WRIT OF CERTIORARI
- ☐ 71977 MISC EQ-STUDENT TRIAL DE NOVO

Signature of Person Filing: _Martin M. Green_

## Instructions for Completing Circuit Civil/Equity Cover Sheet

As part of our reporting requirements to the Missouri Supreme Court and the Office of the State Courts Administrator you are required to complete and submit this Circuit Civil/Equity Cover Sheet at the time you file your cause of action. Your cause of action will not be accepted and/or processed unless it is accompanied by this Circuit Civil/Equity Cover Sheet at the time of filing. The person, or attorney, filing the cause of action should complete the form as follows:

1. Plaintiff(s)/Defendant(s): Enter the names (last, first, middle initial) of plaintiff(s) and defendant(s). If the plaintiff or defendant is a:
    - Corporation – Include the name of the registered agent or corporate officer.
    - Government Agency – Use only the full name or standard abbreviations.
    - Government Official – Identify the Agency and then the official, giving both title and name.
    - If all the parties' names cannot fit on this form, list them on an attachment, noting in this section "see attachment."
    - (b) Address    Enter the address, telephone number, of the first plaintiff and defendant, include zip code.
    - (c) Attorneys  Enter the firm name, address, zip code, telephone & fax number, and bar number(s) of the attorney(s) of record. If there are several attorneys, list them on an attachment, noting in this section "see attachment."
2. Nature of Action. Place an "x" in the one appropriate box which corresponds to the type of action you are filing.
3. **NOTE: If there are multiple counts in the petition that are considered both Civil and Equity, it is the responsibility of the filing party to choose the one appropriate nature of action. The assignment of the case is subject to review by the Presiding Judge. Based on a review, the case may be reassigned.**

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) ) | |
| Plaintiffs, | ) ) | Cause No. |
| v. | ) ) | Division |
| VIZIQOR SOLUTIONS, INC., Serve: CT Corporation System, Reg. Agent 1200 South Pine Island Road Plantation, Florida 33324 (Broward County) | ) ) ) ) ) ) ) | |
| WOODMONT HOLDINGS, INC., f/k/a Viziqor Holdings, Inc., Serve: 2 Bethesda Metro Center Bethesda, MD 20854 (Montgomery County) | ) ) ) ) ) ) | |
| MICHAEL HUBER, Serve: 375 Park Avenue New York, NY 10152 (New York County) | ) ) ) ) ) | |
| and | ) ) | |
| QUADRANGLE GROUP, LLC, Serve: 375 Park Avenue New York, NY 10152 (New York County) | ) ) ) ) ) | |
| Defendants. | ) | |

## PETITION

## GENERAL ALLEGATIONS

1.      Plaintiff Gordon Quick ("Quick") is an individual who resides in St. Louis County, Missouri. Quick was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on November 15, 2005.

2.      Plaintiff William McCausland ("McCausland") is an individual who resides in St. Louis County, Missouri. McCausland was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

3.      Plaintiff John Trecker ("Trecker") is an individual who resides in St. Louis County, Missouri. Trecker was formerly employed by Viziqor Solutions, Inc. until he was terminated without cause on December 6, 2005.

4.      Defendant Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc. ("Holdings"), is a Delaware corporation, with its principal place of business in Bethesda, Maryland. At all material times, Holdings was the alter ego of Solutions.

5.      Defendant Viziqor Solutions, Inc. ("Solutions") is a Delaware corporation. Holdings owned all of the capital stock of Solutions consisting of 100 shares of common stock until December 2005, when it sold Solutions to Formula Telecom Solutions, Ltd. ("Telecom").

6.      Defendant Michael Huber is a resident of New York, New York. He is employed by Defendant Quadrangle Group, LLC. At all material times, he was the representative of Quadrangle, the controlling shareholder of Holdings and a member

-2-

of its Board of Directors. Until Solutions was sold to Telecom, he always acted in the capacity of Chief Executive Officer of Solutions and was a member of its Board of Directors.

7.     Defendant Quadrangle Group, LLC ("Quadrangle") is a limited liability company engaged in the investment banking business. Its principal offices are at 375 Park Avenue, New York, New York. At all material times, Quadrangle was the owner of approximately 56% of the capital stock of Holdings. Quadrangle was paid a management fee for its "services" to Holdings. As Huber's employer, Quadrangle is vicariously liable for the conduct of Huber, as hereafter set forth.

8.     The Court has personal jurisdiction over Defendants under § 506.500, R.S.Mo. because Plaintiffs' claims arise from the Defendants' transaction of business within Missouri, the Defendants' making of contracts within Missouri and the Defendants' commission of tortious acts within Missouri.

9.     Venue in the St. Louis County Circuit Court is proper under §508.010(4), R.S.Mo. Since all Defendants are non-residents of Missouri, venue is proper in any Missouri county.

10.     Holdings entered into employment agreements and retention bonus agreements with each Plaintiff. Although Holdings executed the agreements with each Plaintiff and was the named employer therein, Holdings was nothing more than the alter ego of Solutions:

-3-

(A)     All of the obligations and responsibilities of Holdings to Plaintiffs under the Employment Agreements and Retention Bonus Agreements were assumed and carried out by Solutions.

(B)     Plaintiffs were employed by and worked for Solutions.

(C)     Holdings had no business operations and was not adequately financed. Its only function was to hold the capital stock of several subsidiaries, including Solutions.

(D)     Holdings and Solutions had common interlocking directors and officers.

(E)     Holdings' revenues and income were derived primarily from its wholly owned subsidiary, Solutions.

(F)     Solutions paid virtually all expenses and obligations of Holdings.

(G)     Both Holdings and Solutions occupied the same offices. The only listing in the telephone directories was for "Viziqor Solutions".

(H)     All correspondence for both Holdings and Solutions utilized letterheads and bill heads bearing the name "Viziqor Solutions."

(I)     Quadrangle's management fees were paid by Solutions.

(J)     Plaintiff's salary and other benefits were paid by Solutions. Plaintiffs' W-2 statements showed Solutions, not Holdings, as their employer.

(K)     Other terminated executives who had Employment Agreements signed by Holdings were paid their severance compensation by Solutions.

-4-

11.    Solutions completely dominated all policy and business practices relating to the employment of Plaintiffs. Holdings had no separate mind, will or existence of its own with respect to Plaintiffs' employment and retention bonus agreements. The exercise of control by Solutions was done by Holdings and Solutions for the improper and wrongful purpose of insuring that Holdings would not have the financial wherewithal to compensate Plaintiffs under their employment agreements. Such reckless disregard for the rights of Plaintiffs on the part of Holdings and Solutions was dishonest and in contravention of Plaintiffs' legal rights. Unless the Court disregards the corporate form of Holdings, and holds Solutions equally responsible to Plaintiffs under the employment and retention bonus agreements, the result would constitute an injustice to Plaintiffs.

12.    As a direct and proximate result of Solutions' use of Holdings as its alter ego, Plaintiffs have sustained injuries and losses as hereinafter set forth.

## COUNT I
### (Breach of Contract against Solutions and Holdings)

For their first and separate causes of action against Solutions and Holdings, Plaintiffs state:

13.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 12 as if more fully set forth herein.

14.    In or about October, 2004, Quick entered into an Employment Agreement with Holdings (f/k/a Daleen Holdings, Inc.). At all times material to this Petition,

-5-

Holdings was the alter ego of Solutions who was the *de facto* employer of Quick. Solutions assumed all obligations to Quick under the Agreement.

15.     On or about August, 2005, Quick entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Quick and obligated to Quick under the terms of the Retention Bonus Agreement.

16.     On or about October 15, 2004, McCausland entered into an Employment Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of McCausland. Solutions assumed all obligations to McCausland under the Agreement.

17.     On or about August 29, 2005, McCausland entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of McCausland and obligated to McCausland under the terms of the Retention Bonus Agreement.

18.     In or about October, 2004, Trecker entered into an Employment Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Trecker. Solutions assumed all obligations to Trecker under the Agreement.

19.     On or about August 29, 2005, Trecker entered into a Retention Bonus Agreement with Holdings. At all times material to this Petition, Holdings was the alter ego of Solutions who was the *de facto* employer of Trecker and obligated to Trecker under the terms of the Retention Bonus Agreement.

-6-

20.    Holdings and Solutions have breached the Employment Agreements and Retention Bonus Agreements of each Plaintiff by failing, refusing and neglecting to compensate Plaintiffs under their Employment Agreements and Retention Bonus Agreements.

21.    As a direct and proximate result of the breach of Plaintiffs' employment and retention bonus agreements, Plaintiffs have sustained the following losses:

      (A)    Gordon Quick - $1,110,410.38;

      (B)    William McCausland - $290,036.97;

      (C)    John Trecker - $266,083.00.

WHEREFORE, in Count I, Plaintiffs pray judgment against Defendants Woodmont Holdings, Inc. and Viziqor Solutions, Inc., jointly and severally, in the following amounts, together with interest at the rate of 9% per annum on all amounts due as of the dates of termination:

| (A) | Gordon Quick | $1,110,410.38 |
|-----|--------------------|---------------|
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

## COUNT II
### (Breach of Contract against Quadrangle)

For their separate causes of action against Defendant Quadrangle, Plaintiffs state:

22.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 21 as if more fully set forth herein.

-7-

23.    On or about May 19, 2005, Quadrangle, by and through its agent, servant and employee Huber, made a definite and unambiguous offer to Plaintiffs that if they would continue working for Solutions until it could be sold, Quadrangle would pay Plaintiffs all of their severance benefits and retention bonuses in the event that the Plaintiffs were discharged as employees of Solutions without being paid their benefits and bonuses

24.    As consideration for Quadrangle's agreement, Plaintiffs agreed to continue as employees of Solutions and did continue as employees of Solutions until they were subsequently discharged without cause. In reaching agreement, the parties anticipated that the sale of Solutions could and would be completed within one (1) year. In fact, the sale was completed within one (1) year. Following the sale, Holdings and Solutions failed to compensate Plaintiffs under their contracts.

25.    The agreement was fair to all parties; Plaintiffs fully performed their obligations under the contract. Plaintiffs' performance in remaining employed was pursuant to and in reliance upon Huber's specific offers, as aforesaid.

26.    At all material times Huber was the agent, servant and employee of Quadrangle and authorized to make such offers to Plaintiffs.

27.    At all material times, Huber was acting in the course and scope of his employment with Quadrangle. All of his conduct took place in furtherance of the business and interests of Quadrangle.

28.    Quadrangle has breached its contract with Plaintiffs by failing, refusing and neglecting to pay them their severance payments and their retention bonuses.

-8-

29.    As a direct and proximate result of the breach of the foregoing agreement,

Plaintiffs have sustained the following losses:

     (A)    Gordon Quick - $1,110,410.38;

     (B)    William McCausland - $290,036.97;

     (C)    John Trecker - $266,083.00.

WHEREFORE, in Count II, Plaintiffs pray judgment against Defendant

Quadrangle as follows, together with interest at the rate of 9% per annum on all

amounts due as of the dates of termination:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

## COUNT III
### (Common Law Fraud Against Huber and Quadrangle)

For their separate and alternative cause of action against Defendant Quadrangle

and their separate cause of action against Defendant Huber, Plaintiffs state:

30.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 29

as if more fully set forth herein.

31.    At all material times Huber was the agent, servant and employee of

Quadrangle and authorized to make such representations to the Plaintiffs.

32.    The conduct and acts of Huber took place while he was acting in the

course and scope of his employment with Quadrangle. His conduct and acts were done

in furtherance of the business and interests of Quadrangle.

-9-

33.    At the time the offers and representations, as aforesaid, were  made, Huber and Quadrangle knew they were false.

34.    The representations were material to Plaintiffs' decisions to remain employees of Solutions. Plaintiffs did in fact honor their commitments to remain employees of Solutions until they were terminated without cause just prior to the sale of Solutions some seven (7) months later.

35.    Plaintiffs were ignorant of the fact that the representations and promises being made to them were false.

36.    In making the representations, said Defendants intended that Plaintiffs should rely thereon.  Plaintiffs did rely thereon and their reliance was reasonable and well-founded.

37.    In making the false representations, said Defendants intended to defraud Plaintiffs.

38.    As a direct and proximate result of the fraudulent conduct by Quadrangle and Huber, as aforesaid, Plaintiffs sustained the following damages:

(A)    Gordon Quick - $1,110,410.38;

(B)    William McCausland - $290,036.97;

(C)    John Trecker - $266,083.00.

39.    Said Defendants' conduct, as aforesaid, was willful, intentional, malicious, outrageous and dishonest. Accordingly, Plaintiff is entitled to an award of punitive damages.

-10-

WHEREFORE, in Count III, Plaintiffs pray judgment for actual damages against Defendants Quadrangle and Huber, as follows:

| | | |
|---|---|---|
| (A) | Gordon Quick | $1,110,410.38 |
| (B) | William McCausland | $ 290,036.97 |
| (C) | John Trecker | $ 266,083.00 |

together with interest at the rate of 9% per annum on all amounts due as of the date of termination, punitive damages against each such Defendant in the amount of $10 million for each Plaintiff, and whatever additional relief the Court deems appropriate under the circumstances.

GREEN, SCHAAF & JACOBSON, P.C.

By: _____

Martin M. Green  #16465
James J. Simeri #52506
Attorneys for Plaintiff
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri  63105
314-862-6800
FAX:  314-862-1606
green@stlouislaw.com
simeri@stlouislaw.com

-11-

I certify and attest that the above is a true copy of the original record of the Court in case number _____Obcc 915_____ as it appears on file in my office.



Issued

04-13-2006

**JOAN M. GILMER**, Circuit Clerk
St. Louis County Circuit Court

By

Deputy Clerk

CCOPR36   Rev. 06/00

# Exhibit C

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

2006 APR 12  AM II: 20

JOAN M. GILMER
CIRCUIT CLERK

| | | |
|---|---|---|
| GORDON QUICK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 06CC-000915 |
| | ) | |
| v. | ) | Division 3 |
| | ) | |
| VIZIQOR SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O

By leave of Court, Plaintiffs dismiss the Petition against Defendant Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc., without prejudice.

GREEN, SCHAAF & JACOBSON, P.C.

By: _Martin M. Green_

Martin M. Green #16465
James J. Simeri #52506
Attorneys for Plaintiffs
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
314-862-6800
FAX: 314-862-1606
green@stlouislaw.com
simeri@stlouislaw.com

### CERTIFICATE OF SERVICE

A copy of the foregoing was mailed, postage prepaid, to John T. Carroll, III, Attorney, but not of record for Alfred T. Giuliano, Chapter 7 Trustee for the Estate of Defendant Woodmont Holdings, Inc., 1201 North Market Street, Suite 1400, Wilmington, DE 19801; David S. Slavkin, Attorney, but not of record, for Defendants Huber and Quadrangle Group, LLC, One Metropolitan Square, Suite 3600, St. Louis, MO 63102; and Dawn Landry, General Counsel for Defendant Viziqor Solutions, Inc., 902 Clint Moore Road, Suite 230, Boca Raton, FL 33487, this 12th day of April, 2006.

_Martin M. Green_

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: |
| v. | ) ) | |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANT WOODMONT HOLDINGS, INC.'S CONSENT TO REMOVAL

Defendant Woodmont Holdings, Inc., by and through the Trustee for the Bankruptcy Estate of Woodmont Holdings, Inc., pursuant to 28 U.S.C. §1441, hereby consents to removal to federal court of the case entitled Gordon Quick, William McCausland, and John Trecker v. Visiqor Solutions, Inc., Woodmont Holdings, Inc., Michael Huber, and Quadrangle Group, LLC, Civil Action No. 06CC-000915, now pending in the Circuit Court of the County of St. Louis, Missouri.

Respectfully submitted this 14th day of April 2006.

WOODMONT HOLDINGS, INC.

By: _____

John V. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
Attorney for Trustee
Estate of Woodmont Holdings,
Inc. in Bankruptcy

2335554.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Charles A. Weiss
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2020 (Facsimile)

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)

Michael A. Clithero
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6060 (Facsimile)

# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) ) |
| Plaintiffs, | ) Case No.: ) |
| v. | ) ) |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) ) |
| Defendants. | ) |

### DEFENDANT VIZIQOR SOLUTIONS, INC.'S CONSENT TO REMOVAL

Defendant Viziqor Solutions, Inc., now known as Formula Telecom Solutions, Inc.,

pursuant to 28 U.S.C. §1441, hereby consents to removal to federal court of the case entitled

Gordon Quick, William McCausland, and John Trecker v. Viziqor Solutions, Inc., Woodmont

Holdings, Inc., Michael Huber, and Quadrangle Group, LLC, Civil Action No. 06CC-000915, now

pending in the Circuit Court of the County of St. Louis, Missouri.

Respectfully submitted this 14th day of April 2006.

VIZIQOR SOLUTIONS, INC.

By:_____

Michael A. Clithero #2829
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6462
(314) 345-6060 (Facsimile)
Attorney for Viziqor Solutions, Inc.

2335302.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Charles A. Weiss
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2020 (Facsimile)

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)

John T. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

*Michael A. Clithero*

# Exhibit F

## CIRCUIT COURT OF THE TWENTY-FIRST JUDICIAL CIRCUIT
## ST. LOUIS COUNTY

| | |
|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) ) |
| Plaintiffs, | ) ) Cause No. 06CC-000915 |
| v. | ) Division 3 ) |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) ) ) |
| Defendants. | ) |

## NOTICE TO ST. LOUIS COUNTY CIRCUIT CLERK

TO:   Circuit Clerk of St. Louis County
      7900 Carondelet
      Clayton, Missouri 63105

PLEASE TAKE NOTICE that on this 14th day of April, 2006, pursuant to 28 U.S.C. §1441,

Defendants Quadrangle Group, LLC and Michael Huber removed this cause to the United States

District Court, Eastern District of Missouri. The Notice of Removal is attached.

Respectfully submitted,

BRYAN CAVE LLP

By:_____
    Charles A. Weiss
    One Metropolitan Square
    211 North Broadway, Suite 3600
    St. Louis, Missouri 63102
    (314) 259-2000
    (314) 259-2020 (Facsimile)

    Weil, Gotshal & Manges
    James L. Messenger
    100 Federal Street, Floor 34
    Boston, Massachusetts 02110
    Of Counsel
    Attorneys for Quadrangle Group LLC
    and Michael Huber

2335289.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)

Michael A. Clithero
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6060 (Facsimile)

John T. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

☜JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
Gordon Quick, William McCausland and John Trecker

**DEFENDANTS**
Viziqor Solutions, Inc., Woodmont Holdings, Inc., Michael Huber, and Quadrangle Group, LLC

**(b)** County of Residence of First Listed Plaintiff   St. Louis County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward County Fla
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Green, Schaaf & Jacobson, P.C., 7733 Forsyth Blvd.,
Ste. #700, St. Louis, Missouri 63105 (314) 862-6800

Attorneys (If Known)
Charles Weiss, Bryan Cave, 211 N. Broadway, Ste.
3600, St. Louis, MO 63102  (314) 259-2000

**4:06CV00637SNL**

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | | | Under Equal Access |
| | Employment | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | | | ☐ 950 Constitutionality of |
| | Other | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | |

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

## V. ORIGIN  (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Breach of Contract Claim

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $1,110,410

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE                         DOCKET NUMBER

DATE
4-14-06

SIGNATURE OF ATTORNEY OF RECORD
Charles A. Weiss

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE

CB                             520006-6255

t (
V1

Stephen N. Limbaugh

DECK TYPE: St. Louis - Civil

DATE STAMP :04/14/2006 @ 14:09:04

CASE NUMBER   4:06CV00637
 E &10H

# 4  06CV0 0637SNL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

FILED

APR 1 4 2006

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO

Gordon Quick, William McCausland, and
John Trecker

                 plaintiff,    )
                          )
                          )
         v.            )   Case No.
Vizigor Solutions, Inc., et al.    )

               defendant.  **4  06CV00637SNL**

## ORIGINAL FILING FORM

**THIS FORM MUST BE COMPLETED AND VERIFIED BY THE FILING PARTY WHEN INITIATING A NEW CASE.**

——THIS CAUSE, OR A SUBSTANTIALLY EQUIVALENT COMPLAINT, WAS

PREVIOUSLY FILED IN THIS COURT AS CASE NUMBER_____

AND ASSIGNED TO THE HONORABLE JUDGE_____.

✓ NEITHER THIS CAUSE, NOR A SUBSTANTIALLY EQUIVALENT COMPLAINT,

PREVIOUSLY HAS BEEN FILED IN THIS COURT, AND THEREFORE MAY BE

OPENED AS AN ORIGINAL PROCEEDING.

**The undersigned affirms that the information provided above is true and correct.**

Date: _4-14-06_

_____
          Signature of Filing Party

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

APR 1 4 2006

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO

Gordon Quick, William McCausland,     )
and John Trecker                       )
      Plaintiff(s),                     )
                      )
      Vs.                                )     Case No.
Viziqor Solutions, Inc.,               )
Woodmont Holdings, Inc.,               )
Michael Huber, and Quadrangle Group,   )
LLC    Defendant(s).                   )

**4   06CV0 0637 SNL**

## DISCLOSURE OF CORPORATION INTERESTS
## CERTIFICATE

Pursuant to Rule 2.09 of the Local Rules of the United States District Court for the Eastern District of Missouri notice is hereby given by counsel of record for   Quadrangle Group,  LLC that the following corporate interests are disclosed:

1. The parent companies of the corporation:

    None.

2. Subsidiaries not wholly owned by the corporation:

    None.

3. Any publicly held company that owns ten percent (10%) or more of the corporation:

    None.

Signature (Counsel for Plaintiff/Defendant)
Print Name:  Charles A. Weiss
Address:  211 North Broadway, Ste. 3600

City/State/Zip:  St. Louis, MO 63102
Phone:   (314) 259-2000

**Certificate of Service**

I hereby certify that a true copy of the foregoing Disclosure of Corporate Interest Certificate was served (by mail)
(by hand delivery) on all parties of record in this cause, this  /4  Day of  April  ,20 06

**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

APR 1 4 2006

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

|                                               |   |                              |
|-----------------------------------------------|---|------------------------------|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) |                              |
|                                               | ) |                              |
|                                               | ) |                              |
|                                               | ) |                              |
|    Plaintiffs,                 | ) | Case No.:                    |
|                                               | ) |                              |
| v.                                            | ) |                              |
|                                               | ) | **4  06CV0 0637 S N L**      |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) |       |
|                                               | ) |                              |
|                                               | ) |                              |
|                                               | ) |                              |
|                                               | ) |                              |
|    Defendants.                 | ) |                              |

## DEFENDANT WOODMONT HOLDINGS, INC.'S CONSENT TO REMOVAL

     Defendant Woodmont Holdings, Inc., by and through the Trustee for the Bankruptcy Estate

of Woodmont Holdings, Inc., pursuant to 28 U.S.C. §1441, hereby consents to removal to federal

court of the case entitled Gordon Quick, William McCausland, and John Trecker v. Visiqor

Solutions, Inc., Woodmont Holdings, Inc., Michael Huber, and Quadrangle Group, LLC, Civil

Action No. 06CC-000915, now pending in the Circuit Court of the County of St. Louis, Missouri.

     Respectfully submitted this 14th day of April 2006.

WOODMONT HOLDINGS, INC.

By: _____
John V. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
Attorney for Trustee
Estate of Woodmont Holdings,
Inc. in Bankruptcy

2335554.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Charles A. Weiss
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2020 (Facsimile)

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)

Michael A. Clithero
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6060 (Facsimile)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

**FILED**

GORDON QUICK, WILLIAM )
MCCAUSLAND and JOHN )
TRECKER, )

      Plaintiffs, )

v. )

VIZIQOR SOLUTIONS, INC., )
WOODMONT HOLDINGS, INC., )
MICHAEL HUBER, and )
QUADRANGLE GROUP, LLC. )

      Defendants. )

APR 1 4 2006

U. S. DISTRICT COURT
EASTERN OISTRICT OF MO

Case No.:

**4  06CV0 0637 S N L**

### DEFENDANT VIZIQOR SOLUTIONS, INC.'S CONSENT TO REMOVAL

Defendant Viziqor Solutions, Inc., now known as Formula Telecom Solutions, Inc.,

pursuant to 28 U.S.C. §1441, hereby consents to removal to federal court of the case entitled

Gordon Quick, William McCausland, and John Trecker v. Viziqor Solutions, Inc., Woodmont

Holdings, Inc., Michael Huber, and Quadrangle Group, LLC, Civil Action No. 06CC-000915, now

pending in the Circuit Court of the County of St. Louis, Missouri.

Respectfully submitted this 14th day of April 2006.

VIZIQOR SOLUTIONS, INC.

By: _Michael A. Clithero_

Michael A. Clithero #2829
Blackwell Sanders Peper Martin
720 Olive Street, 24th Floor
St. Louis, Missouri 63101
(314) 345-6462
(314) 345-6060 (Facsimile)
Attorney for Viziqor Solutions, Inc.

2335302.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April 2006, a copy of the foregoing was faxed and served via U.S. Mail, postage prepaid, upon:

Charles A. Weiss
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2020 (Facsimile)

Martin M. Green
James J. Simeri
Green, Schaaf & Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
(314) 862-1606 (Facsimile)

John T. Carroll, III
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

*Michael A. Clithero*

# United States District Court

Eastern District of Missouri
111 South 10th Street
St. Louis, Missouri 63102

James G. Woodward
Clerk of Court

314-244-7900

April 17, 2006

John T. Carroll, III
Chase Manhattan Center
1201 North Market Street, Suite 1400
Wilmington, Delaware 19801

RE: Gordon Quick, et al.  vs. Viziqor Solutions, Inc., et al.
Case # 4:06cv637SNL

Dear : Mr. Carroll,

Please refer to Local Rule 12 of the Local Rules for the Eastern District of Missouri concerning nonresident attorneys and the procedure to follow to practice in this Court.  All pertinent information can be obtained from our website at www.moed.uscourts.gov, including the Verified Motion for Admission Pro Hac Vice form and the E-Filing registration form.

Please note Local Rule 12.01(E) requires the payment of a prescribed fee.  The fee is currently set at $25.00 payable upon filing of the motion. **Please Note:  This fee increases to $100.00 on May 1, 2006**.  Please include your check made payable to *Clerk, U.S. District Court* with your Verified Motion to expedite processing.

If you would like to apply for permanent admission in lieu of filing the motion for admission pro hac vice, that form can also be found on our website.

If you have any questions, please do not hesitate to contact our office.

Sincerely,
JAMES G. WOODWARD, CLERK

By: _____
Cynthia Davis
Deputy Clerk

### UNITED STATES DISTRICT FOR THE
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No.:  4 06 CV 00637 SNL |
| | ) | |
| v. | ) | |
| | ) | |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### <u>UNCONTESTED MOTION FOR ADDITIONAL TIME TO RESPOND TO COMPLAINT</u>

Separate defendants Quadrangle Group LLC and Michael Huber request additional time up to and including April 28, 2006 within which to move, answer or otherwise respond to Plaintiffs' Complaint (Petition).

Defendants' undersigned attorney represents that he has spoken with Plaintiffs' attorney and Plaintiffs' consent to this motion.

Defendants make this motion without prejudice to assert, and without waiving, any defense, including without limitation, lack of personal jurisdiction.

2338934.1

BRYAN CAVE LLP


By    /s/ Charles A. Weiss                     
          Charles A. Weiss
          211 N. Broadway, Suite 3600
          St. Louis, MO 63102
          (314) 259-2215
          Facsimile: (314) 259-2020
          Attorney for Defendant

          James L. Messenger
          Weil, Gotshal & Manges
          100 Federal Street, Floor 34
          Boston, Massachusetts 02110
          Of Counsel
          Attorneys for Quadrangle Group LLC
          and Michael Huber

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

**Martin M. Green**
mann@stlouislaw.com

**Michael A. Clithero**
mclithero@blackwellsanders.com

and by facsimile and First Class U.S. Mail to:

**John T. Carroll, III**
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

/s/ Charles A. Weiss_____

2338934.1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM          )
MCCAUSLAND and JOHN TRECKER,   )
                               )
    Plaintiffs,                )
                               )
v.                             )          Case No. 06CV-00637 SNL
                               )
VIZIQOR SOLUTIONS, INC.,       )
WOODMONT HOLDINGS, INC.,       )
MICHAEL HUBER, and             )
QUADRANGLE GROUP, LLC,         )
                               )
    Defendants.                )

## ENTRY OF APPEARANCE

    COMES NOW the law firm Blackwell Sanders Peper Martin LLP, by Michael A.

Clithero and Christopher A. Perrin, and enters its appearance on behalf Formula Telecom

Solution, Inc., f/k/a Viziqor Solutions, Inc. in the above-referenced cause.

                         BLACKWELL SANDERS PEPER MARTIN LLP


                         By    /s/ Michael A. Clithero
                             Michael A. Clithero, #2829
                             Christopher A. Perrin, #502086
                             720 Olive Street, 24th Floor
                             St. Louis, MO 63101
                             (314) 345-6000
                             (314) 345-6060 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2006, I electronically filed a copy of the foregoing ENTRY OF APPEARANCE to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list

_____/s/ Michael A. Clithero_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND, AND JOHN TRECKER | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| Vs. | ) |
| | ) Case No. 06CV-00637 SNL |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER AND QUADRANGLE GROUP, LLC | ) |
| | ) |
| Defendant(s). | ) |

## DISCLOSURE OF CORPORATION INTERESTS CERTIFICATE

Pursuant to Rule 2.09 of the Local Rules of the United States District Court for the Eastern District of Missouri notice is hereby given by counsel of record for ___FORMULA TELECOM Solutions, Inc. (Formerly known as Viziqor Solutions, Inc.)___ that the following corporate interests are disclosed:

1. The parent companies of the corporation:
   FORMULA TELECOM SOLUTIONS, LTD.

2. Subsidiaries not wholly owned by the corporation:

3. Any publicly held company that owns ten percent (10%) or more of the corporation:
   FORMULA TELECOM SOLUTIONS, LTD. (LISTED ON AIM)

_____Michael A. Clithero_____
Signature (Counsel for Plaintiff/Defendant)
Print Name: Michael A. Clithero
Address: 720 Olive Street, 24th Fl.

City/State/Zip: St. Louis, MO 63101
Phone: (314) 345-6462

**Certificate of Service**
I hereby certify that a true copy of the foregoing Disclosure of Corporate Interest Certificate was served (by mail) (by hand delivery) on all parties of record in this cause, this _____ Day of _____,20 _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM                )
MCCAUSLAND and JOHN TRECKER,         )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )      Case No. 06CV-00637 SNL
                                     )
VIZIQOR SOLUTIONS, INC.,             )
WOODMONT HOLDINGS, INC.,             )
MICHAEL HUBER, and                   )
QUADRANGLE GROUP, LLC,               )
                                     )
        Defendants.                  )

## UNCONTESTED MOTION FOR
## ADDITIONAL TIME TO RESPOND TO COMPLAINT

Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc., requests

additional time up to and including April 28, 2006 within which to move, answer or otherwise

respond to Plaintiff's Complaint (Petition).  Charles Weiss, counsel for co-defendants Michael

Huber and Quadrangle Group, LLC, has spoken with plaintiffs' attorney and plaintiffs consent to

this motion.  Defendants make this motion without prejudice to assert, and without waiving any

defense, including without limitation, lack of personal jurisdiction.

BLACKWELL SANDERS PEPER MARTIN LLP


By:      ___/s/ Michael A. Clithero_____
         Michael A. Clithero, #2829
         Christopher A. Perrin, #502086
         720 Olive Street, 24th Floor
         St. Louis, MO 63101
         (314) 345-6000
         (314) 345-6060 (facsimile)

STLD01-1229580-1

Case 4:06-cv-00637-SNL Document 91 Filed 04/21/2006 Page 2 of 2

## CERTIFICATE OF SERVICE

This is to certify that I have this 21st day of April, 2006, electronically filed a copy of the foregoing with the Clerk of Court to be served by operation of the Court's electronic filing system upon the participants on the electronic-filing service list and mailed by U.S. mail to any non-participant parties.

_____ /s/ Michael A. Clithero _____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **GORDON QUICK, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | )   No. 4:06CV637-SNL |
| | ) |
| **VIZIQOR SOLUTIONS, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER OF DISMISSAL

**IT IS HEREBY ORDERED** that leave is **GRANTED** to plaintiffs to dismiss defendant

Woodmont Holdings, Inc., f/k/a Viziqor Holdings, Inc. without prejudice.

Dated this __24th__ day of April, 2006.

_____

SENIOR UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

GORDON QUICK, WILLIAM      )
MCCAUSLAND and JOHN       )
TRECKER,                      )
                            )
      Plaintiffs,          )      No.: 4 06 CV 00637 SNL
                            )
v.                                 )
                            )
VIZIQOR SOLUTIONS, INC.,      )
WOODMONT HOLDINGS, INC.,    )
MICHAEL HUBER, and         )
QUADRANGLE GROUP, LLC.     )
                            )
      Defendants.        )

## CONSENT MOTION FOR ADDITIONAL TIME TO RESPOND TO COMPLAINT

Separate defendants Quadrangle Group LLC and Michael Huber request additional time up to and including May 3, 2006 within which to move, answer or otherwise respond to Plaintiffs' Complaint (Petition).

Defendants' undersigned attorney represents that he has spoken with Plaintiffs' attorney and Plaintiffs' consent to this motion.

Defendants make this motion without prejudice to assert, and without waiving, any defense, including without limitation, lack of personal jurisdiction.

BRYAN CAVE LLP


By____/s/ Charles A. Weiss_____
        Charles A. Weiss
        211 N. Broadway, Suite 3600
        St. Louis, MO 63102
        (314) 259-2215
        Facsimile: (314) 259-2020
        Attorney for Defendant

        James L. Messenger
        Weil, Gotshal & Manges
        100 Federal Street, Floor 34
        Boston, Massachusetts 02110
        Of Counsel
        Attorneys for Quadrangle Group LLC
        and Michael Huber

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

**Martin M. Green**
mann@stlouislaw.com

**Michael A. Clithero**
mclithero@blackwellsanders.com

and by facsimile and First Class U.S. Mail to:

**John T. Carroll, III**
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

/s/ Charles A. Weiss

2338934.1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM           )
MCCAUSLAND and JOHN TRECKER,    )
                                )
        Plaintiffs,             )
                                )
v.                              )        Case No. 06CV-00637 SNL
                                )
VIZIQOR SOLUTIONS, INC.,        )
WOODMONT HOLDINGS, INC.,        )
MICHAEL HUBER, and              )
QUADRANGLE GROUP, LLC,          )
                                )
        Defendants.             )

**UNCONTESTED MOTION FOR**
**ADDITIONAL TIME TO RESPOND TO COMPLAINT**

Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc., requests

additional time up to and including May 3, 2006 within which to move, answer or otherwise

respond to Plaintiff's Complaint (Petition).  Charles Weiss, counsel for co-defendants Michael

Huber and Quadrangle Group, LLC, has spoken with plaintiffs' attorney and plaintiffs consent to

this motion.  Defendants make this motion without prejudice to assert, and without waiving any

defense, including without limitation, lack of personal jurisdiction.

BLACKWELL SANDERS PEPER MARTIN LLP


By:     _____/s/ Michael A. Clithero_____
        Michael A. Clithero, #2829
        Christopher A. Perrin, #502086
        720 Olive Street, 24th Floor
        St. Louis, MO 63101
        (314) 345-6000
        (314) 345-6060 (facsimile)

STLD01-1231064-1

## CERTIFICATE OF SERVICE

This is to certify that I have this 26th day of April, 2006, electronically filed a copy of the foregoing with the Clerk of Court to be served by operation of the Court's electronic filing system upon the participants on the electronic-filing service list and mailed by U.S. mail to any non-participant parties.

/s/ Michael A. Clithero

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM    )
MCCAUSLAND and JOHN TRECKER,  )
            )
   Plaintiffs,       )
            )
v.            )   Case No. 06CV-00637 SNL
            )
VIZIQOR SOLUTIONS, INC.,    )
WOODMONT HOLDINGS, INC.,   )
MICHAEL HUBER, and     )
QUADRANGLE GROUP, LLC,    )
            )
   Defendants.      )

### ENTRY OF APPEARANCE

COMES NOW the law firm Blackwell Sanders Peper Martin LLP, by Christopher A.

Perrin, and enters its appearance on behalf of Formula Telecom Solution, Inc., f/k/a Viziqor

Solutions, Inc. in the above-referenced cause.

       BLACKWELL SANDERS PEPER MARTIN LLP


       By  /s/ Christopher A. Perrin     
          Christopher A. Perrin, #502086
          720 Olive Street, 24th Floor
          St. Louis, MO 63101
          (314) 345-6000
          (314) 345-6060 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2006, I electronically filed a copy of the foregoing ENTRY OF APPEARANCE to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.


_____/s/ Christopher A. Perrin_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM           )
MCCAUSLAND and JOHN TRECKER,    )
                                )
        Plaintiffs,             )
                                )
v.                              )        Case No. 06CV-00637 SNL
                                )
VIZIQOR SOLUTIONS, INC.,        )
WOODMONT HOLDINGS, INC.,        )
MICHAEL HUBER, and              )
QUADRANGLE GROUP, LLC,          )
                                )
        Defendants.             )

**DEFENDANT FORMULA TELECOM SOLUTIONS, INC.'S MOTION TO DISMISS
FOR FAILURE TO JOIN PARTIES NEEDED FOR JUST ADJUDICATION**

Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc. ("FTS"), by and

through its attorneys, respectfully moves this Court to enter its order dismissing the above-

entitled action for failure to join Woodmont Holdings, Inc., an indispensable party herein,

pursuant to Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure.  FTS files the

accompanying memorandum in support.

WHEREFORE, Defendant Formula Telecom Solutions, Inc. prays that this Court enter

its order dismissing the case and granting such other and further relief as is just and proper under

the circumstances of this case.

BLACKWELL SANDERS PEPER MARTIN LLP


By____/s/ Michael A. Clithero_____
        Michael A. Clithero, #2829
        Christopher A. Perrin, #502086
        720 Olive Street, 24th Floor
        St. Louis, MO 63101
        (314) 345-6000
        (314) 345-6060 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2006, I electronically filed a copy of the foregoing
MOTION TO DISMISS FOR FAILURE TO JOIN PARTIES NEEDED FOR JUST
ADJUDICATION to be served by operation of the Court's electronic filing system upon the
participants on the electronic filing system list

_____/s/ Michael A. Clithero_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM            )
MCCAUSLAND and JOHN TRECKER,     )
                                 )
    Plaintiffs,                  )
                                 )
v.                               )        Case No. 06CV-00637 SNL
                                 )
VIZIQOR SOLUTIONS, INC.,         )
WOODMONT HOLDINGS, INC.,         )
MICHAEL HUBER, and               )
QUADRANGLE GROUP, LLC,           )
                                 )
    Defendants.                  )

**DEFENDANT FORMULA TELECOM SOLUTIONS, INC.'S
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR
<u>FAILURE TO JOIN PARTIES NEEDED FOR JUST ADJUDICATION</u>**

    Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc. ("FTS") has

moved to dismiss for failure to join an indispensable party pursuant to Rules 12(b)(7) and 19 of

the Federal Rule of Civil Procedure.  FTS files this Memorandum in Support of that motion.

**INTRODUCTION**

**Procedural Background.**

    Plaintiffs Gordon Quick, William McCausland and John Trecker (together, "Plaintiffs")

filed a three count Petition in the Circuit Court of the County of St. Louis, State of Missouri on

or about March 3, 2006, against FTS, Woodmont Holdings, Inc. f/k/a Viziqor Holdings, Inc.

("Woodmont Holdings"), Michael Huber, and the Quadrangle Group, LLC ("Quadrangle").

Woodmont Holdings filed for bankruptcy under Chapter 7 of the Bankruptcy Act on March 13,

2006, in the District of Delaware.   On or about April 6, 2006, the bankruptcy trustee filed a

Suggestion of Bankruptcy and Notice of Automatic Stay in connection with the Woodmont

Holdings bankruptcy, and Plaintiffs dismissed Woodmont Holdings from their case (without

prejudice) on or about April 12, 2006.[1]  On April 14, 2006, defendants Huber and Quadrangle

removed this case to this Court.

### A Finding of Liability Against Non-Party Woodmont Holdings Is Necessary to Each of Plaintiffs' Claims.

Plaintiffs' Petition makes clear that Woodmont Holdings is at the core of Plaintiffs'

claims.  In Count I of the Petition, Plaintiffs assert a breach of contract claim against Viziqor

Solutions (n/k/a FTS) and Woodmont Holdings.  Count II is a breach of contract action against

Quadrangle, and Count III is a common law fraud claim against Huber and Quadrangle.  Each of

the counts relates to employment agreements and retention bonus agreements executed solely

between the Plaintiffs and Woodmont Holdings.

In Count I, Plaintiffs seek to impose liability against FTS for the breach of contract by

Woodmont Holdings solely on the basis that Woodmont Holdings is the alter ego of FTS.  (*See*

Petition ¶ 10, 14-21.)  Plaintiffs are quite clear, however, that Woodmont Holdings was a party to

the allegedly breached contracts.  (*See, e.g.*, Petition ¶ 14 ("Quick entered into an Employment

Agreement with [Woodmont] Holdings . . . ."); *see also* Petition ¶¶ 15-19.)  In Count II,

Plaintiffs allege that Quadrangle agreed to pay plaintiffs all of their contractual severance

benefits and retention bonuses in the event that plaintiffs were not paid, and Count III alleges

that Huber and Quadrangle fraudulently misrepresented that they would pay the contractual

severance benefits and retention bonuses in the event that plaintiffs were not paid.  Thus, as

plead in their Petition, Plaintiffs' claim in Counts I, II, and III rely entirely upon a finding of

liability against Woodmont Holdings (the party with whom plaintiffs contracted).

---

[1] The copy of the dismissal indicates that it was file-stamped on April 12, 2006, although the dismissal was not in the court file at the time of removal on April 14, 2006.  This Count has since entered its order granting leave to dismiss Woodmont Holdings (See Order dated April 24, 2006).

# ARGUMENT

"[T]he process for disposition of a motion to dismiss pursuant to Rule 12(b)(7) involves a

two-step process." *Green v. Nationscredit Financial Services Corp.*, No. 03-639-CV-W-FJG,

2005 WL 1005992, *3 (W.D.Mo. mar. 31, 2005). "First, the court must determine whether the

absent party satisfies the threshold requirements of Rule 19(a)." *Id.* "[I]f it does, the court must

then determine whether to dismiss the action . . . ." *Id.* Woodmont Holdings was previously

served as part of the state-court action, and Plaintiffs expressly dismissed Woodmont Holdings

prior to the removal of this action.[2]  Plaintiffs' previous dismissal of Woodmont Holdings from

the state-court action clearly implies that they will not join Woodmont Holdings as a defendant

here.  Accordingly, because Woodmont Holdings is an indispensable party—as discussed

below—this action should be dismissed in its absence.  *See De Wit v. Firstar Corp.*, 879 F.Supp.

947, 992 (N.D.Iowa 1995) ("[D] ismissal of a complaint for failure to join an indispensable party

is entirely appropriate under Rule 12(b)(7).").[3]

Woodmont Holdings is an indispensable party-defendant to this action because liability

against the present Defendants cannot be properly adjudicated absent a determination of

Woodmont Holdings's liability for breach of contract.  Put simply, "[t]here is a general rule that

where rights sued upon arise from a contract all parties to it must be joined." *Ward v. Deavers*,

203 F.2d 72, 75 (D.C. Cir. 1953); s*ee also Greer v. Scearce*, 53 F.Supp. 807, 811 (D.C. Mo.

1944).  In addition, Plaintiffs' allegations that FTS is an alter ego of Woodmont Holdings, a

---

[2] FTS notes that joinder of Woodmont Holdings here would not destroy federal subject matter jurisdiction over this action.

[3] Although FTS believes Plaintiffs position regarding joinder of Woodmont Holdings is clear—having previously dismissed it—the Court could, as an alternative to dismissal, order Plaintiffs join Woodmont Holdings as a defendant under Rule 19.  However, should Plaintiff fail to join Woodmont Holdings after such order, Plaintiffs' Petition should be dismissed with prejudice.  *See Sladek v. Bell Sys. Management Pension Plan*, 880 F.2d 972, 980 (7th Cir.1989) ("[D]ismissal with prejudice should ordinarily result only after the court has ordered the party joined and the plaintiff has failed to do so.").

company that is currently in bankruptcy, confirms that Woodmont/the bankruptcy trustee must

be a party to this action under Rule 19.  As one court has explained in similar circumstances:

> [I]mplicit in a determination that the defendants are the alter ego of
> the bankrupt would be a finding that the defendants have assets
> which are indistinguishable from those of the bankrupt or have
> assets which belong to the bankrupt.  Examining subdivision
> (a)(1)-(2) of Rule 19, it appears that the Court may not be able to
> fashion full relief among the parties without the presence of the
> trustee.

*Steyhr Daimler Puch of Amer. v. Pappas*, 35 B.R. 1001, 1003 (E.D. Va. 1983).

Further, if Woodmont Holdings is not joined, its absence may, as a practical matter,

impair or impede its ability to protect its interest in the lawsuit or the anticipated proof of claim

adjudication.  Moreover, the witnesses and documentary evidence to defend the claim of breach

of contract asserted by Plaintiffs are necessarily in the hands of Woodmont Holdings.  FTS's

(and the other defendants') ability to adequately defend the breach of contract claim will be

prejudiced without the presence of Woodmont Holdings.

WHEREFORE, Defendant Formula Telecom Solutions, Inc. prays that this Court enter

its order dismissing the case[4] and granting such other and further relief as is just and proper

under the circumstances of this case.

BLACKWELL SANDERS PEPER MARTIN LLP


By____/s/ Michael A. Clithero_____
     Michael A. Clithero, #2829
     Christopher A. Perrin, # 502086
     720 Olive Street, 24th Floor
     St. Louis, MO 63101
     (314) 345-6000
     (314) 345-6060 (facsimile)

---

[4] Alternatively, this Court could order that the Woodmont Holdings bankruptcy trustee be added as a plaintiff and transfer the case to the bankruptcy court.  *See Steyhr Daimler Puch of Amer. v. Pappas*, 35 B.R. 1001 (E.D. Va. 1983).

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2006, I electronically filed a copy of the foregoing MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO JOIN PARTIES NEEDED FOR JUST ADJUDICATION to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.


_____/s/ Michael A. Clithero_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, *Plaintiffs,* | ) ) ) ) | |
| v. | ) ) | C.A. 4:06-cv-00637-SNL |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC, *Defendants.* | ) ) ) ) ) ) | |

## DEFENDANTS QUADRANGLE GROUP LLC'S AND MICHAEL HUBER'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(7) OR, ALTERNATIVELY, TO TRANSFER OR STAY

Defendants Quadrangle Group, LLC ("Quadrangle") and Michael Huber ("Huber") and collectively "Defendants," pursuant to Rule 12(b)(7), Fed. R. Civ. P., request this Court order that Woodmont Holdings, Inc. be joined as an indispensable party and if joinder is not defeasible, order that this action be dismissed.

Defendants, alternatively, request that this Action be transferred to the United States District Court for the District of Delaware for reference to the Delaware Bankruptcy Court. Defendants further request that in the event this Court does not dismiss this Action or transfer it to the District of Delaware for reference to the Bankruptcy Court, then this Court stay this Action pending the conclusion of the Delaware Bankruptcy proceeding.

Defendants incorporate herein their Memorandum in support of this motion that is being filed concurrently herewith.

2349439.1

QUADRANGLE GROUP, LLC, and MICHAEL
HUBER

By their Attorneys,

By:  /s/ Charles A. Weiss_____
     Charles A. Weiss
     BRYAN CAVE LLP
     211 N. Broadway, Suite 3600
     St. Louis, MO  63102
     (314) 259-2215
     Facsimile:  (314) 259-2020

     Of Counsel:

     James L. Messenger
     WEIL, GOTSHAL & MANGES LLP
     100 Federal Street, Floor 34
     Boston, MA  02110

     *Attorneys for Quadrangle Group LLC and
     Michael Huber*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2006, the foregoing was filed electronically with the Clerk of the
Court to be served by operation of the Court's electronic filing system upon:  Martin M. Green,
Esq., mann@stlouislaw.com; and Michael A. Clithero, Esq., mclithero@blackwellsanders.com;
and by facsimile and first class U.S. mail to John T. Carroll, III, Esq., COZEN O'CONNER,
Chase Manhattan Center, 1201 North Market Street, suite 1400, Wilmington, DE 19801, (302)
295-2013 (facsimile).

                                    /s/ Charles A. Weiss_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, *Plaintiffs,* | ) ) ) ) | |
| v. | ) ) | C.A. 4:06-cv-00637-SNL |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC, *Defendants.* | ) ) ) ) ) ) | |

## DEFENDANTS QUADRANGLE GROUP LLC'S AND MICHAEL HUBER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR RULE 12(b)(7) MOTION TO DISMISS, OR ALTERNATIVELY, MOTION TO TRANSFER OR STAY

### INTRODUCTION

Defendants Quadrangle Group LLC ("Quadrangle") and Michael Huber ("Huber") (collectively "Defendants") submit this Memorandum of Law in Support of their Rule 12(b)(7) Motion to Dismiss, or alternatively, Motion to Transfer the Action to the United States District Court for the District of Delaware (the "Delaware District Court") pursuant to 28 U.S.C. § 1404(a) and 1412 for reference to the Delaware Bankruptcy Court (the "Delaware Bankruptcy Court").

### STATEMENT OF FACTS

Plaintiffs allege that they are former employees of Defendant Viziqor Solutions, Inc. ("Solutions"), a Delaware corporation. (Compl. ¶¶ 1-3.) Plaintiffs further allege that they entered into retention bonus agreements with Woodmont Holdings, Inc. ("Woodmont"), the

parent company of Solutions and itself a Delaware corporation. (Compl. ¶ 10.) [1] Plaintiffs claim

that Solutions is the alter ego of Woodmont and is therefore responsible for all of Woodmont's

obligations under the retention bonus agreements. (Compl. ¶ 11.) Lastly, Plaintiffs contend that

Quadrangle and Huber orally offered to pay Plaintiffs sums due under their retention bonus

agreements if Woodmont and Solutions did not do so. (Compl. ¶ 23.)

On or about March 3, 2006, Plaintiffs filed an action in the Circuit Court of the

County of St. Louis against Woodmont, Solutions, Quadrangle and Huber (the "Action"). In

Count I, Plaintiffs sued Solutions and Woodmont for breach of contract (Solutions was sued

under an alter ego theory). In Count II, Plaintiffs sued Quadrangle under a claim denominated

breach of contract. In Count III, Plaintiffs recast the contract claim as a fraud claim against

Huber and Quadrangle.

On March 13, 2006, Woodmont filed for bankruptcy under Chapter 7 of the

United States Bankruptcy Code in the Bankruptcy Court for the District of Delaware.

Thereafter, Woodmont filed a suggestion of bankruptcy, and Plaintiffs filed a memorandum in

the State Court action to dismiss Woodmont from the action with leave of court. See Exhibit 2

attached hereto. On April 14, 2006, Defendants removed the case from the Circuit Court of St.

Louis to the United States District Court for the District of Missouri. On April 24, 2006, this

Court issued its own order of dismissal granting Plaintiffs leave to dismiss Woodmont without

prejudice. (Docket #10).

The claims against Huber and Quadrangle are inextricably intertwined with the

liability of Woodmont. Quadrangle and Huber adamantly deny any liability and deny all

---

[1]   Plaintiffs respective retention bonus agreements are collectively attached as Exhibit 1 hereto.
The agreements are between each plaintiff and Woodmont Holdings, Inc. None of the other
Defendants are parties to these agreements.

pertinent factual allegations, including, without limitation, the allegations in Counts II or III that

they offered to pay any sums to Plaintiffs.  However, even under Plaintiffs' theory, Quadrangle's

and Huber's liability is dependent, as a threshold matter on this Court finding that (i) Woodmont

has a contractual obligation to pay Plaintiffs sums due under the alleged Agreements with

Plaintiffs, and (ii) Woodmont is unable to pay those sums.  If Woodmont pays Plaintiffs the sums

it allegedly owes them, there can certainly be no liability against Quadrangle and Huber, and

there would not even be a need to adjudicate the claims against Quadrangle and Huber.

Moreover, the determination of whether Quadrangle and Huber made the offers alleged

necessarily entails overlapping proofs of fact with the claims against Woodmont.  Accordingly,

for the reasons articulated below, Woodmont is an indispensable party, and the claims against

Woodmont and Defendants should be decided in one proceeding.

## ARGUMENT

### I.  THE RULE 12(B)(7) MOTION SHOULD BE GRANTED

A Rule 12(b)(7) Motion to Dismiss must be granted when the following three

conditions are present:  (i) the absent party is needed for just adjudication; (ii) joinder of the

absent party is not feasible; and (iii) dismissal is required based on equity and good conscience

because the action cannot proceed without the absent party.  Fed. R. Civ. P. Rule 19.  See also

Equal Employment Opportunity Comm'n v. Apria Healthcare Group, Inc., 222 F.R.D. 608, 609

(E.D. Mo. 2004)("[w]hen a person needed for just adjudication (as set forth in Rule 19) has not

been included in an action, a party may move for dismissal pursuant to Rule 12(b)(7)")(citation

omitted); Schweyer Import-Schnittholtz GmbH v. Genesis Capital Fund, L.P., 220 F.R.D. 582,

590 (S.D. Iowa 2004).  The court should apply a flexible and pragmatic approach when

adjudicating whether to dismiss a motion pursuant to Rules 12(b)(7) and 19.  Provident

<u>Trademens Bank & Trust Co. v. Patterson</u>, 390 U.S. 102, 108 (1968).  Applying these factors,

the case should be dismissed.

> **A.**     **Woodmont is Needed for Just Adjudication Under 19(a), and Because There is an Automatic Stay in Effect as a Result of Woodmont's Chapter 7 Proceedings, It is Not Feasible for the Court to Join Woodmont.**

> 1.     <u>Standard under Rule 19(a)</u>

The Rule 19(a) standard is satisfied and the absent party deemed necessary when

joinder is needed to avoid multiple lawsuits concerning the same subject matter or complete

relief cannot be accorded the parties already before the court without joinder of the absentee

party.  <u>See</u>, <u>e.g.</u>, Fed. R. Civ. P. Rule 19(a) advisory committee's note ("[t]he interests that are

being furthered here are not only those of the parties, but also that of the public in avoiding

repeated lawsuits on the same essential subject matter"); <u>Shelley v. Noffsinger</u>, 91 F.R.D. 263

(N.D. Ill. 1981) ("[t]he provisions of Rule 19(a)(2)(ii), Fed. R. Civ. P., are designed to protect

defendants from multiple, double, or inconsistent lawsuits."); 7 CHARLES ALAN WRIGHT,

ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE §1604 (3d ed.

2001) (Rule 19(a) standard is satisfied when joinder will avoid multiple lawsuits concerning the

same subject matter).

> If an absent party is needed for a just adjudication, the court must join the party

and if joinder is impossible, joinder of the absent party shall be found not to be feasible.

> 2.     <u>Woodmont is a necessary party, but joinder is not feasible</u>

First, Woodmont is a necessary party needed for just adjudication of this lawsuit

to avoid multiple litigation on the same subject.  Here, even assuming arguendo that Quadrangle

and Huber made the alleged oral offer (which is emphatically denied), Plaintiffs' claims against

Defendants are dependent, *inter alia*, upon Woodmont not paying sums allegedly due under the

retention bonus agreements.  If Woodmont is not joined in this action, the resolution of whether

Woodmont has liability, and the extent to which it can satisfy any judgment, will be addressed in two separate courts. Moreover, there is a risk of inconsistent verdicts unless the liability of Woodmont, Solutions, Quadrangle and Huber is decided in one forum. Lastly, the failure to join Woodmont impedes the Court's ability to award damages because only the Bankruptcy Court can determine whether and how much Woodmont is liable to pay in connection with the alleged agreements.[2]

Second, joinder of Woodmont is not feasible. Woodmont is a Chapter 7 bankruptcy debtor before the Delaware Bankruptcy Court and has filed a suggestion of bankruptcy in this Court. Pursuant to section 362 of the Bankruptcy Code (11 U.S.C. 362), the automatic stay in effect precludes Plaintiffs from prosecuting their claims against Woodmont in this Court, or any forum other than the Delaware Bankruptcy Court, without relief from the Bankruptcy Court. See, Am. Fin. Corp. v. Gen. Elec. Credit Corp., 97 F.R.D. 408, 413(S.D. Ohio 1983) (in determining a motion for failure to join an indispensable party, the district court rules that the automatic stay of Bankruptcy Court precluded district court from making corporation in reorganization a party in the action before the district court). See also PLM Fin. Servs., Inc. v. Coast to Coast Trucking, Inc., 90 B.R. 664, 668 E.D. Pa. 1988) (proceedings before district court to determine if absent party was necessary to avoid the risk of defendant facing double liability stayed because of the automatic stay imposed by the bankruptcy code when absent party filed for bankruptcy); Constitution Bank v. Tubbs, 68 F. 3d 685, 691 (3d Cir.

---

[2] Plaintiffs may claim that Solutions is present before this Court and that it stands in the shoes of Woodmont under an alter ego theory. But, for the reasons articulated in Solutions' Memorandum of Law, Woodmont must be joined to determine the alter ego issue.

1995) ("once triggered by a debtor's bankruptcy petition, the automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor").[3]

**B.    Equity and Good Conscience Require That Since Joinder of a Necessary Party, Woodmont, is Not Feasible, the Court Should Dismiss the Defendants from the Action Pursuant to Rules 12(b)(7) and 19(b)**

1.    Standard under Rule 19(b)

If the court determines that the absentee party is needed for a just adjudication, but joinder of that party is not feasible, the Court may either allow the action to proceed or dismiss the case based on equity and good conscience.  Rule 19(b) provides four factors, which are considered when determining whether a necessary party should be dismissed as indispensable.  The four factors, which must be balanced and analyzed when applying the equity and good conscience standard in a flexible and pragmatic manner, are:  (i) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (ii) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  Provident Trademens, 390 U.S. at 108.

2.    Equity and good conscience favor the dismissal of the Action given it is not feasible to join Woodmont

If Woodmont is not joined, Quadrangle and Huber will be prejudiced and the prejudice cannot be minimized by protective provisions.  As previously noted, even assuming arguendo that Quadrangle and Huber made any offer to Plaintiffs as alleged in Counts II and III

_____

[3]    The courts in both Am. Fin. Corp. and PLM Fin. Servs. stayed the actions to allow Plaintiffs to seek relief from the automatic stay in the bankruptcy court.  If the court is not prepared to dismiss or transfer the Action, the court should stay the Action, until the conclusion of the bankruptcy proceedings.

(which is emphatically denied), Plaintiffs' claims against Defendants are dependent, *inter alia*, upon Woodmont not paying sums due under the alleged Agreements. If the claims against Woodmont are not joined with the claims against Quadrangle and Huber, this Court will have to address the liability of Woodmont – which is not a party – even though the issue of Woodmont's liability will be addressed in another proceeding in which Woodmont is a party. Moreover, there is no way for this Court to determine whether or not Woodmont has the ability to pay any judgment (and to what extent) since it is in bankruptcy.

3.       Plaintiffs will have an adequate remedy if the claim is dismissed

There is no prejudice to Plaintiffs because, if the case is dismissed, Plaintiffs will need to file a proof of claim against Woodmont in Delaware Bankruptcy Court and resolve all claims against Woodmont by filing an adversary proceeding in Delaware Bankruptcy Court.

## II.       IF THE CASE IS NOT DISMISSED, THE ACTION SHOULD BE TRANSFERRED

In the event that this Court does not dismiss the Action on account of Woodmont being an indispensable party, Defendants move, pursuant to 28 U.S.C. § 1404(a) and 1412, that this Action be transferred to the Delaware District Court, to be referred to the Delaware Bankruptcy Court, so that the Action may be consolidated with related proceedings that will transpire in Woodmont's bankruptcy case. Plaintiffs will no doubt file proofs of claim to protect their claims against Woodmont arising from their agreements with Woodmont — claims that the Plaintiffs originally asserted in this Action before Woodmont's dismissal therefrom following its bankruptcy filing. Quadrangle will file a proof of claim in connection with sums Woodmont owes to Quadrangle. The proofs of claim filed by the Plaintiffs and Defendants will result in litigation in the Bankruptcy Court involving overlapping issues to those present in this Action. Therefore, transfer of this Action to the Delaware would consolidate related proceedings,

produce judicial economy, minimize the chances of inconsistent rulings, and minimize the expense of the parties.

### A. Change of Venue Statutes

Section 1404(a) sets forth the following statutory basis for a change of venue:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).  Section 1412 provides a similar, though not identical, basis for a change in venue:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

28 U.S.C. § 1412.  Section 1412 applies to civil proceedings, such as the Action, that are "related to" to a bankruptcy case.  See Collier on Bankruptcy (15th ed. rev.) § 4.04[1].

Section 1412 requires a court to undergo a similar, though not identical, analysis as that required by section 1404(a).  Compare Collier at § 4.04[b] (citing factors considered under section 1412) with Terra Int'l, Inc. v. Miss. Chemical Corp., 119 F.3d 688, 696 (8th Cir. 1997) (citing factors considered under section 1404(a)).  "There is no requirement in section 1412, as there is in section 1404(a), that the case can be transferred only to a district in which it might have originally been brought."  Collier at § 4.04[4][a].  Further, section 1412 implies a lesser standard than section 1404(a), requiring a court to consider the "interest of justice" or the "convenience of the parties" rather than the "interest of justice" and the "convenience of the parties and witnesses."  See Collier at § 4.04[3].  Nonetheless, transfer of the Action to Delaware is appropriate under either section 1404(a) or section 1412.  Because of the higher transfer standard under section 1404(a) is unequivocally met in this matter, this memorandum focuses on this standard.

B.    **Analysis**

The language of 28 U.S.C. § 1404(a) "reveals three general categories of factors that courts must consider when deciding a motion to transfer:  (i) the convenience of the parties, (ii) the convenience of the witnesses, and (iii) the interests of justice."  Terra Int'l, 119 F.3d at 691 (8th Cir. 1997).  It also requires that the Court to which transfer is sought is one where the matter could have been brought.

1.    Delaware is a proper forum

When a bankruptcy is pending, the bankruptcy court is considered the "home court" for purposes of adjudicating matters that impact the bankruptcy, and there is a "well-settled presumption that 'related to' proceedings should be litigated in the 'home court[.]'"  Dunlap v. Friedman's, Inc., 331 B.R. 674, 678 (S.D. W.Va. 2005); see also Hohl v. Bastian, 279 B.R. 165, 177-78 (W.D. Pa. 2002) ("[T]he home court presumption provides that a court in which the bankruptcy case itself is pending is the proper venue for adjudicating all related litigation, including those suits which have been filed in other state or federal courts."); In re Vital Link Lodi, Inc., 240 B.R. 15 (Bankr. W.D. Mo. 1999) ("[t]he general rule is that where the bankruptcy case is pending is the proper venue for all related proceedings within the court's jurisdiction, because speedy and economic administration of cases is a paramount consideration in the bankruptcy process.")  See also Nixon Mach. Co. v. Roy Energy, Inc., 27 B.R. 871, 873 (Bankr. E.D. Tenn. 1993) (collecting authority).  The Action relates to Woodmont's bankruptcy for the reasons previously identified.  Thus, there is a presumption that the Action should be transferred to the Delaware Bankruptcy Court.

The threshold inquiry under 28 U.S.C. § 1404(a) (but not § 1412) is whether the civil action to be transferred could have been brought originally in the court to which it is to be transferred.  See Biometics, LLC v. New Womyn, Inc., 112 F.Supp.2d 869, 875 (E.D. Mo.

2000).  This Action could have been brought in Delaware District Court under diversity jurisdiction.  Specifically, all three Plaintiffs are Missouri residents and no Defendant is a citizen of Missouri.[4]  Moreover, all of the Defendants are either Delaware entities or employees of a Delaware entity.  Indeed, this action has already been removed to federal court.  The threshold inquiry of section 1404(a) is therefore met.

       2.    <u>Convenience</u>

In evaluating considerations of convenience, courts examine the following factors:  "(i) the convenience of the parties, (ii) the convenience of the witnesses —including the willingness of witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony, (iii) the accessibility to records and documents, (iv) the location where the conduct complained of occurred, and (v) the applicability of each forum state's substantive law."  <u>Terra Int'l</u> 119 F.3d at 696; <u>see also</u> <u>Enterprise Rent-A-Car Co. v. U-Haul Int'l, Inc.</u>, 327 F.Supp.2d 1032, 1045 n.5 (E.D. Mo. 2004); <u>Biometics</u>, 112 F.Supp.2d at 875 n.4.

All the applicable factors here weigh in favor of transfer.  The parties will find it more convenient to litigate in the Delaware Bankruptcy Court in one consolidated proceeding rather than in both the Delaware Bankruptcy Court and this Court.  All of the Defendants are located closer to Delaware than Missouri.  Plaintiffs will have to litigate their claims against Woodmont in Delaware anyway, so there is no additional burden.  Further, if the case remains in this Court, Woodmont's official representative, its Chapter 7 trustee, will be outside of this Court's subpoena power.

---

[4]    Huber is alleged to be a resident of New York.  (Compl. ¶ 6.)  Quadrangle allegedly is a New York limited liability company with its principal place of business in New York.  (Compl. ¶ 7.) Woodmont allegedly is a Delaware corporation with its principal place of business in Maryland. (Compl. ¶ 4.)  Solutions allegedly is a Delaware corporation.  (Compl. ¶ 5.)

3.      Interest of Justice

In evaluating the interests of justice, courts examine the following factors: "(i) judicial economy, (ii) the plaintiff's choice of forum, (iii) the comparative costs to the parties of litigating in each forum, (iv) each party's ability to enforce a judgment, (v) obstacles to a fair trial, (vi) conflict of law issues, and (vii) the advantages of having a local court determine questions of local law." Terra Int'l 119 F.3d at 696; see also Enterprise Rent-A-Car, 327 F.Supp.2d at 1045 n.5 (E.D. Mo. 2004); Biometics, 112 F.Supp.2d at 875 n.4.  All of the applicable factors in evaluating the interests of justice weigh in favor of transfer.

As discussed above, judicial economy will be served by transferring the Action to Delaware.  The proceedings that will take place in the Delaware Bankruptcy Court respecting the proofs of claim that will be filed by the Plaintiffs and Defendants will involve overlapping issues to those present in this Action.  Transfer of the Action to Delaware will result in a consolidation of proceedings, thereby eliminating duplication of effort and the possibility of inconsistent verdicts.  Plaintiffs' choice of forum is of little weight when the action relates to an ongoing bankruptcy case in another forum.  As discussed above, there is a presumption that litigation related to a bankruptcy case should be transferred to the bankruptcy court.

Costs will be reduced by transferring the Action to Delaware.  Presently, the parties will have to litigate issues relating to the employment agreements and retention bonus agreements in two forums—in this Court and in the Delaware Bankruptcy Court.  Duplication of effort and expenses will be avoided by transferring the Action to Delaware, thereby permitting all issues to be litigated in one forum.

The Parties ability to enforce a judgment will be enhanced by transferring the Action to Delaware.  In Delaware, the Delaware Bankruptcy Court, unlike this Court, will have jurisdiction over Woodmont, thereby enabling any judgment, if appropriate, to be entered against

Woodmont. Given Woodmont's centrality to the matters raised in the Action, the inability to obtain, much less enforce, a judgment against Woodmont in this Court is a major obstacle, which would be removed if the Action were transferred to Delaware.

As discussed above, Woodmont is an indispensable party to this Action. Woodmont's absence from this action greatly hinders the Defendant's ability to obtain a fair trial. Further, Delaware has a strong interest in this matter. All of the corporate entities were formed in Delaware and all of the Plaintiffs' claims in connection with an agreement with Delaware corporation in connection with employment by a Delaware entity.

The Delaware Bankruptcy Court is essentially the "local court" in this matter. As discussed above, when a bankruptcy is pending, the bankruptcy court is considered the "home court" for purposes of adjudicating matters that impact the bankruptcy estate. See Dunlap, 331 B.R. at 678 (S.D. W.Va. 2005). The presumption that the Action should be transferred to the Delaware District Court for referral to the Delaware Bankruptcy Court cannot be overcome. As demonstrated above, the interest of justice and convenience of the parties and witnesses will be enhanced by transferring the Action.

## III.   THE COURT MAY STAY THIS ACTION PENDING THE BANKRUPTCY PROCEEDING

Alternatively, if the Court does not dismiss or transfer this Action to Delaware, it should stay this action pending the outcome of the Bankruptcy case. Plaintiffs can file their claims against Woodmont and have them adjudicated by the Bankruptcy court before proceeding with this case. See Am. Fin. Corp., 97 F.R.D. at 413. The Bankruptcy court may or may not find that Woodmont owed Plaintiffs some amount of money under their respective agreements. The findings and order of the Bankruptcy court may obviate the need to even adjudicate the

claims against Quadrangle and Huber. In any event, proceeding this way would avoid any inconsistent judgments.

## **CONCLUSION**

Accordingly, Defendants Quadrangle Group LLC and Michael Huber request that (i) this Court order that Woodmont be joined, but if joinder is not feasible, that the case be dismissed; or (ii) that the action be transferred to the District of Delaware to be referred to the Bankruptcy for the District of Delaware. Alternatively, Defendants request that the Court stay this action pending the filing and adjudication of Plaintiffs claims against Woodmont in the Bankruptcy proceeding in Delaware.

QUADRANGLE GROUP, LLC, and MICHAEL HUBER

By their Attorneys,

By:   /s/ Charles A. Weiss
        Charles A. Weiss
        BRYAN CAVE LLP
        211 N. Broadway, Suite 3600
        St. Louis, MO 63102
        (314) 259-2215

Of Counsel:

James L. Messenger
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, Floor 34
Boston, MA 02110
(617) 772-8300

*Attorneys for Quadrangle Group LLC and Michael Huber*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon: Martin M. Green, Esq., mann@stlouislaw.com; and Michael A. Clithero, Esq., mclithero@blackwellsanders.com; and by facsimile and first class U.S. mail to John T. Carroll, III, Esq., COZEN O'CONNER, Chase Manhattan Center, 1201 North Market Street, suite 1400, Wilmington, DE 19801, (302) 295-2013 (facsimile).

_/s/ Charles A. Weiss_____

August 29, 2005

Gordon Quick
800 South Hanley Road 4E
Clayton, MO 63105

                        Re:    **Retention Bonus Agreement**

Dear Gordon:

                        I am pleased to inform you that you have been selected to be eligible to
receive a retention bonus if you continue to be employed by Viziqor Holdings, Inc. (the
"Company") through a Change in Control (as defined in the Viziqor Holdings, Inc. 2004
Stock Incentive Plan). This letter sets out the terms and conditions of the retention bonus
arrangement (the "Agreement") between you and the Company.

                        **1.    Right to Payment.**

                        Subject to the terms and conditions of this Agreement, you will be
entitled to receive a minimum retention bonus of $250,000 if you continue to be
employed by the Company through a Change in Control Subject to this minimum, you
will be entitled to receive the retention bonus based on gross proceeds resulting from a
Change in Control as more particularly set forth in Schedule A hereto. If a payment
becomes due under this paragraph 1. the payment will be made in a single lump sum
payment, net of all Federal, state, local, or other taxes as are required to be withheld,
within thirty (30) days after the effective date of a Change in Control.

                        **2.    Effect of Termination.**

                        (a)    If, prior to the date that you become entitled to a payment under
Paragraph 1 of this Agreement, your employment with the Company is terminated by the
Company without "Cause" or you resign with "Good Reason" (as those terms are defined
in your employment agreement), you will be entitled to receive the retention bonus set
forth in Paragraph 1 of this Agreement, payable in a single lump sum payment, net of all
Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days
after the effective date of a Change in Control provided that such date is within six (6)
months of the effective date of your termination or resignation.

                        (b)    If, prior to the date that you become entitled to a payment under
Paragraph 1 of this Agreement, your employment with the Company is terminated for
any reason other than as described in Paragraph 2(a) of this Agreement, you will have no
right to receive a payment under this Agreement.

                        **3.    Binding Effect** This Agreement is personal to you and without the prior
written consent of the Company will not be assignable by you otherwise than by will or

                                                                                **Exhibit 1**

the laws of descent and distribution. This Agreement will inure to the benefit of and be enforceable by your legal representatives. This Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.

4.       **Employment Status.** This Agreement will not be deemed to create in or confer upon you any right to be retained in the employ of the Company or any subsidiary or other affiliate thereof.

5.       **Entire Agreement.** This Agreement contains the entire understanding of the Company and you with respect to the subject matter hereof.

6.       **Severability.** In the event any provision of this Agreement will be held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Agreement are not part of its provisions and will have no force and effect.

7.       **Amendment and Termination.** This Agreement may be amended or terminated at any time by written agreement of the parties hereto.

8.       **Applicable Law.** To the extent not preempted by the laws of the United States, the laws of the State of Florida, other than the conflict of law provisions thereof, will be the controlling law in all matters relating to this Agreement.

Yours truly,

VIZIQOR HOLDINGS, INC.

By:

Title: _CFO_

**ACCEPTED AND ACKNOWLEDGED:**

Name: Gordon Quick

## Schedule A

You will be entitled to receive an additional bonus based on the Gross Proceeds exchanged related to a Change in Control. For purposes hereof, Gross Proceeds shall mean an amount equal to (i) the aggregate fair market present value as of the closing of a Change in Control of any securities issued, earn-out granted and any cash consideration paid to the Company or its security holders and option holders plus (ii) the amount of any interest bearing indebtedness, capital leases and preferred stock obligations (other than any management fees payable) of the Company assumed or repaid by a purchaser in connection with a Change in Control plus (iii) liabilities assumed for contractual severance (for the avoidance of doubt, not adding back Retention Payments paid or payable pursuant to this incremental Retention Plan) relating to the management team plus (iv) any proceeds, net of taxes, received through the sale of any assets prior to a change of control less the sum of (v) any investment made by the existing investors after June 1, 2005 and any investment made by the existing investors or an acquirer in conjunction with the Change in Control. The fair market value of any such securities issued to the Company will be the value determined in good faith by the Company on the date of the closing of a Change in Control.

The payout amount for the additional bonus, payable upon a change of control, is shown in the following schedule, and adjusted by notes 1 and 2 below:

| Gross Proceeds to all Shareholders | Incremental % of Value | Value at High End of Range |
|---|---|---|
| excess of $0MM up to $3MM | 1 00% | 30 |
| excess of $3MM up to $8MM | 2 00% | 130 |
| excess of $8MM up to $13MM | 4 00% | 330 |
| excess of $13MM up to $18MM | 7.00% | 680 |
| excess of $18MM up to $25MM | 9.00% | 1,310 |
| excess of $25MM up to $30MM | 10.00% | 1,810 |
| excess of $30MM up to $40MM | 10.00% | 2,810 |

1. The incentive payment for asset sales is 4% of the net (after tax) proceeds, with any such payment credited toward the aggregate change of control payment
2. Cash payable on the change of control is reduced by any net option proceeds
3. Subject to Minimum Retention Payment of $250,000 as per Paragraph 1



August 29, 2005

Mr. William McCausland
17714 Drummer Lane
Wildwood. MO 63005

**Re:** **Retention Bonus Agreement**

Dear Bill:

I am pleased to inform you that you have been selected to be eligible to receive a retention bonus if you continue to be employed by Viziqor Holdings, Inc. (the "Company") through a Change in Control (as defined in the Viziqor Holdings. Inc. 2004 Stock Incentive Plan). This letter sets out the terms and conditions of the retention bonus arrangement (the "Agreement") between you and the Company.

### 1.    **Right to Payment.**

Subject to the terms and conditions of this Agreement, you will be entitled to receive a retention bonus of $50.000 if you continue to be employed by the Company through a Change in Control. In addition to this amount, you will be entitled to receive an additional bonus based on gross proceeds resulting from a Change in Control as more particularly set forth in Schedule A hereto. If a payment becomes due under this paragraph 1, the payment will be made in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control.

### 2.    **Effect of Termination.**

(a)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated by the Company without "Cause" or you resign with "Good Reason" (as those terms are defined in your employment agreement), you will be entitled to receive the retention bonus set forth in Paragraph 1 of this Agreement, payable in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control provided that such date is within six (6) months of the effective date of your termination or resignation.

(b)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated for any reason other than as described in Paragraph 2(a) of this Agreement, you will have no right to receive a payment under this Agreement.

**3.    Binding Effect.** This Agreement is personal to you and without the prior written consent of the Company will not be assignable by you otherwise than by will or

the laws of descent and distribution. This Agreement will inure to the benefit of and be enforceable by your legal representatives. This Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.

4.     **Employment Status**. This Agreement will not be deemed to create in or confer upon you any right to be retained in the employ of the Company or any subsidiary or other affiliate thereof.

5.     **Entire Agreement**. This Agreement contains the entire understanding of the Company and you with respect to the subject matter hereof.

6.     **Severability**. In the event any provision of this Agreement will be held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Agreement are not part of its provisions and will have no force and effect.

7.     **Amendment and Termination**. This Agreement may be amended or terminated at any time by written agreement of the parties hereto.

8.     **Applicable Law**. To the extent not preempted by the laws of the United States, the laws of the State of Florida, other than the conflict of law provisions thereof, will be the controlling law in all matters relating to this Agreement.

Yours truly,

VIZIQOR HOLDINGS, INC.

By:

Title: President & CEO

**ACCEPTED AND ACKNOWLEDGED:**

Name: William McCausland

## Schedule A

You will be entitled to receive an additional bonus based on the Gross Proceeds exchanged related to a Change in Control. For purposes hereof, Gross Proceeds shall mean an amount equal to (i) the aggregate fair market present value as of the closing of a Change in Control of any securities issued, earn-out granted and any cash consideration paid to the Company or its security holders and option holders plus (ii) the amount of any interest bearing indebtedness, capital leases and preferred stock obligations (other than any management fees payable) of the Company assumed or repaid by a purchaser in connection with a Change in Control plus (iii) liabilities assumed for contractual severance (for the avoidance of doubt, not adding back Retention Payments paid or payable pursuant to this incremental Retention Plan) relating to the management team less the sum of (iv) any investment made by the existing investors after June 1, 2005, and any investment made by the existing investors or an acquirer in conjunction with the Change in Control. The fair market value of any such securities issued to the Company will be the value determined in good faith by the Company on the date of the closing of a Change in Control.

The payout target for the additional bonus, payable upon a change of control, is $50,000 with the actual amount calculated as follows:

- Zero incentive payable if Gross Proceeds $10MM or less
- Target amount payable based on Gross Proceeds of $20 million
- Actual amount paid adjusted ratably up or down based on linear interpolation from $10MM to $20MM or more Gross Proceeds



August 29, 2005

Mr. John Trecker
1644 Lochrest
Chesterfield, MO 63017

#### Re:    Retention Bonus Agreement

Dear John:

I am pleased to inform you that you have been selected to be eligible to receive a retention bonus if you continue to be employed by Viziqor Holdings, Inc. (the "Company") through a Change in Control (as defined in the Viziqor Holdings, Inc. 2004 Stock Incentive Plan). This letter sets out the terms and conditions of the retention bonus arrangement (the "Agreement") between you and the Company.

#### 1.    Right to Payment.

Subject to the terms and conditions of this Agreement, you will be entitled to receive a retention bonus of $50,000 if you continue to be employed by the Company through a Change in Control. In addition to this amount, you will be entitled to receive an additional bonus based on gross proceeds resulting from a Change in Control as more particularly set forth in Schedule A hereto. If a payment becomes due under this paragraph 1, the payment will be made in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control.

#### 2.    Effect of Termination.

(a)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated by the Company without "Cause" or you resign with "Good Reason" (as those terms are defined in your employment agreement), you will be entitled to receive the retention bonus set forth in Paragraph 1 of this Agreement, payable in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control provided that such date is within six (6) months of the effective date of your termination or resignation.

(b)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated for any reason other than as described in Paragraph 2(a) of this Agreement, you will have no right to receive a payment under this Agreement.

3.    **Binding Effect.** This Agreement is personal to you and without the prior written consent of the Company will not be assignable by you otherwise than by will or

the laws of descent and distribution. This Agreement will inure to the benefit of and be enforceable by your legal representatives. This Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.

4.    **Employment Status.** This Agreement will not be deemed to create in or confer upon you any right to be retained in the employ of the Company or any subsidiary or other affiliate thereof.

5.    **Entire Agreement.** This Agreement contains the entire understanding of the Company and you with respect to the subject matter hereof.

6.    **Severability.** In the event any provision of this Agreement will be held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Agreement are not part of its provisions and will have no force and effect.

7.    **Amendment and Termination.** This Agreement may be amended or terminated at any time by written agreement of the parties hereto.

8.    **Applicable Law.** To the extent not preempted by the laws of the United States, the laws of the State of Florida, other than the conflict of law provisions thereof, will be the controlling law in all matters relating to this Agreement.

Yours truly,

**VIZIQOR HOLDINGS, INC.**

By.

Title: President & CEO

**ACCEPTED AND ACKNOWLEDGED:**

Name: John Trecker

## Schedule A

You will be entitled to receive an additional bonus based on the Gross Proceeds exchanged related to a Change in Control. For purposes hereof, Gross Proceeds shall mean an amount equal to (i) the aggregate fair market present value as of the closing of a Change in Control of any securities issued, earn-out granted and any cash consideration paid to the Company or its security holders and option holders plus (ii) the amount of any interest bearing indebtedness, capital leases and preferred stock obligations (other than any management fees payable) of the Company assumed or repaid by a purchaser in connection with a Change in Control plus (iii) liabilities assumed for contractual severance (for the avoidance of doubt, not adding back Retention Payments paid or payable pursuant to this incremental Retention Plan) relating to the management team less the sum of (iv) any investment made by the existing investors after June 1, 2005, and any investment made by the existing investors or an acquirer in conjunction with the Change in Control. The fair market value of any such securities issued to the Company will be the value determined in good faith by the Company on the date of the closing of a Change in Control.

The payout target for the additional bonus, payable upon a change of control, is $50,000 with the actual amount calculated as follows:

- Zero incentive payable if Gross Proceeds $10MM or less
- Target amount payable based on Gross Proceeds of $20 million
- Actual amount paid adjusted ratably up or down based on linear interpolation from $10MM to $20MM or more Gross Proceeds

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.           )
                               )
              Plaintiffs,      )
                               )
v.                             )        No.:   4:06CV637-SNL
                               )
VIZIQUOR SOLUTIONS, INC., et al. )
                               )
              Defendants.      )

### PLAINTIFFS' UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE MEMORANDUM OPPOSING DEFENDANTS' MOTIONS TO DISMISS AND FOR TRANSFER OR STAY

Viziquor Solutions has filed a motion to dismiss.  Quadrangle Group and Huber have filed a joint motion to dismiss, or alternatively, motion to transfer or stay.  These motions were filed on May 3, 2006.  Plaintiffs' responses are due on May 15, 2006.  Because of obligations in other cases, plaintiffs request that the Court extend the deadline for filing a response to defendants' motions up to and including May 22, 2006.  The defendants do not object to the relief sought in this motion.

GREEN JACOBSON & BUTSCH, P.C.

By:___/s/ Fernando Bermudez_____
       Martin M. Green, 3265
       Fernando Bermudez, 79964
       James J. Simeri, 102201
       Attorneys for Plaintiffs
       7733 Forsyth Boulevard, Suite 700
       Clayton, Missouri 63105
       Phone: (314) 862-6800
       Fax:   (314) 862-1606
       green@stlouislaw.com
       bermudez@stlouislaw.com
       simeri@stlouislaw.com

# CERTIFICATE OF SERVICE

    I certify that on May 10, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, and Charles A. Weiss.

    I certify that on May 10, 2006 copies of the foregoing were mailed to each of the following named non-participants in Electronic Case Filing: John L. Messenger, Weil, Gotshal & Manges LLP, 100 Federal Street, Floor 34, Boston, MA  02110.

                        ___/s/ Fernando Bermudez_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.            )
                               )
                Plaintiffs,     )
                               )
v.                             )        No.:   4:06CV637-SNL
                               )
VIZIQUOR SOLUTIONS, INC., et al. )
                               )
                Defendants.     )

## PROPOSED ORDER

Plaintiffs' unopposed motion for extension of time to file memorandum

opposing defendants' motions to dismiss and for transfer or stay is granted.

Plaintiffs granted up to and including May 22, 2006 to file their response.

**SO ORDERED:**


_____        **Dated: _____**
**Stephen N. Limbaugh**
**United States District Judge**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.              )
                                  )
                    Plaintiffs,   )
                                  )
v.                                )        No.:   4:06CV637-SNL
                                  )
VIZIQOR SOLUTIONS, INC., et al.   )
                                  )
                    Defendants.   )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO MOTION TO DISMISS, TRANSFER AND STAY

Viziqor Solutions, Michael Huber and Quadrangle Group (collectively

"defendants") filed two motions making similar arguments and seeking similar relief.

This memorandum by plaintiffs address both motions.  Essentially, defendants seek any

type of relief that would prevent this Court from ruling on the merits of the complaint.

They seek a stay, dismissal or transfer of venue because Woodmont Holdings, a former

defendant now dismissed, filed for bankruptcy in Delaware.  The defendants are not

entitled to relief and this Court should proceed with adjudicating the breach of contracts

and fraud claims against defendants.

## I.  Facts

Gordon Quick, William McCausland and John Trecker (collectively "plaintiffs")

sued defendants and Woodmont Holdings in a Missouri state court.  They alleged that

Viziqor and Woodmont breached their Employment Agreements and their Retention

Bonus Agreements (collectively the "Agreements) by failing to pay them their severance

pay. Woodmont was a party to the Agreements and Viziqor was alleged to be an alter-ego of Woodmont because Viziqor was the operating entity while Woodmont was merely the holding company for Viziqor stock. They also alleged that Quadrangle breached a separate contract with them that guaranteed the payments under the Agreements. Alternatively, they alleged that Huber and Quadrangle committed fraud by falsely representing to plaintiffs that Quadrangle would guarantee the payments under the Agreements.

Immediately after plaintiffs filed their lawsuit, Woodmont filed its bankruptcy petition in Delaware. Plaintiffs then moved to dismiss Woodmont. The remaining defendants timely removed the case to this Court and the Court allowed the dismissal. The defendants now seek to have this case stayed, dismissed or transferred to Delaware to prevent the plaintiffs from obtaining a just and orderly trial on the merits.

## II. Defendants are not entitled to a stay.

The defendants request a stay of this case until Woodmont's liability is established in the bankruptcy court. This relief is frequently requested by defendants when a co-defendant files for bankruptcy. Courts have uniformly rejected relief. For example, in *Lynch v. Johns-Manville*, 710 F.2d 1194 (6th Cir 1983) a defendant requested a stay after a co-defendant filed for bankruptcy. As here, the defendant invoked every conceivable basis for a stay including the designation of the bankrupt co-defendant as an indispensable party under Rule 19. The court summarily rejected the arguments finding

that parties that are jointly liable are permissive, not indispensable, parties and therefore refused to grant a stay. *Id*. at 1198. It also rejected the argument that failure to grant a stay may result in duplicative litigation with possibly inconsistent verdicts. The court found that "any duplicative or multiple litigation which may occur is a direct by-product of bankruptcy law. As such, the duplication, to the extent that it may exist, is congressionally created and sanctioned." *Id*. at 1199. As in *Lynch*, there is no basis for defendants' request for a stay pending the resolution of Woodmont's bankruptcy which could go on for years.

Furthermore, a plaintiff is the master of his complaint and may choose who to sue, who not to sue and where to sue. *Lincoln Prop. Co. v. Roche*, __ U.S. __, 126 S.Ct. 606 (2005). Defendants' suggestion that this Court issue a stay and force plaintiffs to adjudicate Woodmont's liability in Delaware squarely violates plaintiffs' choice of who to sue and where to sue them. At this stage, plaintiffs have chosen to sue the defendants in Missouri. They have not chosen to sue Woodmont in Delaware. This choice should be respected. For this reason, courts have found that a plaintiff would be prejudiced by a stay to force a plaintiff to sue another party in another jurisdiction.

> Although district courts have broad power to stay pending proceedings, a
> stay is inappropriate here. Contrary to [defendant's] claim, [plaintiff] *will*
> be prejudiced by a stay. Even if a state court provides [plaintiff] with a
> forum to raise all of its claims relating to this dispute, it is not the forum
> that [plaintiff] chose. [Plaintiff] is entitled to enforce its rights as it chooses
> ....

*Hedman, Gibson, Costigan & Hoarse v. Sullivan*, 775 F. Supp. 658, 659 (N.Y.S.D. 1991). Similarly, defendants' suggestion that this Court should issue a stay to force plaintiffs to adjudicate their claim against Woodmont in Delaware should be denied.

## III.  Defendants are not entitled to dismissal for failure to join an allegedly indispensable party.

In a related point, defendants request that the Court dismiss the case under Rule 12(b)(7) for plaintiff's failure to join an indispensable party. Rule 12(b)(7) explicitly incorporates Rule 19 concerning who is an indispensable party.

Determining who is an indispensable party is a two step process. First, the court must determine whether the party is a necessary party under Rule 19(a). If the party is not deemed a necessary party, the analysis ends and relief is denied. *Gwartz v. Jefferson Memorial Hosp.*, 23 F.3d 1426, 1428 (8th Cir. 1994)("If the person is not necessary, then the case must go forward without him and there is no need to make a Rule 19(b) inquiry."). If the party is deemed a necessary party, it should be joined in the litigation. If the necessary party cannot be joined, the court must determine whether the party is indispensable under Rule 19(b). If the party is deemed an indispensable party, the action should be dismissed. *Janney Montgomery Scott, Inc. v. Shepard Niles*, 11 F.3d 399 (3rd Cir. 1993).

## A.  Woodmont is not a necessary party.

Woodmont is a necessary party under Rule 19(a) only if:

> (1) in [Woodmont's] absence complete relief cannot be accorded among [plaintiffs and defendants], or (2) [Woodmont] claims an interest relating to the subject of the action and is so situated that the disposition of the action in [Woodmont's] absence may (i) as a practical matter impair or impede [Woodmont's] ability to protect that interest or (ii) leave [plaintiffs or defendants] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Rule 19(a).

It is impossible to determine which of the criteria in Rule 19(a) the defendants believe has been satisfied because their memoranda fails to apply the criteria to the facts of this case.[1]  Nevertheless, even a cursory analysis shows that Woodmont does not meet any of the criteria to be deemed a necessary party.

## Rule 19(a)(1)

Rule 19(a)(1) concerning complete relief "relates to those persons already parties and does not concern any subsequent relief via contribution or indemnification for which the absent party might later be responsible."  *Bedel v. Thompson*, 103 F.R.D. 78, 80 (S.D. Ohio 1984).  Here, as in *Bedel*, a bankrupt company was not joined as a defendant even though it was jointly and severally liable to the plaintiff.  The court concluded, however,

---

[1]  For example, citing two old cases, Viziqor summarily states that the general rule is that all parties to a contract must be joined.  (Viziqor memorandum at 3).  Amazingly, neither case deals with Rule 19 which was completely rewritten 13 years *after* the more recent of the two cited cases or even with the old version of the Rule.  More amazing, the only place that the court in *Greer v. Scearce*, 53 F. Supp. 807, 811 (W.D. Mo. 1944) cites the "rule" is when it was reciting the argument made by one of the parties.  In the court's analysis, it rejected the "rule".  *Id.*

5

that "[a] plaintiff is under no requirement to join all parties who might be jointly and severally liable." *Id.* at 81.  The Court can easily grant plaintiffs full relief if they win any of their claims.  The Court can simply issue a routine money judgment against the defendants.  Unlike, for example, cases where the court is asked to issue specific performance against a non-party, this Court faces no obstacle in ordering all of the relief that plaintiffs seek.[2]

<center>Rule 19(a)(2)(i)</center>

Rule 19(a)(2)(i) concerns whether, as a practical matter, Woodmont's interests will be compromised by not being included in this case.  In the Delaware bankruptcy, Woodmont has already admitted that it owes the plaintiffs the money that they seek under the Agreements.  (Exhibit 1; transcript of May 2006 hearing which will be filed as soon as it is available).  Thus, from Woodmont's perspective there is no real issue concerning liability or damages.  From the perspective of the defendants in this case, the only real issue will be whether plaintiffs can prove their alter-ego allegations against Viziqor or, alternatively, whether they can prove the breach of the separate contract or fraudulent

---

[2] Defendants' exposition about the public's interest in avoiding multiple lawsuits is largely taken out of context.  (Quadrangle and Huber memorandum at 4-5).  Rule 19 explicitly contemplates the possibility of multiple lawsuits.  The advisory committee notes quoted by Quadrangle and Huber do not condemn multiple lawsuits generally.  They condemn multiple lawsuits if the first lawsuit grants "partial or hollow" relief to the parties before the court.  Advisory committee notes to Rule 19(a)(1).  As plaintiffs have just explained, this Court's judgment will grant complete relief to the parties before it.  Rule 19 does not condemn subsequent contribution or indemnification lawsuits.

<center>6</center>

statements by Quadrangle and Huber.  In no way will Woodmont's interests be
compromised by a judgment against the defendants in this case.  Woodmont filed for
bankruptcy, not Viziqor.  Regardless of what happens in this Court, Woodmont's assets
are protected by the bankruptcy.  A finding of alter-ego would allow plaintiffs to pursue
Viziqor's assets but those of Woodmont would still be protected by the bankruptcy court.

Should defendants seek contribution or indemnification from Woodmont, they can
do so in Delaware.  Because Woodmont is not a party here, the defendants cannot use
offensive collateral estoppel or res judicata against Woodmont in Delaware if the
defendants were found liable in Missouri.  Likewise, plaintiffs could not use any
preclusive effect of a judgment in this case against Woodmont if they later choose to
pursue those claims.  In short, Woodmont's legal interests and financial obligations
cannot be affected, in any way, by what happens in this Court.  *See Bedel*, 103 F.R.D. at
81.  If plaintiffs or defendants later choose to go after Woodmont's assets, they will have
to go through the bankruptcy court without the benefit of any preclusive effect by this
Court's judgment.  "[A] defendant's right to contribution or indemnity from an absent
party who may be jointly liable to the plaintiff does not render the absentee an
indispensable party under Rule 19."  *Standard Chlorine v. Sinibaldi*, 821 F. Supp. 232,
260 (D. Del. 1992).

Rule 19(a)(2)(ii)

Rule 19(a)(2)(ii) addresses whether there is a substantial risk of double, multiple or inconsistent obligations to the defendants.  As mentioned earlier, Woodmont has judicially admitted its liability to plaintiffs thus there is little risk of inconsistent verdicts to the defendants.  Regardless, the small, hypothetical chance of inconsistent verdicts is not enough to meet Rule 19(a)(2)(ii) requirements.  "Rule 19 does not speak of inconsistent 'results.'  Rather, it speaks of inconsistent 'obligations.'" *Bedel,* 103 F.R.D. at 81.  "A finding of liability in this action coupled with a determination by the Bankruptcy Court of no entitlement to contribution or indemnification would subject defendant [] to but one judgment 'obligation.' ... [A] determination in the Bankruptcy Court of no liability on the part of the [bankrupt] would impose no 'obligation' on the part of the defendant ...."  *Id.*  (Denying motion to dismiss under Rule 19 and motion for stay due to bankruptcy of co-defendant.)

Defendants have failed to meet any of the criteria in Rule 19(a) and Woodmont is not a necessary party.  As such, this Court's analysis should end and defendants' motion to dismiss should be denied.  If for some reason this Court were to address whether Woodmont is an indispensable party under Rule 19(b), it would find that it is not.[3]

---

[3] For purposes of this motion, plaintiffs will assume that Woodmont cannot be joined in this case because of the bankruptcy stay.

8

**B. Woodmont is not an indispensable party under Rule 19(b).**

Rule 19(b) outlines four non-exhaustive factors to determine whether a necessary party is also an indispensable party. Those factors are the possible prejudice to the parties in the case and the parties not in the case, the ability of the Court to minimize the prejudice, the adequacy of the judgment and whether dismissal leaves the plaintiff with an adequate remedy. These factors are not analyzed mechanically but rather inform the court's decision about whether dismissal can be ordered in good conscience. *Colorado Nat. Bank v. Adventura Assoc.*, 757 F. Supp. 1167, 1169 (D. Colo. 1991).

As discussed earlier, there is no prejudice in allowing this case to proceed as the Court can issue complete and effective relief. Defendants are under the mistaken notion that because this Court will address whether Woodmont has failed to meet its obligations under the Agreements, Woodmont is a necessary and indispensable party. It is not. It is a rare case where a court is not asked to look at the conduct of a nonparty to determine whether a defendant is liable. In a construction case, the court may look to the performance/nonperformance of a subcontractor to determine whether a contractor is liable to a property owner. In an automobile accident case, the court usually looks to the responsibility of an employee to determine whether the employer is liable to the victim. Yet, in neither case is the subcontractor or employee an indispensable party. In fact, it is typically the defendant who chooses whether to bring in the third party by filing a cross-claim.

9

For these reasons, the vast majority of courts that have determined whether absent parties are indispensable have found that they are not. *Bendel* provides an indistinguishable parallel. In that case, plaintiffs filed a case against corporate directors, an accounting firm and underwriters of an initial public offering alleging securities violations. The plaintiffs did not sue the corporation whose securities underlay the action because the corporation filed for bankruptcy. As here, the defendants asked the court to dismiss the action claiming that the corporation was an indispensable party. The court did not reach the issue of whether the corporation was an indispensable party under Rule 19(b)(2) because it found that the corporation was not even a necessary party under Rule 19(b)(1). *Bedel*, 103 F.R.D. at 80-81. The fact that the bankrupt corporation's conduct would be considered by the court did not make the corporation an indispensable party. *See also Adventura*, 757 F. Supp. at 1168-69 (bankrupt guarantor not a necessary or indispensable party in a loan default case).

Another analogous case is *FinanceAmerica Credit Corp. v. Kruse Classic Auction Co.,* 428 F. Supp. 135 (E.D. Penn. 1977). In that case, Kruse guaranteed payment on a debt that the borrower, Egidi, owed to FinanceAmerica. FinanceAmerica alleged that Egidi defaulted on the loan and that Kruse failed to make good on the guarantee. FinanceAmerica sued Kruse but not Egidi. As with the defendants in this case, Kruse moved to dismiss, transfer or stay the action. The court denied all relief. It found that "a surety can be sued separately from the principal and that the principal is not an

10

indispensable party ... FinanceAmerica may pursue its remedies against Kruse without

concern as to any available remedies against Egidi." *Id*. at 137.  These facts are

indistinguishable from the facts before this Court.  In both cases, the default of an absent

party is a prerequisite to recovery against the defendants.  That fact, however, does not

make the absent party an indispensable party.  *See also Hedman, Gibson, Costigan &*

*Hoare v. Sullivan*, 775 F. Supp. 658 (S.D.N.Y. 1991)(Rule 19 does not require a plaintiff

to sue the principal or even all of the guarantors of a debt.  Plaintiff "is entitled to enforce

its rights as it chooses."); *Southern Railway System v. Leyden Shipping*, 290 F. Supp.

742, 744 (S.D.N.Y. 1968)("Thus, even if the plaintiff here, for business reasons, sought

collection from [a secondarily liable party] rather than from parties who might be

primarily liable, [] joinder of the [primarily liable party] is not dictated by Rule 19.")

Thus, both in the context of a co-defendant seeking bankruptcy protection and in

the context of a plaintiff suing defendants that are not primarily liable, courts have not

required that plaintiffs join the missing party and have allowed the cases to proceed.

**IV.  This case should not be transferred to Delaware.**

Although defendants cite 28 U.S.C. §§1404(a) and 1412 as statutory support for

transferring this case to Delaware, they spend their whole analysis on 28 U.S.C.

§1404(a).  "Because of [sic] the higher transfer standard under section 1404(a) is

unequivocally met in this matter, this memorandum focuses on this standard."  (Huber

and Quadrangle memorandum at 8).  That section provides that "[f]or the convenience of

11

the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division *where it may have been brought*." (Emphasis added.]

Defendants properly point out that there is complete diversity between the plaintiffs and defendants so the federal courts have subject matter jurisdiction under 28 U.S.C. §1332. Defendants err, however, in not properly considering venue. A civil action may only be brought in (and therefore transferred to) a district where venue is proper. *FinanceAmerica*, 428 F. Supp. at 137. In a diversity case, venue is proper only in a district 1) where all defendants reside; 2) where a substantial part of the events or omissions giving rise to the claim occurred; or 3) where a defendant is subject to jurisdiction if no other district exists where the action may otherwise be brought. 42 U.S.C. §1391(a). Because Huber and Quadrangle are New York residents, not all of the defendants reside in Delaware therefore it is not a proper venue under the first option. Because a substantial part of the events or omissions giving rise to the claim did not occur in Delaware, it is not a proper venue under the second option. The contracts were not negotiated in Delaware. Plaintiffs employment obligations were primarily in Missouri with some duties in Florida. Defendants had no obligations to plaintiffs in Delaware. None of the contemplated witnesses live in Delaware. The bulk of the documents relevant to this litigation are in Florida and Missouri not in Delaware. In short, nothing relevant to this case occurred in Delaware. Because defendants do not

12

challenge this Court's venue over the case, they implicitly acknowledge (and waive any objection to) this Court's venue.  Accordingly, Delaware is not a proper venue under the third option because the case could have been brought in Missouri.

Defendants' argument that the case could have been brought in Delaware because it is the "home court" venue for any bankruptcy related matters misses the point.  The argument is flawed because it ignores the tense of 28 U.S.C. §1404(a).  That section is written in the past tense and provides for transfer to a "district or division where it *might have been* brought."  (Emphasis added.)  It does not provide for transfer to a "district or division where it can now be brought."  When plaintiffs filed their lawsuit, there was no bankruptcy proceeding.  Woodmont filed for bankruptcy *after* plaintiffs filed their case.  There was no "home court" bankruptcy venue when plaintiffs filed their case.  The Woodmont bankruptcy plays no role in determining where the case could have been brought for purposes of  28 U.S.C. §1404(a).

In *Hoffman v. Blaski*, 363 U.S. 340 (1960), the Supreme Court rejected an interpretation that "might have been brought" is equivalent of "could now be brought."  "But we do not see how the conduct of a defendant after suit has been instituted can add to the forums where 'it might have been brought.'  In the normal meaning of words this language of Section 1404(a) directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted."  *Id.* at 343.  When

plaintiffs filed their suit, Delaware was not a jurisdiction where they could have brought their suit and it is not now a jurisdiction where this Court can transfer the case.

As discussed earlier, defendants refer to but spend very little time analyzing 28 U.S.C. §1412 as independent statutory authority for change of venue.  It provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  It is not surprising that defendants spent little effort analyzing this section because it does not apply to the case before this Court.  This is not a case "under title 11."  Federal bankruptcy courts have jurisdiction over: 1) proceedings under title 11; 2) proceedings arising under rule 11; 3) proceedings "arising in" a case under title 11; and 4) proceedings "related to" a case under title 11.  *Sosna v. Iowa*, 419 U.S. 393 (1975). Assuming for the moment that, as suggested by defendants, the Delaware bankruptcy court could have "related to"[4] jurisdiction over this case, the transfer statute, by its very terms, only applies to proceedings "under title 11" and not those "related to" title 11. *Rumore v. Wamstad*, No. 01:2997, 2001 U.S. Dist. LEXIS 19064 at 6-8 (E.D. La. Nov. 13, 2001).  Proceedings involving the bankruptcy petition itself are the only proceedings

---

[4] Of course the bankruptcy court does not have jurisdiction over this case because, as explained earlier, nothing that this Court does can affect the assets or legal rights of Woodmont therefore this action is not "related to" the bankruptcy.  *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999).

"under title 11" and thus subjet to transfer of venue under 28 U.S.C. §1412.  *Id*.  Thus,

the statute provides no statutory authority for transfer of venue.[5]

For all of these reasons, defendants effort to derail this litigation fails.  The Court

should deny all motions and proceed with adjudicating this case on its merits.

GREEN JACOBSON & BUTSCH, P.C.


By:___/s/ Fernando Bermudez_____
  Martin M. Green, 3265
  Fernando Bermudez, 79964
  James J. Simeri, 102201
  Attorneys for Plaintiffs
  7733 Forsyth Boulevard, Suite 700
  Clayton, Missouri 63105
  Phone: (314) 862-6800
  Fax: (314) 862-1606
  green@stlouislaw.com
  bermudez@stlouislaw.com
  simeri@stlouislaw.com

## CERTIFICATE OF SERVICE

I certify that on May 22, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, and Charles A. Weiss.

I certify that on May 22, 2006, copies of the foregoing were mailed to each of the following named non-participants in Electronic Case Filing: John L. Messenger, Weil, Gotshal & Manges LLP, 100 Federal Street, Floor 34, Boston, MA  02110.

---

[5] Even if the court were to apply the criteria in the statute, it would find that transfer is inappropriate.  None of the parties or witnesses live in Delaware while all of the plaintiffs live in Missouri.  The majority of the relevant documents are in Missouri and Florida not Delaware.  None of the relevant conduct occurred in Delaware.

_____/s/ Fernando Bermudez_____

## UNITED STATES DISTRICT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No.:  4 06 CV 00637 SNL |
| | ) | |
| v. | ) | |
| | ) | |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

### UNCONTESTED MOTION FOR ADDITIONAL TIME TO FILE REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(7) OR, ALTERNATIVELY, TO TRANSFER OR STAY

Defendants Quadrangle Group LLC and Michael Huber request one additional week, up to and including Thursday, June 8, 2006, within which to file their reply memorandum in support of their motion to dismiss or, alternatively, to transfer or stay.

Defendants' undersigned attorney represents that he has spoken with plaintiffs' attorney and plaintiffs consent to this motion.

BRYAN CAVE LLP


By_____/s/ Charles A. Weiss_____
        Charles A. Weiss
        211 N. Broadway, Suite 3600
        St. Louis, MO  63102
        (314) 259-2215
        Facsimile:  (314) 259-2020
        Attorney for Defendant

        James L. Messenger
        Weil, Gotshal & Manges
        100 Federal Street, Floor 34
        Boston, Massachusetts 02110
        Of Counsel
        Attorneys for Quadrangle Group LLC
        and Michael Huber

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

**Martin M. Green**
mann@stlouislaw.com

**Fernando Bermudez**
bermudez@stlouislaw.com

**Michael A. Clithero**
mclithero@blackwellsanders.com

**Christopher A. Perrin**
cperrin@blackwellsanders.com

and by facsimile and First Class U.S. Mail to:

**John T. Carroll, III**
Cozen O'Conner
Chase Manhattan Center
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
(302) 295-2013 (Facsimile)

/s/ Charles A. Weiss

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GORDON QUICK, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.:   4:06CV637-SNL |
| | ) | |
| VIZIQUOR SOLUTIONS, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF NAME CHANGE**

Green Schaaf & Jacobson, P.C., attorneys for plaintiffs Gordon Quick, et al.

has changed its name. The new name is: Green Jacobson & Butsch, P.C. Our

address and telephone numbers are unchanged. We request that the Clerk and all

parties update their records to reflect this change.

GREEN JACOBSON & BUTSCH, P.C.


By:   /s/ Fernando Bermudez
        Martin M. Green, 3265
        Fernando Bermudez, 79964
        James J. Simeri, 102201
        Attorneys for Plaintiffs
        7733 Forsyth Boulevard, Suite 700
        Clayton, Missouri 63105
        Phone: (314) 862-6800
        Fax:    (314) 862-1606
        bermudez@stlouislaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 30, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, and Charles A. Weiss.

I certify that on May 30, 2006 copies of the foregoing were mailed to each of the following named non-participants in Electronic Case Filing: John L. Messenger, Weil, Gotshal & Manges LLP, 100 Federal Street, Floor 34, Boston, MA  02110.


_____ /s/ Fernando Bermudez_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM )
MCCAUSLAND and JOHN TRECKER, )
)
    Plaintiffs, )
)
v. )    Case No. 06CV-00637 SNL
)
VIZIQOR SOLUTIONS, INC., )
WOODMONT HOLDINGS, INC., )
MICHAEL HUBER, and )
QUADRANGLE GROUP, LLC, )
)
    Defendants. )

**UNCONTESTED MOTION FOR ADDITIONAL TIME TO
FILE REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS**

    Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc. ("FTS")

requests one additional week, up to and including Thursday, June 8, 2006 within which to file its

Reply Memorandum in Further Support of Motion to Dismiss.  Counsel for defendants Michael

Huber and Quadrangle Group, LLC have spoken with plaintiffs' attorney and plaintiffs consent

to this motion.

              BLACKWELL SANDERS PEPER MARTIN LLP


              By    /s/ Michael A. Clithero
                    Michael A. Clithero, #2829
                    Christopher A. Perrin, # 502086
                    720 Olive Street, 24th Floor
                    St. Louis, MO 63101
                    (314) 345-6000
                    (314) 345-6060 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2006, I electronically filed a copy of the foregoing UNCONTESTED MOTION FOR ADDITIONAL TIME TO FILE REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.

_____ /s/ Michael A. Clithero _____

## UNITED STATES DISTRICT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) ) | |
|     Plaintiffs, | ) ) | No.:  4 06 CV 00637 SNL |
| v. | ) ) | |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) ) | |
|     Defendants. | ) | |

### ENTRY OF APPEARANCE

Comes now Timothy C. Mooney, Jr., of the law firm Bryan Cave LLP, and enters his appearance on behalf of defendants Quadrangle Group LLC and Michael Huber.


                              BRYAN CAVE LLP


                              By    /s/ Timothy C. Mooney, Jr.    
                                      Charles A. Weiss
                                      Timothy C. Mooney, Jr.
    211 N. Broadway, Suite 3600
    St. Louis, MO  63102
    (314) 259-2000
    Facsimile:  (314) 259-2020

    James L. Messenger
    Weil, Gotshal & Manges
    100 Federal Street, Floor 34
    Boston, Massachusetts 02110
    Of Counsel
    Attorneys for Quadrangle Group LLC
    and Michael Huber

**CERTIFICATE OF SERVICE**

       I hereby certify that on June 2, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

**Martin M. Green**
mann@stlouislaw.com

**Fernando Bermudez**
bermudez@stlouislaw.com

**Michael A. Clithero**
mclithero@blackwellsanders.com

**Christopher A. Perrin**
cperrin@blackwellsanders.com

                          /s/ Timothy C. Mooney, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM   )
MCCAUSLAND and JOHN TRECKER, )
             )
  Plaintiffs,       )
             )
v.            )   Case No. 06CV-00637 SNL
             )
VIZIQOR SOLUTIONS, INC.,   )
WOODMONT HOLDINGS, INC.,  )
MICHAEL HUBER, and    )
QUADRANGLE GROUP, LLC,   )
             )
  Defendants.      )

**DEFENDANT FORMULA TELECOM SOLUTIONS, INC.'S
REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS**

In opposing Defendant Formula Telecom Solutions, Inc., f/k/a Viziqor Solutions, Inc. ("FTS")'s Motion to Dismiss, Plaintiffs Gordon Quick, William McCausland, and John Trecker ("Plaintiffs") ignore the significance of their allegation that FTS is an alter-ego of bankrupt Woodmont Holdings, Inc. f/k/a Viziqor Holdings, Inc. ("Woodmont Holdings"). Because Plaintiffs allege that FTS is an alter ego of Woodmont Holdings, Woodmont Holdings/the bankruptcy trustee *must* be a party to this action under Rule 19. As one court has explained in similar circumstances:

> [I]mplicit in a determination that the defendants are the alter ego of the bankrupt would be a finding that the defendants have assets which are indistinguishable from those of the bankrupt or have assets which belong to the bankrupt. Examining subdivision (a)(1)-(2) of Rule 19, it appears that the Court may not be able to fashion full relief among the parties without the presence of the trustee.

*Steyhr Daimler Puch of Amer. v. Pappas*, 35 B.R. 1001, 1003 (E.D. Va. 1983).

Plaintiffs concede that if they "choose to go after Woodmont [Holdings]'s assets, *they will have to go through the bankruptcy court*." (Plaintiffs' Memorandum in Opposition to

Motion to Dismiss, Transfer and Stay ("Opp. Memo") at page 7 (emphasis added).) The upshot of their allegation that FTS is the alter ego of Woodmont Holdings is, however, that FTS and Woodmont should be treated as a single entity. If FTS is the alter ego of Woodmont Holdings, then FTS's assets are property of the Woodmont Holdings bankruptcy estate. *See*, *e.g.*, *In re Estate of Graven*, 64 F.3d 453, 455 (8th Cir. 1995) (affirming district court order for alter egos to turn over their assets to the bankruptcy estate); *In re Americana Services, Inc.*, 173 B.R. 650, 653 (Bkrtcy. W.D.Mo. 1994) (noting that bankruptcy trustee can bring alter ego action to bring assets into the bankruptcy estate); *In re Schimmelpenninck*, 183 F.3d 347, 366 (5th Cir. 1999) (holding that "any veil-piercing action vis-à-vis [debtor] and its affiliated companies to be 'property of the estate' for purposes of [debtor's] bankruptcy proceedings"). Accordingly, based on Plaintiffs' alter ego allegations, this action as against FTS should be maintained as part of the Woodmont Holdings bankruptcy.

Still further, Plaintiffs concede that their only link to FTS is through these alter ego allegations. Specifically, aside from the allegations in their original Petition, Plaintiffs assert that "[f]rom the perspective of the defendants in this case, *the only real issue will be whether plaintiffs can prove their alter-ego allegations against Viziqor [FTS]* or, alternatively, whether they can prove the breach of the separate contract or fraudulent statements by [the other defendants]." (Opp. Memo. at pages 6-7 (emphasis added).) Thus, there appear to be only two options with respect to Plaintiffs' claim against FTS: (i) FTS is the alter ego of Woodmont, and Plaintiffs need to proceed in the bankruptcy action; or (ii) FTS is not the alter ego of Woodmont, and Plaintiffs have no claim against FTS.

* * * * *

WHEREFORE, Defendant Formula Telecom Solutions, Inc. prays that this Court enter

its order dismissing the case pending before this Court[1] and granting such other and further relief

as is just and proper under the circumstances of this case.

BLACKWELL SANDERS PEPER MARTIN LLP

By     /s/ Christopher A. Perrin
      Michael A. Clithero, #2829
      Christopher A. Perrin, # 502086
      720 Olive Street, 24th Floor
      St. Louis, MO 63101
      (314) 345-6000
      (314) 345-6060 (facsimile)

---

[1] Alternatively, this court should stay this action, as numerous other courts have done where a plaintiff has sued a non-debtor defendant when that defendant is allegedly the debtor's alter ego. *See*, *e.g.*, *In re Schimmelpenninck*, 183 F.3d 347 (5th Cir. 1999) (citing  numerous cases).  Or, as another alternative, this Court could order that the Woodmont Holdings bankruptcy trustee be added as a plaintiff and transfer the case to the bankruptcy court.  Plaintiffs assertion that "Delaware was not a jurisdiction where they could have brought their suit"—in an effort to avoid transfer under 28 U.S.C. § 1404—is overstated.  Both Woodmont Holdings and FTS are Delaware corporations and as such, are subject to jurisdiction in Delware.  A suit as against FTS could have been brought in Delaware under 28 U.S.C. § 1391, and therefore, transfer to Delaware under § 1404 is permissible.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 8, 2006, I electronically filed a copy of the foregoing REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.

_____/s/ Christopher A. Perrin_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

_____
)
GORDON QUICK, WILLIAM       )
MCCAUSLAND and JOHN TRECKER,  )
       *Plaintiffs,*      )
          )
    v.           )    C.A. 4:06-cv-00637-SNL
          )
VIZIQOR SOLUTIONS, INC.,     )
MICHAEL HUBER, and       )
QUADRANGLE GROUP, LLC,     )
       *Defendants.*     )
_____)

## DEFENDANTS MICHAEL HUBER'S AND
## QUADRANGLE GROUP, LLC'S REPLY BRIEF

## I.    INTRODUCTION

In their Opposition, Plaintiffs allege that the Missouri Action should proceed in tandem

with the Delaware Bankruptcy Proceeding.  Relying principally upon cases in which plaintiffs

seek to hold defendants jointly and severally liable, Plaintiffs claim that Defendants fail to satisfy

the requirements needed to dismiss, transfer or stay the Missouri Action.  However, Plaintiffs'

argument does not account for the fact that Quadrangle Group, LLC ("Quadrangle") and Michael

Huber ("Huber") have been sued on a contingent liability theory where the primary alleged

obligor is in bankruptcy.  Moreover, Plaintiffs do not account for the fact that they seek to hold

Viziqor Solutions, Inc. ("Viziqor") and Woodmont Holdings, Inc. ("Woodmont") liable as one

another's alter egos.  In such circumstances, any finding for or against Viziqor certainly would

impact Woodmont's estate (in fact, any alter ego claim necessarily must be brought by the

chapter 7 trustee).  Further, Plaintiffs misinterpret the transfer powers permitted by section 1412.

As further demonstrated herein, Plaintiffs' arguments fail as a matter of law and fact.

Not surprisingly, the law is consistent with common sense – the Missouri Action should not

proceed simultaneously with the Delaware Bankruptcy Proceeding when the legal and factual issues in the two actions completely overlap with one another.

## II.    THE COURT SHOULD STAY THE CASE PENDING THE COMPLETION OF WOODMONT'S BANKRUPTCY PROCEEDINGS.

As set forth in Defendants' Memorandum of Law in Support of Their Motion to Dismiss, if the Defendants' Motion to Dismiss is not allowed, the Court should stay this case pending the completion of Woodmont's bankruptcy proceedings.  In their response, Plaintiffs allege that the courts have "uniformly rejected" staying cases based on the bankruptcy proceedings of a co-defendant.  Plaintiffs' assertion is simply inaccurate.  See e.g., A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994 (4th Cir. 1986); In re North Star Contracting Corp., 125 B.R. 368 (S.D.N.Y. 1991); Trimec, Inc. v. Zale Corp., 150 B.R. 685 (N.D. Ill. 1993).

As a general proposition, the automatic stay provision of the Bankruptcy Code, 11 U.S.C. §362(a)(1), bars actions against the debtor and typically does not extend to solvent co-defendants.  C.H. Robinson Co. v. Paris & Sons, Inc., 180 F. Supp.2d 1002, 1009-10 (N.D. Iowa 2001), (citing Sav-A-Trip, Inc. v. Belfort, 164 F.3d 1137, 1139 (8th Cir. 1999)).  However, the Eighth Circuit has recognized that extension of the automatic stay to a debtor's co-defendants is proper in "unusual circumstances."  Id.  Specifically, an automatic stay is appropriate "when there is such identity between the debtor and the [non-debtor co-defendant] that the debtor may be said to be the real party defendant and ... a judgment against the [non-debtor co-defendant] will in effect be a judgment or finding against the debtor."  Robins, 788 F.2d at 999.

Critically, where the requirements of the automatic stay have been met, the district court does not have discretion to refuse implementation of the stay.  Pursuant to the plain language of the Bankruptcy Code, if the automatic stay is appropriate, the Court must stay other proceedings

pending the resolution of the bankruptcy proceedings. Those requirements have been met in this case, and the case must be stayed.

### A.     The Automatic Stay Applies To This Case.

The "unusual circumstances" exception applies here with respect to all of the defendants. First, Plaintiffs' allegations against Viziqor present "unusual circumstances" which would justify staying this case, because Plaintiffs have alleged that Viziqor and Woodmont have a common identity, and any judgment against Viziqor is effectively a judgment against Woodmont. Ultimately, Plaintiffs' alter ego claim against Viziqor is a thinly-veiled attempt to circumvent Woodmont's bankruptcy protections at the expense of Woodmont's creditors by seeking to recover Woodmont's assets without filing a claim in bankruptcy court. Plaintiffs allege Viziqor is the alter ego of Woodmont and any obligations of Woodmont under the agreements can be satisfied by its alter ego, Viziqor. Thus, to find liability against Viziqor, this Court must pierce Woodmont's corporate veil and find Viziqor is Woodmont's alter ego, and Viziqor's assets are, in fact, Woodmont's assets.[1] If successful, Plaintiffs would thereby obtain Woodmont's assets through this Court proceeding without subjecting such assets to the claims of Woodmont's other creditors. The automatic stay in the Bankruptcy Code is designed to prevent just such impropriety by an individual creditor.

---

[1]  To "pierce the corporate veil" under an alter ego theory in Missouri:

[A] plaintiff must meet a two-part test: first, the corporation must be controlled and influenced by persons or another corporation; second, evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud. Implicit in this test for piercing the corporate veil is the requirement that the wrong done be the proximate cause of injury to third persons who dealt with the corporation.

Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp., 885 S.W.2d 771, 773-74 (Mo.App. E.D. 1994)(internal citations omitted).

For purposes of the Bankruptcy Code, there is no practical difference between a claim against a debtor, and a claim against the debtor's alter ego.  As the Second Circuit held:

> Although the claims raised by [the creditor] are not against the debtor but are against a third party, the same reasoning applies.  The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors.  It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor.

St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 701 (2nd Cir. 1989).  As a result, courts have routinely stayed cases against non-debtor defendants when the defendant is allegedly the debtor's alter ego.  See e.g., In re Schimmelpenninck, 183 F.3d 347 (5th Cir. 1999); Steyr-Daimler-Puch of America Corp. v. Pappas, 852 F.2d 132 (4th Cir. 1988); Matter of S.I. Acquisition, Inc., 817 F.2d 1142 (5th Cir. 1987); SAS Overseas Consultants v. Benoit, 2000 WL 140611 (E.D. La., Feb. 7, 2000).

The courts' reasoning for extending the stay to non-debtor defendants in alter ego claims is simple.  An alter ego claim brought against a third party could benefit the debtor's estate and all of the general creditors if it resulted in a finding that additional assets were available as part of the estate.  Since a claim for outside assets may benefit the debtor's estate, it is, therefore, the property of the estate's estate.  The debtor's bankruptcy trustee "has the right to bring actions that will benefit the estate...[and s]uch claims can either be founded on the rights of the debtor or on the rights of the debtor's creditors."  In re Schimmelpenninck, 183 F.3d at 359.  Therefore, the debtor's trustee has the exclusive authority to pursue such claims on behalf of the estate, not an individual creditor, and a creditor's attempt to individually prosecute the claim on its own should be prevented by means of the automatic stay.

The Fifth Circuit succinctly recognized the inherent problem with allowing alter ego claims by individual creditors against non-debtor defendants:

[The creditor's] action is based upon allegations that if proven would benefit all of S.I.A.'s creditors, i.e., making more assets available to satisfy S.I.A. debts. But Eastway is proceeding alone, only for its benefit, and without giving notice to other creditors of S.I.A. Thus it seems clear that to allow Eastway's actions to proceed would undercut the general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly. If Eastway's action is not stayed it would collect its claim from a pool of assets that should be available to all creditors. But satisfaction of Eastway's claim will be undiluted by the pro-rata distribution between all creditors that would otherwise occur in bankruptcy court or in a nonbankruptcy forum into which the other creditors could intervene if they knew of Eastway's action. Thus, not to stay Eastway's action would promote the first-come-first-served unequal distribution dilemma that the Bankruptcy Code . . . sought to prevent.

Matter of S.I. Acquisition, Inc., 817 F.2d at 1153-54.

Plaintiffs' claim against Viziqor raises the same concerns. Plaintiffs' basic claim is a breach of contract claim against Woodmont. In seeking payment from Woodmont, Plaintiffs brought an alter ego claim against Viziqor to locate additional assets which could be credited to Woodmont's estate. Plaintiffs' success on the alter ego issue would benefit not just them individually, but all creditors who might intervene in this action. As a result, the alter ego claim belongs to the estate – and by extension, the bankruptcy trustee – not to Plaintiffs as individual creditors. Thus, the automatic stay applies to this case.[2]

Second, although Quadrangle and Huber are not alleged to have a common identity with Woodmont, a judgment against Quadrangle would necessitate a finding against the debtor Woodmont and/or against Viziqor. According to Plaintiffs' allegations in their Petition,

---

[2]  The alter ego claim against Viziqor also affects Quadrangle and Huber, such that any stay entered with respect to Viziqor should apply to all defendants. As set forth above, a pre-condition to Quadrangle's and Huber's alleged liability is Woodmont's liability and its alleged inability to pay Plaintiffs. If Viziqor is determined to be Woodmont's alter ego and Woodmont is liable on its contracts, Viziqor would be responsible for paying Woodmont's alleged debt to Plaintiffs and Quadrangle and Huber would not be liable to Plaintiffs as the alleged guarantor. If the claim against Viziqor is stayed, but not the claims against Quadrangle and Huber, the risk of inconsistent rulings between this Court and the bankruptcy court would be substantial. Thus, the automatic stay must apply to all defendants in this case.

Plaintiffs had Employment Agreements and Retention Bonus Agreements with Woodmont, which would grant them severance benefits and retention bonuses provided they met certain contractual requirements.  Plaintiffs allege Quadrangle, by and through Huber, promised it would pay Plaintiffs the severance and retention bonuses if Woodmont failed to meet its contractual obligations.[3]  Plaintiffs further allege Woodmont breached the agreements by failing to pay them any severance or bonuses, and Quadrangle and Huber breached their agreement by failing to pay Plaintiffs the amount allegedly owed by Woodmont.

Based on Plaintiffs' allegations, Quadrangle and Huber can only be liable to Plaintiffs if, as a threshold matter, Woodmont (or Viziqor, to the extent that it is the alter ego of Woodmont) failed to fulfill its own obligations under the contracts.  Thus, to succeed on their claims against Quadrangle and Huber, Plaintiffs must as a preliminary matter prove they were contractually entitled to their bonuses and severance pursuant to their Woodmont agreements, and that Woodmont and/or Viziqor failed to pay them.[4]  If, and only if, Plaintiffs can establish Woodmont and/or Viziqor was liable to Plaintiffs for breach of contract, then Plaintiffs can try to establish that Quadrangle and Huber are liable pursuant to the alleged guarantee (Quadrangle and Huber adamantly deny liability).  Therefore, Woodmont's and/or Viziqor's liability for breach of contract is effectively a condition precedent of Quadrangle's and Huber's liability.  Any finding of liability in this case against Quadrangle or Huber would necessarily require a finding

---

[3]   As noted in Quadrangle's and Huber's Memorandum of Law in Support of its Motion to Dismiss, Quadrangle and Huber deny any liability and deny all pertinent factual allegations, including, without limitation, the allegations in Counts II or III that they offered to pay any sums to Plaintiffs.

[4]   Plaintiffs vaguely claim that Woodmont admitted liability to Plaintiffs during a May 2006 hearing before the bankruptcy court.  (Pl. Resp. 6).  However, Plaintiffs referred to, but did not file, the transcript of this alleged meeting, or any other exhibit establishing that Woodmont admitted that it owed Plaintiffs the money requested in this case.  Defendants deny that Woodmont admitted liability.

regarding Woodmont's and/or Viziqor's liability.  This result would be problematic both because it would have an adverse impact on the debtor Woodmont, and may result in conflicting judgments with the bankruptcy court.  Further, to the extent that the action is stayed against Viziqor, pursuing claims against Quadrangle and Huber is problematic because the Court must address Viziqor's liability s a precondition of determining Quadrangle's and Huber's liability. Significantly, Viziqor would not be represented in a proceeding in which its liability may be at issue.  Moreover, any finding against Viziqor would bind Viziqor in future proceedings.  Indeed, because Quadrangle and Huber would necessarily have to involve Viziqor in the discovery process, Viziqor in effect would not get the benefit of a stay of the proceedings.

These problems can only be avoided by the Court staying this case until the conclusion of Woodmont's bankruptcy proceedings.  See Trimec, Inc., 150 B.R. at 687 (case stayed against non-debtor defendant, where finding against the defendant would necessarily impact the debtor, and because of risk of conflicting judgments between court and bankruptcy court proceeding).

In Plaintiffs' argument against a stay, Plaintiffs cite only Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194 (6th Cir. 1983), which is inapplicable here because no "unusual circumstances" existed in that case to justify a stay.  In Lynch, the solvent co-defendants in a products liability case sought protection under the automatic stay provision of the Bankruptcy Code, because one of the other co-defendants had filed for bankruptcy.  Critically, the plaintiff in Lynch claimed that all of the co-defendants were jointly and severally liable for his injury, because the plaintiff's asbestosis was allegedly caused by exposure to all of the defendants' products.  Id. at 1199.  Recognizing that joint tortfeasors are not indispensable parties under federal law, the Sixth Circuit held that the action did not need to stay the case against the non-

bankrupt defendants.  Id. at 1198-99.[5]  Thus, where each of the defendants could be individually held liable to the plaintiff, there was no reason to stay the case pending the completion of one defendant's bankruptcy proceedings.

In the instant case, there is no joint and several liability among the defendants.  If Woodmont is not liable to Plaintiffs under their agreements, Viziqor, Quadrangle, and Huber cannot be independently liable to Plaintiffs.  Accordingly, the holding of Lynch should carry no weight in the instant case, and certainly does not justify denying defendants' request for a stay.

### B.   The Court Should, At Minimum, Enter A Temporary Stay.

Even if the automatic stay provision of the Bankruptcy Code does not apply to this case, the Court should invoke its inherent equitable authority to stay this case pending the resolution of Woodmont's bankruptcy.  As discussed herein, the potential liability of Viziqor, Quadrangle, and Huber will be predicated upon Woodmont's liability to Plaintiffs, and such liability may only be determined through its bankruptcy proceedings.  If it is determined therein that Woodmont has no contractual obligations to Plaintiffs, none of the defendants could be deemed liable to Plaintiffs.  However, if this case is not stayed until the bankruptcy proceedings are completed, both this Court and the Delaware bankruptcy court may consider Woodmont's liability in separate, yet parallel proceedings, which may result in inherently inconsistent rulings. See e.g., Mobil Oil Corp. v. Days, 618 S.W.2d 286, 287 (Mo.App. E.D. 1981) (judgment against guarantor reversed because it was inconsistent with ruling in favor of underlying debtor).

_____

[5]   The Sixth Circuit also noted that a stay was not appropriate in that specific type of case, because time was of the essence in completing the litigation.  Lynch, 710 F.2d at 1199.  Specifically, in asbestos-related torts, "plaintiffs and crucial witnesses [we]re dying" and the plaintiffs would be severely prejudiced if the courts stayed proceedings on their cases while waiting for the bankrupt co-defendants to emerge from bankruptcy protection.  The same timing concerns are not present in this case.

Staying this case while the bankruptcy court resolves outstanding issues related to Woodmont's alleged debts will avoid any undue prejudice to the parties resulting from inconsistent decisions, and would avoid unnecessarily duplicative litigation.  Plaintiffs have identified no unfair prejudice which they would suffer as a result of a stay.  The balance of equities, therefore, favors staying this case pending Woodmont's bankruptcy proceedings.

At minimum, this case should be stayed until the claims period has closed for Woodmont's bankruptcy proceedings.  Under the bankruptcy court's order, all claims against Woodmont's estate must be filed by no later than August 1, 2006.  Plaintiffs claim in their Response that they "have not chosen to sue Woodmont in Delaware."  (Pl. Resp. 3).  However, it should be called to the Court's attention that Plaintiff Gordon Quick, representing his own personal interest, appeared at Woodmont's Meeting of Creditors, that was held on May 3, 2006, and was administered by the chapter 7 trustee.  Plaintiffs still have nearly two months within which to file a claim.  This Court should stay the case at least long enough to determine whether Plaintiffs will file a claim against Woodmont in the bankruptcy court.  This brief stay certainly would not prejudice Plaintiffs and would give this Court full and complete information regarding Plaintiffs' intent in pursuing their claims against Woodmont.

## III.      WOODMONT IS AN INDISPENSABLE PARTY WHOSE JOINDER IS NOT FEASIBLE.

### A.      Woodmont is a Necessary Party

Plaintiffs claim that Woodmont is not a necessary party under Rule 19(a)(1) because Woodmont and Defendants are jointly and severally liable and that Plaintiffs can choose which Defendant to sue when Defendants are jointly and severally liable.  However, Plaintiffs have not pled that Woodmont and Quadrangle/Huber are jointly and severally liable.  To the contrary, Plaintiffs admit in their Opposition Memorandum that Quadrangle and Huber's alleged liability

is in the form of a guarantee.  A guarantor's liability is a contingent liability – a guarantor can have no liability unless the primary obligor is liable.  <u>United Missouri Bank of Kansas City, N.A. v. Gagel, et al.</u>, 815 F. Supp. 387, 391 (D. Kan. 1993); <u>Mobil Oil Corp.</u>, 618 S.W. 2d at 287 ("guarantor could not be liable if the debtor ... was found not liable").  Accordingly, the cases Plaintiff cite concerning joint and several liability are inapposite.

Plaintiffs claim that the standard of Rule 19(a)(2)(i) – the absent party's interest may be compromised if the case proceeds without the absent party – is not satisfied because (i) Woodmont has supposedly admitted liability, and (ii) Woodmont's estate could not be impacted by any judgment in the Missouri Action.  Both of Plaintiffs' arguments fail.  First, there is no proof that the chapter 7 trustee has admitted liability during any hearing.  Second, if Plaintiffs are correct that Woodmont and Viziqor are alter egos, any finding against Viziqor would have an impact on the amount of money available to pay creditors of the estate.

Plaintiffs lastly claim that the standard of Rule 19(a)(2)(ii) is not satisfied because there is no risk of prejudice resulting from inconsistent verdicts when the liability of Defendants is joint and several to the liability of the absent party.  However, as already noted, Defendants' alleged liability is contingent – not joint and several.  There is a risk that this Court and the Delaware Bankruptcy Court could render inconsistent rulings concerning Woodmont's liability and that by doing so Quadrangle/Huber would be prejudiced.  Moreover, any judgment against Quadrangle and Huber could not be set until the Delaware Bankruptcy Court determines how much, if anything, Woodmont is liable to pay.

**B.    Woodmont is an Indispensable Party**

Plaintiffs claim that Quadrangle and Huber cannot satisfy the standard of Rule 19(b) – prejudice to the named party – because courts do not require that the absent party be joined even

in circumstances where the conduct of a non-party is essential to determine the liability of the named party.  However, as conceded by Plaintiffs in their Opposition, Plaintiffs' claim against Quadrangle and Huber is a contingent liability claim and the primary obligor is in bankruptcy.  The cases cited by Plaintiffs are inapposite and not controlling.[6]  Only the Bankruptcy Court can determine if, and how much, Woodmont is liable to pay.  In these circumstances, permitting the case to go forward would effectively prejudice Quadrangle and Huber.

Lastly, Plaintiffs have failed to address the alter ego claim in their indispensable party analysis.  To the extent that Viziqor and Woodmont are determined to be alter egos of one another, a judgment would be enormously prejudicial to Woodmont and would effectively deprive the Delaware Bankruptcy Court of jurisdiction over Woodmont's bankruptcy.

## IV.  SECTION 1412 COMPELS THE TRANSFER OF THIS ACTION TO THE DELAWARE BANKRUPTCY COURT.

In their Opposition Memorandum, Plaintiffs contend that this matter may not be transferred pursuant to section 1412 for two reasons.  First, Plaintiffs contend that the transfer provisions of section 1412 does not authorize the transfer of actions that are related to a bankruptcy proceeding venued in another judicial district (as opposed to the transfer of an action "under" title 11 [the actual bankruptcy filing] to another judicial district).  Secondly, Plaintiffs

---

[6]  The Finance America and Hedman cases, although involving a Rule 19 analysis when the guarantor and primary obligor were sued separately, do not involve situations in which the primary obligor is in bankruptcy.  Bedell involved a case of joint and several liability, not contingent liability.  None of the cases cited by Plaintiffs are controlling in this matter.

argue that the Missouri Action is not related to the Delaware Bankruptcy Proceeding.  Plaintiffs

are wrong on both counts.[7]

## A.    Section 1412 applies to *related-to* proceedings

Section 1412 provides:

> A district court may transfer a case or proceeding under title 11 to a
> district court for another district, in the interest of justice or for the
> convenience of the parties.

28 U.S.C. § 1412.

Section 1412 authorizes courts to transfer actions that are related to a bankruptcy

proceeding venued in another district.  This conclusion is compelled for four separate reasons.

First, the majority of courts have held that section 1412 permits courts to transfer cases

that are to *related to* bankruptcy proceedings in another jurisdiction, and Collier on Bankruptcy,

the authoritative bankruptcy treatise, agrees with this position.  See In re Harnischfeger Ind., Inc.,

246 B.R. 421, 434-35 (Bankr. N.D. Ala. 2000); In re Bruno's, Inc., 227 B.R. 311, 323 & n. 39

(Bankr. N.D. Ala. 1998); Collier on Bankruptcy (15th ed. rev.) §§ 4.04[1] and 4.04[5][b].  "The

rationale for this majority view appears to be based on the widely held view that the most

important factor in determining whether to transfer a bankruptcy case or proceeding is whether

the transfer would promote the economic and efficient administration of the estate."  In re

Bruno's, Inc., 227 B.R. at 323 n.39.  The limited reading of section 1412 advocated by Plaintiffs

---

[7]    Section 1412 does not restrict a transfer to a district where the Action could have originally
been brought.  In re Capitol Hotel, 206 B.R. 190, 192 (E.D. Mo. 1997), see also 3 Collier on
Bankruptcy § 4.04[4][a][ii] (Matthew Bender 15th Ed. Revised 1996).

would prevent the transfer of proceedings that could be more efficiently and economically administered in bankruptcy court.[8]

Second, limiting the reach of section 1412 so that it does not to apply to *related-to* proceedings contradicts the "well-settled presumption that 'related to' proceedings should be litigated in the 'home court[.]'"  Dunlap, 331 B.R. at 678; see also Hohl v. Bastian, 279 B.R. 165, 177-78 (W.D. Pa. 2002) ("[T]he home court presumption provides that a court in which the bankruptcy case itself is pending is the proper venue for adjudicating all related litigation, including those suits which have been filed in other state or federal courts."); In re Vital Link Lodi, Inc., 240 B.R. 15, 19 (Bankr. W.D. Mo. 1999) ("[t]he general rule is that where the bankruptcy case is pending is the proper venue for all related proceedings within the court's jurisdiction, because speedy and economic administration of cases is a paramount consideration in the bankruptcy process.")  See also Nixon Mach. Co. v. Roy Energy, Inc., 27 B.R. 871, 873 (Bankr. E.D. Tenn. 1983) (collecting authority).[9]

Third, courts which have analyzed the legislative history of section 1412 have determined that Congress intended for section 1412 to permit the transfer of *related-to* proceedings.  See Dunlap, 331 B.R. at 674.  In Dunlap, the Court noted that 28 U.S.C. § 1409 was amended at the same as 28 U.S.C. § 1412.  It further stated that Section 1409(a) used the term "proceeding" to

---

[8]   There is no Eighth Circuit case on point.  However, another court in the Eastern District of Missouri recognized that section 1412 permits a court to transfer a case which is "related to" a bankruptcy proceeding in another judicial district.  See Wittes v. Interco, 139 B.R. 718 (Bankr. E.D. Mo. 1992) (section 1412 entitled Bankruptcy Court in Missouri to transfer a claim objection to Massachusetts Bankruptcy Court).  See also, Dunlap v. Friedman's, Inc., 331 B.R. 674, 677 (S.D. W.Va. 2005) (citing Interco as a decision supporting the view that section 1412 transfers power apply to related-to proceedings).

[9]   Without citation to any pertinent authority, Plaintiffs claim that the home-court advantage rule does not apply to cases filed before the bankruptcy.  However, nothing the well-established case law contradicts this position.  See Dunlap, 331 B.R. at 674 (transferring pre-petition action under section 11412 and referencing home court presumption as ground to transfer).

include an action related to a case under title 11.  The district court then noted the definition of proceeding in section 1409 as including related-to cases "lends strong credence to the notion the word 'proceeding' as used in section 1412 should be accorded the same breadth."  <u>Id</u>. at 680.

Finally, limiting section 1412's applicability so that it does not apply to *related-to* proceedings creates an anomalous result.  Because section 1412 permits transfer only if it is in the interest of justice or for the convenience of the parties, a narrow reading of 1412 would not permit the transfer of a *related-to* proceeding even though it was in the interests of justice and would be convenient for the parties to do so.

### B.    The Action is related to the Woodmont Bankruptcy

The Eight Circuit has adopted the *conceivable-effect* test for determining whether a proceeding is related to a bankruptcy case:

> The test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* . . . .  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankruptcy estate.

<u>In re Dogpatch U.S.A., Inc.</u>, 810 F.2d 782, 786 (8th Cir. 1987) (quoting <u>Pacor v. Higgins</u>, 743 F.2d 984, 994 (3rd Cir. 1984) (emphasis included).  The conceivable effect test "implements a fairly broad interpretation of the scope of a bankruptcy court's related-to jurisdiction, and even a proceeding which portends a mere contingent or tangential effect on a debtor's estate meets the broad jurisdictional test adopted by the Eighth Circuit."  <u>Columbia Sussex Corp., Inc. v. Wiman Tahoe Corp.</u>, 2006 U.S. Dist. LEXIS 4810 (E.D. Mo. 2006).

Applying these standards to the facts in this case, the outcome of the Missouri Action will almost certainly have an effect on the Woodmont bankruptcy estate for two separate reasons.

First, if Plaintiffs are correct that Viziqor is liable for the debts of Woodmont under an alter ego theory, this Court will necessarily have to determine whether Woodmont has any liability to Plaintiffs in order to address the liability of all Defendants. This finding of the Court would necessarily alter Woodmont's liabilities since the finding in the Missouri Action could have *res judicata* effect on Woodmont if Viziqor was determined to be the alter ego of Woodmont. Further, any ruling that Woodmont and Viziqor are or are not alter egos would either increase or decrease the amount of money available to pay creditors. Either way, the ruling in the Missouri Action would have an effect on Woodmont's estate.

Second, the judgment by the Court on the claims against Quadrangle and Huber could have an effect on Woodmont's estate. If the Court enters judgment against Quadrangle and Huber, Plaintiffs could not pursue claims against Woodmont, since Plaintiffs could not obtain a double recovery. Further, a judgment against the Defendants would pave the way for Quadrangle and Huber to assert contribution and indemnity claims against Woodmont, which could have an impact on Woodmont's estate. More significantly, if Viziqor is the alter ego of Woodmont, the Court would effectively be ruling in this Action on whether the Estate is liable as a precondition to determining whether Quadrangle and Huber could potentially have any liability. Case law in the Eighth Circuit supports the conclusion that the Missouri Action is related to the Delaware Bankruptcy Proceeding. See Integrated Health Services of Cliff Manor, Inc. v. THCI Co. LLC, 417 F.3d 953 (8th Cir. 2005) (transferring pursuant to § 1404 an action brought by debtor's successor seeking a declaration that lease obligation and lease guarantees were unenforceable and finding that the action was related to the bankruptcy proceedings pending in Delaware).

## V.   __CONCLUSION__

Wherefore, Defendants respectfully request that their motion to dismiss, or in the

alternative, stay or transfer the action, be granted.

Dated: June 8, 2006

<div style="margin-left: 40%;">

QUADRANGLE GROUP, LLC and
MICHAEL HUBER

By:   _/s/ Charles A. Weiss_____
    Charles A. Weiss
    Timothy C. Mooney, Jr.
    BRYAN CAVE LLP
    211 N. Broadway, Suite 3600
    St. Louis, MO 63102
    (314) 259-2215

    Of Counsel:

    James L. Messenger
    WEIL, GOTSHAL & MANGES LLP
    100 Federal Street, 34th Floor
    Boston, MA 02110
    (617) 772-8300

    *Attorneys for Quadrangle Group LLC*
    *and Michael Huber*

</div>

### __CERTIFICATE OF SERVICE__

    I hereby certify that on June 8, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon:  Martin M. Green, Esq., mann@stlouislaw.com; and Michael A. Clitero, Esq., mclithero@blackwellsanders.com; and by facsimile and first class mail to John T. Carroll, III, Esq., COZEN O'CONNOR, Chase Manhattan Center, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, (302) 295-2013 (facsimile).

<div style="margin-left: 40%;">/s/ Charles A. Weiss_____</div>

<div style="text-align: center;">16</div>

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

_____
                                )

GORDON QUICK, WILLIAM       )
MCCAUSLAND and JOHN TRECKER,   )
       *Plaintiffs,*            )
                               )
     v.                   )     C.A. 4:06-cv-00637-SNL
                               )
VIZIQOR SOLUTIONS, INC.,       )
MICHAEL HUBER, and          )
QUADRANGLE GROUP, LLC,       )
       *Defendants.*         )
_____)

## <u>MEMORANDUM TO COURT</u>

In their Reply Memorandum in Support of Defendants' Motion to Dismiss, or in the

Alternative, Stay or Transfer the Action, defendants Quadrangle Group, LLC, and Michael

Huber stated that the claims period for Woodmont Holdings, Inc.'s bankruptcy ended August 1,

2006. (<u>See</u> Def. Reply, p. 9). Defendants have subsequently learned the claims deadline is now

set on September 7, 2006. A copy of the notice from United States Bankruptcy Court, District of

Delaware, which establishes the proof of claim deadline has been attached to this memorandum

as Exhibit A.

QUADRANGLE GROUP, LLC and
MICHAEL HUBER

By:   /s/ Timothy C. Mooney, Jr.
      Charles A. Weiss
      Timothy C. Mooney, Jr.
      BRYAN CAVE LLP
      211 N. Broadway, Suite 3600
      St. Louis, MO 63102
      (314) 259-2215

Of Counsel:

James L. Messenger
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, 34th Floor
Boston, MA 02110
(617) 772-8300

*Attorneys for Quadrangle Group LLC
and Michael Huber*

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon:  Fernando Bermudez, bermudez@stlouislaw.com, Michael A. Clithero, mclithero@blackwellsanders.com, Martin M. Green, mann@stlouislaw.com, and Christopher A. Perrin, cperrin@blackwellsanders.com.

/s/ Timothy C. Mooney, Jr.

# UNITED STATES BANKRUPTCY COURT
## District of Delaware
### 824 Market Street, 3rd Floor
### Wilmington, DE 19801

In Re:

Woodmont Holding, Inc.

Chapter: 7

2 Bethesda Metro Center, Suite 777
Bethesda, MD 20854
 EIN: 05–0606004
Viziqor Holdings, Inc.
Daleen Holdings, Inc.

Case No.: 06–10236–MFW

## NOTICE THAT THERE ARE ASSETS FROM
## WHICH A DIVIDEND MIGHT POSSIBLY BE PAID TO CREDITORS

**YOU ARE HEREBY NOTIFIED** that there are assets from which a dividend might possibly be paid to creditors.

In order to share in any distribution, a creditor must file a proof of claim with the Clerk of the Bankruptcy Court. Claims must be filed on or before 9/7/2006 . Late claims will not be allowed.

David D. Bird, Clerk

Return Proof of Claim to:
U.S. Bankruptcy Court
ATTN: Claims
824 Market Street, 3rd Floor
Wilmington, DE 19801

Dated: 6/8/06
(VAN–043)

32408

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF DELAWARE | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>Woodmont Holding, Inc. | Case Number<br>06-10236 - MFW |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Quadrangle<br><br>Name and Address where notices should be sent:<br><br>Quadrangle<br>375 Park Avenue<br>New York, NY 10152-0002<br><br><br><br>Telephone Number: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY<br><br>06-10236<br><br>1758076 |
|---|---|---|

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces<br>this claim ☐ amends          a previously filed claim, dated:_____ |
|---|---|

| **1. Basis for Claim**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☐ Other_____ | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS #:_____<br>Unpaid compensation for services performed<br>from _____ to _____<br>       (date)        (date) |
|---|---|

| **2. Date debt was incurred:** | **3. If court judgment, date obtained:** |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

| **Unsecured Nonpriority Claim** $_____<br>☐          Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.<br><br>**Unsecured Priority Claim**<br><br>☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.<br><br>Amount entitled to priority $_____<br><br>Specify the priority of the claim:<br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).<br><br>☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).<br><br>☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5). | **Secured Claim**<br>☐ Check this box if your claim is secured by collateral (including a right of setoff).<br><br>Brief Description of Collateral:<br>☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____<br><br>Value of Collateral:   $_____<br><br>Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____<br><br><br>☐ Up to $ 2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).<br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).<br>*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |
|---|---|

| **5. Total Amount of Claim at Time Case Filed:** | $_____ | _____ | _____ | _____ |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| **6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br>**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date: | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|

032408    *alty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10) (10/05)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## ---- DEFINITIONS ----

**Debtor**

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

**Secured Claim**

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*.)

**Unsecured Claim**

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims*.

# Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**

Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**

Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**

If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Classification of Claim**

**Secured Claim:**

Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state

the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

**Unsecured Priority Claim:**

Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**Unsecured Nonpriority Claim:**

Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount not entitled to priority.

**5. Total Amount of Claim at Time Case Filed:**

Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**6. Credits:**

By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**7. Supporting Documents:**

You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

**DO NOT SEND ORIGINAL SUPPORTING DOCUMENTS, ORIGINAL GIFT CERTIFICATES/GIFT CARDS, ETC.**

SUBMITTING PROOF OF CLAIM FORM:
Submit original and one (1) copy of proof of claim form with any attachments to the Court at the below address. To receive acknowledgment of receipt, an additional copy (original + 2 copies) must be provided along with a self-addressed stamped envelope.

U.S. Bankruptcy Court, District of Delaware
ATTN: Claims

032409                 26012032473028

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.          )
                              )
            Plaintiffs,       )
                              )
v.                            )      No.:   4:06CV637-SNL
                              )
VIZIQOR SOLUTIONS, INC., et al.  )
                              )
            Defendants.       )

## MEMORANDUM TO COURT

In plaintiffs' memorandum in opposition to defendants' motions to dismiss, transfer or stay, the plaintiffs wrote: "In the Delaware bankruptcy, Woodmont has already admitted that it owes the plaintiffs the money that they seek under the Agreements. (Exhibit 1; transcript of May 2006 hearing which will be filed as soon as it is available)." (Plaintiffs' memorandum at 6). The May 2006 hearing to which the plaintiffs referred was not in open court or recorded by a court reporter. Rather, it was a meeting between Woodmont's trustee and some of its creditors. The plaintiffs regret the factual discrepancy.

Regardless, although a transcript is not currently available to show that "in the Delaware bankruptcy, Woodmont has already admitted that it owes the plaintiffs the money that they seek under the Agreements," Woodmont's filings in Delaware provide the evidence for this fact. Attached as Exhibit 1 is Woodmont's filings in Delaware indicating that: a) plaintiffs have unsecured, undisputed, priority claims totaling $30,000 (schedule E); b) plaintiffs have unsecured, undisputed,  nonpriority claims

totaling over $1.4 million (schedule F); and c) the total amount of undisputed claims greatly exceeds Woodmont's assets (summary of schedules). Therefore, there is no real dispute that Woodmont cannot fully pay the amounts due to plaintiffs. The only issue is whether and how much the defendants here will have to pay.

GREEN JACOBSON & BUTSCH, P.C.

By:   /s/ Fernando Bermudez

Martin M. Green, 3265
Fernando Bermudez, 79964
James J. Simeri, 102201
Attorneys for Plaintiffs
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
Phone: (314) 862-6800
Fax:    (314) 862-1606
green@stlouislaw.com
bermudez@stlouislaw.com
simeri@stlouislaw.com

## CERTIFICATE OF SERVICE

I certify that on July 5, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, and Charles A. Weiss.

I certify that on July 5, 2006, copies of the foregoing were mailed to each of the following named non-participants in Electronic Case Filing: John L. Messenger, Weil, Gotshal & Manges LLP, 100 Federal Street, Floor 34, Boston, MA  02110.

/s/ Fernando Bermudez

Form B6E - Cont.
(10/05)

In re  Woodmont Holdings, Inc. _____,          Case No. _____
                  Debtor                                                              (If known)

# SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS
## (Continuation Sheet)

Wages, Salaries and Commissions

TYPE OF PRIORITY

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See Instructions.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM | AMOUNT ENTITLED TO PRIORITY |
|---|---|---|---|---|---|---|---|---|
| Account No. <br><br> Gordon Quick <br> 800 South Hanley Road <br> Clayton MO 63105 | | | 12/6/06 <br> Employment Termination | | | | $10,000.00 | $10,000.00 |
| Account No. <br><br> John Trecker <br> 1644 Lochrest <br> Chesterfield , MO 63005 | | | 12/6/06 <br> Employment Termination | | | | $10,000.00 | $10,000.00 |
| Account No. <br><br> William McCausland <br> 17714 Drummer Lane Wildwood, MO 63005 | | | 12/6/06 <br> Employment Termination | | | | $10,000.00 | $10,000.00 |
| Account No. <br><br> Ian Watterson <br> 2853 NW27 Aveune <br> Boca Raton, FL 33434 | | | 12/6/06 <br> Employment Termination | | | | $10,000.00 | $10,000.00 |
| Account No. <br><br> Dawn Laundry <br> 6201 Crystal Pointe Drive <br> Louisville KY 40299 | | | 12/6/06 <br> Employment Termination | | | | $10,000.00 | $10,000.00 |

Sheet no. ___ of ___ sheets attached to Schedule of Creditors
Holding Priority Claims

Subtotal ▶ (Total of this page):  $ _____ | $ _____

Total ▶
(Use only on last page of the completed Schedule E.
(Report total also on Summary of Schedules)   $ 50,000.00 | $ 50,000.00

EXHIBIT

1

Form B6F (10/05)

In re  Woodmont Holdings, Inc. _____     Case No. _____
                    Debtor                                                    (If known)

# SCHEDULE F- CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed.R.Bankr.P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community maybe liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐  Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br><br>Gordon Quick<br>800 South Hanley Road<br>Clayton MO 63105 | | | 12/6/05<br>Employment Termination | | | | $920,693.00 |
| ACCOUNT NO.<br><br>John Tracker<br>1644 Lochrest<br>Chesterfield , MO 63005 | | | 12/6/05<br>Employment Termination | | | | $263,720.00 |
| ACCOUNT NO.<br><br>William McCausland<br>17714 Drummer Lane Wildwood,<br>MO 63005 | | | 12/6/05<br>Employment Termination | | | | $293,677.00 |
| ACCOUNT NO.<br><br>Ian Watterson<br>4867 Ashford Dunwoody Road<br># 3202<br>Atlanta, GA 30338 | | | 12/6/05<br>Employment Termination | | | | $264,985.00 |

1  continuation sheets attached

Subtotal ➤  $  1,743,077.00

Total ➤  $
(Use only on last page of the completed Schedule F.)
( Report also on Summary of Schedules.)

In re _Woodmont Holdings, Inc._____,     Case No. _____
            Debtor                                              (If known)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
## (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br><br> Dawn Laundry <br> 6201 Crystal Pointe Drive <br> Louisville KY 40299 | | | 12/6/05 <br> Employment Termination | | | | $232,241.00 |
| ACCOUNT NO. <br><br> Formula Telecom Solutions <br> 902 Clint Moore Road <br> Boca Raton, FL 33487 | | | 12/6/05 | ✓ | ✓ | ✓ | $1,000,000.00 |
| ACCOUNT NO. <br><br> Quadrangle <br> 375 Park Avenue <br> New York, NY 10152 | | | 12/2005 <br> Management Services | | | | $250,000.00 |
| ACCOUNT NO. <br><br> | | | | | | | |
| ACCOUNT NO. <br><br> | | | | | | | |

Sheet no. _2_ of _2_ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal ► $  1,743,077.00

Total ► $  3,225,318.00
(Use only on last page of the completed Schedule F.)
( Report also on Summary of Schedules.)

Form 6-Summary
(10/05)

# United States Bankruptcy Court

For The _____ District Of Delaware _____

In re Woodmont Holdings, Inc. _____ ,          Case No. _____

                    Debtor

                                                          Chapter 7 _____

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors must also complete the "Statistical Summary of Certain Liabilities."

AMOUNTS SCHEDULED

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A – Real Property | Yes | 1 | $ -0- | | |
| B – Personal Property | Yes | 5 | $ 1,619,669.54 | | |
| C – Property Claimed as Exempt | No | | | | |
| D – Creditors Holding Secured Claims | Yes | 1 | | $ -0- | |
| E – Creditors Holding Unsecured Priority Claims | Yes | 2 | | $ 50,000.00 | |
| F – Creditors Holding Unsecured Nonpriority Claims | Yes | 2 | | $ 3,225,318.00 | |
| G – Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H – Codebtors | Yes | 1 | | | |
| I – Current Income of Individual Debtor(s) | No | | | | $ |
| J – Current Expenditures of Individual Debtor(s) | No | | | | $ |
| **TOTAL** | | | $ 1,619,669.54 | $ 3,275,318.00 | |

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

_____
                                          )
GORDON QUICK, WILLIAM                     )
MCCAUSLAND and JOHN TRECKER,              )
            *Plaintiffs,*                 )
                                          )
        v.                                )        C.A. 4:06-cv-00637-SNL
                                          )
VIZIQOR SOLUTIONS, INC.,                  )
MICHAEL HUBER, and                        )
QUADRANGLE GROUP, LLC,                    )
            *Defendants.*                 )
_____   )

### DEFENDANTS MICHAEL HUBER'S AND QUADRANGLE GROUP, LLC'S RESPONSE TO PLAINTIFFS' MEMORANDUM TO COURT FILED ON JULY 5, 2006

On July 5, 2006, Plaintiffs filed a *Memorandum to Court*, in which Plaintiffs cited to and attached copies of the schedules of liabilities filed by Woodmont in its bankruptcy case before the chapter 7 trustee was appointed. According to Plaintiffs, the fact that Woodmont (without the input or involvement of the chapter 7 trustee) scheduled certain claims allegedly owed to Plaintiffs as being undisputed establishes that liability is admitted on behalf of the Woodmont estate. However, as demonstrated below, the schedules of liabilities filed by a debtor are not admissions of the estate's liability and certainly do not estop or otherwise preclude a chapter 7 trustee from later denying liability on behalf of the estate with respect to scheduled claims.

Although Woodmont – the debtor – did not indicate that the Plaintiffs' claims were disputed claims in the schedules accompanying the bankruptcy filing, a chapter 7 trustee has now been appointed. As a starting point, "it is fundamental that the interests of the debtor and the trustee can be adverse, [and] it is likewise fundamental that they are entitled to take inconsistent positions." <u>An-Tze-Cheng v. K&S Diversified Investments, Inc. (In re An-Tze-</u>

Cheng), 308 B.R. 448, 454-55 (9th Cir. 2004).  Further, the debtor does not even have standing

in these circumstances.  See, e.g., Willard v. O'Neil, 240 B.R. 664, 668 (Bankr. D. Conn. 1999).

Accordingly, the debtor's failure to list a claim as disputed has no effect on the trustee's or other

creditors' ability to later object to the claim.  See, e.g., Lorax Corp. v. Shepard, 307 B.R. 560,

567 n. 15 (Bankr. N.D. Tex. 2004) ("That a debtor lists a creditor's claim as liquidated, not

disputed and not contingent does not mean it is exempt from objection.  Even if a debtor thereby

'waives' any objection (a dubious proposition), other parties may object.")  Indeed, a trustee has

an obligation to independently determine whether to object to a claim and may not rely on the

fact that the debtor did not schedule the claim as being disputed.  See In re Cluff, 313 B.R. 323,

343 (Bankr. D. Utah 2004) ("Unless claims are already listed as disputed, unliquidated, or

contingent on a debtor's statements and schedules, a Chapter 7 or 11 trustee must examine a

debtor's books and records to determine which claims are truly owed and which claims are

objectionable.").

       Here, Plaintiffs have provided no evidence that the chapter 7 trustee has admitted

any liability to Plaintiffs on behalf of the Woodmont estate.  Accordingly, there is no factual or

legal basis for Plaintiff's representation that there has been an admission of liability by the

Woodmont estate.

QUADRANGLE GROUP, LLC and
MICHAEL HUBER

By:  /s/ Charles A. Weiss
      Charles A. Weiss
      Timothy C. Mooney, Jr.
      BRYAN CAVE LLP
      211 N. Broadway, Suite 3600
      St. Louis, MO 63102
      (314) 259-2215

Of Counsel:

James L. Messenger
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, 34th Floor
Boston, MA 02110
(617) 772-8300

*Attorneys for Quadrangle Group LLC
and Michael Huber*

## CERTIFICATE OF SERVICE

     I hereby certify that on July 13, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon:  Fernando Bermudez, bermudez@stlouislaw.com, Michael A. Clithero, mclithero@blackwellsanders.com, Martin M. Green, mann@stlouislaw.com, and Christopher A. Perrin, cperrin@blackwellsanders.com.; and by facsimile and first class mail to John T. Carroll, III, Esq., COZEN O'CONNOR, Chase Manhattan Center, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, (302) 295-2013 (facsimile).

             /s/ Timothy C. Mooney, Jr.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

_____
                                                )
GORDON QUICK, WILLIAM                           )
MCCAUSLAND and JOHN TRECKER,                    )
                    *Plaintiffs,*               )
                                                )
          v.                                    )      C.A. 4:06-cv-00637-SNL
                                                )
VIZIQOR SOLUTIONS, INC.,                        )
MICHAEL HUBER, and                              )
QUADRANGLE GROUP, LLC,                          )
                    *Defendants.*               )
_____         )

## MEMORANDUM TO COURT

In Plaintiffs' Memorandum and Opposition to Motion to Dismiss, Transfer and

Stay, Plaintiffs stated:

> "Defendants' suggestion that this Court issue a stay and force plaintiffs to
> adjudicate Woodmont's liability in Delaware squarely violates plaintiffs' choice
> of who to sue and where to sue them.  At this stage, plaintiffs have chosen to sue
> the defendants in Missouri.  They have not chosen to sue Woodmont in Delaware.
> This choice should be respected.  For this reason, Courts have found that a
> Plaintiff would be prejudiced by a stay to force a plaintiff to sue another party in
> another jurisdiction."  Id. at 3.

Subsequent to the filing of Plaintiffs' Memorandum and Opposition to Motion to

Dismiss, Transfer and Stay on May 24, 2006, Plaintiffs have each filed a Proof of Claim in the

Delaware Bankruptcy Court asserting claims against Woodmont in connection with the alleged

Employment Agreements and Retention Bonus Agreement which are the subject matter of this

Action.  The Proofs of Claim are attached hereto as Exhibits A-C.  Accordingly, the arguments

made by Plaintiffs as referenced above are now moot.

Dated:  August 14, 2006

QUADRANGLE GROUP, LLC and
MICHAEL HUBER

By:   /s/ Timothy C. Mooney, Jr.
Charles A. Weiss
Timothy C. Mooney, Jr.
BRYAN CAVE LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2215

Of Counsel:

James L. Messenger
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, 34th Floor
Boston, MA 02110
(617) 772-8300

*Attorneys for Quadrangle Group LLC
and Michael Huber*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon:  Fernando Bermudez, bermudez@stlouislaw.com, Michael A. Clithero, mclithero@blackwellsanders.com, Martin M. Green, mann@stlouislaw.com, and Christopher A. Perrin, cperrin@blackwellsanders.com.; and by facsimile and first class mail to John T. Carroll, III, Esq., COZEN O'CONNOR, Chase Manhattan Center, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, (302) 295-2013 (facsimile).

  /s/ Timothy C. Mooney, Jr.

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | CLAIM 1 | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor Woodmont Holding, Inc. | Case Number 06-10236 - MFW |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
William McCausland

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and Address where notices should be sent:
William McCausland
~~17714 Hummer Lane~~
~~Wildwood, MO 63005-4225~~
311 WESTHAVEN DR.
AUSTIN, TX 78746

☐ Check box if you have never received any notices from the bankruptcy court in this case.
☒ Check box if the address differs from the address on the envelope sent to you by the court.

Telephone Number: 512-471-3804

THIS SPACE IS FOR COURT USE ONLY

Last four digits of account or other number by which creditor identifies debtor:

Check here if ☐ replaces ☐ amends this claim   a previously filed claim, dated:_____

1. Basis for Claim
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☒ Wages, salaries, and compensation (fill out below)
Last four digits of your SS #: 6071
Unpaid compensation for services performed
from 12/06/05 to _____
(date)        (date)

2. Date debt was incurred: 12/06/05

3. If court judgment, date obtained:

4. Classification of Claim. Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim $ 220,845.33
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

Secured Claim
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle ☐ Other _____
Value of Collateral: $_____

Unsecured Priority Claim
☒ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.
Amount entitled to priority $ 10,000

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).
☒ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

☐ Up to $ 2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

5. Total Amount of Claim at Time Case Filed: $ 220,845.33 (unsecured) $ 10,000 (secured) _____ (priority) $ 230,845.33 (Total)
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

6. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
7. Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
8. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date 6/24/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): WILLIAM H. MCCAUSLAND   William [signature] |
|---|---|

005867   ...alty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

EXHIBIT
A

# William H. McCausland

## Claim 1

### Claim 1 Detail

**Employment Contract**

| | Base | Hours | Amount | Explanation | Date Due |
|---|---|---|---|---|---|
| 30 day notice period for termination | $208,000.00 | 173.3333 | $ 17,333.33 | 30 day notice required per employment agreement - Section 3 | 1/5/2006 |
| Salary (severance pay) | $208,000.00 | 2080 | $ 208,000.00 | 12 Months of salary per employment agreement - Sections 11.c.1 and 11.f.5 | Monthly pay out |
| Vacation Pay - Abiliti | $208,000.00 | 55.12 | $ 5,512.00 | 55.12 hours Unpaid at termination | 12/20/2005 |
| **Total** | | | $ 230,845.33 | | |

**Documentation**
Employment Agreement
Paystub showing vacation time

## EMPLOYMENT AGREEMENT

The parties to this Employment Agreement (the "**Agreement**") are **Viziqor Holdings, Inc.** (the "**Employer**" or the "**Company**"), a Delaware corporation, and **Bill McCausland** (the "**Employee**").

The Employer proposes to enter into a series of transactions (the "Transactions") pursuant to which the Employer shall (i) cause its newly formed, wholly-owned subsidiary to merge with and into Daleen Technologies, Inc., a Delaware corporation ("**Daleen**") and (ii) purchase all of the shares of the outstanding capital stock of Protek Telecommunications Solutions Ltd, a company organized under the laws of England and Wales ("**Protek**"). Upon the date of consummation of the Transactions (the "**Effective Date**"), each of Daleen and Protek will be a wholly-owned subsidiary of the Employer.

The Employer desires to ensure itself of the services of the Employee following the consummation of the Transactions and the Employee is willing to provide full-time services to the Employer on the terms and conditions provided herein.

Accordingly, in consideration of the mutual covenants and representations contained herein, the parties to this Agreement, intending to be legally bound, agree as follows:

1. EMPLOYMENT. The Employer hereby employs Employee in its business as its **Senior Vice President of Operations**, and Employee hereby accepts such employment, all upon the terms and conditions hereinafter set forth.

2. DUTIES. Employee shall report directly to and perform under and according to the reasonable direction of the Chief Executive Officer of the Company (the "**Chief Executive Officer**") and control and to the best of Employee's abilities, all executive, advisory, administrative, and/or managerial duties (if any) which may reasonably be assigned or delegated to Employee from time to time by the Chief Executive Officer.

3. TERM. Unless sooner terminated pursuant to the provisions of this Agreement, the term of employment under this Agreement shall commence on the Effective Date and shall extend for as long as Employee remains employed hereunder ("**Term**"), with Employee acknowledging that the Employee is an at-will employee. Employee's employment may be terminated by either party upon thirty (30) days prior written notice.

4. BASE SALARY. Employee shall be entitled to receive salary at the rate of $208,000 per annum, as such may be increased pursuant to Section 9

hereof (the "**Base Salary**"). The Base Salary shall be payable in accordance with the current payroll policies of Company, which policies may be changed by Company from time to time in its sole discretion, and shall be subject to all appropriate withholding taxes. Annually during the Term of this Agreement, the Employer shall review Employee's performance and may make such increases to Employee's base salary if any such increase is warranted.

5. EXPENSES. Employee shall be entitled to reimbursement by the Employer for ordinary and necessary business expenses incurred by Employee in the performance of his duties for the Employer, which types of expenditures shall be determined and approved by the Employer, and further provided that: (a) each such expenditure is of a nature qualifying it as a proper deduction on the Federal and State income tax returns of the Employer as a business expense and not as deductible compensation to Employee; and (b) Employee furnishes the Employer with adequate records and other documentary evidence required by Federal and State statutes and regulations for the substantiation of such expenditures as deductible business expenses of the Employer and not as deductible compensation to Employee, as well as any other documentation reasonably requested by the Employer.

6. BENEFITS. Employee shall be entitled to receive the following benefits during employment:

   a. Employee agrees that the Base Salary, Bonus Compensation, the Stock Options, and the Benefits and the other compensation provided in accordance with this Agreement, are the sole and exclusive compensation of Employee for his duties hereunder.

   b. Continuing throughout the Term:

      1. Employee shall receive all of the employee benefits including, without limitation, pension, disability, profit sharing and retirement benefits, provided at any time by the Employer to any of its employees in the sole and absolute discretion of the Board of Directors of the Employer (the "**Board**");

      2. Employee shall receive a minimum of four (4) weeks of paid vacation annually, to be taken at times mutually agreeable to the Chief Executive Officer and Employee;

      3. the Employer shall provide health insurance providing full hospital, medical and dental coverage pursuant to the Employer plans in effect from time to time for Employee

and each of Employee's dependents at similar expense to Employee or such dependents as charged to other employees of the Employer.

7. **BONUS COMPENSATION.** Employee shall be eligible to receive an annual bonus of up to 35% of his Base Salary for each fiscal year. The bonus will be at the discretion of the Board and based upon a combination of goals determined by the compensation committee of the Board for personal objectives as well as the Employer performance compared to its strategic objectives for the fiscal year.

8. **STOCK OPTIONS.** In addition to Employee's Base Salary, Benefits and Bonus Compensation, Employee shall be granted stock options to purchase a number of shares as determined by the Board at an exercise price as determined by the Board, which options will vest over a period specified by the Board at the time of Grant. The options, and the specific terms applicable thereto, shall be granted to Employee pursuant to an Option Agreement satisfactory as to its other terms to the Employer, and all of these grants and terms are subject to the approval of the Board.

9. **REVIEW.** The Board shall from time to time, no less frequently than annually, review Employee's compensation and may (in its sole discretion) increase, but not decrease, the compensation provided for herein. Any such increase in compensation shall be valid only if in writing, executed by the appropriate officer, and such writing shall constitute an amendment solely to the payments to be made to Employee under this Agreement, without waiver or modification of any other provision hereof.

10. Restrictive Covenants.

a. <u>Exclusive Property</u>. The Employee confirms that all Company Property is the exclusive property of the Employer. Employee agrees that during his employment Employee shall not make, use or permit to be used any Company Property other than for the benefit of the Company. The term "**Company Property**" shall include all automobiles, Confidential Information, notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, and any copies thereof, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control. Employee further agrees that he shall not, after the termination of employment, use or permit others

to use any such Company Property for any reason.  Promptly upon the termination of employment (for any reason), Employee shall immediately deliver all Company Property in Employee's possession, and all copies thereof, to the Company; provided, however, that the Employee shall be permitted to retain copies of any documents or materials of a personal nature or otherwise related to the Employee's rights under this Agreement.

b.  Nondisclosure.  Employee acknowledges that the Company has agreed to provide, and during the course of employment with the Company Employee will acquire, knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, business and financial methods, practices, plans, pricing information, marketing information and strategies, merchandising and selling techniques and information, customer lists and preferences, supplier lists, inventions, products, designs, know-how, techniques, processes, engineering data, software programs, works of authorship, projects, proposals, and confidential information relating to the Company's policies and/or business strategy (all of such information herein referred to as the "**Confidential Information**").  The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company.  Employee agrees that he will not, during the course of employment, divulge to any person, directly or indirectly, except to the Company or its officers and agents or as reasonably required in connection with Employee's duties on behalf of the Company, or use in any way, except on behalf of the Company, any Confidential Information acquired by Employee at any time during my employment.  Employee agrees that he will not, at any time after his employment with the Company has ended (for whatever reason), use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in any subsequent employment.  Employee acknowledges that the Company would not provide him with access to Confidential Information but for his covenants contained in this Agreement.  Employee understands and agrees that the obligations under this Section shall survive the termination of this Agreement and of his employment. The above restrictions on disclosure and use of Confidential Information shall not prevent the Employee from: (i)  using or disclosing information in the good faith performance of the Employee's duties; (ii) using or disclosing information to another employee to whom disclosure is required to perform in good faith the duties of either; (iii) using or disclosing information to another person or entity pursuant to a binding confidentiality agreement in a Company-approved form as part of

the performance in good faith of the Employee's duties or as authorized in writing by the Company; (iv) using or disclosing information to the extent such information is or may be, through no fault or disclosure on the part of the Employee, generally made know to the public or throughout the industry in which the Company is engaged; (v) using or disclosing information which is disclosed to the Employee after termination of my employment with the Company by a third party who is under no duty or obligation not to disclose such information; or (vi) disclosing information as required by law. If the Employee becomes legally compelled to disclose any of the Confidential Information, Employee shall (i) provide the Company with prior written notice of the need for such disclosure; (ii) if disclosure is required, furnish only that portion of the Confidential Information which, in the opinion of the Employee's counsel, is legally required; and (iii) exercise reasonable efforts to obtain reliable assurances that confidential treatment will be accorded to the Confidential Information.

c. <u>Non Competition</u>. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, unless the Employee receives the prior written consent of the Employer, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to, participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, or engage in any activity or capacity (collectively, the "<u>**Competitive Activities**</u>") with respect to any individual, partnership, limited liability company, firm, corporation or other business organization or entity (each, a "<u>**Person**</u>"), that is engaged directly or indirectly in the provision of software offerings substantially similar to those of the Employer, provided that those offerings represent at least 20% of the revenue of the Employer including its direct or indirect subsidiaries anywhere in the world; provided, however, that the foregoing (i) shall not apply with respect to any line-of-business in which the Employer or its direct or indirect subsidiaries was not engaged on or before the date of termination of Employee's employment, and (ii) shall not prohibit the Employee from owning, or otherwise having an interest in, less than three percent (3%) of any publicly-owned entity or five percent (5%) of any private equity fund or similar investment fund, provided the Employee has no active role with respect to any investment by such fund in any Person referred to in this Section 10(c). Employee hereby acknowledges that the scope of prohibited activities and the time duration of the provisions of this Section 10(c) are reasonable and are no broader than are necessary to protect the legitimate business interests of the Company. Employee acknowledges and

agrees that this noncompetition provision shall survive the termination of his employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this provision. Employee acknowledge that the Company would not employ him or provide him with access to its Confidential Information but for his covenants or promises contained in this Section.

d. <u>Non-Solicitation</u>. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, whether for his own account or for the account of any other Person (other than the Employer or its direct or indirect subsidiaries), intentionally solicit, endeavor to entice away from the Employer or its direct or indirect subsidiaries, or otherwise interfere with the relationship of the Employer or its direct or indirect subsidiaries with, (i) any person who is employed by the Employer or its direct or indirect subsidiaries (including any independent sales representatives or organizations), or (ii) any client or customer of the Employer or its direct or indirect subsidiaries.

e. <u>Assignment of Developments</u>. If at any time or times during Employee's employment, whether during work hours or off-duty hours, Employee shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to Employee by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. The term "<u>Development</u>" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection). Employee shall promptly disclose to the Company (or any persons designated by it) each such Development. Employee hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) Employee may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further

compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

f. <u>Injunctive Relief</u>. The Employee acknowledges that a breach of any of the covenants contained in this Section 10 may result in material, irreparable injury to the Employer for which there is no adequate remedy at law, that it shall not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat of breach, the Employer shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Employee from engaging in activities prohibited by this Section 10 or such other relief as may be required to specifically enforce any of the covenants in this Section 10. The Employee agrees and consents that injunctive relief may be sought in any state or federal court of record in the State of Florida, or in the state and county in which a violation may occur or in any other court having jurisdiction, at the election of the Employer; to the extent that the Employer seeks a temporary restraining order (but not a preliminary or permanent injunction), the Employee agrees that a temporary restraining order may be obtained ex parte. The Employee agrees and submits to personal jurisdiction before each and every court designated above for that purpose.

g. <u>Blue-Penciling</u>. The parties consider the covenants and restrictions contained in this Section 10 to be reasonable. However, if and when any such covenant or restriction is found to be void or unenforceable and would have been valid had some part of it been deleted or had its scope of application been modified, such covenant or restriction shall be deemed to have been applied with such modification as would be necessary and consistent with the intent of the parties to have made it valid, enforceable and effective.

11. SEPARATION BENEFITS.

a. <u>Provision of Separation Benefits</u>. In the event that the Employee's employment with the Employer is terminated or Employee terminates for Good Reason, the Employer shall, subject to the requirement of subsection b. below, provide the separation benefits specified in subsection c. below unless the Employee's termination of employment results from:

1. The Employee's death.

2. The Employee's disability (in which event Employee shall, subject to the terms and conditions thereof, be entitled to the benefits described in paragraph (d) below).

3. The Employee voluntarily resigning his employment with any member of the Company Group without Good Reason.

4. The termination of the Employee's employment by a member of the Company Group at a time when the Employee has accepted an offer of immediate employment with another member of the Company Group.

5. The termination of the Employee's employment by any member of the Company Group for "Cause".

b. <u>Separation Benefits Contingent on Executed and Valid Release.</u> No separation benefits specified in subsection c. or d. below shall be provided to the Employee unless and until the Employee has executed a separation and release agreement with the Employer (or the appropriate member of the Company Group) in a form reasonably acceptable to the Employer, and such separation and release agreement has become valid and enforceable. Such separation and release agreement shall contain provisions in which (1) the Employee shall agree to a date of termination of employment, and (2) the Employee shall release and discharge the Company Group and their related employees, directors, consultants, advisors, and other persons from any claim or liability, whether known or unknown, arising out of the Employee's employment with the Employer or the member of the Company Group or the termination of such employment.

c. <u>Separation Benefits to be Provided.</u> The separation benefits that the Employee shall receive under subsection a. above shall consist of:

1. A cash amount equal to one-twelfth (1/12) of the regular annual salary (exclusive of bonuses, commissions, and any other extra compensation) of the Employee in effect as of the Employee's date of termination of employment multiplied by the number of months of the Employee's Separation Period, which shall be payable in installments consistent with the Company's general payroll practices over the Employee's Separation Period;

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as

bonuses for the annual period are paid to other executive officers of the Employer; and

3. Reimbursement of any COBRA group health plan premiums paid by the Employee for the coverage of the Employee (and any of the Employee's covered dependents, provided that such dependents were covered at the time of termination) during the Separation Period. Reimbursements will be made within fifteen (15) days following submission of proof of the expense and the payment thereof by the Employee.

4. All payments will be subject to applicable federal, state and local tax withholdings.

d. <u>Disability Benefits</u>. In the event that Employee becomes Disabled, as defined herein, then the Employer may terminate Employee's employment and Employee shall be entitled to the following:

1. A cash amount equal to his Base Salary earned to the date of termination, plus for the first six (6) months after Employee is terminated due to the disability, Employee shall be entitled to his then Base Salary less any amounts paid to Employee under any disability insurance policy provided by the Employer; and

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as bonuses for the annual period are paid to other executive officers of the Employer.

e. <u>Documents</u>. If termination is due to Employee's disability or death, the Employer shall provide Employee or Employee's estate with such documents and information as reasonably may be requested by such person to assist in the collection of any disability or life insurance proceeds payable under any disability or life insurance policy pursuant to the Employer's standard policies and procedures.

f. <u>Definitions</u>. For this purpose, the following terms shall have the following meanings:

1. The term "<u>Disability</u>" shall mean that the Employee has been determined to be disabled under the company's long-term disability plan, if any, and/or under the Federal Social Security Act.

2. The term **"Cause"** shall mean an act or acts by the Employee involving (a) the use for profit or willful disclosure to unauthorized persons of confidential information or trade secrets of the Employer or any member of the Company Group in violation of company policy or company agreements with such persons protecting such matters, (b) the material and willful breach of any written contract between the Employee and the Employer, any member of the Company Group, or of any employment or business policies of the Employer or any member of the Company Group (including, without limitation, theft or misuse of property) (c) the unlawful trading in the securities of the Employer or any member of the Company Group or of another corporation based on information gained as a result of the performance of services for the Employer or any member of the Company Group, (d) a conviction for, or pleading NOLO CONTENDERE to, a felony or other crime involving moral turpitude or dishonesty (other than traffic violations and similar misdemeanors), or (e) any other act or omission by Employee which is in violation of the Agreement or written company policy and which the Employer in good faith believes has occurred to its material detriment and about which Employee has received at least one (1) written warning by the Employer and despite such prior written warning, Employee has on a second occasion committed such act or omission.

3. The term **"Good Reason"** shall mean:

   (i) a reduction of the Employee's base salary; or

   (ii) a material reduction in the Employee's responsibilities or status, other than an act that is remedied by the Employer promptly after receipt of notice given by the Employee; or

   (iii) any material breach by the Employer of any material provision of this Agreement which is not cured within thirty (30) days following written notice by Employee to the Employer of such breach.

4. The term **"Company Group"** shall mean the Employer and any parent or subsidiary of the Employer (or a successor entity of any such entity).

5. The term "**Separation Period**" shall mean twelve (12) months; provided, however, to the extent that the Employee receives any payments of base salary, excluding any earned vacation pay, prior to his termination of employment for a period of time while he is performing no (or DE MINIMIS) services for the Company Group, such period of time shall be subtracted from his Separation Period.

12. CONFLICT OF INTEREST. The Employee shall devote substantially all of the Employee's full working time to the business and affairs of the Employer. Notwithstanding the preceding sentence, the Employee (a) may serve on the board of directors (or similar managing body) of one or more corporations or other entities, provided such service does not violate any other covenant or term of this Agreement, interfere with the performance of the Employee's duties for the Employer or create a conflict of interest or the appearance of a conflict of interest with respect to the Employer; (b) may invest the Employee's personal assets in any form or manner so long as it does not require the Employee's services or advice in the operation of any business in which such investment is made, provided such activity does not violate any other covenant or term of this Agreement (nothing in this Agreement shall restrict the Employee's right to invest in the Employer); and (c) may engage in such other activities that do not violate any other covenant or term of this Agreement (including any restrictive covenants incorporated herein), create a conflict of interest or the appearance of a conflict of interest with the Employer or materially interfere with the performance of the Employee's obligations to the Employer under this Agreement.

13. JURISDICTION AND VENUE. The parties acknowledge that the administration and execution of this Agreement occurred or shall occur in Palm Beach County, Florida, and that, therefore, without limiting the jurisdiction or venue of any other federal or state courts, each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement may be brought in the courts of record of the State of Florida in Palm Beach County or the court of the United States, Southern District of Florida; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules in said state. At the Employee's sole discretion, any dispute relating to this Agreement, other than a dispute relating to Section 16, may be submitted to binding arbitration. The arbitrator shall be selected by agreement of the parties or,

if they do not agree on an arbitrator within 30 days after the Employee has notified the Employer of his desire to have the question settled by arbitration, then the arbitrator shall be selected pursuant to the procedures of the American Arbitration Association (the "**AAA**") in Boca Raton, Florida. The determination reached in such arbitration shall be final and binding on all parties. Enforcement of the determination by such arbitrator may be sought in any court of competent jurisdiction. Unless otherwise agreed by the parties, any such arbitration shall take place in Boca Raton, Florida, and shall be conducted in accordance with the Commercial Arbitration Rules of the AAA.

14. SURVIVAL. Notwithstanding anything to the contrary herein, the provisions of this Agreement shall survive and remain in effect in accordance with their respective terms in the event the employment is terminated.

15. EMPLOYEE REPRESENTATIONS, WARRANTIES, AND ACKNOWLEDGMENTS. Employee represents and warrants to the Employer that he is fully empowered to enter and perform his obligations under this Agreement and, without limitation, that he is under no restrictive covenants to any person or entity that will be violated by his entering into and performing this Agreement, and that this Agreement constitutes the valid and legally binding obligation of Employee enforceable in accordance with its terms. The execution and delivery of this Agreement by Employee has been duly authorized by all necessary action. Employee shall indemnify the Employer upon demand for and against any and all judgments, losses, claims, damages, costs (including without limitation all legal fees and costs, even if incident to appeals) incurred or suffered by any of them as a result of the breach of the representations and warranties made in this section, or as a result of the failure of the acknowledgment made in this section to be true and correct at all times.

16. SPECIFIC PERFORMANCE. Employee acknowledges that the services to be rendered by Employee hereunder are extraordinary and unique and are vital to the success of the Employer, and that damages at law would be an inadequate remedy for any breach or threatened breach of this Agreement by Employee. Therefore, in the event of a breach or threatened breach by Employee of any provision of this Agreement, then the Employer shall be entitled, in addition to all other rights or remedies, to injunctions restraining such breach.

17. REMEDIES CUMULATIVE. No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right,

power or remedy hereunder shall preclude any other or further exercise thereof.

18. ASSIGNMENT; SUCCESSORS; BINDING AGREEMENT. This Agreement shall not be assignable by Employee and shall be assignable by the Company, provided that (i) the assignee or transferee is the successor to all or substantially all of the assets of the Company, and (ii) such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. The Company further agrees that, in such an event, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder, it being understood that the Company shall remain liable for all separation and other benefits hereunder in the absence of a written assumption by the transferee of the Company's obligations under this Agreement. None of the rights or obligations of Employee under this Agreement may be assigned or transferred by Employee other than his rights to compensation and benefits, which may be transferred only by will or operation of law. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legatees, devisees, personal representatives, successors and assigns.

19. MODIFICATION AND WAIVER. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification or discharge is duly approved by the Board and is agreed to in writing by the Employee and such officer(s) as may be specifically authorized by the Board to effect it. No waiver by any party of any breach by any other party of, or of compliance with, any term or condition of this Agreement to be performed by any other party, at any time, shall constitute a waiver of similar or dissimilar terms or conditions at that time or at any prior or subsequent time.

20. ENTIRE AGREEMENT. This Agreement, along with the Restrictive Covenant Agreement contains the entire agreement between the Employer and Employee with respect to the subject matter hereof and, from and after the date of this Agreement, this Agreement shall supersede any other agreement between the parties with respect to the subject matter hereof.

21. GOVERNING LAW. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Missouri other than the conflict of laws provision thereof.

22. WITHHOLDING OF TAXES. The Employer shall withhold from any amounts payable under the Agreement all federal, state, local or other taxes as legally shall be required to be withheld.

23. NOTICE. For the purposes of this Agreement, notices and all other communications to either party provided for in this Agreement shall be furnished in writing and shall be deemed to have been duly given when delivered or when mailed if such mailing is by United States certified or registered mail, return receipt requested, postage prepaid, addressed to such party (notices to the Employer being addressed to the Secretary of the Employer) at the Employer's principal executive office, or at other address as either party shall have designated by giving written notice of such change to the other party at anytime hereafter.

24. SEVERABILITY. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

25. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

26. HEADINGS. The headings used in this Agreement are for convenience only, do not constitute a part of the Agreement; and shall not be deemed to limit, characterize, or affect in any way the provisions of the Agreement, and all provisions of the Agreement shall be construed as if no headings had been used in the Agreement.

27. CONSTRUCTION. As used in this Agreement, unless the context otherwise requires: (a) the terms defined herein shall have the meanings set forth herein for all purposes; (b) references to "Section" are to a section hereof; (c) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (d) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (e) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section or other subdivision hereof or attachment hereto; (f) references to any gender include references to all genders; and (g) references to any agreement or other instrument or statute or regulation are referred to as amended or supplemented from time to time (and, in the case of a statute or regulation, to any successor provision).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Viziqor Holdings, Inc.**

By: _____
   Name:
   Title:

EMPLOYEE

_____
Name:
   WILLIAM H. M^CAUSLAND
   10/15/04

15

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Vizigor Holdings, Inc.**

By: _____
Name: GORDON Quick
Title: CEO & Treasurer

**EMPLOYEE**

_____
Name:

## Earnings Statement

**VIZIQOR SOLUTIONS, INC.**
**902 CLINT MOORE ROAD, SUITE 230**
**BOCA RATON, FL 33487**

Period Ending: 12/15/2005
Pay Date: 12/20/2005

Taxable Marital Status:  Married
Exemptions/Allowances:
Federal:  4
MO:  4

Social Security Number: XXX-XX-8071

**WILLIAM MCCAUSLAND**
**17714 DRUMMER LANE**
**WILDWOOD, MO 63005**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 8666.67 | | 3,151.52 | 202,484.93 |
| Personal Time | | | 15,999.39 | 15,999.39 |
| Gross Pay | | | $19,150.91 | 218,484.32 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -5,286.95 | 40,897.39 |
| | Medicare Tax | -275.64 | 3,104.01 |
| | MO State Income Tax | -1,069.00 | 10,292.00 |
| | Social Security Tax | | 5,580.00 |
| | **Other** | | |
| | Checking | -12,336.12 | |
| | Dental | -7.00* | 168.00 |
| | Flex Medical | -125.00* | 3,000.00 |
| | Life Ins | -23.91 | 1,535.93 |
| | Sec125-Medical | -25.61* | 1,645.27 |
| | Vision | -1.68* | 40.32 |
| | Employee Reimb | | -35,480.89 |
| | 401K | | 13,953.41 |
| | **Net Pay** | | $0.00 |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$19,009.92

| Other Benefits and Information | this period | total to date |
|---|---|---|
| G.T.L. | 18.30 | 439.20 |
| Abilit Vac | | 128.13 |
| Float Holiday | | 0.00 |
| Personal Time | | 86.99 |
| Sick Hours | | 40.00 |

128.13
86.99
215.12
PAID 160.00
55.12 due

©2001 Automatic Data Processing Inc

---

VERIFY DOCUMENT AUTHENTICITY - COLOR AREA MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHT AT BOTTOM

**VIZIQOR SOLUTIONS, INC.**
**902 CLINT MOORE ROAD, SUITE 230**
**BOCA RATON, FL 33487**

Advice number: 00000500029
Pay date: 12/20/2005

Deposited to the account of
**WILLIAM MCCAUSLAND**

| | account number | transit ABA | amount |
|---|---|---|---|
| | 003475884832 | 0810 0003 | $12,336.12 |

VOID AFTER 180 DAYS

**WACHOVIA**
FLORIDA

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | CLAIM 2 | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor Woodmont Holding, Inc. | Case Number 06-10236 - MFW |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
William McCausland

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and Address where notices should be sent:

William McCausland
1771-1 Drummond Lane
Wildwood, MO 63005-4223
**311 WEST HAVEN DR.**
**AUSTIN, TX 78746**

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☑ Check box if the address differs from the address on the envelope sent to you by the court.

Telephone Number: **512-471-3804**

THIS SPACE IS FOR COURT USE ONLY

Last four digits of account or other number by which creditor identifies debtor:

Check here if ☐ replaces ☐ amends a previously filed claim, dated: _____ this claim

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☑ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: **6071**
  Unpaid compensation for services performed
  from **12/06/05** to _____
  (date)         (date)

**2. Date debt was incurred: 12/06/05**

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $_____**
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $ **UNKNOWN - TO BE DETERMINED**

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☑ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle ☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $ **TOTAL LESS PRIORITY** **UNKNOWN** $ **21,005.27**
(unsecured)   (secured)   (priority)   (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

THIS SPACE IS FOR COURT USE ONLY

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date 6/24/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): WILLIAM H. McCAUSLAND  *[signature]* |
|---|---|

005867     alty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# William H. McCausland

## Claim 2

### Claim 2 Detail

| Benefits | Base | Factor | Amount | Explanation | Date Due |
|---|---|---|---|---|---|
| COBRA Payments - Mos. 1-4 | $ 765.97 | 4 | $ 3,063.88 | $ 12,603.16 ⌐ 12 months of COBRA | Monthly pay out |
| Mos. 5-12 | $ 1,192.41 | 8 | $ 9,539.28 | | Monthly pay out |
| Gross-up amount | | | | $ 8,402.11  Gross up needed for tax effect | |
| Total | | | | $ 21,005.27 | |
| | | | | All above based on employment agreement - Sec. 11.c.3 | |

**Input Information**
Effective state and federal tax rate          40%        Gross up multiplier
    (For tax effect gross up)                      1.6667
Marginal federal tax rate was 35% (plus phase-out, medicare and AMT)
State marginal tax rate of 6%

**Documentation**
Employment Agreement
Current COBRA Statement

## EMPLOYMENT AGREEMENT

The parties to this Employment Agreement (the "**Agreement**") are **Viziqor Holdings, Inc.** (the "**Employer**" or the "**Company**"), a Delaware corporation, and **Bill McCausland** (the "**Employee**").

The Employer proposes to enter into a series of transactions (the "Transactions") pursuant to which the Employer shall (i) cause its newly formed, wholly-owned subsidiary to merge with and into Daleen Technologies, Inc., a Delaware corporation ("**Daleen**") and (ii) purchase all of the shares of the outstanding capital stock of Protek Telecommunications Solutions Ltd, a company organized under the laws of England and Wales ("**Protek**"). Upon the date of consummation of the Transactions (the "**Effective Date**"), each of Daleen and Protek will be a wholly-owned subsidiary of the Employer.

The Employer desires to ensure itself of the services of the Employee following the consummation of the Transactions and the Employee is willing to provide full-time services to the Employer on the terms and conditions provided herein.

Accordingly, in consideration of the mutual covenants and representations contained herein, the parties to this Agreement, intending to be legally bound, agree as follows:

1.  EMPLOYMENT. The Employer hereby employs Employee in its business as its **Senior Vice President of Operations**, and Employee hereby accepts such employment, all upon the terms and conditions hereinafter set forth.

2.  DUTIES. Employee shall report directly to and perform under and according to the reasonable direction of the Chief Executive Officer of the Company (the "**Chief Executive Officer**") and control and to the best of Employee's abilities, all executive, advisory, administrative, and/or managerial duties (if any) which may reasonably be assigned or delegated to Employee from time to time by the Chief Executive Officer.

3.  TERM. Unless sooner terminated pursuant to the provisions of this Agreement, the term of employment under this Agreement shall commence on the Effective Date and shall extend for as long as Employee remains employed hereunder ("**Term**"), with Employee acknowledging that the Employee is an at-will employee. Employee's employment may be terminated by either party upon thirty (30) days prior written notice.

4.  BASE SALARY. Employee shall be entitled to receive salary at the rate of **$208,000** per annum, as such may be increased pursuant to Section 9

hereof (the "**Base Salary**"). The Base Salary shall be payable in accordance with the current payroll policies of Company, which policies may be changed by Company from time to time in its sole discretion, and shall be subject to all appropriate withholding taxes. Annually during the Term of this Agreement, the Employer shall review Employee's performance and may make such increases to Employee's base salary if any such increase is warranted.

5. EXPENSES. Employee shall be entitled to reimbursement by the Employer for ordinary and necessary business expenses incurred by Employee in the performance of his duties for the Employer, which types of expenditures shall be determined and approved by the Employer, and further provided that: (a) each such expenditure is of a nature qualifying it as a proper deduction on the Federal and State income tax returns of the Employer as a business expense and not as deductible compensation to Employee; and (b) Employee furnishes the Employer with adequate records and other documentary evidence required by Federal and State statutes and regulations for the substantiation of such expenditures as deductible business expenses of the Employer and not as deductible compensation to Employee, as well as any other documentation reasonably requested by the Employer.

6. BENEFITS. Employee shall be entitled to receive the following benefits during employment:

    a. Employee agrees that the Base Salary, Bonus Compensation, the Stock Options, and the Benefits and the other compensation provided in accordance with this Agreement, are the sole and exclusive compensation of Employee for his duties hereunder.

    b. Continuing throughout the Term:

        1. Employee shall receive all of the employee benefits including, without limitation, pension, disability, profit sharing and retirement benefits, provided at any time by the Employer to any of its employees in the sole and absolute discretion of the Board of Directors of the Employer (the "**Board**");

        2. Employee shall receive a minimum of four (4) weeks of paid vacation annually, to be taken at times mutually agreeable to the Chief Executive Officer and Employee;

        3. the Employer shall provide health insurance providing full hospital, medical and dental coverage pursuant to the Employer plans in effect from time to time for Employee

and each of Employee's dependents at similar expense to Employee or such dependents as charged to other employees of the Employer.

7. BONUS COMPENSATION. Employee shall be eligible to receive an annual bonus of up to 35% of his Base Salary for each fiscal year. The bonus will be at the discretion of the Board and based upon a combination of goals determined by the compensation committee of the Board for personal objectives as well as the Employer performance compared to its strategic objectives for the fiscal year.

8. STOCK OPTIONS. In addition to Employee's Base Salary, Benefits and Bonus Compensation, Employee shall be granted stock options to purchase a number of shares as determined by the Board at an exercise price as determined by the Board, which options will vest over a period specified by the Board at the time of Grant. The options, and the specific terms applicable thereto, shall be granted to Employee pursuant to an Option Agreement satisfactory as to its other terms to the Employer, and all of these grants and terms are subject to the approval of the Board.

9. REVIEW. The Board shall from time to time, no less frequently than annually, review Employee's compensation and may (in its sole discretion) increase, but not decrease, the compensation provided for herein. Any such increase in compensation shall be valid only if in writing, executed by the appropriate officer, and such writing shall constitute an amendment solely to the payments to be made to Employee under this Agreement, without waiver or modification of any other provision hereof.

10. Restrictive Covenants.

   a. Exclusive Property. The Employee confirms that all Company Property is the exclusive property of the Employer. Employee agrees that during his employment Employee shall not make, use or permit to be used any Company Property other than for the benefit of the Company. The term "**Company Property**" shall include all automobiles, Confidential Information, notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, and any copies thereof, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control. Employee further agrees that he shall not, after the termination of employment, use or permit others

to use any such Company Property for any reason. Promptly upon the termination of employment (for any reason), Employee shall immediately deliver all Company Property in Employee's possession, and all copies thereof, to the Company; provided, however, that the Employee shall be permitted to retain copies of any documents or materials of a personal nature or otherwise related to the Employee's rights under this Agreement.

b.  Nondisclosure. Employee acknowledges that the Company has agreed to provide, and during the course of employment with the Company Employee will acquire, knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, business and financial methods, practices, plans, pricing information, marketing information and strategies, merchandising and selling techniques and information, customer lists and preferences, supplier lists, inventions, products, designs, know-how, techniques, processes, engineering data, software programs, works of authorship, projects, proposals, and confidential information relating to the Company's policies and/or business strategy (all of such information herein referred to as the "**Confidential Information**"). The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company. Employee agrees that he will not, during the course of employment, divulge to any person, directly or indirectly, except to the Company or its officers and agents or as reasonably required in connection with Employee's duties on behalf of the Company, or use in any way, except on behalf of the Company, any Confidential Information acquired by Employee at any time during my employment. Employee agrees that he will not, at any time after his employment with the Company has ended (for whatever reason), use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in any subsequent employment. Employee acknowledges that the Company would not provide him with access to Confidential Information but for his covenants contained in this Agreement. Employee understands and agrees that the obligations under this Section shall survive the termination of this Agreement and of his employment. The above restrictions on disclosure and use of Confidential Information shall not prevent the Employee from: (i) using or disclosing information in the good faith performance of the Employee's duties; (ii) using or disclosing information to another employee to whom disclosure is required to perform in good faith the duties of either; (iii) using or disclosing information to another person or entity pursuant to a binding confidentiality agreement in a Company-approved form as part of

the performance in good faith of the Employee's duties or as authorized in writing by the Company; (iv) using or disclosing information to the extent such information is or may be, through no fault or disclosure on the part of the Employee, generally made know to the public or throughout the Industry in which the Company is engaged; (v) using or disclosing information which is disclosed to the Employee after termination of my employment with the Company by a third party who is under no duty or obligation not to disclose such Information; or (vi) disclosing information as required by law. If the Employee becomes legally compelled to disclose any of the Confidential Information, Employee shall (i) provide the Company with prior written notice of the need for such disclosure; (ii) if disclosure is required, furnish only that portion of the Confidential Information which, in the opinion of the Employee's counsel, is legally required; and (iii) exercise reasonable efforts to obtain reliable assurances that confidential treatment will be accorded to the Confidential Information.

c. Non Competition. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, unless the Employee receives the prior written consent of the Employer, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to, participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, or engage in any activity or capacity (collectively, the "**Competitive Activities**") with respect to any individual, partnership, limited liability company, firm, corporation or other business organization or entity (each, a "**Person**"), that is engaged directly or indirectly in the provision of software offerings substantially similar to those of the Employer, provided that those offerings represent at least 20% of the revenue of the Employer including its direct or indirect subsidiaries anywhere in the world; provided, however, that the foregoing (i) shall not apply with respect to any line-of-business in which the Employer or its direct or indirect subsidiaries was not engaged on or before the date of termination of Employee's employment, and (ii) shall not prohibit the Employee from owning, or otherwise having an interest in, less than three percent (3%) of any publicly-owned entity or five percent (5%) of any private equity fund or similar investment fund, provided the Employee has no active role with respect to any investment by such fund in any Person referred to in this Section 10(c). Employee hereby acknowledges that the scope of prohibited activities and the time duration of the provisions of this Section 10(c) are reasonable and are no broader than are necessary to protect the legitimate business Interests of the Company. Employee acknowledges and

agrees that this noncompetition provision shall survive the termination of his employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this provision. Employee acknowledge that the Company would not employ him or provide him with access to its Confidential Information but for his covenants or promises contained in this Section.

d. <u>Non-Solicitation</u>. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, whether for his own account or for the account of any other Person (other than the Employer or its direct or indirect subsidiaries), intentionally solicit, endeavor to entice away from the Employer or its direct or indirect subsidiaries, or otherwise interfere with the relationship of the Employer or its direct or indirect subsidiaries with, (i) any person who is employed by the Employer or its direct or indirect subsidiaries (including any independent sales representatives or organizations), or (ii) any client or customer of the Employer or its direct or indirect subsidiaries.

e. <u>Assignment of Developments</u>. If at any time or times during Employee's employment, whether during work hours or off-duty hours, Employee shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to Employee by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. The term "**Development**" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection). Employee shall promptly disclose to the Company (or any persons designated by it) each such Development. Employee hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) Employee may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further

compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

f.  Injunctive Relief.  The Employee acknowledges that a breach of any of the covenants contained in this Section 10 may result in material, irreparable injury to the Employer for which there is no adequate remedy at law, that it shall not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat of breach, the Employer shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Employee from engaging in activities prohibited by this Section 10 or such other relief as may be required to specifically enforce any of the covenants in this Section 10. The Employee agrees and consents that injunctive relief may be sought in any state or federal court of record in the State of Florida, or in the state and county in which a violation may occur or in any other court having jurisdiction, at the election of the Employer; to the extent that the Employer seeks a temporary restraining order (but not a preliminary or permanent injunction), the Employee agrees that a temporary restraining order may be obtained ex parte.  The Employee agrees and submits to personal jurisdiction before each and every court designated above for that purpose.

g.  Blue-Pencilling.  The parties consider the covenants and restrictions contained in this Section 10 to be reasonable. However, if and when any such covenant or restriction is found to be void or unenforceable and would have been valid had some part of it been deleted or had its scope of application been modified, such covenant or restriction shall be deemed to have been applied with such modification as would be necessary and consistent with the intent of the parties to have made it valid, enforceable and effective.

11. SEPARATION BENEFITS.

a.  Provision of Separation Benefits.  In the event that the Employee's employment with the Employer is terminated or Employee terminates for Good Reason, the Employer shall, subject to the requirement of subsection b. below, provide the separation benefits specified in subsection c. below unless the Employee's termination of employment results from:

   1.  The Employee's death.

2. The Employee's disability (in which event Employee shall, subject to the terms and conditions thereof, be entitled to the benefits described in paragraph (d) below).

3. The Employee voluntarily resigning his employment with any member of the Company Group without Good Reason.

4. The termination of the Employee's employment by a member of the Company Group at a time when the Employee has accepted an offer of immediate employment with another member of the Company Group.

5. The termination of the Employee's employment by any member of the Company Group for "Cause".

b. Separation Benefits Contingent on Executed and Valid Release. No separation benefits specified in subsection c. or d. below shall be provided to the Employee unless and until the Employee has executed a separation and release agreement with the Employer (or the appropriate member of the Company Group) in a form reasonably acceptable to the Employer, and such separation and release agreement has become valid and enforceable. Such separation and release agreement shall contain provisions in which (1) the Employee shall agree to a date of termination of employment, and (2) the Employee shall release and discharge the Company Group and their related employees, directors, consultants, advisors, and other persons from any claim or liability, whether known or unknown, arising out of the Employee's employment with the Employer or the member of the Company Group or the termination of such employment.

c. Separation Benefits to be Provided. The separation benefits that the Employee shall receive under subsection a. above shall consist of:

1. A cash amount equal to one-twelfth (1/12) of the regular annual salary (exclusive of bonuses, commissions, and any other extra compensation) of the Employee in effect as of the Employee's date of termination of employment multiplied by the number of months of the Employee's Separation Period, which shall be payable in installments consistent with the Company's general payroll practices over the Employee's Separation Period;

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as

8

bonuses for the annual period are paid to other executive officers of the Employer; and

3. Reimbursement of any COBRA group health plan premiums paid by the Employee for the coverage of the Employee (and any of the Employee's covered dependents, provided that such dependents were covered at the time of termination) during the Separation Period. Reimbursements will be made within fifteen (15) days following submission of proof of the expense and the payment thereof by the Employee.

4. All payments will be subject to applicable federal, state and local tax withholdings.

d. Disability Benefits. In the event that Employee becomes Disabled, as defined herein, then the Employer may terminate Employee's employment and Employee shall be entitled to the following:

1. A cash amount equal to his Base Salary earned to the date of termination, plus for the first six (6) months after Employee is terminated due to the disability, Employee shall be entitled to his then Base Salary less any amounts paid to Employee under any disability insurance policy provided by the Employer; and

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as bonuses for the annual period are paid to other executive officers of the Employer.

e. Documents. If termination is due to Employee's disability or death, the Employer shall provide Employee or Employee's estate with such documents and information as reasonably may be requested by such person to assist in the collection of any disability or life insurance proceeds payable under any disability or life insurance policy pursuant to the Employer's standard policies and procedures.

f. Definitions. For this purpose, the following terms shall have the following meanings:

1. The term "Disability" shall mean that the Employee has been determined to be disabled under the company's long-term disability plan, if any, and/or under the Federal Social Security Act.

9

2. The term **"Cause"** shall mean an act or acts by the Employee involving (a) the use for profit or willful disclosure to unauthorized persons of confidential information or trade secrets of the Employer or any member of the Company Group in violation of company policy or company agreements with such persons protecting such matters, (b) the material and willful breach of any written contract between the Employee and the Employer, any member of the Company Group, or of any employment or business policies of the Employer or any member of the Company Group (including, without limitation, theft or misuse of property) (c) the unlawful trading in the securities of the Employer or any member of the Company Group or of another corporation based on information gained as a result of the performance of services for the Employer or any member of the Company Group, (d) a conviction for, or pleading NOLO CONTENDERE to, a felony or other crime involving moral turpitude or dishonesty (other than traffic violations and similar misdemeanors), or (e) any other act or omission by Employee which is in violation of the Agreement or written company policy and which the Employer in good faith believes has occurred to its material detriment and about which Employee has received at least one (1) written warning by the Employer and despite such prior written warning, Employee has on a second occasion committed such act or omission.

3. The term **"Good Reason"** shall mean:

   (i)    a reduction of the Employee's base salary; or

   (ii)   a material reduction in the Employee's responsibilities or status, other than an act that is remedied by the Employer promptly after receipt of notice given by the Employee; or

   (iii)  any material breach by the Employer of any material provision of this Agreement which is not cured within thirty (30) days following written notice by Employee to the Employer of such breach.

4. The term **"Company Group"** shall mean the Employer and any parent or subsidiary of the Employer (or a successor entity of any such entity).

5. The term "**Separation Period**" shall mean twelve (12) months; provided, however, to the extent that the Employee receives any payments of base salary, excluding any earned vacation pay, prior to his termination of employment for a period of time while he is performing no (or DE MINIMIS) services for the Company Group, such period of time shall be subtracted from his Separation Period.

12. CONFLICT OF INTEREST. The Employee shall devote substantially all of the Employee's full working time to the business and affairs of the Employer. Notwithstanding the preceding sentence, the Employee (a) may serve on the board of directors (or similar managing body) of one or more corporations or other entities, provided such service does not violate any other covenant or term of this Agreement, interfere with the performance of the Employee's duties for the Employer or create a conflict of interest or the appearance of a conflict of interest with respect to the Employer; (b) may invest the Employee's personal assets in any form or manner so long as it does not require the Employee's services or advice in the operation of any business in which such investment is made, provided such activity does not violate any other covenant or term of this Agreement (nothing in this Agreement shall restrict the Employee's right to invest in the Employer); and (c) may engage in such other activities that do not violate any other covenant or term of this Agreement (including any restrictive covenants incorporated herein), create a conflict of interest or the appearance of a conflict of interest with the Employer or materially interfere with the performance of the Employee's obligations to the Employer under this Agreement.

13. JURISDICTION AND VENUE. The parties acknowledge that the administration and execution of this Agreement occurred or shall occur in Palm Beach County, Florida, and that, therefore, without limiting the jurisdiction or venue of any other federal or state courts, each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement may be brought in the courts of record of the State of Florida in Palm Beach County or the court of the United States, Southern District of Florida; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules in said state. At the Employee's sole discretion, any dispute relating to this Agreement, other than a dispute relating to Section 16, may be submitted to binding arbitration. The arbitrator shall be selected by agreement of the parties or,

if they do not agree on an arbitrator within 30 days after the Employee has notified the Employer of his desire to have the question settled by arbitration, then the arbitrator shall be selected pursuant to the procedures of the American Arbitration Association (the "**AAA**") in Boca Raton, Florida. The determination reached in such arbitration shall be final and binding on all parties. Enforcement of the determination by such arbitrator may be sought in any court of competent jurisdiction. Unless otherwise agreed by the parties, any such arbitration shall take place in Boca Raton, Florida, and shall be conducted in accordance with the Commercial Arbitration Rules of the AAA.

14. SURVIVAL. Notwithstanding anything to the contrary herein, the provisions of this Agreement shall survive and remain in effect in accordance with their respective terms in the event the employment is terminated.

15. EMPLOYEE REPRESENTATIONS, WARRANTIES, AND ACKNOWLEDGMENTS. Employee represents and warrants to the Employer that he is fully empowered to enter and perform his obligations under this Agreement and, without limitation, that he is under no restrictive covenants to any person or entity that will be violated by his entering into and performing this Agreement, and that this Agreement constitutes the valid and legally binding obligation of Employee enforceable in accordance with its terms. The execution and delivery of this Agreement by Employee has been duly authorized by all necessary action. Employee shall indemnify the Employer upon demand for and against any and all judgments, losses, claims, damages, costs (including without limitation all legal fees and costs, even if incident to appeals) incurred or suffered by any of them as a result of the breach of the representations and warranties made in this section, or as a result of the failure of the acknowledgment made in this section to be true and correct at all times.

16. SPECIFIC PERFORMANCE. Employee acknowledges that the services to be rendered by Employee hereunder are extraordinary and unique and are vital to the success of the Employer, and that damages at law would be an inadequate remedy for any breach or threatened breach of this Agreement by Employee. Therefore, in the event of a breach or threatened breach by Employee of any provision of this Agreement, then the Employer shall be entitled, in addition to all other rights or remedies, to injunctions restraining such breach.

17. REMEDIES CUMULATIVE. No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right,

power or remedy hereunder shall preclude any other or further exercise thereof.

18. ASSIGNMENT; SUCCESSORS; BINDING AGREEMENT. This Agreement shall not be assignable by Employee and shall be assignable by the Company, provided that (i) the assignee or transferee is the successor to all or substantially all of the assets of the Company, and (ii) such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law. The Company further agrees that, in such an event, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder, it being understood that the Company shall remain liable for all separation and other benefits hereunder in the absence of a written assumption by the transferee of the Company's obligations under this Agreement. None of the rights or obligations of Employee under this Agreement may be assigned or transferred by Employee other than his rights to compensation and benefits, which may be transferred only by will or operation of law. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legatees, devisees, personal representatives, successors and assigns.

19. MODIFICATION AND WAIVER. No provision of this Agreement may be · modified, waived, or discharged unless such waiver, modification or discharge is duly approved by the Board and is agreed to in writing by the Employee and such officer(s) as may be specifically authorized by the Board to effect it. No waiver by any party of any breach by any other party of, or of compliance with, any term or condition of this Agreement to be performed by any other party, at any time, shall constitute a waiver of similar or dissimilar terms or conditions at that time or at any prior or subsequent time.

20. ENTIRE AGREEMENT. This Agreement, along with the Restrictive Covenant Agreement contains the entire agreement between the Employer and Employee with respect to the subject matter hereof and, from and after the date of this Agreement, this Agreement shall supersede any other agreement between the parties with respect to the subject matter hereof.

21. GOVERNING LAW. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Missouri other than the conflict of laws provision thereof.

22. WITHHOLDING OF TAXES. The Employer shall withhold from any amounts payable under the Agreement all federal, state, local or other taxes as legally shall be required to be withheld.

23. NOTICE. For the purposes of this Agreement, notices and all other communications to either party provided for in this Agreement shall be furnished in writing and shall be deemed to have been duly given when delivered or when mailed if such mailing is by United States certified or registered mail, return receipt requested, postage prepaid, addressed to such party (notices to the Employer being addressed to the Secretary of the Employer) at the Employer's principal executive office, or at other address as either party shall have designated by giving written notice of such change to the other party at anytime hereafter.

24. SEVERABILITY. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

25. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

26. HEADINGS. The headings used in this Agreement are for convenience only, do not constitute a part of the Agreement, and shall not be deemed to limit, characterize, or affect in any way the provisions of the Agreement, and all provisions of the Agreement shall be construed as if no headings had been used in the Agreement.

27. CONSTRUCTION. As used in this Agreement, unless the context otherwise requires: (a) the terms defined herein shall have the meanings set forth herein for all purposes; (b) references to "Section" are to a section hereof; (c) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (d) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (e) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section or other subdivision hereof or attachment hereto; (f) references to any gender include references to all genders; and (g) references to any agreement or other instrument or statute or regulation are referred to as amended or supplemented from time to time (and, in the case of a statute or regulation, to any successor provision).

IN WITNESS WHEREOF, the parties hereto have executed this
Agreement as of the day and year first above written.

**Viziqor Holdings, Inc.**

By: _____

   Name:
   Title:

**EMPLOYEE**

_~~signature~~_

Name: _____

WILLIAM H. McCAUSLAND
10/15/04

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Vizicor Holdings, Inc.**

By: _____

Name: GORDON Ourick

Title: CEO & Treasurer

**EMPLOYEE**

_____

Name:

‖‖‖‖‖‖‖‖‖‖‖‖‖   ‖‖‖‖‖‖

*Quick account summary:*

*Your account number is 15C289741.*

*This premium reminder is for coverage ending ▓▓▓▓▓▓▓▓*

*Your regular premium payment is 1192.41. However please see the reverse side for important information. Payment for this period may already be credited OR payment for prior periods may still be unpaid.*

*Based on current information, your coverage continuation will end 5/31/2007*

Friday, April 14, 2006

McCausland, William
17714 Drummer Lane
Wildwood, MO 63005

### Formula Telecom Solutions
### COBRA Continuation Program

# AMENDED

*Your COBRA Program Administrator*

Administrative Outsourcing Services, LLC
an affiliate of Mahoney & Associates
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, FL 33304
(877) 564-4300 x223

*Make your premium payments to*

AOS Premium Account
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, Florida 33304

**Please attach your payment to this form. Do not send or deliver cash. Write your account number on your payment. Your account number is 15C289741 your scheduled payment is $1192.41.**

Payment must be mailed by the last day of the month for which it is due. You are responsible for the timely delivery of your premium payment. If you have not paid premiums currently due, please make your payments as soon as possible. This notice does not exempt you from paying prior months. Coverage may terminate if full payment is not received or if the payment check is returned uncollected for any reason. Send full/complete payments - do not send installments. In the event you send an amount of premium that is less than the amount due, the payment will be held for the balance and no coverage will be paid for until receipt of the entire remaining balance. Premiums are subject to change.

Please notify your Program Administrator of any change of address and telephone number.

Based on current information, your continuation will end on 5/31/2007. However, continuation is subject to terms and conditions including, but not limited to, timely premium payment. Notify the Program Administrator if anyone covered under this continuation plan becomes covered by another health plan.

---

*Use this section to STOP this coverage*

ELECTIVE COVERAGE TERMINATION: Please cancel this coverage as of ___/___/___ because _____.

Your signature required: _____ Spouse's signature required if canceling: _____

---

DISABILITY BENEFITS: You, or a covered dependent, may be able to extend COBRA coverage from 18 months to 29 months, if the Social Security Administration has determined [or determines] that you, or a covered dependent, have been totally disabled since the date of eligibility for COBRA continuation coverage. Premiums during the additional 11 months of coverage may be at a substantially higher rate than you are currently paying. To qualify for the extension, you must submit a copy of the Social Security disability determination notice within 60 days of the date of the notice to your COBRA Administrator.

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF DELAWARE | CLAIM 3 | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>Woodmont Holding, Inc. | Case Number<br>06-10236 - MFW |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):
William McCausland

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

Name and Address where notices should be sent:

William McCausland
~~1271 Drummer Lane~~
~~Wildwood, MO 63005-4227~~

311 WESTHAVEN DR.
AUSTIN, TX 78746

☒ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Telephone Number:  512-471-3804

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces<br>this claim ☐ amends   a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☒ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: 6071
  Unpaid compensation for services performed
  from 12/06/05 to _____
  (date)       (date)

**2. Date debt was incurred:**
EARNED 12/06/05   DUE 01/05/06

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ 50,000
☒ Check this box: if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| **5. Total Amount of Claim at Time Case Filed:** | $ 50,000 | | | $ 50,000 |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

THIS SPACE IS FOR COURT USE ONLY

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date<br>6/24/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>WILLIAM H. McCAUSLAND   *[signature]* |
|---|---|

005867  Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# William H. McCausland

## Claim 3

### Claim 3 Detail

#### Retention Agreement

| | Amount | Explanation | Date Due |
|---|---|---|---|
| Per Agreement | $ 50,000.00 | Earned at 12/6/05 | 1/5/2006 |

**Documentation**
Retention Agreement



August 29, 2005

Mr. William McCausland
17714 Drummer Lane
Wildwood, MO 63005

    **Re:  Retention Bonus Agreement**

Dear Bill:

    I am pleased to inform you that you have been selected to be eligible to receive a retention bonus if you continue to be employed by Viziqor Holdings, Inc. (the "Company") through a Change in Control (as defined in the Viziqor Holdings, Inc. 2004 Stock Incentive Plan). This letter sets out the terms and conditions of the retention bonus arrangement (the "Agreement") between you and the Company.

    **1.  Right to Payment.**

    Subject to the terms and conditions of this Agreement, you will be entitled to receive a retention bonus of $50,000 if you continue to be employed by the Company through a Change in Control. In addition to this amount, you will be entitled to receive an additional bonus based on gross proceeds resulting from a Change in Control as more particularly set forth in Schedule A hereto. If a payment becomes due under this paragraph 1, the payment will be made in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control.

    **2.  Effect of Termination.**

    (a)  If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated by the Company without "Cause" or you resign with "Good Reason" (as those terms are defined in your employment agreement), you will be entitled to receive the retention bonus set forth in Paragraph 1 of this Agreement, payable in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control provided that such date is within six (6) months of the effective date of your termination or resignation.

    (b)  If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated for any reason other than as described in Paragraph 2(a) of this Agreement, you will have no right to receive a payment under this Agreement.

    **3.  Binding Effect.** This Agreement is personal to you and without the prior written consent of the Company will not be assignable by you otherwise than by will or

the laws of descent and distribution. This Agreement will inure to the benefit of and be enforceable by your legal representatives. This Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.

**4.    Employment Status.** This Agreement will not be deemed to create in or confer upon you any right to be retained in the employ of the Company or any subsidiary or other affiliate thereof.

**5.    Entire Agreement.** This Agreement contains the entire understanding of the Company and you with respect to the subject matter hereof.

**6.    Severability.** In the event any provision of this Agreement will be held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Agreement are not part of its provisions and will have no force and effect.

**7.    Amendment and Termination.** This Agreement may be amended or terminated at any time by written agreement of the parties hereto.

**8.    Applicable Law.** To the extent not preempted by the laws of the United States, the laws of the State of Florida, other than the conflict of law provisions thereof, will be the controlling law in all matters relating to this Agreement.

Yours truly,

**VIZIQOR HOLDINGS, INC.**

By: _____

Title: President & CEO

ACCEPTED AND ACKNOWLEDGED:

Name:  William McCausland

**Schedule A**

You will be entitled to receive an additional bonus based on the Gross Proceeds exchanged related to a Change in Control. For purposes hereof, Gross Proceeds shall mean an amount equal to (i) the aggregate fair market present value as of the closing of a Change in Control of any securities issued, earn-out granted and any cash consideration paid to the Company or its security holders and option holders plus (ii) the amount of any interest bearing indebtedness, capital leases and preferred stock obligations (other than any management fees payable) of the Company assumed or repaid by a purchaser in connection with a Change in Control plus (iii) liabilities assumed for contractual severance (for the avoidance of doubt, not adding back Retention Payments paid or payable pursuant to this incremental Retention Plan) relating to the management team less the sum of (iv) any investment made by the existing investors after June 1, 2005, and any investment made by the existing investors or an acquirer in conjunction with the Change in Control. The fair market value of any such securities issued to the Company will be the value determined in good faith by the Company on the date of the closing of a Change in Control.

The payout target for the additional bonus, payable upon a change of control, is $50,000 with the actual amount calculated as follows:
- Zero incentive payable if Gross Proceeds $10MM or less
- Target amount payable based on Gross Proceeds of $20 million
- Actual amount paid adjusted ratably up or down based on linear interpolation from $10MM to $20MM or more Gross Proceeds

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Woodmont Holding, Inc. | Case Number<br>06-10236 - MFW |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Gordon Quick | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|
| Name and Address where notices should be sent:<br>Gordon Quick<br>800 South Hanley Road #E<br>Clayton, MO 63105-2689 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |

Telephone Number: 314 721-411

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces<br>this claim ☐ amends     a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☒ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: 5461
  Unpaid compensation for services performed
  from 11/15/05 to _____
       (date)        (date)

**2. Date debt was incurred:** 12|15|05

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $_____
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____

Value of Collateral: $_____

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $ UNKNOWN - TBD

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☒ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

☐ Up to $ 2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. Total Amount of Claim at Time Case Filed: | $ Balance<br>(unsecured) | UNKNOWN-TBD<br>(secured) | _____<br>(priority) | $98,379.85<br>(Total) |
|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>4/20/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>GORDON QUICK |
|---|---|

005083  _Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571._

EXHIBIT
B1

## Claim Detail

### Claim 2

| Benefits | Base | Factor | | Amount | | Explanation | Date Due |
|---|---|---|---|---|---|---|---|
| COBRA Payments - Mos. 1-4 | $ 602.34 | 4 | $ 2,409.36 | | | 18 months of COBRA | 12/15/2005 |
| Mos. 5-18 | $ 820.14 | 14 | $11,481.96 | | | | |
| Gross-up amount | | | | $ | 12,318.72 | Gross up needed for tax effect | 12/15/2005 |
| Disability Insurance (annual) | $21,000.00 | 1.5 | | $ | 31,500.00 | 18 Months of Disability Insurance | 12/15/2005 |
| Gross-up amount | | | | $ | 27,933.96 | (plus gross up) | 12/15/2005 |
| Life Insurance and gross-up | $ 4,500.00 | 1.5 | | $ | 6,750.00 | For 18 months of severance | 12/15/2005 |
| Gross-up amount | | | | $ | 5,985.85 | (plus gross up) | 12/15/2005 |
| Total | | | | $ | 98,379.85 | All above based on employment agreement - Sec. 4.3 | |

**Input Information**
Effective state and federal tax rate    47%
(For tax effect gross up)    1.8868    Gross up multiplier
Marginal federal tax rate was 35% (plus phase-out, medicare and AMT)
State marginal tax rate of 6%

**Documentation**
Employment Agreement
COBRA Statements

## EMPLOYMENT AGREEMENT
## WITH GORDON D. QUICK

The parties to this Employment Agreement (the "Agreement") are Daleen Holdings, Inc., a Delaware corporation (the "Company"), and Gordon D. Quick (the "Executive").

The Company proposes to enter into a series of transactions (the "Transactions") pursuant to which the Company shall (i) cause its newly formed, wholly-owned subsidiary to merge with and into Daleen Technologies, Inc., a Delaware corporation ("Daleen") and (ii) purchase all of the shares of the outstanding capital stock of Protek Telecommunications Solutions Ltd, a company organized under the laws of England and Wales ("Protek"). Upon the date of consummation of the Transactions (the "Effective Date"), each of Daleen and Protek will be a wholly-owned subsidiary of the Company.

The Company desires to ensure itself of the services of the Executive following the consummation of the Transactions and the Executive is willing to provide full-time services to the Company on the terms and conditions provided herein. Simultaneously with the execution of this Agreement, the Executive and the Company shall also enter into an Indemnification Agreement, dated as of the Effective Date (the "Indemnification Agreement"). In addition, under the Company's 2004 Stock Incentive Plan (the "Incentive Plan") the Executive and the Company shall be entering into a Stock Option Award Agreement, dated as of the Effective Date (the "Option Agreement").

Accordingly, in consideration of the mutual covenants and representations contained herein, the parties to this Agreement, intending to be legally bound, agree as follows:

1.      <u>Full-time Service of Executive.</u>

1.1     <u>Term, Duties and Permitted Activities.</u>

(a)     <u>Service Period</u>. The Company hereby engages the Executive to provide the Company and its subsidiaries full-time service for the period (the "Service Period") commencing on the Effective Date and ending on the earliest to occur of (i) the third anniversary of the Effective Date (the "Completion Date"), (ii) a termination of the Executive's service by reason of any of the circumstances defined in Sections 2 or 3, or (iii) the Executive's death; provided, however, that the Service Period shall automatically be extended for successive one year annual terms following the Completion Date and each renewal term hereunder, unless either party hereto provides the other with a written notice of non-renewal at least ninety (90) days prior to the Completion Date or the end of any renewal term.

      (b)    Duties. During the Service Period, the Executive shall serve as an officer of the Company with the title of Chief Executive Officer and shall be entitled to exercise the rights, authority, duties and responsibilities customarily associated with such position as reasonably assigned to him from time to time by the board of directors of the Company (the "Board"), including, without limitation, authority, direction and control over day-to-day business, financial and personnel matters of the Company, subject to the lawful and reasonable policies and guidelines as may be established by the Board. As Chief Executive Officer of the Company, the Executive shall report to and otherwise shall be subject to the direction and control of the Board and shall have no other officer or employee of the Company of equal or senior rank or authority to him. The Executive's duties, titles and responsibilities shall not be changed materially at any time without his consent; *provided*, that any change in the Executive's duties, titles and responsibilities as a result of a change in the size or activities of the Company shall not be subject to this sentence as long as such new duties, titles and responsibilities are substantially consistent with those of a chief executive officer of a business of like size and nature. The Executive shall use his best efforts to promote the Company's interests and he shall perform his duties and responsibilities faithfully, diligently and to the best of his ability, consistent with sound business practices. The Executive may be required by the Board to provide services to, or otherwise serve as an officer or director of, any direct or indirect subsidiary of the Company. The Executive shall comply with the Company's policies applicable to executive officers of the Company of which he is given advance written notice. During the Service Period, the Executive shall be a member of the Board.

      (c)    Outside Activities. The Executive shall devote substantially his full working time to the business and affairs of the Company. Notwithstanding the preceding sentence, the Executive (a) may serve on the Board of Directors (or similar managing body) of one or more corporations or other entities, provided such service does not violate any other covenant or term of this Agreement, interfere with the performance of the Executive's duties for the Company or create a conflict of interest or the appearance of a conflict of interest with respect to the Company; (b) may invest the Executive's personal assets in any form or manner so long as it does not require the Executive's services or advice in the operation of any business in which such investment is made, provided such activity does not violate any other covenant or term of this Agreement (nothing in this Agreement shall restrict the Executive's right to invest in the Company); and (c) may engage in such other activities that do not violate the covenants in Section 5, create a conflict of interest or the appearance of a conflict of interest with the Company or materially interfere with the performance of his obligations to the Company under this Agreement.

      (d)    Place of Employment. The Executive shall perform his duties under this Agreement primarily in St. Louis, Missouri, with the likelihood of substantial business travel, including regular travel to and from the Company's offices in Boca Raton, Florida, London, England and other corporate offices. At any time during the Service Period, but not earlier than nine (9) months after the Effective Date, the Company, at the direction of the Board of Directors, may, with reasonable advance notice, require the Executive to relocate his primary residence to Boca Raton, Florida,

<div align="center">2</div>

or any other mutually agreeable location. In the event that the Company requires the Executive to relocate his primary residence, the Company shall pay or reimburse the Executive's relocation costs in accordance with the provisions of Appendix A to this Agreement. The Company shall further pay the Executive an amount determined by its accountants to be equal to Executive's federal, state and local taxes, if any, on the payment or reimbursement of the Executive's relocation costs (taking into account the deductibility of such costs by the Executive) (the "Relocation Tax Gross-Up"), and the federal, state and local taxes on the Relocation Tax Gross-Up, all to the end that the Executive be held harmless, on an after-tax basis, from the tax impact of such reimbursement.

1.2     Compensation and General Benefits. As compensation for the Executive's services under this Agreement, the Executive shall be compensated in the manner described below.

(a)     Base Salary. During the Service Period, the Executive shall be entitled to receive a base salary ("Base Salary") at the annual rate of not less than $425,000 for services rendered to the Company or any of its direct or indirect subsidiaries and payable in accordance with the Company's regular payroll practices. The Executive's Base Salary under this Section 1.2 shall be increased on each January 1 during the Service Period, beginning on January 1, 2006, by the amount of $25,000. The Executive's Base Salary shall be subject to further increases, if any, as may be approved at any time by the Board of Directors of the Company in its discretion.

(b)     Bonus Compensation.

(i)     Annual Formula Bonus. Appendix B to this Agreement sets forth a framework for determining the initial annual formula bonus to be paid to the Executive during the Service Period. Subsequent annual bonus targets will continue to be 50% of Base Salary, and targets will be set annually by the Board of Directors.

(ii)    Annual Discretionary Bonus. The Executive shall be eligible for such annual bonus, in addition to the formula annual bonus described in Section 1.2(b)(i) above, as the Board may approve in its sole discretion.

(c)     Reimbursement of Expenses. During the Service Period, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by him (in accordance with the policies and practices presently followed by the Company or as may be established by the Board for its senior executive officers) in performing services under this Agreement, provided that the Executive properly accounts for such expenses in accordance with the Company's policies.

(d)     Vacation. During the Service Period, the Executive shall receive four (4) weeks of paid vacation annually, to be taken at times mutually agreeable to the Company and the Executive. In accordance with the Company's vacation policy, the Executive shall be entitled to carry over from year-to-year up to four (4) weeks of unused vacation time.

3

(e)     Disability and Life Insurance Coverage.  During the Service Period, the Company shall pay for or otherwise provide long-term disability coverage for the Executive that is not less favorable than the Executive's coverage as of the Effective Date, providing for a minimum disability benefit of $20,000 per month.  Further, during the Service Period, the Company shall maintain life insurance coverage on the Executive's life with a minimum death benefit of $1,500,000 at no cost to him.  The Executive shall be permitted to designate the beneficiary or beneficiaries of the life insurance and may change such designation from time to time without the Company's consent.

(f)     Option Plan.  As promptly as practicable after the Effective Date, and, in any event, within thirty days after the Effective Date, the Executive shall be entitled to receive a grant of stock options ("Options") under the Incentive Plan in respect of shares of Common Stock of the Company representing a minimum of 35% of the initial shares reserved for issuance under the Incentive Plan.  Further, the Executive shall be entitled under the Incentive Plan to an allocation of a minimum of 35% of the additional shares that become available for allocation under the Incentive Plan by reason of the operation of Schedule A to the Incentive Plan.  Notwithstanding any provision of the Incentive Plan or the Option Agreement to the contrary, in the event of a termination by the Company of the Executive's service with the Company without Cause (as defined in Section 2.2), a termination by the Executive of the Executive's service with the Company with Good Reason (as defined in Section 2.3), the Executive's death or the Executive's Disability, then (i) if such event occurs prior to the second anniversary of the Effective Date, the Executive shall be deemed vested in a total amount equal to 50% of the Options and (ii) if such event occurs on or after the second anniversary of the Effective Date, the Executive shall be deemed vested in 25% of the then unvested balance of his Options.  In addition, all of Executive's then unvested Options shall vest upon a Change in Control (as defined in the Incentive Plan) in the event that the Executive is not retained as the highest ranking employee and executive officer of the Company or its successor following such Change in Control.

(g)     Benefits and Perquisites Generally.  Subject to the foregoing provisions, during the Service Period, the Executive shall be entitled to participate in and to receive benefits as a senior member under all of the Company's employee benefit plans, programs and arrangements available to senior members of the Company, as they may be duly amended, approved or adopted by the Board as of the Effective Date and from time to time thereafter, including any retirement plan, profit sharing plan, savings plan, life insurance plan, health insurance plan, stock-based compensation or incentive plan, and accident or disability insurance plan.  The Executive's benefits hereunder shall also include the cost of annual physical examinations.

(h)     Tax Gross-Up.  The Company shall further pay the Executive an amount determined by its accountants to be equal to the Executive's federal, state and local taxes, if any, related to or arising from the Company's payment or reimbursement of the Executive's benefit costs or expenses under subsection (e) above (the "Benefit Tax Gross-Up"), and the federal, state and local taxes on the Benefit Tax Gross-Up, all

4

to the end that the Executive be held harmless, on an after-tax basis, from the tax impact of such reimbursement.

## 2. Termination of Services.

2.1   **Death.**  The Executive's service under this Agreement shall terminate upon his death.

2.2   **Termination by the Company.**  The Company may terminate the Executive's service under this Agreement with or without Cause (as defined below). For purposes of this Agreement, the Company shall have "Cause" to terminate the Executive's service under this Agreement if (i) the Executive willfully, or as a result of gross negligence on his part, fails substantially to (A) carry out the material and lawful policies of the Board or (B) discharge his material duties and responsibilities under this Agreement for any reason other than the Executive's Disability (as defined in Section 3), (ii) the Executive is convicted of or enters a plea of no contest with respect to a felony, (iii) the Executive engages in conduct that is materially in violation of his obligations to the Company under this Agreement and which is demonstrably and substantially injurious to the Company (as determined in good faith by the Board), or (iv) the Executive materially breaches this Agreement, or commits any deliberate and intentional violation of the provisions of Section 5.  During the initial three-year term of this Agreement, a determination that "Cause" exists for the Executive's termination shall be made by the affirmative vote of not less than two-thirds (2/3) of the entire membership of the Board (excluding the Executive) at a meeting of the Board called and held for the purpose of finding that, in the reasonable good faith opinion of the Board members so voting, there is Cause for termination as set forth in this Section 2.2. For purposes of this Agreement, a "termination by the Company without Cause" shall include the termination of the Executive's service on the Expiration Date solely as a result of the Company's electing under Section 1.1(a) not to extend the term of the Agreement.  The Executive shall be afforded a reasonable opportunity to cure any act or omission that would otherwise constitute "Cause" hereunder according to the following terms.  The Board shall give the Executive written notice stating with reasonable specificity the nature of the circumstances determined by the Board of Directors in good faith to constitute "Cause."  The Executive shall have thirty (30) days from his receipt of such notice to cure such circumstances or such breach if such breach is reasonably susceptible to cure.  If, in the reasonable good faith judgment of the Board of Directors, the alleged breach is not reasonably susceptible to cure, or such circumstances or material breach has not been satisfactorily cured within such thirty (30) day cure period, such neglect of duties or material breach shall thereupon constitute "Cause" hereunder.

2.3   **Termination by Executive.**  The Executive may terminate his service under this Agreement with or without Good Reason (as defined below).  If such termination is with Good Reason, the Executive shall give the Company notice, which shall identify with reasonable specificity the grounds for the Executive's resignation and provide the Company with thirty (30) days from the day such notice is given to cure the alleged

6

grounds for resignation contained in the notice.  For purposes of this Agreement, "Good Reason" shall mean any of the following to which the Executive shall not consent in writing: (i) a reduction in the Executive's Base Salary, (ii) a material breach by the Company of this Agreement that is not remedied by the Company within thirty (30) days after receipt of a reasonably detailed notice given by the Executive, (iii) a relocation of the Executive's primary place of employment from his current place of employment other than to Boca Raton, Florida, or any other mutually agreeable location, (iv) any diminution in offices, titles, status or reporting requirements in the Executive's specific executive officer position, other than an insubstantial or inadvertent act that is remedied by the Company promptly after receipt of notice given by the Executive or (v) the removal of the Executive or the failure to reelect the Executive as a director of the Company.

    2.4    <u>Date of Termination</u>.  "Date of Termination" shall mean the earlier of (a) the "Completion Date" (as defined in Section 1.1(a)) and (b) if the Executive's service is terminated (i) by his death, the date of his death, or (ii) pursuant to the provisions of Section 2.2 or Section 2.3, as the case may be, the date on which the Executive's service with the Company actually terminates.

    3.    <u>Disability</u>.  The Executive shall be determined to be "Disabled" if the Executive is unable to perform his duties under this Agreement on essentially a full-time basis for six (6) consecutive months by reason of a physical or mental condition (a "Disability") and, within thirty (30) days after the Company gives notice to the Executive that it intends to replace him due to his Disability, the Executive shall not have returned to the performance of his duties on essentially a full-time basis.  Upon a determination that the Executive is Disabled, the Company may replace the Executive without breaching this Agreement.

    4.    <u>Compensation Upon Termination</u>.

<div align="center">6</div>

monthly basis for a period of eighteen (18) months following the month in which the Date of Termination occurs; provided, however, that in the event any such termination occurs in anticipation of or within eighteen (18) months following a Change of Control (as defined below), the payments payable pursuant to this section will be made in a single lump sum cash payment within thirty (30) days of the Date of Termination;

(iii)     a cash amount equal to the Executive's pro rata Bonus at the target level, payable at such time as bonuses for the annual period are paid to other executive officers of the Company, such pro rata Bonus being based on a fraction of the target Bonus, the numerator of which is the number of days from the first day of the fiscal year of the Company in which such termination occurs through and including the Date of Termination and the denominator of which is 365;

(iv)     all welfare benefits, including (to the extent applicable) medical, dental, vision, life and disability benefits (including the life and disability described in Section 1.2(c)) pursuant to plans maintained by the Company under which the Executive and/or the Executive's family receives benefits and/or coverage on the Date of Termination, shall be continued  for a period of  eighteen (18) months following the month in which the Date of Termination occurs, with such benefits provided to the Executive at the same coverage levels as may be in effect for the Company's executive officers and the Executive shall pay any portion of such cost as was required to be borne by key executives of the Company generally on the Date of Termination; provided, however, that, notwithstanding the foregoing, the benefits described in this Section 4.3(a)(iv) may be discontinued prior to the end of the period provided in this subsection (iv) to the extent, but only to the extent, that the Executive receives substantially similar benefits from a subsequent employer.

(b)     Superseding Termination.  If, subsequent to the giving by either party of a notice of termination under this Agreement and prior to the actual Date of Termination pursuant to such notice, the Executive's service is properly terminated pursuant to any other provision of this Agreement, the Executive shall be entitled only to those benefits, if any, arising out of such subsequent and superseding termination.

(c)     Definition of Change in Control.  For purposes of this Agreement, a "Change in Control" shall have the meaning given to such term in the Incentive Plan.

(d)     Conditions to Receipt of Severance Benefits under Section 4.3(a).

(i)     Release.  As a condition to receiving any Severance Benefits to which the Executive may otherwise be entitled under Section 4.3(a) the Executive shall execute a release (the "Release"), which shall include an affirmation of the restrictive covenants set forth in Section 5 and a non-disparagement provision, in a form and substance reasonably satisfactory to the Company and acceptable to the Executive (whose acceptance shall not be unreasonably withheld), of any claims, whether arising under federal, state or local statute, common law or otherwise, against the Company and its direct or indirect subsidiaries which arise or may have arisen on or before the date of the Release, other than any claims under this Agreement or any

8

rights to indemnification from the Company and its direct or indirect subsidiaries pursuant to any provisions of the Company's (or any of its subsidiaries') articles of incorporation or by-laws or any directors and officers liability insurance policies maintained by the Company. If the Executive fails or otherwise refuses to execute a Release within a reasonable time after the Company's request to do so, the Executive shall not be entitled to any Severance Benefits, or any other benefits provided under this Agreement and the Company shall have no further obligations with respect to the payment of those benefits.

(ii)    Limitation on Benefits.  If, following a termination of service that gives the Executive a right to the payment of Severance Benefits under Section 4.3(a) Executive violates in any material respect any of the covenants in Section 5 or as otherwise set forth in the Release, the Executive shall have no further right or claim to any payments or other benefits to which the Executive may otherwise be entitled under Section 4.3(a) from and after the date on which the Executive engages in such activities and the Company shall have no further obligations with respect to such payments or benefits.

4.4    No Mitigation.  The Executive shall not be required to mitigate the amount of any payment or benefit provided for in this Section 4 by seeking other employment or otherwise, and, except as otherwise expressly provided in Sections 4.3(a)(iv) the amounts of compensation or benefits payable or otherwise due to the Executive under this Section 4 or other provisions of this Agreement shall not be reduced by compensation or benefits received by the Executive from any other employment he shall choose to undertake following termination of his service under this Agreement; provided, however, that the Executive's entitlement to Severance Benefits shall be subject to his compliance with the covenants set forth in Section 5.

4.5    Certain Additional Payments by the Company.

(a)    Notwithstanding anything in this Agreement to the contrary, in the event it shall be determined that any economic benefit, payment or distribution by the Company to or for the benefit of the Executive, whether paid, payable, distributed or distributable pursuant to the terms of this Agreement or otherwise (a "Payment"), would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code"), (such excise tax referred to in this Agreement as the "Excise Tax"), the Executive and the Company shall each undertake reasonable efforts to ensure that such Payment is not so subject.  If notwithstanding the efforts of the Executive and the Company pursuant to, and in accordance with, the preceding sentence, a Payment would be subject to the Excise Tax, then the Executive shall be entitled to receive an additional payment (a "Gross-Up-Payment") in an amount such that after payment by the Executive of all applicable federal, state and local income and excise taxes, the Executive retains an amount equal to the amount he would have retained had one-third (1/3) of the Excise Tax been imposed upon the Payment.

(b)    Subject to the provisions of Section 4.5(c), all determinations required to be made under this Section 4.5, including whether a Gross-Up Payment is

9

required and the amount of such Gross-Up Payment, shall be made by the Company's regular outside independent public accounting firm (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Executive within 30 business days of the Date of Termination, if applicable, or such earlier time as is requested by the Company. The initial Gross-Up Payment, if any, as determined pursuant to this Section 4.5, shall be paid to the Executive within 30 days of the Date of Termination or, if later, within 5 business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm, it is possible that Gross-Up Payments that have not been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made under this Section 4.5(b). In the event that the Company exhausts its remedies pursuant to Section 4.5(c) and the Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

(c)     Executive shall notify the Company of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment under the terms of this Section 4.5. This notice shall be given as soon as practicable but no later than ten business days after the date the Executive has actual knowledge of the claim, and shall apprise the Company of the nature of the claim and the date on which the claim is requested to be paid. The Executive shall not pay the claim prior to the expiration of the thirty-day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to the claim is due). If the Company notifies the Executive prior to the expiration of the above period that it desires to contest the claim, the Executive shall: (A) give the Company any information reasonably requested by the Company relating to the claim, (B) take such action in connection with contesting the claim as the Company shall reasonably request in writing from time to time, including accepting legal representation with respect to the claim by an attorney reasonably selected by the Company, (C) cooperate with the Company in good faith in order to effectively contest the claim, (D) permit the Company to control any proceedings relating to the claim; provided, however, that the Company shall bear and pay directly any and all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after-tax basis, for two-thirds (2/3) of any Excise Tax or income tax related to the Excise Tax, including interest and penalties with respect thereto, imposed as a result of such representation and payment of costs and expenses. Without limitation of the foregoing provisions of this Section 4.5(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of the claim and may, at its sole option, either direct the Executive to request or accede to a request for an extension of the statute of limitations with respect only to the tax claimed, or pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a

10

determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Executive to pay the claim and sue for a refund, the Company shall advance the amount of the required payment to the Executive, on an interest-free basis and shall indemnify and hold the Executive harmless, on an after-tax basis, from two-thirds (2/3) of any Excise Tax or income tax related to the Excise Tax, including interest or penalties with respect thereto, imposed with respect to any advance or with respect to any imputed income in relation to any advance. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable under the Agreement and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)  If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 4.5(c), the Executive becomes entitled to receive any refund with respect to the claim, the Executive shall promptly pay to the Company two-thirds (2/3) of the amount of that refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 4.5(c), a determination is made that the Executive shall not be entitled to any refund with respect to the claim and the Company does not notify the Executive of its intent to contest such denial of refund prior to the expiration of thirty days after the determination, then the advance shall be forgiven and shall not be required to be repaid and the amount of the advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

(e)  In the event that any state or municipality or subdivision thereof shall subject any Payment to any special tax which is analogous to the Excise Tax which shall be in addition to the generally applicable income tax imposed by the state, municipality, or subdivision with respect to receipt of the Payment, the foregoing provisions of this Section 4.5 shall apply, mutatis mutandis, with respect to such special tax.

4.6  **Severance Benefits Not Includable for Employee Benefits Purposes.** Subject to all applicable federal and state laws and regulations, and except to the extent the terms of any applicable benefit plan, policy or program provide otherwise, income recognized by the Executive pursuant to the provisions of this Section 4 (other than income accrued but unpaid as of the Date of Termination) shall not be included in the determination of benefits under any employee benefit plan (as that term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) or any other benefit plans, policies or programs applicable to the Executive that are maintained by the Company or any of its direct or indirect subsidiaries and the Company shall be under no obligation to continue to offer or provide such benefits to the Executive after the Date of Termination other than as provided under this Section 4.

11

4.7   Exclusive Benefits.  The Severance Benefits payable under Section 4.3(a) shall be in lieu of any other severance or similar benefits that would otherwise be payable under any other agreement, plan, program or policy of the Company.

5.   Restrictive Covenants.

5.1   Exclusive Property.  The Executive confirms that all Company Property is the exclusive property of the Company.  Executive agrees that during his employment Executive shall not make, use or permit to be used any Company Property other than for the benefit of the Company.  The term "Company Property" shall include all automobiles, Confidential Information, notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, and any copies thereof, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Executive's possession, custody or control.  Executive further agrees that he shall not, after the termination of employment, use or permit others to use any such Company Property for any reason.  Promptly upon the termination of employment (for any reason), Executive shall immediately deliver all Company Property in Executive's possession, and all copies thereof, to the Company; provided, however, that the Executive shall be permitted to retain copies of any documents or materials of a personal nature or otherwise related to the Executive's rights under this Agreement.

5.2   Nondisclosure.  Executive acknowledge that the Company has agreed to provide, and during the course of employment with the Company Executive will acquire, knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, business and financial methods, practices, plans, pricing information, marketing information and strategies, merchandising and selling techniques and information, customer lists and preferences, supplier lists, inventions, products, designs, know-how, techniques, processes, engineering data, software programs, works of authorship, projects, proposals, and confidential information relating to the Company's policies and/or business strategy (all of such information herein referred to as the "Confidential Information").  The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company.  Executive agrees that he will not, during the course of employment, divulge to any person, directly or indirectly, except to the Company or its officers and agents or as reasonably required in connection with Executive's duties on behalf of the Company, or use in any way, except on behalf of the Company, any Confidential Information acquired by Executive at any time during my employment.  Executive agrees that he will not, at any time after his employment with the Company has ended (for whatever reason), use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in any subsequent employment.  Executive acknowledges that the Company would not provide him with access to Confidential Information but for his covenants contained in this Agreement.  Executive understands and agrees that the

12

obligations under this Section shall survive the termination of this Agreement and of his employment. The above restrictions on disclosure and use of Confidential Information shall not prevent the Executive from: (i) using or disclosing Information in the good faith performance of the Executive's duties; (ii) using or disclosing information to another employee to whom disclosure is required to perform in good faith the duties of either; (iii) using or disclosing Information to another person or entity pursuant to a binding confidentiality agreement in a Company-approved form as part of the performance in good faith of the Executive's duties or as authorized in writing by the Company; (iv) using or disclosing information to the extent such information is or may be, through no fault or disclosure on the part of the Executive, generally made know to the public or throughout the industry in which the Company is engaged; (v) using or disclosing information which is disclosed to the Executive after termination of his employment with the Company by a third party who is under no duty or obligation not to disclose such information; or (vi) disclosing information as required by law. If the Executive becomes legally compelled to disclose any of the Confidential Information, he shall (i) provide the Company with prior written notice of the need for such disclosure; (ii) if disclosure is required, furnish only that portion of the Confidential Information which, in the opinion of the Executive's counsel, is legally required; and (iii) exercise reasonable efforts to obtain reliable assurances that confidential treatment will be accorded to the Confidential Information.

5.3    Non Competition. During the Service Period and for a period of eighteen (18) months after the Date of Termination, the Executive shall not, unless he receives the prior written consent of the Company, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to, participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, or engage in any activity or capacity (collectively, the "Competitive Activities") with respect to any individual, partnership, limited liability company, firm, corporation or other business organization or entity (each, a "Person"), that is engaged directly or indirectly in the provision of software offerings substantially similar to those of the Company, provided that those offerings represent at least 10% of the revenue of the Company including its direct or indirect subsidiaries anywhere in the world; provided, however, that the foregoing (a) shall not apply with respect to any line-of-business in which the Company or its direct or indirect subsidiaries was not engaged on or before the Date of Termination, and (b) shall not prohibit the Executive from (i) owning, or otherwise having an interest in, less than three percent (3%) of any publicly-owned entity or (ii) owning, or otherwise having an interest in, less than five percent (5%) of any private equity fund or similar investment fund that invests in companies engaged in Competitive Activities, or providing consulting or advisory services with respect to any such fund, provided the Executive has no active role with respect to any investment by such fund in any Person referred to in this Section 5.3. Executive hereby acknowledges that the scope of prohibited activities and the time duration of the provisions of this Section 5.3 are reasonable and are no broader than are necessary to protect the legitimate business interests of the Company. Executive acknowledges and agrees that this noncompetition provision shall survive the termination of his employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this provision. Executive

13

acknowledges that the Company would not employ him or provide him with access to its Confidential Information but for his covenants or promises contained in this Section.

5.4    Non-Solicitation. During the Service Period and for a period of eighteen (18) months after the Date of Termination, the Executive shall not, whether for his own account or for the account of any other Person (other than the Company or its direct or indirect subsidiaries), intentionally solicit, endeavor to entice away from the Company or its direct or indirect subsidiaries, or otherwise interfere with the relationship of the Company or its direct or indirect subsidiaries with, (a) any person who is employed by the Company or its direct or indirect subsidiaries (including any independent sales representatives or organizations), or (b) any client or customer of the Company or its direct or indirect subsidiaries.

5.5    Assignment of Developments. If at any time or times during Executive's employment, whether during work hours or off-duty hours, Executive shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to Executive by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. The term "Development" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection). Executive shall promptly disclose to the Company (or any persons designated by it) each such Development. Executive hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) Executive may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

5.6    Injunctive Relief. The Executive acknowledges that a breach of any of the covenants contained in this Section 5 may result in material, irreparable injury to the Company for which there is no adequate remedy at law, that it shall not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat of breach, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Executive from engaging in activities prohibited by this Section 5 or such other relief as may be required to specifically enforce any of the covenants in this Section 5. The Executive agrees and consents that injunctive relief may be sought in any state or federal court of record in the State of Missouri, or in the state and county in which a violation may occur or in any

14

other court having jurisdiction, at the election of the Company; to the extent that the Company seeks a temporary restraining order (but not a preliminary or permanent injunction), the Executive agrees that a temporary restraining order may be obtained ex parte. The Executive agrees and submits to personal jurisdiction before each and every court designated above for that purpose.

5.7     Blue-Penciling. The parties consider the covenants and restrictions contained in this Section 5 to be reasonable. However, if and when any such covenant or restriction is found to be void or unenforceable and would have been valid had some part of it been deleted or had its scope of application been modified, such covenant or restriction shall be deemed to have been applied with such modification as would be necessary and consistent with the intent of the parties to have made it valid, enforceable and effective.

6.     Miscellaneous.

6.1     Assignment; Successors; Binding Agreement. This Agreement may not be assigned by either party, whether by operation of law or otherwise, without the prior written consent of the other party, except that any right, title or interest of the Company arising out of this Agreement may be assigned to any corporation or entity controlling, controlled by, or under common control with the Company, or succeeding to the business and substantially all of the assets of the Company or any affiliates for which the Executive performs substantial services. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legatees, devisees, personal representatives, successors and assigns.

6.2     Modification and Waiver. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification or discharge is duly approved by the Board and is agreed to in writing by the Executive and such officer(s) as may be specifically authorized by the Board to effect it. No waiver by any party of any breach by any other party of, or of compliance with, any term or condition of this Agreement to be performed by any other party, at any time, shall constitute a waiver of similar or dissimilar terms or conditions at that time or at any prior or subsequent time.

6.3     Entire Agreement. No agreement or representation, oral or otherwise, express or implied, with respect to the subject matter of this Agreement, has been made by either party which is not set forth expressly in this Agreement. Further, the Executive's current employment agreement with Daleen, dated October 7, 2002, as it have been amended, and any long-term incentive compensation agreements, plans or other arrangements between the Executive and Daleen are terminated and superseded by this Agreement. This Agreement shall not affect the validity or enforceability of the Indemnification Agreement or the Option Agreement except as otherwise expressly provided in this Agreement.

6.4     Governing Law. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Missouri other than the conflict of laws provision thereof.

15

6.10   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

6.11   Headings. The headings used in this Agreement are for convenience only, do not constitute a part of the Agreement, and shall not be deemed to limit, characterize, or affect in any way the provisions of the Agreement, and all provisions of the Agreement shall be construed as if no headings had been used in the Agreement.

6.12   Construction. As used in this Agreement, unless the context otherwise requires: (a) the terms defined herein shall have the meanings set forth herein for all purposes; (b) references to "Section" are to a section hereof; (c) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (d) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (e) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section or other subdivision hereof or attachment hereto; (f) references to any gender include references to all genders; and (g) references to any agreement or other instrument or statute or regulation are referred to as amended or supplemented from time to time (and, in the case of a statute or regulation, to any successor provision).

17

## APPENDIX A

### Payment or Reimbursement of Executive's Relocation Costs

In the event that the Company requires the Executive to relocate his primary residence under the terms of Section 1.3 of the Agreement, the Company shall pay or otherwise reimburse the Executive for all reasonable costs and expenses ("Relocation Expenses") described below incurred by the Executive in connection with such location. Relocation Expenses shall include:

(a)  House Hunting.  Reasonable travel and related expenses for the Executive and the Executive's spouse for up to two "house hunting trips" from the Executive's present location to the new location to find a new home.

(b)  Selling Home and Acquiring New Home.  If the Executive sells his home and/or purchases a new home in connection with the relocation, the Company shall reimburse the Executive for all reasonable costs normally paid by the seller in connection with selling a home and a buyer in connection with purchase of a new home, including:  broker's fees, recording costs, transfer fees and taxes, mortgage placement fees (including customary origination fees, required points, loan commitment fees, warehouse and assumption fees, but excluding any additional fees or points (buy down) to permit a smaller than normal down payment or to obtain a lower than customary interest rate), appraisal fees required by lending institutions, title insurance and examination fees, settlement fees, and escrow agent fees.  If the Executive leases a residence, the Company shall pay any broker's fees required to obtain a lease (but not advance rental, security or cleaning deposits).  .

(c)  Moving Expenses.  The Company or the Executive shall select a reliable mover and the Company shall pay for the following expenses in connection with the transportation of the Executive's household goods, household pets, personal effects and cars to the Executive's new location:  packing, transportation, unpacking, insurance, and appraisals for fine arts, antiques and items of unusual value (including the Executive's wine collection).  The Company shall make arrangements for movement to the Executive's new location for two motor vehicles registered in the Executive's name or in the name of any member of the Executive's household.  The Company shall pay the corresponding expenses for the insurance and transportation of such vehicles.

(d)  Temporary Storage.  If the Executive's household goods have been moved, and the Executive cannot obtain immediate possession of the Executive's new home, the Company shall pay fees for the storage of the Executive's household goods. Automobiles shall not be stored and must be delivered to the Executive at the new location.  Further, the Company shall not have any liability or risk of loss with respect to such stored goods.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

**EXHIBIT**

B2

(e)   Travel to New Location.  The Company shall reimburse the Executive for the travel and related expenses for the Executive and the other members of the Executive's household to the new location by the most direct route.

(f)   Temporary Living at New Location.  If the Executive begins work at the new location before moving into his new home, the Company shall pay the reasonable temporary housing costs from the time of the Executive's arrival in the new location and for up to two (2) days after the arrival of the Executive's furniture and household goods at the new home provided that the Company shall not be required to pay such temporary housing costs for a period exceeding eight (8) weeks.

(g)   Second Moves.  If the Executive moves into rented quarters and later purchases and moves into permanent housing, the provisions detailed in items (b) and (c) above shall apply.  This second move must occur within eighteen (18) months from the effective date of transfer to the location to be reimbursable.

2

## APPENDIX B

The Executive shall be entitled to a bonus for the twelve months ended June 1, 2005 of the Company based on the following: A target bonus of 50% of Base Salary will be paid if Company attains 2 out of 3 of the Daleen Projection of Revenues, EDITDA and Cash Balance. A minimum bonus of 20% of Base Salary will be paid if Company attains 2 out of 3 of the Trigger Levels of Revenues, EBITDA and Cash Balance. Performance between Trigger Levels and the Daleen Projection will generate a bonus based upon linear interpolation. Bonus in excess of 50% of Base Salary will be at the discretion of the Board. Capitalized terms used above and not otherwise defined in this Agreement shall have the respective meanings given to such terms in Schedule 7.2 to the Series A Convertible Redeemable PIK Preferred Stock Investment Agreement, dated as of May ___, 2004, by and among the Company, Quadrangle Capital Partners LP, a Delaware limited partnership, Quadrangle Select Partners LP, a Delaware limited partnership, Quadrangle Capital Partners-A LP, a Delaware limited partnership, Behrman Capital II, L.P., a Delaware limited partnership, Strategic Entrepreneur Fund II, L.P., a Delaware limited partnership, and any signatories thereto. For all future periods, the Executive shall participate in annual incentive compensation arrangements that provide for a target bonus of 50% of Base Salary based on performance metrics to be determined by the Board and additional bonuses at the discretion of the Board to the extent the Company's performance exceeds the targeted performance metrics. Notwithstanding the foregoing, the Company and Executive will endeavor to migrate the Executive to an annual bonus period consistent with the Company's fiscal year as soon as practicable.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

DALEEN HOLDINGS, INC.

By: _____

Name: Dawn Landry

Title: VP + Secretary

EXECUTIVE

_____

Name:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

DALEEN HOLDINGS, INC.

By:_____
   Name:
   Title:

EXECUTIVE

_____

Name:

**Quick account summary:**

*Your account number is 15C487184.*

*This premium reminder is for coverage ending 3/31/2006*

*Your regular premium payment is 16.01. However please see the reverse side for important information. Payment for this period may already be credited OR payment for prior periods may still be unpaid.*

*Based on current information, your coverage continuation will end 5/31/2007*

*A monthly premium subsidy of $602.34 applies through 1/15/2006.*
*Net due is $-586.33*

Friday, February 10, 2006

Quick, Gordon
800 S Hanley Road 4E
Clayton, MO 63105

*old plan*

## Viziqor Solutions, Inc.
## COBRA Continuation Program

**Your COBRA Program Administrator**
Administrative Outsourcing Services, LLC
an affiliate of Mahoney & Associates
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, FL 33304
(877) 564-4300 x223

**Make your premium payments to**
AOS Premium Account
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, Florida 33304

**Please attach your payment to this form. Do not send or deliver cash. Write your account number on your payment. Your account number is 15C487184 your scheduled payment is $16.01.**

Payment must be mailed by the last day of the month for which it is due. You are responsible for the timely delivery of your premium payment. If you have not paid premiums currently due, please make your payments as soon as possible. This notice does not exempt you from paying prior months. Coverage may terminate if full payment is not received or if the payment check is returned uncollected for any reason. Send full/complete payments - do not send installments. In the event you send an amount of premium that is less than the amount due, the payment will be held for the balance and no coverage will be paid for until receipt of the entire remaining balance. Premiums are subject to change.

Please notify your Program Administrator of any change of address and telephone number.

Based on current information, your continuation will end on 5/31/2007. However, continuation is subject to terms and conditions including, but not limited to, timely premium payment. Notify the Program Administrator if anyone covered under this continuation plan becomes covered by another health plan.

---

**Use this section to STOP this coverage**

ELECTIVE COVERAGE TERMINATION: Please cancel this coverage as of __/__/__ because _____.

Your signature required: _____ Spouse's signature required if canceling: _____

---

DISABILITY BENEFITS: You, or a covered dependent, may be able to extend COBRA coverage from 18 months to 29 months, if the Social Security Administration has determined [or determines] that you, or a covered dependent, have been totally disabled since the date of eligibility for COBRA continuation coverage. Premiums during the additional 11 months of coverage may be at a substantially higher rate than you are currently paying. To qualify for the extension, you must submit a copy of the Social Security disability determination notice within 60 days of the date of the notice to your COBRA Administrator.

||||||||||||   ||||||||

**Quick account summary:**

*Your account number is 15C487184.*

*This premium reminder is for coverage ending 05/31/2006*

*Your regular premium payment is 820.14. However please see the reverse side for important information. Payment for this period may already be credited OR payment for prior periods may still be unpaid.*

*Based on current information, your coverage continuation will end 5/31/2007*

**Friday, April 14, 2006**

Quick, Gordon
800 S Hanley Road 4E
Clayton, MO 63105

*new plan effective 4/1/06*
# AMENDED

## Formula Telecom Solutions
## COBRA Continuation Program

**Your COBRA Program Administrator**
Administrative Outsourcing Services, LLC
an affiliate of Mahoney & Associates
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, FL 33304
(877) 564-4300 x223

**Make your premium payments to**
AOS Premium Account
2455 East Sunrise Blvd., Suite 304
Ft. Lauderdale, Florida 33304

**Please attach your payment to this form. Do not send or deliver cash. Write your account number on your payment. Your account number is 15C487184 your scheduled payment is $820.14.**

Payment must be mailed by the last day of the month for which it is due. You are responsible for the timely delivery of your premium payment. If you have not paid premiums currently due, please make your payments as soon as possible. This notice does not exempt you from paying prior months. Coverage may terminate if full payment is not received or if the payment check is returned uncollected for any reason. Send full/complete payments – do not send installments. In the event you send an amount of premium that is less than the amount due, the payment will be held for the balance and no coverage will be paid for until receipt of the entire remaining balance. Premiums are subject to change.

Please notify your Program Administrator of any change of address and telephone number.

Based on current information, your continuation will end on 5/31/2007. However, continuation is subject to terms and conditions including, but not limited to, timely premium payment. Notify the Program Administrator if anyone covered under this continuation plan becomes covered by another health plan.

**Use this section to STOP this coverage**

ELECTIVE COVERAGE TERMINATION: Please cancel this coverage as of ___/___/___ because _____.

Your signature required: _____   Spouse's signature required if canceling: _____

DISABILITY BENEFITS: You, or a covered dependent, may be able to extend COBRA coverage from 18 months to 29 months, if the Social Security Administration has determined [or determines] that you, or a covered dependent, have been totally disabled since the date of eligibility for COBRA continuation coverage. Premiums during the additional 11 months of coverage may be at a substantially higher rate than you are currently paying. To qualify for the extension, you must submit a copy of the Social Security disability determination notice within 60 days of the date of the notice to your COBRA Administrator.

**EXHIBIT**

**B2**

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor Woodmont Holding, Inc. | Case Number 06-10236 - MFW |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): Gordon Quick | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and Address where notices should be sent: Gordon Quick 800 South Hanley Road -IE Clayton, MO 63105-2689 | ☐ Check box if you have never received any notices from the bankruptcy court in this case. ☐ Check box if the address differs from the address on the envelope sent to you by the court. | |
| Telephone Number: 314-721-4111 | | THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____
- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☑ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: __5461__
  Unpaid compensation for services performed
  from __11/18/05__ to _____
  (date)          (date)

**2. Date debt was incurred:** 12/15/05

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim $758,054.85
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☑ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $ 10,000

Specify the priority of the claim:
- ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).
- ☑ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle ☐ Other___

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $758,054.85 / $10,000 / 768,054.85
(unsecured)   (secured)   (priority)   (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date 4/20/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): GORDON QUICK | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

005083  *Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Claim 1

**Claim Detail**

### Employment Contract

| | Base | Factor | Amount | Explanation | Date Due |
|---|---|---|---|---|---|
| Salary (severance pay) | $425,000.00 | 1.5 | $ 637,500.00 | 18 Months of salary per employment agreement - Section 4.3 | 12/15/2005 |
| Bonus (@ 50% of salary) | $425,000.00 | 0.228767 | $ 97,226.03 | For the period 8/2 to 11/15 Same as above | 12/15/2005 |
| Vacation Pay - Abiliti | $425,000.00 | 0.062962 | $ 26,758.65 | 130.96 hours or 3.274 weeks Unpaid at termination | 12/15/2005 |
| Flexible deduction | | | $ 250.00 | Erroneous deduction taken See paystub | 12/15/2005 |
| Tax gross-up for basic insurance ($3956 shown as income on W2) | $ 3,956.00 | 1.8868 | $ 3,508.15 | Should have been reimbursed Employment Agree. Sec. 1.2(h) | 12/15/2005 |
| Tax gross-up for add'l insurance ($3171 shown on 1099) | $ 3,171.00 | 1.8868 | $ 2,812.02 | Tax on supplemental life ins. Employment Agree. Sec. 1.2(h) | 12/15/2005 |
| Total | | | $ 768,054.85 | | |

---

**Input Information**

| | | |
|---|---|---|
| Basic Life insurance cost per W2 | $ 3,956.00 | Paid taxes on this |
| Add'l Life insurance cost per 1099 | $ 3,171.00 | Paid taxes on this |

| | | |
|---|---|---|
| Effective state and federal tax rate (For tax effect gross up) | 47% | |
| | 1.8868 | Gross up multiplier |

Marginal federal tax rate was 35% (plus phase-out, medicare and AMT)
State marginal tax rate of 6%

---

**Documentation**
Employment Agreement
W2 Statement
Paystub showing flexible deduction and vacation
1099 Statement

## EMPLOYMENT AGREEMENT
## WITH GORDON D. QUICK

The parties to this Employment Agreement (the "Agreement") are Daleen Holdings, Inc., a Delaware corporation (the "Company"), and Gordon D. Quick (the "Executive").

The Company proposes to enter into a series of transactions (the "Transactions") pursuant to which the Company shall (i) cause its newly formed, wholly-owned subsidiary to merge with and into Daleen Technologies, Inc., a Delaware corporation ("Daleen") and (ii) purchase all of the shares of the outstanding capital stock of Protek Telecommunications Solutions Ltd, a company organized under the laws of England and Wales ("Protek"). Upon the date of consummation of the Transactions (the "Effective Date"), each of Daleen and Protek will be a wholly-owned subsidiary of the Company.

The Company desires to ensure itself of the services of the Executive following the consummation of the Transactions and the Executive is willing to provide full-time services to the Company on the terms and conditions provided herein. Simultaneously with the execution of this Agreement, the Executive and the Company shall also enter into an Indemnification Agreement, dated as of the Effective Date (the "Indemnification Agreement"). In addition, under the Company's 2004 Stock Incentive Plan (the "Incentive Plan") the Executive and the Company shall be entering into a Stock Option Award Agreement, dated as of the Effective Date (the "Option Agreement").

Accordingly, in consideration of the mutual covenants and representations contained herein, the parties to this Agreement, intending to be legally bound, agree as follows:

1. **Full-time Service of Executive.**

1.1 **Term, Duties and Permitted Activities.**

(a) **Service Period.** The Company hereby engages the Executive to provide the Company and its subsidiaries full-time service for the period (the "Service Period") commencing on the Effective Date and ending on the earliest to occur of (i) the third anniversary of the Effective Date (the "Completion Date"), (ii) a termination of the Executive's service by reason of any of the circumstances defined in Sections 2 or 3, or (iii) the Executive's death; provided, however, that the Service Period shall automatically be extended for successive one year annual terms following the Completion Date and each renewal term hereunder, unless either party hereto provides the other with a written notice of non-renewal at least ninety (90) days prior to the Completion Date or the end of any renewal term.

(b) <u>Duties</u>. During the Service Period, the Executive shall serve as an officer of the Company with the title of Chief Executive Officer and shall be entitled to exercise the rights, authority, duties and responsibilities customarily associated with such position as reasonably assigned to him from time to time by the board of directors of the Company (the "Board"), including, without limitation, authority, direction and control over day-to-day business, financial and personnel matters of the Company, subject to the lawful and reasonable policies and guidelines as may be established by the Board. As Chief Executive Officer of the Company, the Executive shall report to and otherwise shall be subject to the direction and control of the Board and shall have no other officer or employee of the Company of equal or senior rank or authority to him. The Executive's duties, titles and responsibilities shall not be changed materially at any time without his consent; *provided*, that any change in the Executive's duties, titles and responsibilities as a result of a change in the size or activities of the Company shall not be subject to this sentence as long as such new duties, titles and responsibilities are substantially consistent with those of a chief executive officer of a business of like size and nature. The Executive shall use his best efforts to promote the Company's interests and he shall perform his duties and responsibilities faithfully, diligently and to the best of his ability, consistent with sound business practices. The Executive may be required by the Board to provide services to, or otherwise serve as an officer or director of, any direct or indirect subsidiary of the Company. The Executive shall comply with the Company's policies applicable to executive officers of the Company of which he is given advance written notice. During the Service Period, the Executive shall be a member of the Board.

(c) <u>Outside Activities</u>. The Executive shall devote substantially his full working time to the business and affairs of the Company. Notwithstanding the preceding sentence, the Executive (a) may serve on the Board of Directors (or similar managing body) of one or more corporations or other entities, provided such service does not violate any other covenant or term of this Agreement, interfere with the performance of the Executive's duties for the Company or create a conflict of interest or the appearance of a conflict of interest with respect to the Company; (b) may invest the Executive's personal assets in any form or manner so long as it does not require the Executive's services or advice in the operation of any business in which such investment is made, provided such activity does not violate any other covenant or term of this Agreement (nothing in this Agreement shall restrict the Executive's right to invest in the Company); and (c) may engage in such other activities that do not violate the covenants in Section 5, create a conflict of interest or the appearance of a conflict of interest with the Company or materially interfere with the performance of his obligations to the Company under this Agreement.

(d) <u>Place of Employment</u>. The Executive shall perform his duties under this Agreement primarily in St. Louis, Missouri, with the likelihood of substantial business travel, including regular travel to and from the Company's offices in Boca Raton, Florida, London, England and other corporate offices. At any time during the Service Period, but not earlier than nine (9) months after the Effective Date, the Company, at the direction of the Board of Directors, may, with reasonable advance notice, require the Executive to relocate his primary residence to Boca Raton, Florida,

2

or any other mutually agreeable location.  In the event that the Company requires the Executive to relocate his primary residence, the Company shall pay or reimburse the Executive's relocation costs in accordance with the provisions of Appendix A to this Agreement.  The Company shall further pay the Executive an amount determined by its accountants to be equal to Executive's federal, state and local taxes, if any, on the payment or reimbursement of the Executive's relocation costs (taking into account the deductibility of such costs by the Executive) (the "Relocation Tax Gross-Up"), and the federal, state and local taxes on the Relocation Tax Gross-Up, all to the end that the Executive be held harmless, on an after-tax basis, from the tax impact of such reimbursement.

    1.2   Compensation and General Benefits.  As compensation for the Executive's services under this Agreement, the Executive shall be compensated in the manner described below.

    (a)   Base Salary.  During the Service Period, the Executive shall be entitled to receive a base salary ("Base Salary") at the annual rate of not less than $425,000 for services rendered to the Company or any of its direct or indirect subsidiaries and payable in accordance with the Company's regular payroll practices.  The Executive's Base Salary under this Section 1.2 shall be increased on each January 1 during the Service Period, beginning on January 1, 2006, by the amount of $25,000.  The Executive's Base Salary shall be subject to further increases, if any, as may be approved at any time by the Board of Directors of the Company in its discretion.

    (b)   Bonus Compensation.

    (i)   Annual Formula Bonus.  Appendix B to this Agreement sets forth a framework for determining the initial annual formula bonus to be paid to the Executive during the Service Period.  Subsequent annual bonus targets will continue to be 50% of Base Salary, and targets will be set annually by the Board of Directors.

    (ii)   Annual Discretionary Bonus.  The Executive shall be eligible for such annual bonus, in addition to the formula annual bonus described in Section 1.2(b)(i) above, as the Board may approve in its sole discretion.

    (c)   Reimbursement of Expenses.  During the Service Period, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by him (in accordance with the policies and practices presently followed by the Company or as may be established by the Board for its senior executive officers) in performing services under this Agreement, provided that the Executive properly accounts for such expenses in accordance with the Company's policies.

    (d)   Vacation.  During the Service Period, the Executive shall receive four (4) weeks of paid vacation annually, to be taken at times mutually agreeable to the Company and the Executive.  In accordance with the Company's vacation policy, the Executive shall be entitled to carry over from year-to-year up to four (4) weeks of unused vacation time.

3

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.     3

(e)     Disability and Life Insurance Coverage. During the Service Period, the Company shall pay for or otherwise provide long-term disability coverage for the Executive that is not less favorable than the Executive's coverage as of the Effective Date, providing for a minimum disability benefit of $20,000 per month. Further, during the Service Period, the Company shall maintain life insurance coverage on the Executive's life with a minimum death benefit of $1,500,000 at no cost to him. The Executive shall be permitted to designate the beneficiary or beneficiaries of the life insurance and may change such designation from time to time without the Company's consent.

(f)     Option Plan. As promptly as practicable after the Effective Date, and, in any event, within thirty days after the Effective Date, the Executive shall be entitled to receive a grant of stock options ("Options") under the Incentive Plan in respect of shares of Common Stock of the Company representing a minimum of 35% of the initial shares reserved for issuance under the Incentive Plan. Further, the Executive shall be entitled under the Incentive Plan to an allocation of a minimum of 35% of the additional shares that become available for allocation under the Incentive Plan by reason of the operation of Schedule A to the Incentive Plan. Notwithstanding any provision of the Incentive Plan or the Option Agreement to the contrary, in the event of a termination by the Company of the Executive's service with the Company without Cause (as defined in Section 2.2), a termination by the Executive of the Executive's service with the Company with Good Reason (as defined in Section 2.3), the Executive's death or the Executive's Disability, then (i) if such event occurs prior to the second anniversary of the Effective Date, the Executive shall be deemed vested in a total amount equal to 50% of the Options and (ii) if such event occurs on or after the second anniversary of the Effective Date, the Executive shall be deemed vested in 25% of the then unvested balance of his Options. In addition, all of the Executive's then unvested Options shall vest upon a Change in Control (as defined in the Incentive Plan) in the event that the Executive is not retained as the highest ranking employee and executive officer of the Company or its successor following such Change in Control.

(g)     Benefits and Perquisites Generally. Subject to the foregoing provisions, during the Service Period, the Executive shall be entitled to participate in and to receive benefits as a senior member under all of the Company's employee benefit plans, programs and arrangements available to senior members of the Company, as they may be duly amended, approved or adopted by the Board as of the Effective Date and from time to time thereafter, including any retirement plan, profit sharing plan, savings plan, life insurance plan, health insurance plan, stock-based compensation or incentive plan, and accident or disability insurance plan. The Executive's benefits hereunder shall also include the cost of annual physical examinations.

(h)     Tax Gross-Up. The Company shall further pay the Executive an amount determined by its accountants to be equal to the Executive's federal, state and local taxes, if any, related to or arising from the Company's payment or reimbursement of the Executive's benefit costs or expenses under subsection (e) above (the "Benefit Tax Gross-Up"), and the federal, state and local taxes on the Benefit Tax Gross-Up, all

4

to the end that the Executive be held harmless, on an after-tax basis, from the tax impact of such reimbursement.

## 2.  Termination of Services.

2.1  Death.  The Executive's service under this Agreement shall terminate upon his death.

2.2  Termination by the Company.  The Company may terminate the Executive's service under this Agreement with or without Cause (as defined below). For purposes of this Agreement, the Company shall have "Cause" to terminate the Executive's service under this Agreement if (i) the Executive willfully, or as a result of gross negligence on his part, fails substantially to (A) carry out the material and lawful policies of the Board or (B) discharge his material duties and responsibilities under this Agreement for any reason other than the Executive's Disability (as defined in Section 3), (ii) the Executive is convicted of or enters a plea of no contest with respect to a felony, (iii) the Executive engages in conduct that is materially in violation of his obligations to the Company under this Agreement and which is demonstrably and substantially injurious to the Company (as determined in good faith by the Board), or (iv) the Executive materially breaches this Agreement, or commits any deliberate and intentional violation of the provisions of Section 5.  During the initial three-year term of this Agreement, a determination that "Cause" exists for the Executive's termination shall be made by the affirmative vote of not less than two-thirds (2/3) of the entire membership of the Board (excluding the Executive) at a meeting of the Board called and held for the purpose of finding that, in the reasonable good faith opinion of the Board members so voting, there is Cause for termination as set forth in this Section 2.2. For purposes of this Agreement, a "termination by the Company without Cause" shall include the termination of the Executive's service on the Expiration Date solely as a result of the Company's electing under Section 1.1(a) not to extend the term of the Agreement.  The Executive shall be afforded a reasonable opportunity to cure any act or omission that would otherwise constitute "Cause" hereunder according to the following terms.  The Board shall give the Executive written notice stating with reasonable specificity the nature of the circumstances determined by the Board of Directors in good faith to constitute "Cause."  The Executive shall have thirty (30) days from his receipt of such notice to cure such circumstances or such breach if such breach is reasonably susceptible to cure.  If, in the reasonable good faith judgment of the Board of Directors, the alleged breach is not reasonably susceptible to cure, or such circumstances or material breach has not been satisfactorily cured within such thirty (30) day cure period, such neglect of duties or material breach shall thereupon constitute "Cause" hereunder.

2.3  Termination by Executive.  The Executive may terminate his service under this Agreement with or without Good Reason (as defined below).  If such termination is with Good Reason, the Executive shall give the Company notice, which shall identify with reasonable specificity the grounds for the Executive's resignation and provide the Company with thirty (30) days from the day such notice is given to cure the alleged

5

grounds for resignation contained in the notice. For purposes of this Agreement, "Good Reason" shall mean any of the following to which the Executive shall not consent in writing: (i) a reduction in the Executive's Base Salary, (ii) a material breach by the Company of this Agreement that is not remedied by the Company within thirty (30) days after receipt of a reasonably detailed notice given by the Executive, (iii) a relocation of the Executive's primary place of employment from his current place of employment other than to Boca Raton, Florida, or any other mutually agreeable location, (iv) any diminution in offices, titles, status or reporting requirements in the Executive's specific executive officer position, other than an insubstantial or inadvertent act that is remedied by the Company promptly after receipt of notice given by the Executive or (v) the removal of the Executive or the failure to reelect the Executive as a director of the Company.

2.4    Date of Termination. "Date of Termination" shall mean the earlier of (a) the "Completion Date" (as defined in Section 1.1(a)) and (b) if the Executive's service is terminated (i) by his death, the date of his death, or (ii) pursuant to the provisions of Section 2.2 or Section 2.3, as the case may be, the date on which the Executive's service with the Company actually terminates.

3.    Disability. The Executive shall be determined to be "Disabled" if the Executive is unable to perform his duties under this Agreement on essentially a full-time basis for six (6) consecutive months by reason of a physical or mental condition (a "Disability") and, within thirty (30) days after the Company gives notice to the Executive that it intends to replace him due to his Disability, the Executive shall not have returned to the performance of his duties on essentially a full-time basis. Upon a determination that the Executive is Disabled, the Company may replace the Executive without breaching this Agreement.

4.    Compensation Upon Termination.

8

**4.1**   **Death or Disability.**  If the Executive's service under this Agreement is terminated by reason of his death, the Company shall pay to the person or persons designated by the Executive for that purpose in a notice filed with the Company, or, if no such person shall have been so designated, to his estate, the amount of (a) the Executive's accrued but unpaid Base Salary (b) any accrued but unpaid Bonus; provided that such Bonus is determined to have been earned and provided that such Bonus is payable at such time as similar Bonuses are payable by the Company and (c) other amounts that may be reimbursable by the Company to the Executive under this Agreement.  Any amounts payable under this Section 4.1 shall be exclusive of and in addition to any payments which the Executive's widow, beneficiaries or estate may be entitled to receive pursuant to any pension plan, profit sharing plan, employee benefit plan, or life insurance policy maintained by the Company.  In the event that the Executive becomes Disabled, as defined herein, then the Company may terminate the Executive's employment and the Executive shall be entitled to the following:

    **(a)**   A cash amount equal to his Base Salary earned to the Date of Termination, plus for the first six (6) months after the Executive is terminated due to the disability, the Executive shall be entitled to his then Base Salary less any amounts paid to the Executive under any disability insurance policy provided by the Employer; and

    **(b)**   A cash amount equal to the Employee's pro rata bonus for the year in which the Date of Termination occurs, if such bonus is deemed earned, payable at such time as bonuses for the annual period are paid to other executive officers of the Company.

**4.2**   **By the Company for Cause or the Executive Without Good Reason.**  If the Executive's service is terminated by the Company for Cause, or if the Executive terminates his service other than for Good Reason, the Company shall pay to the Executive the amount of any accrued but unpaid Base Salary within 30 days of the Date of Termination and the Company thereafter shall have no further obligation to the Executive under this Agreement, other than for payment of any amounts accrued and vested under any employee benefit plans or programs of the Company.

**4.3**   **By the Executive for Good Reason or the Company other than for Cause.**

    **(a)**   **Severance Benefits on Termination.**  Subject to the provisions of Section 4.3(b) and Section 4.3(d), if the Company terminates the Executive's service without Cause, or the Executive terminates his service for Good Reason, then the Executive shall be entitled to the following benefits (the "Severance Benefits"):

        **(i)**   the sum of his accrued but unpaid Base Salary, that amount being payable in a single lump sum cash payment within thirty (30) days of the Date of Termination;

        **(ii)**   a cash amount equal to one-twelfth (1/12) of the Executive's Base Salary in effect at the Date of Termination, that total amount being payable on a

7

monthly basis for a period of eighteen (18) months following the month in which the Date of Termination occurs; provided, however, that in the event any such termination occurs in anticipation of or within eighteen (18) months following a Change of Control (as defined below), the payments payable pursuant to this section will be made in a single lump sum cash payment within thirty (30) days of the Date of Termination;

(iii)     a cash amount equal to the Executive's pro rata Bonus at the target level, payable at such time as bonuses for the annual period are paid to other executive officers of the Company, such pro rata Bonus being based on a fraction of the target Bonus, the numerator of which is the number of days from the first day of the fiscal year of the Company in which such termination occurs through and including the Date of Termination and the denominator of which is 365;

(iv)     all welfare benefits, including (to the extent applicable) medical, dental, vision, life and disability benefits (including the life and disability described in Section 1.2(c)) pursuant to plans maintained by the Company under which the Executive and/or the Executive's family receives benefits and/or coverage on the Date of Termination, shall be continued  for a period of eighteen (18) months following the month in which the Date of Termination occurs, with such benefits provided to the Executive at the same coverage levels as may be in effect for the Company's executive officers and the Executive shall pay any portion of such cost as was required to be borne by key executives of the Company generally on the Date of Termination; provided, however, that, notwithstanding the foregoing, the benefits described in this Section 4.3(a)(iv) may be discontinued prior to the end of the period provided in this subsection (iv) to the extent, but only to the extent, that the Executive receives substantially similar benefits from a subsequent employer.

(b)     Superseding Termination.  If, subsequent to the giving by either party of a notice of termination under this Agreement and prior to the actual Date of Termination pursuant to such notice, the Executive's service is properly terminated pursuant to any other provision of this Agreement, the Executive shall be entitled only to those benefits, if any, arising out of such subsequent and superseding termination.

(c)     Definition of Change in Control.  For purposes of this Agreement, a "Change in Control" shall have the meaning given to such term in the Incentive Plan.

(d)     Conditions to Receipt of Severance Benefits under Section 4.3(a).

(i)     Release.  As a condition to receiving any Severance Benefits to which the Executive may otherwise be entitled under Section 4.3(a) the Executive shall execute a release (the "Release"), which shall include an affirmation of the restrictive covenants set forth in Section 5 and a non-disparagement provision, in a form and substance reasonably satisfactory to the Company and acceptable to the Executive (whose acceptance shall not be unreasonably withheld), of any claims, whether arising under federal, state or local statute, common law or otherwise, against the Company and its direct or indirect subsidiaries which arise or may have arisen on or before the date of the Release, other than any claims under this Agreement or any

8

required and the amount of such Gross-Up Payment, shall be made by the Company's regular outside independent public accounting firm (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Executive within 30 business days of the Date of Termination, if applicable, or such earlier time as is requested by the Company. The initial Gross-Up Payment, if any, as determined pursuant to this Section 4.5, shall be paid to the Executive within 30 days of the Date of Termination or, if later, within 5 business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm, it is possible that Gross-Up Payments that have not been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made under this Section 4.5(b). In the event that the Company exhausts its remedies pursuant to Section 4.5(c) and the Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

(c)     Executive shall notify the Company of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment under the terms of this Section 4.5. This notice shall be given as soon as practicable but no later than ten business days after the date the Executive has actual knowledge of the claim, and shall apprise the Company of the nature of the claim and the date on which the claim is requested to be paid. The Executive shall not pay the claim prior to the expiration of the thirty-day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to the claim is due). If the Company notifies the Executive prior to the expiration of the above period that it desires to contest the claim, the Executive shall: (A) give the Company any information reasonably requested by the Company relating to the claim, (B) take such action in connection with contesting the claim as the Company shall reasonably request in writing from time to time, including accepting legal representation with respect to the claim by an attorney reasonably selected by the Company, (C) cooperate with the Company in good faith in order to effectively contest the claim, (D) permit the Company to control any proceedings relating to the claim; provided, however, that the Company shall bear and pay directly any and all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after-tax basis, for two-thirds (2/3) of any Excise Tax or income tax related to the Excise Tax, including interest and penalties with respect thereto, imposed as a result of such representation and payment of costs and expenses. Without limitation of the foregoing provisions of this Section 4.5(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of the claim and may, at its sole option, either direct the Executive to request or accede to a request for an extension of the statute of limitations with respect only to the tax claimed, or pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a

10

4.7    Exclusive Benefits. The Severance Benefits payable under Section 4.3(a) shall be in lieu of any other severance or similar benefits that would otherwise be payable under any other agreement, plan, program or policy of the Company.

5.    Restrictive Covenants.

5.1    Exclusive Property. The Executive confirms that all Company Property is the exclusive property of the Company. Executive agrees that during his employment Executive shall not make, use or permit to be used any Company Property other than for the benefit of the Company. The term "Company Property" shall include all automobiles, Confidential Information, notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, and any copies thereof, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Executive's possession, custody or control. Executive further agrees that he shall not, after the termination of employment, use or permit others to use any such Company Property for any reason. Promptly upon the termination of employment (for any reason), Executive shall immediately deliver all Company Property in Executive's possession, and all copies thereof, to the Company; provided, however, that the Executive shall be permitted to retain copies of any documents or materials of a personal nature or otherwise related to the Executive's rights under this Agreement.

5.2    Nondisclosure. Executive acknowledge that the Company has agreed to provide, and during the course of employment with the Company Executive will acquire, knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, business and financial methods, practices, plans, pricing information, marketing information and strategies, merchandising and selling techniques and information, customer lists and preferences, supplier lists, inventions, products, designs, know-how, techniques, processes, engineering data, software programs, works of authorship, projects, proposals, and confidential information relating to the Company's policies and/or business strategy (all of such information herein referred to as the "Confidential Information"). The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company. Executive agrees that he will not, during the course of employment, divulge to any person, directly or indirectly, except to the Company or its officers and agents or as reasonably required in connection with Executive's duties on behalf of the Company, or use in any way, except on behalf of the Company, any Confidential Information acquired by Executive at any time during my employment. Executive agrees that he will not, at any time after his employment with the Company has ended (for whatever reason), use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in any subsequent employment. Executive acknowledges that the Company would not provide him with access to Confidential Information but for his covenants contained in this Agreement. Executive understands and agrees that the

12

acknowledges that the Company would not employ him or provide him with access to its Confidential Information but for his covenants or promises contained in this Section.

5.4     Non-Solicitation.  During the Service Period and for a period of eighteen (18) months after the Date of Termination, the Executive shall not, whether for his own account or for the account of any other Person (other than the Company or its direct or indirect subsidiaries), intentionally solicit, endeavor to entice away from the Company or its direct or indirect subsidiaries, or otherwise interfere with the relationship of the Company or its direct or indirect subsidiaries with, (a) any person who is employed by the Company or its direct or indirect subsidiaries (including any independent sales representatives or organizations), or (b) any client or customer of the Company or its direct or indirect subsidiaries.

5.5     Assignment of Developments.  If at any time or times during Executive's employment, whether during work hours or off-duty hours, Executive shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to Executive by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise.  The term "Development" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection).  Executive shall promptly disclose to the Company (or any persons designated by it) each such Development.  Executive hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) Executive may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

5.6     Injunctive Relief.  The Executive acknowledges that a breach of any of the covenants contained in this Section 5 may result in material, irreparable injury to the Company for which there is no adequate remedy at law, that it shall not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat of breach, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Executive from engaging in activities prohibited by this Section 5 or such other relief as may be required to specifically enforce any of the covenants in this Section 5.  The Executive agrees and consents that injunctive relief may be sought in any state or federal court of record in the State of Missouri, or in the state and county in which a violation may occur or in any

14

## APPENDIX A

### Payment or Reimbursement of Executive's Relocation Costs

In the event that the Company requires the Executive to relocate his primary residence under the terms of Section 1.3 of the Agreement, the Company shall pay or otherwise reimburse the Executive for all reasonable costs and expenses ("Relocation Expenses") described below incurred by the Executive in connection with such location. Relocation Expenses shall include:

(a)    House Hunting. Reasonable travel and related expenses for the Executive and the Executive's spouse for up to two "house hunting trips" from the Executive's present location to the new location to find a new home.

(b)    Selling Home and Acquiring New Home. If the Executive sells his home and/or purchases a new home in connection with the relocation, the Company shall reimburse the Executive for all reasonable costs normally paid by the seller in connection with selling a home and a buyer in connection with purchase of a new home, including: broker's fees, recording costs, transfer fees and taxes, mortgage placement fees (including customary origination fees, required points, loan commitment fees, warehouse and assumption fees, but excluding any additional fees or points (buy down) to permit a smaller than normal down payment or to obtain a lower than customary interest rate), appraisal fees required by lending institutions, title insurance and examination fees, settlement fees, and escrow agent fees. If the Executive leases a residence, the Company shall pay any broker's fees required to obtain a lease (but not advance rental, security or cleaning deposits).

(c)    Moving Expenses. The Company or the Executive shall select a reliable mover and the Company shall pay for the following expenses in connection with the transportation of the Executive's household goods, household pets, personal effects and cars to the Executive's new location: packing, transportation, unpacking, insurance, and appraisals for fine arts, antiques and items of unusual value (including the Executive's wine collection). The Company shall make arrangements for movement to the Executive's new location for two motor vehicles registered in the Executive's name or in the name of any member of the Executive's household. The Company shall pay the corresponding expenses for the insurance and transportation of such vehicles.

(d)    Temporary Storage. If the Executive's household goods have been moved, and the Executive cannot obtain immediate possession of the Executive's new home, the Company shall pay fees for the storage of the Executive's household goods. Automobiles shall not be stored and must be delivered to the Executive at the new location. Further, the Company shall not have any liability or risk of loss with respect to such stored goods.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

(e)  <u>Travel to New Location</u>.  The Company shall reimburse the Executive for the travel and related expenses for the Executive and the other members of the Executive's household to the new location by the most direct route.

(f)  <u>Temporary Living at New Location</u>.  If the Executive begins work at the new location before moving into his new home, the Company shall pay the reasonable temporary housing costs from the time of the Executive's arrival in the new location and for up to two (2) days after the arrival of the Executive's furniture and household goods at the new home provided that the Company shall not be required to pay such temporary housing costs for a period exceeding eight (8) weeks.

(g)  <u>Second Moves</u>.  If the Executive moves into rented quarters and later purchases and moves into permanent housing, the provisions detailed in items (b) and (c) above shall apply.  This second move must occur within eighteen (18) months from the effective date of transfer to the location to be reimbursable.

2

## APPENDIX B

The Executive shall be entitled to a bonus for the twelve months ended June 1, 2005 of the Company based on the following: A target bonus of 50% of Base Salary will be paid if Company attains 2 out of 3 of the Daleen Projection of Revenues, EBITDA and Cash Balance. A minimum bonus of 20% of Base Salary will be paid if Company attains 2 out of 3 of the Trigger Levels of Revenues, EBITDA and Cash Balance. Performance between Trigger Levels and the Daleen Projection will generate a bonus based upon linear interpolation. Bonus in excess of 50% of Base Salary will be at the discretion of the Board. Capitalized terms used above and not otherwise defined in this Agreement shall have the respective meanings given to such terms in Schedule 7.2 to the Series A Convertible Redeemable PIK Preferred Stock Investment Agreement, dated as of May ___, 2004, by and among the Company, Quadrangle Capital Partners LP, a Delaware limited partnership, Quadrangle Select Partners LP, a Delaware limited partnership, Quadrangle Capital Partners-A LP, a Delaware limited partnership, Behrman Capital II, L.P., a Delaware limited partnership, Strategic Entrepreneur Fund II, L.P., a Delaware limited partnership, and any signatories thereto. For all future periods, the Executive shall participate in annual incentive compensation arrangements that provide for a target bonus of 50% of Base Salary based on performance metrics to be determined by the Board and additional bonuses at the discretion of the Board to the extent the Company's performance exceeds the targeted performance metrics. Notwithstanding the foregoing, the Company and Executive will endeavor to migrate the Executive to an annual bonus period consistent with the Company's fiscal year as soon as practicable.

**EXHIBIT**

B3

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

**DALEEN HOLDINGS, INC.**

By: _____
Name: Dawn Landry
Title: V P + Secretary

**EXECUTIVE**

_____
Name:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

DALEEN HOLDINGS, INC.

By:_____
   Name:
   Title:

EXECUTIVE

_____
Name:

# 2005 W-2 and EARNINGS SUMMARY

**Employee Reference Copy**

ada, accurate.
4371  Use

e-file  Visit the IRS Website at www.irs.gov.

**W-2 Wage and Tax Statement 2005**

OMB No. 1545-0008

Control number
00075 04/WTT | Dept. 300 | Corp. | A | Employer use only 50

Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

Batch #00278

Employee's name, address, and ZIP code
GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

| c Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
| Wages, tips, other comp. 403982.06 | 2 Federal income tax withheld 94937.06 |
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 421982.06 | 6 Medicare tax withheld 6118.74 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 3956.00 |
| | 12b D 18000.00 |
| 14 Other | 12c |
| | 13 Stat emp Ret. plan 3rd party sick pay |
| 15 State MO  Employer's state ID no. 17560934 | 16 State wages, tips, etc. 403982.06 |
| 17 State income tax 22190.00 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

---

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2005 pay stub plus any adjustments submitted by your employer.**

| Gross Pay | 422274.30 | Social Security Tax Withheld | 5580.00 | MO. State Income Tax Box 17 of W-2 | 22190.00 |
| Fed. Income Tax Withheld Box 2 of W-2 | 94937.06 | Medicare Tax Withheld Box 6 of W-2 | 6118.74 | SUI/SDI Box 14 of W-2 | |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | MO. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 422,274.30 | 422,274.30 | 422,274.30 | 422,274.30 |
| Plus GTL (C-Box 12) *life insur.* | 3,956.00 | 3,956.00 | 3,956.00 | 3,956.00 |
| Less 401(k) (D-Box 12) | 18,000.00 | N/A | 18,000.00 | 18,000.00 |
| Less Medical FSA | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Less Other Cafe 125 | 1,248.24 | 1,248.24 | 1,248.24 | 1,248.24 |
| Wages Over Limit | N/A | 331,982.06 | N/A | N/A |
| Reported W-2 Wages | 403,982.06 | 90,000.00 | 421,982.06 | 403,982.06 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

Social Security Number: 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
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 18
STATE: 10   (Spouse does not Work)

© 2005 AUTOMATIC DATA PROCESSING, INC.

Fold and Detach Here

---

| 1 Wages, tips, other comp. 403982.06 | 2 Federal income tax withheld 94937.06 |
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 421982.06 | 6 Medicare tax withheld 6118.74 |
| c Control number 100075 04/WTT | Dept. 300 | Corp. A | Employer use only 50 |
| e Employer's name, address, and ZIP code | |

VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| c Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 3956.00 |
| 14 Other | 12b D 18000.00 |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay X |
| e Employee's name, address and ZIP code | |

GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

| 15 State MO  Employer's state ID no. 17560934 | 16 State wages, tips, etc. 403982.06 |
| 17 State income tax 22190.00 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2 Wage and Tax Statement 2005**
OMB No. 1545-0008
**Federal Filing Copy**
Copy B to be filed with employee's Federal Income Tax Return.

---

| 1 Wages, tips, other comp. 403982.06 | 2 Federal income tax withheld 94937.06 |
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 421982.06 | 6 Medicare tax withheld 6118.74 |
| c Control number 100075 04/WTT | Dept. 300 | Corp. A | Employer use only 50 |
| e Employer's name, address, and ZIP code | |

VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| c Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 3956.00 |
| 14 Other | 12b D 18000.00 |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay X |
| e Employee's name, address and ZIP code | |

GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

| 15 State MO  Employer's state ID no. 17560934 | 16 State wages, tips, etc. 403982.06 |
| 17 State income tax 22190.00 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2 Wage and Tax Statement 2005**
OMB No. 1545-0008
**MO.State Reference Copy**
Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. 403982.06 | 2 Federal income tax withheld 94937.06 |
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 421982.06 | 6 Medicare tax withheld 6118.74 |
| c Control number 100075 04/WTT | Dept. 300 | Corp. A | Employer use only 50 |
| e Employer's name, address, and ZIP code | |

VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| c Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 3956.00 |
| 14 Other | 12b D 18000.00 |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay X |
| e Employee's name, address and ZIP code | |

GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

| 15 State MO  Employer's state ID no. 17560934 | 16 State wages, tips, etc. 403982.06 |
| 17 State income tax 22190.00 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**W-2 Wage and Tax Statement 2005**
OMB No. 1545-0008
**MO.State Filing Copy**
Copy 2 to be filed with employee's State Income Tax Return.

VIZIQOR SOLUTIONS, INC.
902 CLINT MOORE ROAD, SUITE 230
BOCA RATON, FL 33487

**Earnings Statement**

**ADP**

Period Ending: 12/15/2005
Pay Date: 12/20/2005

Taxable Marital Status: Married
Exemptions/Allowances:
 Federal: 18
 MO: 10

GORDON D QUICK
800 S. HANLEY ROAD
4E
CLAYTON, MO 63105

Social Security Number: XXX-XX-5461

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Personal Time | | | 32,691.04 | 32,691.04 |
| Regular | | | | 389,583.26 |
| | | | | 422,274.30 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| G.T.L. | 172.00 | 3,956.00 |
| Abilii Vac | *Never paid* | 130.96 |
| Float Holiday | | 0.00 |
| Personal Time | | 184.86 |
| Sick Hours | | 28.00 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -9,887.99 | 94,937.06 |
| | Medicare Tax | -471.38 | 6,118.74 |
| | MO State Income Tax | -1,761.00 | 22,190.00 |
| | Social Security Tax | | 5,580.00 |

*Taken after termination*

| Other | this period | year to date |
|---|---|---|
| Checking | -19,852.91 | |
| Dental | -14.00* | 168.00 |
| Flex Medical | -250.00* | 3,000.00 |
| Sec125-Medical | -86.66* | 1,039.92 |
| Vision | -3.36* | 40.32 |
| 401K Catch Up | -1,343.74* | 4,000.00 |
| Employee Reimb | | -118,129.02 |
| 401K | | 14,000.00 |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$31,165.28

*2 pay periods worth of Deductions*
*Nov. 16th → Nov. 31st*
*Dec. 1 → Dec. 15th*

9595    ☒ VOID    ☐ CORRECTED

**PAYER'S name, street address, city, state, ZIP code, and telephone no.**

Vizigar Solutions Inc.
902 Clint Moore Rd   Ste 230
Boca Raton FL 33487

| 1 Rents | OMB No. 1545-0115 | |
|---|---|---|
| $ | **2005** | Miscellaneous Income |
| 2 Royalties | | |
| $ | Form 1099-MISC | |
| 3 Other Income | 4 Federal income tax withheld | **Copy A** |
| $ | $ | **For Internal Revenue Service Center** |

**PAYER'S Federal identification number** 65-0944514  **RECIPIENT'S identification number** 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

| 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
|---|---|---|
| $ | $ | |

**RECIPIENT'S name** Gordon Quick

| 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
|---|---|---|
| $ 3171.00 | $ | |

**Street address (including apt. no.)** 800 S. Hanley Road   4E

| 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
|---|---|---|

**City, state, and ZIP code** Clayton MO 63105

| 11 | 12 |
|---|---|

**Account number (see instructions)**     ☐ 2nd TIN not.

| 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney |
|---|---|
| $ | $ |

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $ | | $ |

Form **1099-MISC**                41-0852411                Department of the Treasury - Internal Revenue Service

**Do Not Cut or Separate Forms on This Page  —  Do Not Cut or Separate Forms on This Page**

---

9595    ☐ VOID    ☒ CORRECTED

**PAYER'S name, street address, city, state, ZIP code, and telephone no.**

Vizigar Solutions Inc.
902 Clint Moore Rd   Ste 230
Boca Raton FL 33487

| 1 Rents | OMB No. 1545-0115 | |
|---|---|---|
| $ | **2005** | Miscellaneous Income |
| 2 Royalties | | |
| $ | Form 1099-MISC | |
| 3 Other Income | 4 Federal income tax withheld | **Copy A** |
| $ 3171.00 | $ | **For Internal Revenue Service Center** |

**PAYER'S Federal identification number** 65-0944514  **RECIPIENT'S identification number** 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

| 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
|---|---|---|
| $ | $ | |

**RECIPIENT'S name** Gordon Quick

| 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
|---|---|---|
| $ | $ | |

**Street address (including apt. no.)** 800 S Hanley Road   4E

| 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
|---|---|---|

**City, state, and ZIP code** Clayton MO 63105

| 11 | 12 |
|---|---|

**Account number (see instructions)**     ☐ 2nd TIN not.

| 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney |
|---|---|
| $ | $ |

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $ | | $ |

Form **1099-MISC**                41-0852411                Department of the Treasury - Internal Revenue Service

DETACH BEFORE MAILING
MANUFACTURED IN U.S.A. ON RECYCLED PAPER USING HEAT RESISTANT INKS
Printed on Recycled Paper

5110
FORA

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: Woodmont Holding, Inc. | Case Number 06-10236 - MFW | |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): John Trecker | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|

Name and Address where notices should be sent:

John Trecker
1644 Lochrest
Chesterfield, MO 63017-7021

☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

Telephone Number: 636-537-5322

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☒ Wages, salaries, and compensation (fill out below)
Last four digits of your SS #: 9801
Unpaid compensation for services performed
from 12/6/2005 to _____
(date)            (date)

**2. Date debt was incurred:** 12/6/2005

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ 50,000
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $_____

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other _____

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $ 50,000 _____ _____ $ 50,000
(unsecured)   (secured)   (priority)   (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

THIS SPACE IS FOR COURT USE ONLY

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date 4/2/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): John Trecker | |
|---|---|---|

003151  alty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

EXHIBIT
C



August 29, 2005

Mr. John Trecker
1644 Lochrest
Chesterfield, MO 63017

Re:    Retention Bonus Agreement

Dear John:

I am pleased to inform you that you have been selected to be eligible to receive a retention bonus if you continue to be employed by Viziqor Holdings, Inc. (the "Company") through a Change in Control (as defined in the Viziqor Holdings, Inc. 2004 Stock Incentive Plan). This letter sets out the terms and conditions of the retention bonus arrangement (the "Agreement") between you and the Company.

1.    **Right to Payment.**

Subject to the terms and conditions of this Agreement, you will be entitled to receive a retention bonus of $50,000 if you continue to be employed by the Company through a Change in Control. In addition to this amount, you will be entitled to receive an additional bonus based on gross proceeds resulting from a Change in Control as more particularly set forth in Schedule A hereto. If a payment becomes due under this paragraph 1, the payment will be made in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control.

2.    **Effect of Termination.**

(a)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated by the Company without "Cause" or you resign with "Good Reason" (as those terms are defined in your employment agreement), you will be entitled to receive the retention bonus set forth in Paragraph 1 of this Agreement, payable in a single lump sum payment, net of all Federal, state, local, or other taxes as are required to be withheld, within thirty (30) days after the effective date of a Change in Control provided that such date is within six (6) months of the effective date of your termination or resignation.

(b)    If, prior to the date that you become entitled to a payment under Paragraph 1 of this Agreement, your employment with the Company is terminated for any reason other than as described in Paragraph 2(a) of this Agreement, you will have no right to receive a payment under this Agreement.

3.    **Binding Effect.** This Agreement is personal to you and without the prior written consent of the Company will not be assignable by you otherwise than by will or

the laws of descent and distribution. This Agreement will inure to the benefit of and be enforceable by your legal representatives. This Agreement will inure to the benefit of and be binding upon the Company and its successors and assigns.

4. **Employment Status**. This Agreement will not be deemed to create in or confer upon you any right to be retained in the employ of the Company or any subsidiary or other affiliate thereof.

5. **Entire Agreement**. This Agreement contains the entire understanding of the Company and you with respect to the subject matter hereof.

6. **Severability**. In the event any provision of this Agreement will be held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included. Further, the captions of this Agreement are not part of its provisions and will have no force and effect.

7. **Amendment and Termination**. This Agreement may be amended or terminated at any time by written agreement of the parties hereto.

8. **Applicable Law**. To the extent not preempted by the laws of the United States, the laws of the State of Florida, other than the conflict of law provisions thereof, will be the controlling law in all matters relating to this Agreement.

Yours truly,

VIZIQOR HOLDINGS, INC.

By: _____

Title: President & CEO

ACCEPTED AND ACKNOWLEDGED:

Name: John Trecker

## Schedule A

You will be entitled to receive an additional bonus based on the Gross Proceeds exchanged related to a Change in Control. For purposes hereof, Gross Proceeds shall mean an amount equal to (i) the aggregate fair market present value as of the closing of a Change in Control of any securities issued, earn-out granted and any cash consideration paid to the Company or its security holders and option holders plus (ii) the amount of any interest bearing indebtedness, capital leases and preferred stock obligations (other than any management fees payable) of the Company assumed or repaid by a purchaser in connection with a Change in Control plus (iii) liabilities assumed for contractual severance (for the avoidance of doubt, not adding back Retention Payments paid or payable pursuant to this incremental Retention Plan) relating to the management team less the sum of (iv) any investment made by the existing investors after June 1, 2005, and any investment made by the existing investors or an acquirer in conjunction with the Change in Control. The fair market value of any such securities issued to the Company will be the value determined in good faith by the Company on the date of the closing of a Change in Control.

The payout target for the additional bonus, payable upon a change of control, is $50,000 with the actual amount calculated as follows:
- Zero incentive payable if Gross Proceeds $10MM or less
- Target amount payable based on Gross Proceeds of $20 million
- Actual amount paid adjusted ratably up or down based on linear interpolation from $10MM to $20MM or more Gross Proceeds

## 2005 W-2 and EARNINGS SUMMARY

Safe, accurate, **e-file** Visit the IRS Website
FAST! Use at www.irs.gov.

**Employee Reference Copy**

# W-2 Wage and Tax Statement 2005
OMB No. 1545-0008

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2005 pay stub plus any adjustments submitted by your employer.**

| | | | |
|---|---|---|---|
| Gross Pay | 194324.84 | Social Security Tax Withheld Box 17 of W-2 | 5580.00 |
| | | SUI/SDI Box 14 of W-2 | |
| | | MO. State Income Tax | 10137.00 |
| Fed. Income Tax Withheld Box 2 of W-2 | 41708.38 | Medicare Tax Withheld Box 6 of W-2 | 2810.20 |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | MO. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 194,324.84 | 194,324.84 | 194,324.84 | 194,324.84 |
| Plus GTL (C-Box 12) | 576.00 | 576.00 | 576.00 | 576.00 |
| Less Other Cafe 125 | 1,094.27 | 1,094.27 | 1,094.27 | 1,094.27 |
| Wages Over Limit | N/A | 103,806.57 | N/A | N/A |
| Reported W-2 Wages | 193,806.57 | 90,000.00 | 193,806.57 | 193,806.57 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

Social Security Number: 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
Taxable Marital Status: MARRIED

Exemptions/Allowances:
FEDERAL: 1
STATE: 1 (Spouse does not Work)

© 2005 AUTOMATIC DATA PROCESSING, INC.

---

**Copy C for employee's records**

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 100078 04/WTT | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

Batch #00278

a/f Employee's name, address, and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

| b Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
|---|---|
| 1 Wages, tips, other comp. 193806.57 | 2 Federal income tax withheld 41708.38 |
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 193806.57 | 6 Medicare tax withheld 2810.20 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 576.00 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

| 15 State MO | Employer's state ID no. 17560934 | 16 State wages, tips, etc. 193806.57 |
|---|---|---|
| 17 State income tax 10137.00 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

---

| 1 Wages, tips, other comp. 193806.57 | 2 Federal income tax withheld 41708.38 |
|---|---|
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 193806.57 | 6 Medicare tax withheld 2810.20 |

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 100078 04/WTT | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 576.00 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

a/f Employee's name, address, and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

| 15 State MO | Employer's state ID no. 17560934 | 16 State wages, tips, etc. 193806.57 |
|---|---|---|
| 17 State income tax 10137.00 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

**MO.State Reference Copy**

# W-2 Wage and Tax Statement 2005
OMB No. 1545-0008

Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. 193806.57 | 2 Federal income tax withheld 41708.38 |
|---|---|
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 193806.57 | 6 Medicare tax withheld 2810.20 |

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 100078 04/WTT | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 576.00 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

a/f Employee's name, address, and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

| 15 State MO | Employer's state ID no. 17560934 | 16 State wages, tips, etc. 193806.57 |
|---|---|---|
| 17 State income tax 10137.00 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

**MO.State Filing Copy**

# W-2 Wage and Tax Statement 2005
OMB No. 1545-0008

Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. 193806.57 | 2 Federal income tax withheld 41708.38 |
|---|---|
| 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| 5 Medicare wages and tips 193806.57 | 6 Medicare tax withheld 2810.20 |

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 100078 04/WTT | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number 65-0944514 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 C 576.00 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

a/f Employee's name, address, and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

| 15 State MO | Employer's state ID no. 17560934 | 16 State wages, tips, etc. 193806.57 |
|---|---|---|
| 17 State income tax 10137.00 | 18 Local wages, tips, etc. | |
| 19 Local income tax | 20 Locality name | |

**Federal Filing Copy**

# W-2 Wage and Tax Statement 2005
OMB No. 1545-0008

Copy B to be filed with employee's Federal Income Tax Return.

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>Woodmont Holding, Inc. | Case Number<br>06-10236 - MFW |
|---|---|

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>John Trecker | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|

| Name and Address where notices should be sent:<br><br>John Trecker<br>1644 Larchrest<br>Chesterfield, MO 63017-7021 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |
|---|---|

Telephone Number: 636 - 537 - 5322

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor: | Check here if ☐ replaces<br>this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☒ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: 9185
  Unpaid compensation for services performed
  from 12/6/05 to _____
  (date)      (date)

**2. Date debt was incurred:**
12/6/05

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim $ 185,000**
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☒ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $ 10,000

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☒ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(5).

**Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| **5. Total Amount of Claim at Time Case Filed:** | $ 175,000<br>(unsecured) | _____<br>(secured) | 10,000<br>(priority) | 185,000<br>(Total) |
|---|---|---|---|---|

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>4/21/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>John Trecker |
|---|---|

003151   *Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# EMPLOYMENT AGREEMENT

The parties to this Employment Agreement (the "**Agreement**") are **Viziqor Holdings, Inc.** (the "**Employer**" or the "**Company**"), a Delaware corporation, and **John Trecker** (the "**Employee**").

The Employer proposes to enter into a series of transactions (the "Transactions") pursuant to which the Employer shall (i) cause its newly formed, wholly-owned subsidiary to merge with and into Daleen Technologies, Inc., a Delaware corporation ("**Daleen**") and (ii) purchase all of the shares of the outstanding capital stock of Protek Telecommunications Solutions Ltd, a company organized under the laws of England and Wales ("**Protek**"). Upon the date of consummation of the Transactions (the "**Effective Date**"), each of Daleen and Protek will be a wholly-owned subsidiary of the Employer.

The Employer desires to ensure itself of the services of the Employee following the consummation of the Transactions and the Employee is willing to provide full-time services to the Employer on the terms and conditions provided herein.

Accordingly, in consideration of the mutual covenants and representations contained herein, the parties to this Agreement, intending to be legally bound, agree as follows:

1. EMPLOYMENT. The Employer hereby employs Employee in its business as its **Senior Vice President of Software Engineering**, and Employee hereby accepts such employment, all upon the terms and conditions hereinafter set forth.

2. DUTIES. Employee shall report directly to and perform under and according to the reasonable direction of the Chief Executive Officer of the Company (the "**Chief Executive Officer**") and control and to the best of Employee's abilities, all executive, advisory, administrative, and/or managerial duties (if any) which may reasonably be assigned or delegated to Employee from time to time by the Chief Executive Officer.

3. TERM. Unless sooner terminated pursuant to the provisions of this Agreement, the term of employment under this Agreement shall commence on the Effective Date and shall extend for as long as Employee remains employed hereunder ("**Term**"), with Employee acknowledging that the Employee is an at-will employee. Employee's employment may be terminated by either party upon thirty (30) days prior written notice.

4. BASE SALARY. Employee shall be entitled to receive salary at the rate of $185,000 per annum, as such may be increased pursuant to Section 9

hereof (the "**Base Salary**"). The Base Salary shall be payable in accordance with the current payroll policies of Company, which policies may be changed by Company from time to time in its sole discretion, and shall be subject to all appropriate withholding taxes. Annually during the Term of this Agreement, the Employer shall review Employee's performance and may make such increases to Employee's base salary if any such increase is warranted.

5. EXPENSES. Employee shall be entitled to reimbursement by the Employer for ordinary and necessary business expenses incurred by Employee in the performance of his duties for the Employer, which types of expenditures shall be determined and approved by the Employer, and further provided that: (a) each such expenditure is of a nature qualifying it as a proper deduction on the Federal and State income tax returns of the Employer as a business expense and not as deductible compensation to Employee; and (b) Employee furnishes the Employer with adequate records and other documentary evidence required by Federal and State statutes and regulations for the substantiation of such expenditures as deductible business expenses of the Employer and not as deductible compensation to Employee, as well as any other documentation reasonably requested by the Employer.

6. BENEFITS. Employee shall be entitled to receive the following benefits during employment:

   a. Employee agrees that the Base Salary, Bonus Compensation, the Stock Options, and the Benefits and the other compensation provided in accordance with this Agreement, are the sole and exclusive compensation of Employee for his duties hereunder.

   b. Continuing throughout the Term:

      1. Employee shall receive all of the employee benefits including, without limitation, pension, disability, profit sharing and retirement benefits, provided at any time by the Employer to any of its employees in the sole and absolute discretion of the Board of Directors of the Employer (the "**Board**");

      2. Employee shall receive a minimum of four (4) weeks of paid vacation annually, to be taken at times mutually agreeable to the Chief Executive Officer and Employee;

      3. the Employer shall provide health insurance providing full hospital, medical and dental coverage pursuant to the Employer plans in effect from time to time for Employee

and each of Employee's dependents at similar expense to Employee or such dependents as charged to other employees of the Employer.

7. **BONUS COMPENSATION.** Employee shall be eligible to receive an annual bonus of up to 35% of his Base Salary for each fiscal year. The bonus will be at the discretion of the Board and based upon a combination of goals determined by the compensation committee of the Board for personal objectives as well as the Employer performance compared to its strategic objectives for the fiscal year.

8. **STOCK OPTIONS.** In addition to Employee's Base Salary, Benefits and Bonus Compensation, Employee shall be granted stock options to purchase a number of shares as determined by the Board at an exercise price as determined by the Board, which options will vest over a period specified by the Board at the time of Grant. The options, and the specific terms applicable thereto, shall be granted to Employee pursuant to an Option Agreement satisfactory as to its other terms to the Employer, and all of these grants and terms are subject to the approval of the Board.

9. **REVIEW.** The Board shall from time to time, no less frequently than annually, review Employee's compensation and may (in its sole discretion) increase, but not decrease, the compensation provided for herein. Any such increase in compensation shall be valid only if in writing, executed by the appropriate officer, and such writing shall constitute an amendment solely to the payments to be made to Employee under this Agreement, without waiver or modification of any other provision hereof.

10. <u>Restrictive Covenants</u>.

a. <u>Exclusive Property</u>. The Employee confirms that all Company Property is the exclusive property of the Employer. Employee agrees that during his employment Employee shall not make, use or permit to be used any Company Property other than for the benefit of the Company. The term "**Company Property**" shall include all automobiles, Confidential Information, notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, and any copies thereof, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in Employee's possession, custody or control. Employee further agrees that he shall not, after the termination of employment, use or permit others

to use any such Company Property for any reason. Promptly upon the termination of employment (for any reason), Employee shall immediately deliver all Company Property in Employee's possession, and all copies thereof, to the Company; provided, however, that the Employee shall be permitted to retain copies of any documents or materials of a personal nature or otherwise related to the Employee's rights under this Agreement.

b. Nondisclosure. Employee acknowledges that the Company has agreed to provide, and during the course of employment with the Company Employee will acquire, knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, business and financial methods, practices, plans, pricing information, marketing information and strategies, merchandising and selling techniques and information, customer lists and preferences, supplier lists, inventions, products, designs, know-how, techniques, processes, engineering data, software programs, works of authorship, projects, proposals, and confidential information relating to the Company's policies and/or business strategy (all of such information herein referred to as the "**Confidential Information**"). The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company. Employee agrees that he will not, during the course of employment, divulge to any person, directly or indirectly, except to the Company or its officers and agents or as reasonably required in connection with Employee's duties on behalf of the Company, or use in any way, except on behalf of the Company, any Confidential Information acquired by Employee at any time during my employment. Employee agrees that he will not, at any time after his employment with the Company has ended (for whatever reason), use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in any subsequent employment. Employee acknowledges that the Company would not provide him with access to Confidential Information but for his covenants contained in this Agreement. Employee understands and agrees that the obligations under this Section shall survive the termination of this Agreement and of his employment. The above restrictions on disclosure and use of Confidential Information shall not prevent the Employee from: (i) using or disclosing information in the good faith performance of the Employee's duties; (ii) using or disclosing information to another employee to whom disclosure is required to perform in good faith the duties of either; (iii) using or disclosing information to another person or entity pursuant to a binding confidentiality agreement in a Company-approved form as part of

the performance in good faith of the Employee's duties or as authorized in writing by the Company; (iv) using or disclosing Information to the extent such Information is or may be, through no fault or disclosure on the part of the Employee, generally made know to the public or throughout the industry in which the Company is engaged; (v) using or disclosing Information which is disclosed to the Employee after termination of my employment with the Company by a third party who is under no duty or obligation not to disclose such information; or (vi) disclosing Information as required by law. If the Employee becomes legally compelled to disclose any of the Confidential Information, Employee shall (i) provide the Company with prior written notice of the need for such disclosure; (ii) if disclosure is required, furnish only that portion of the Confidential Information which, in the opinion of the Employee's counsel, is legally required; and (iii) exercise reasonable efforts to obtain reliable assurances that confidential treatment will be accorded to the Confidential Information.

c. Non Competition. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, unless the Employee receives the prior written consent of the Employer, directly or indirectly, own an interest in, manage, operate, join, control, lend money or render financial or other assistance to, participate in or be connected with, as an officer, employee, partner, stockholder, consultant or otherwise, or engage in any activity or capacity (collectively, the "**Competitive Activities**") with respect to any individual, partnership, limited liability company, firm, corporation or other business organization or entity (each, a "**Person**"), that is engaged directly or indirectly in the provision of software offerings substantially similar to those of the Employer, provided that those offerings represent at least 20% of the revenue of the Employer including its direct or indirect subsidiaries anywhere in the world; provided, however, that the foregoing (i) shall not apply with respect to any line-of-business in which the Employer or its direct or indirect subsidiaries was not engaged on or before the date of termination of Employee's employment, and (ii) shall not prohibit the Employee from owning, or otherwise having an interest in, less than three percent (3%) of any publicly-owned entity or five percent (5%) of any private equity fund or similar investment fund, provided the Employee has no active role with respect to any investment by such fund in any Person referred to in this Section 10(c). Employee hereby acknowledges that the scope of prohibited activities and the time duration of the provisions of this Section 10(c) are reasonable and are no broader than are necessary to protect the legitimate business interests of the Company. Employee acknowledges and

agrees that this noncompetition provision shall survive the termination of his employment, and can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this provision. Employee acknowledge that the Company would not employ him or provide him with access to its Confidential Information but for his covenants or promises contained in this Section.

d. <u>Non-Solicitation</u>. During the Term and for a period of twelve (12) months after the date of termination of the Employee's employment, the Employee shall not, whether for his own account or for the account of any other Person (other than the Employer or its direct or indirect subsidiaries), intentionally solicit, endeavor to entice away from the Employer or its direct or indirect subsidiaries, or otherwise interfere with the relationship of the Employer or its direct or indirect subsidiaries with, (i) any person who is employed by the Employer or its direct or indirect subsidiaries (including any independent sales representatives or organizations), or (ii) any client or customer of the Employer or its direct or indirect subsidiaries.

e. <u>Assignment of Developments</u>. If at any time or times during Employee's employment, whether during work hours or off-duty hours, Employee shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to Employee by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. The term "<u>**Development**</u>" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection). Employee shall promptly disclose to the Company (or any persons designated by it) each such Development. Employee hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) Employee may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further

compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

f.  Injunctive Relief.  The Employee acknowledges that a breach of any of the covenants contained in this Section 10 may result in material, irreparable injury to the Employer for which there is no adequate remedy at law, that it shall not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat of breach, the Employer shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Employee from engaging in activities prohibited by this Section 10 or such other relief as may be required to specifically enforce any of the covenants in this Section 10.  The Employee agrees and consents that injunctive relief may be sought in any state or federal court of record in the State of Florida, or in the state and county in which a violation may occur or in any other court having jurisdiction, at the election of the Employer; to the extent that the Employer seeks a temporary restraining order (but not a preliminary or permanent injunction), the Employee agrees that a temporary restraining order may be obtained ex parte.  The Employee agrees and submits to personal jurisdiction before each and every court designated above for that purpose.

g.  Blue-Pencilling.  The parties consider the covenants and restrictions contained in this Section 10 to be reasonable.  However, if and when any such covenant or restriction is found to be void or unenforceable and would have been valid had some part of it been deleted or had its scope of application been modified, such covenant or restriction shall be deemed to have been applied with such modification as would be necessary and consistent with the intent of the parties to have made it valid, enforceable and effective.

11. SEPARATION BENEFITS.

a.  Provision of Separation Benefits.  In the event that the Employee's employment with the Employer is terminated or Employee terminates for Good Reason, the Employer shall, subject to the requirement of subsection b. below, provide the separation benefits specified in subsection c. below unless the Employee's termination of employment results from:

1.  The Employee's death.

2. The Employee's disability (in which event Employee shall, subject to the terms and conditions thereof, be entitled to the benefits described in paragraph (d) below).

3. The Employee voluntarily resigning his employment with any member of the Company Group without Good Reason.

4. The termination of the Employee's employment by a member of the Company Group at a time when the Employee has accepted an offer of immediate employment with another member of the Company Group.

5. The termination of the Employee's employment by any member of the Company Group for "Cause".

b. <u>Separation Benefits Contingent on Executed and Valid Release</u>. No separation benefits specified in subsection c. or d. below shall be provided to the Employee unless and until the Employee has executed a separation and release agreement with the Employer (or the appropriate member of the Company Group) in a form reasonably acceptable to the Employer, and such separation and release agreement has become valid and enforceable. Such separation and release agreement shall contain provisions in which (1) the Employee shall agree to a date of termination of employment, and (2) the Employee shall release and discharge the Company Group and their related employees, directors, consultants, advisors, and other persons from any claim or liability, whether known or unknown, arising out of the Employee's employment with the Employer or the member of the Company Group or the termination of such employment.

c. <u>Separation Benefits to be Provided</u>. The separation benefits that the Employee shall receive under subsection a. above shall consist of:

1. A cash amount equal to one-twelfth (1/12) of the regular annual salary (exclusive of bonuses, commissions, and any other extra compensation) of the Employee in effect as of the Employee's date of termination of employment multiplied by the number of months of the Employee's Separation Period, which shall be payable in installments consistent with the Company's general payroll practices over the Employee's Separation Period;

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as

bonuses for the annual period are paid to other executive officers of the Employer; and

3. Reimbursement of any COBRA group health plan premiums paid by the Employee for the coverage of the Employee (and any of the Employee's covered dependents, provided that such dependents were covered at the time of termination) during the Separation Period. Reimbursements will be made within fifteen (15) days following submission of proof of the expense and the payment thereof by the Employee.

4. All payments will be subject to applicable federal, state and local tax withholdings.

d. <u>Disability Benefits</u>. In the event that Employee becomes Disabled, as defined herein, then the Employer may terminate Employee's employment and Employee shall be entitled to the following:

1. A cash amount equal to his Base Salary earned to the date of termination, plus for the first six (6) months after Employee is terminated due to the disability, Employee shall be entitled to his then Base Salary less any amounts paid to Employee under any disability insurance policy provided by the Employer; and

2. A cash amount equal to the Employee's pro rata Bonus, if such Bonus is deemed earned, payable at such time as bonuses for the annual period are paid to other executive officers of the Employer.

e. <u>Documents</u>. If termination is due to Employee's disability or death, the Employer shall provide Employee or Employee's estate with such documents and information as reasonably may be requested by such person to assist in the collection of any disability or life insurance proceeds payable under any disability or life insurance policy pursuant to the Employer's standard policies and procedures.

f. <u>Definitions</u>. For this purpose, the following terms shall have the following meanings:

1. The term "**Disability**" shall mean that the Employee has been determined to be disabled under the company's long-term disability plan, if any, and/or under the Federal Social Security Act.

2. The term **"Cause"** shall mean an act or acts by the Employee involving (a) the use for profit or willful disclosure to unauthorized persons of confidential information or trade secrets of the Employer or any member of the Company Group in violation of company policy or company agreements with such persons protecting such matters, (b) the material and willful breach of any written contract between the Employee and the Employer, any member of the Company Group, or of any employment or business policies of the Employer or any member of the Company Group (including, without limitation, theft or misuse of property) (c) the unlawful trading in the securities of the Employer or any member of the Company Group or of another corporation based on information gained as a result of the performance of services for the Employer or any member of the Company Group, (d) a conviction for, or pleading NOLO CONTENDERE to, a felony or other crime involving moral turpitude or dishonesty (other than traffic violations and similar misdemeanors), or (e) any other act or omission by Employee which is in violation of the Agreement or written company policy and which the Employer in good faith believes has occurred to its material detriment and about which Employee has received at least one (1) written warning by the Employer and despite such prior written warning, Employee has on a second occasion committed such act or omission.

3. The term **"Good Reason"** shall mean:

   (i)   a reduction of the Employee's base salary; or

   (ii)  a material reduction in the Employee's responsibilities or status, other than an act that is remedied by the Employer promptly after receipt of notice given by the Employee; or

   (iii) any material breach by the Employer of any material provision of this Agreement which is not cured within thirty (30) days following written notice by Employee to the Employer of such breach.

4. The term **"Company Group"** shall mean the Employer and any parent or subsidiary of the Employer (or a successor entity of any such entity).

5. The term "**Separation Period**" shall mean twelve (12) months; provided, however, to the extent that the Employee receives any payments of base salary, excluding any earned vacation pay, prior to his termination of employment for a period of time while he is performing no (or DE MINIMIS) services for the Company Group, such period of time shall be subtracted from his Separation Period.

12. CONFLICT OF INTEREST. The Employee shall devote substantially all of the Employee's full working time to the business and affairs of the Employer. Notwithstanding the preceding sentence, the Employee (a) may serve on the board of directors (or similar managing body) of one or more corporations or other entities, provided such service does not violate any other covenant or term of this Agreement, interfere with the performance of the Employee's duties for the Employer or create a conflict of interest or the appearance of a conflict of interest with respect to the Employer; (b) may invest the Employee's personal assets in any form or manner so long as it does not require the Employee's services or advice in the operation of any business in which such investment is made, provided such activity does not violate any other covenant or term of this Agreement (nothing in this Agreement shall restrict the Employee's right to invest in the Employer); and (c) may engage in such other activities that do not violate any other covenant or term of this Agreement (including any restrictive covenants incorporated herein), create a conflict of interest or the appearance of a conflict of interest with the Employer or materially interfere with the performance of the Employee's obligations to the Employer under this Agreement.

13. JURISDICTION AND VENUE. The parties acknowledge that the administration and execution of this Agreement occurred or shall occur in Palm Beach County, Florida, and that, therefore, without limiting the jurisdiction or venue of any other federal or state courts, each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement may be brought in the courts of record of the State of Florida in Palm Beach County or the court of the United States, Southern District of Florida; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts; and (d) agrees that service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules in said state. At the Employee's sole discretion, any dispute relating to this Agreement, other than a dispute relating to Section 16, may be submitted to binding arbitration. The arbitrator shall be selected by agreement of the parties or,

if they do not agree on an arbitrator within 30 days after the Employee has notified the Employer of his desire to have the question settled by arbitration, then the arbitrator shall be selected pursuant to the procedures of the American Arbitration Association (the "AAA") in Boca Raton, Florida. The determination reached in such arbitration shall be final and binding on all parties. Enforcement of the determination by such arbitrator may be sought in any court of competent jurisdiction. Unless otherwise agreed by the parties, any such arbitration shall take place in Boca Raton, Florida, and shall be conducted in accordance with the Commercial Arbitration Rules of the AAA.

14. SURVIVAL. Notwithstanding anything to the contrary herein, the provisions of this Agreement shall survive and remain in effect in accordance with their respective terms in the event the employment is terminated.

15. EMPLOYEE REPRESENTATIONS, WARRANTIES, AND ACKNOWLEDGMENTS. Employee represents and warrants to the Employer that he is fully empowered to enter and perform his obligations under this Agreement and, without limitation, that he is under no restrictive covenants to any person or entity that will be violated by his entering into and performing this Agreement, and that this Agreement constitutes the valid and legally binding obligation of Employee enforceable in accordance with its terms. The execution and delivery of this Agreement by Employee has been duly authorized by all necessary action. Employee shall indemnify the Employer upon demand for and against any and all judgments, losses, claims, damages, costs (including without limitation all legal fees and costs, even if incident to appeals) incurred or suffered by any of them as a result of the breach of the representations and warranties made in this section, or as a result of the failure of the acknowledgment made in this section to be true and correct at all times.

16. SPECIFIC PERFORMANCE. Employee acknowledges that the services to be rendered by Employee hereunder are extraordinary and unique and are vital to the success of the Employer, and that damages at law would be an inadequate remedy for any breach or threatened breach of this Agreement by Employee. Therefore, in the event of a breach or threatened breach by Employee of any provision of this Agreement, then the Employer shall be entitled, in addition to all other rights or remedies, to injunctions restraining such breach.

17. REMEDIES CUMULATIVE. No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right,

power or remedy hereunder shall preclude any other or further exercise thereof.

18. ASSIGNMENT; SUCCESSORS; BINDING AGREEMENT.  Agreement shall not be assignable by Employee and shall be assignable by the Company, provided that (i) the assignee or transferee is the successor to all or substantially all of the assets of the Company, and (ii) such assignee or transferee assumes the liabilities, obligations and duties of the Company, as contained in this Agreement, either contractually or as a matter of law.  The Company further agrees that, in such an event, it shall take whatever action it legally can in order to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder, it being understood that the Company shall remain liable for all separation and other benefits hereunder in the absence of a written assumption by the transferee of the Company's obligations under this Agreement.  None of the rights or obligations of Employee under this Agreement may be assigned or transferred by Employee other than his rights to compensation and benefits, which may be transferred only by will or operation of law.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legatees, devisees, personal representatives, successors and assigns.

19. MODIFICATION AND WAIVER.  No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification or discharge is duly approved by the Board and is agreed to in writing by the Employee and such officer(s) as may be specifically authorized by the Board to effect it.  No waiver by any party of any breach by any other party of, or of compliance with, any term or condition of this Agreement to be performed by any other party, at any time, shall constitute a waiver of similar or dissimilar terms or conditions at that time or at any prior or subsequent time.

20. ENTIRE AGREEMENT.  This Agreement, along with the Restrictive Covenant Agreement  contains the entire agreement between the Employer and Employee with respect to the subject matter hereof and, from and after the date of this Agreement, this Agreement shall supersede any other agreement between the parties with respect to the subject matter hereof.

21. GOVERNING LAW.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Missouri other than the conflict of laws provision thereof.

22. WITHHOLDING OF TAXES. The Employer shall withhold from any amounts payable under the Agreement all federal, state, local or other taxes as legally shall be required to be withheld.

23. NOTICE. For the purposes of this Agreement, notices and all other communications to either party provided for in this Agreement shall be furnished in writing and shall be deemed to have been duly given when delivered or when mailed if such mailing is by United States certified or registered mail, return receipt requested, postage prepaid, addressed to such party (notices to the Employer being addressed to the Secretary of the Employer) at the Employer's principal executive office, or at other address as either party shall have designated by giving written notice of such change to the other party at anytime hereafter.

24. SEVERABILITY. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

25. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

26. HEADINGS. The headings used in this Agreement are for convenience only, do not constitute a part of the Agreement, and shall not be deemed to limit, characterize, or affect in any way the provisions of the Agreement, and all provisions of the Agreement shall be construed as if no headings had been used in the Agreement.

27. CONSTRUCTION. As used in this Agreement, unless the context otherwise requires: (a) the terms defined herein shall have the meanings set forth herein for all purposes; (b) references to "Section" are to a section hereof; (c) "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (d) "writing," "written" and comparable terms refer to printing, typing, lithography and other means of reproducing words in a visible form; (e) "hereof," "herein," "hereunder" and comparable terms refer to the entirety of this Agreement and not to any particular section or other subdivision hereof or attachment hereto; (f) references to any gender include references to all genders; and (g) references to any agreement or other instrument or statute or regulation are referred to as amended or supplemented from time to time (and, in the case of a statute or regulation, to any successor provision).

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Vizigor Holdings, Inc.

By: _____

Name: Gordon Welick

Title: CEO & Treasurer

EMPLOYEE

Name: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Viziqor Holdings, Inc.**

By:_____
    Name:
    Title:

EMPLOYEE

_____
Name:

**Safe, accurate, FAST! Use** ~~e-file~~    **Visit the IRS Website at www.irs.gov.**

Employee Reference Copy

# W-2 Wage and Tax Statement 2005

OMB No. 1545-0008

Copy C for employee's records.

| a Control number | | | Dept | Corp. | Employer use only |
|---|---|---|---|---|---|
| 100078 04/WTT | | | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

Batch #00278

a/f Employee's name, address, and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD,MO 63017

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 65-0944514 | 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 |

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 193806.57 | 41708.38 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 90000.00 | 5580.00 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 193806.57 | 2810.20 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

| 11 Nonqualified plans | 12a See instructions for box D    C    576.00 |
|---|---|
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| MO | 17560934 | 193806.57 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 10137.00 | |

| 19 Local income tax | 20 Locality name |
|---|---|

---

# 2005 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2005 pay stub plus any adjustments submitted by your employer.**

| | | | |
|---|---|---|---|
| Gross Pay | 194324.84 | Social Security Tax Withheld    Box 4 of W-2 | 5580.00 |
| | | MO. State Income Tax    Box 17 of W-2 | 10137.00 |
| | | SUI/SDI    Box 14 of W-2 | |
| Fed. Income Tax Withheld    Box 2 of W-2 | 41708.38 | Medicare Tax Withheld    Box 6 of W-2 | 2810.20 |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation    Box 1 of W-2 | Social Security Wages    Box 3 of W-2 | Medicare Wages    Box 5 of W-2 | MO. State Wages, Tips, Etc.    Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 194,324.84 | 194,324.84 | 194,324.84 | 194,324.84 |
| Plus GTL (C-Box 12) | 576.00 | 576.00 | 576.00 | 576.00 |
| Less Other Cafe 125 | 1,094.27 | 1,094.27 | 1,094.27 | 1,094.27 |
| Wages Over Limit | N/A | 103,806.57 | N/A | N/A |
| Reported W-2 Wages | 193,806.57 | 90,000.00 | 193,806.57 | 193,806.57 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD, MO 63017

Social Security Number: 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
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL:    1
STATE:    1
(Spouse does not Work)

© 2005 AUTOMATIC DATA PROCESSING, INC.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 193806.57 | 41708.38 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 90000.00 | 5580.00 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 193806.57 | 2810.20 |

| a Control number | | | Dept. | Corp. | Employer use only |
|---|---|---|---|---|---|
| 100078 04/WTT | | | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 65-0944514 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

| 11 Nonqualified plans | 12a See instructions for box 12    C    576.00 |
|---|---|
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD,MO 63017

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| MO | 17560934 | 193806.57 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 10137.00 | |

| 19 Local income tax | 20 Locality name |
|---|---|

# W-2 Wage and Tax Statement 2005
OMB No. 1545-0008

**Federal Filing Copy**
Copy B to be filed with employee's Federal Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 193806.57 | 41708.38 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 90000.00 | 5580.00 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 193806.57 | 2810.20 |

| a Control number | | | Dept. | Corp. | Employer use only |
|---|---|---|---|---|---|
| 100078 04/WTT | | | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 65-0944514 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

| 11 Nonqualified plans | 12a    C    576.00 |
|---|---|
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD,MO 63017

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| MO | 17560934 | 193806.57 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 10137.00 | |

| 19 Local income tax | 20 Locality name |
|---|---|

# W-2 Wage and Tax Statement 2005

**MO.State Reference Copy**
Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 193806.57 | 41708.38 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 90000.00 | 5580.00 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 193806.57 | 2810.20 |

| a Control number | | | Dept. | Corp. | Employer use only |
|---|---|---|---|---|---|
| 100078 04/WTT | | | 150 | T | 66 |

c Employer's name, address, and ZIP code
VIZIQOR SOLUTIONS INC
902 CLINT MOORE RD
BOCA RATON FL 33487

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 65-0944514 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

| 11 Nonqualified plans | 12a    C    576.00 |
|---|---|
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code
JOHN E TRECKER
1644 LOCHCREST
CHESTERFIELD,MO 63017

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| MO | 17560934 | 193806.57 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 10137.00 | |

| 19 Local income tax | 20 Locality name |
|---|---|

# W-2 Wage and Tax Statement 2005

**MO.State Filing Copy**
Copy 2 to be filed with employee's State Income Tax Return.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.            )
                               )
                Plaintiffs,     )
                               )
v.                             )        No.:   4:06CV637-SNL
                               )
VIZIQOR SOLUTIONS, INC., et al. )
                               )
                Defendants.     )

## MEMORANDUM TO COURT

On August 14, 2006, Quadrangle and Huber ("defendants") filed a memorandum to court attaching plaintiffs' proofs of claim filed in the Delaware bankruptcy case. As an initial matter, most of these proofs of claim were filed before defendants had completed their briefing on their motion to dismiss therefore they waived any arguments concerning the proofs of claim by not making them earlier.

Addressing the merits, defendants contend that filing the proofs of claim in Delaware negates plaintiffs' argument that their choice to sue defendants in Missouri should be respected. The opposite is actually true. Plaintiffs respected Woodmont's decision to file its bankruptcy in Delaware. Therefore, the only place for plaintiffs to file their proofs of claim was in the bankruptcy action in Delaware. Plaintiffs decided to sue defendants in Missouri. The defendants should show the same deference to plaintiffs' choice of forum in this case that plaintiffs showed Woodmont's choice of forum in the bankruptcy case.

1

GREEN JACOBSON & BUTSCH, P.C.

By: __/s/ Fernando Bermudez_____
Martin M. Green, 3265
Fernando Bermudez, 79964
James J. Simeri, 102201
Attorneys for Plaintiffs
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
Phone: (314) 862-6800
Fax:     (314) 862-1606
green@stlouislaw.com
bermudez@stlouislaw.com
simeri@stlouislaw.com

## CERTIFICATE OF SERVICE

I certify that on August 18, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, Timothy C. Mooney, Jr. and Charles A. Weiss.

I certify that on August 18, 2006, copies of the foregoing were mailed to each of the following named non-participants in Electronic Case Filing: John L. Messenger, Weil, Gotshal & Manges LLP, 100 Federal Street, Floor 34, Boston, MA 02110.


____/s/ Fernando Bermudez_____

# UNITED STATES DISTRICT FOR THE
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) |
| | ) |
| Plaintiffs, | ) No.: 4 06 CV 00637 SNL |
| | ) |
| v. | ) |
| | ) |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC. | ) ) ) ) |
| | ) |
| Defendants. | ) |

## <u>WITHDRAWAL</u>

COMES NOW Timothy C. Mooney, Jr., and hereby withdraws as counsel for defendants Quadrangle Group LLC and Michael Huber.

BRYAN CAVE LLP


By: /s/ Timothy C. Mooney, Jr.
    Timothy C. Mooney, Jr., #49147
    One Metropolitan Square
    211 N. Broadway, Suite 3600
    St. Louis, Missouri 63102
    Phone: (314) 259-2000
    Fax No. (314) 259-2020

Attorneys for defendants Quadrangle Group LLC and Michael Huber

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2006, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

**Martin M. Green**
mann@stlouislaw.com

**Fernando Bermudez**
bermudez@stlouislaw.com

**Michael A. Clithero**
mclithero@blackwellsanders.com

**Christopher A. Perrin**
cperrin@blackwellsanders.com

/s/ Timothy C. Mooney, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GORDON QUICK, WILLIAM )
MCCAUSLAND and JOHN TRECKER, )
)
    Plaintiffs, )
)
v. )    Case No. 06CV-00637 SNL
)
VIZIQOR SOLUTIONS, INC., )
WOODMONT HOLDINGS, INC., )
MICHAEL HUBER, and )
QUADRANGLE GROUP, LLC, )
)
    Defendants. )

## SUPPLEMENT TO DEFENDANT FORMULA TELECOM SOLUTIONS, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS

Plaintiffs Gordon Quick, William McCausland and John Trecker filed proofs of claim in the Delaware Bankruptcy of Woodmont Holdings, Inc. ("Woodmont"). (See Exhibits A-C of Defendants Huber and Quadrangle's Memorandum to Court of August 14, 2006). In attempting to maintain this action against Formula Telecom Solutions, Inc. f/k/a Viziqor Solutions, Inc ("FTS")—a party they claim to be an alter-ego of Woodmont—outside of that bankruptcy proceeding, Plaintiffs essentially ask this Court to ignore that banktuptcy proceeding and the fact that they submitted to the jurisdiction of the Bankruptcy Court by the filing of their proofs of claim.

Accordingly, Plaintiffs' claims should be heard by the Bankruptcy Court, and this action must be dismissed.

## ARGUMENT

By filing a proof of claim or interest in a bankruptcy case, a party submits itself to the substantive jurisdiction of the bankruptcy court. *See* Lawrence P. King, *Collier on Bankruptcy*, ¶

5.01.01(2)(d) (15th ed. 2006).  In the Woodmont bankruptcy proceeding, Plaintiffs have

specifically requested through their proofs of claim monetary relief for the same claims—alleged

breach of contractual obligations—they purport to assert in this litigation against FTS.

Currently, Plaintiffs' claims in the bankruptcy proceeding are deemed allowed as no objections

have been raised to the claims.  11 U.S.C. § 502(b).  Pursuant to 28 U.S.C. § 157(b)(2)(B),

allowance or disallowance of claims against the estate is a core proceeding, and Plaintiffs are

currently subject to the Bankruptcy Court's jurisdiction.  *See In re EXDS, Inc.*, 301 B.R. 436,

439 (Bkrtcy.D.Del.2003) ("[B]y filing a claim against a bankruptcy estate the creditor triggers

the process of 'allowance and disallowance of claims,' thereby subjecting himself to the

bankruptcy court's equitable power.") (quoting *Langenkamp v. Culp*, 498 U.S. 42, 58-59

(1990));  *In re PRS Insurance Group, Inc.*, 331 B.R. 580, 586 (Bkrtcy.D.Del.2005) ("When a

creditor files a proof of claim, it subjects itself to the jurisdiction of the Bankruptcy Court to hear

all matters related to the allowance of that claim.") (citing *Gardner v. New Jersey*, 329 U.S. 565,

573-574 (1947);  *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1249 (3d Cir.1994).

Indeed, courts have held that when a creditor files a proof of claim, the bankruptcy court has core

jurisdiction to determine that claim, *even if* it was a pre-petition contract claim arising out of

state law.  *See In re S.G. Philips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995) (citing *In re

Manville, Forest Prods. Corp.*, 896 F.2d 1384, 1389-90 (2d Cir.1990)).

　　As previously noted (*see* FTS's Memorandum of Law in Support of Motion to Dismiss

and Reply in Further Support), Plaintiffs allege that FTS is the alter ego of Woodmont.  Given

these allegations, the conduct (and outcome) of this litigation will  have an impact in the

bankruptcy proceeding.  "The usual articulation of the test for determining whether a civil

proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably

have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984). Put slightly differently, "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of actions (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Id.* Thus, this litigation is plainly related to the Woodmont bankruptcy, and should be conducted before the bankruptcy court.

Moreover, if Plaintiffs' allegations that FTS is an alter-ego of Woodmont are taken as true (which they must be for purposes of a motion to dismiss), then any decision relating to or disposing of FTS's assets should be made by the Woodmont bankruptcy court. Under the Bankruptcy Code an automatic stay is triggered by the filing of a petition in bankruptcy, and it stays the continuation of prepetition litigation against the debtor. *See* 11 U.S.C. § 362(a) (1) ("[A bankruptcy] petition . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title . . . ."). Among the purposes of the automatic stay is protection of "creditors by averting a scramble for the debtor's assets and promoting instead an orderly liquidation procedure under which all creditors are to be treated equally." *Farley v. Henson*, 2 F.3d 273, 274 (8th Cir.1993) (quotation omitted). Plaintiffs should not be permitted to pursue a claim clearly related to a bankruptcy proceeding outside of that proceeding, potentially in violation of the automatic stay.

## CONCLUSION

By reason of Plaintiffs' filing of the proofs of claim in the bankruptcy case, Plaintiffs have submitted to the substantive jurisdiction of the Bankruptcy Court. For this and all the

reasons set forth in previous memoranda, Plaintiffs' claims must be decided in the Bankruptcy

Court.

BLACKWELL SANDERS PEPER MARTIN LLP

By   /s/ Christopher A. Perrin
       Michael A. Clithero, #2829
       Christopher A. Perrin, # 502086
       720 Olive Street, 24th Floor
       St. Louis, MO 63101
       (314) 345-6000
       (314) 345-6060 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2007, I electronically filed a copy of the foregoing
SUPPLEMENT TO REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO
DISMISS to be served by operation of the Court's electronic filing system upon the participants
on the electronic filing system list.

       /s/ Christopher A. Perrin

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GORDON QUICK, et al.          )
                              )
              Plaintiffs,     )
                              )
v.                            )       No.:   4:06CV637-SNL
                              )
VIZIQOR SOLUTIONS, INC., et al. )
                              )
              Defendants.     )

### PLAINTIFFS' MOTION TO STRIKE FORMULA TELECOM'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS

This Court should strike Formula Telecom's January 30, 2007 Memorandum because the Local Rules do not allow for endless briefing of a motion absent intervening events or leave of court.  In support of its motion to strike, plaintiffs state:

1.     Local Rule 4.01 provides that the party filing a motion may include a memorandum in support of its motion.  In turn, the opposing party may then file a memorandum in opposition to the motion.  Finally, the party filing the motion may file a reply memorandum.

2.     Rule 4.01(C) provides that "additional memoranda may be filed by either party only with leave of court."

3.     In this case, the two law firm representing the defendants each filed a motion and memorandum in support of their motions on May 3, 2006.  The plaintiffs filed their memorandum in opposition to the motions on May 22, 2006.

The two law firms representing the defendants filed their reply memoranda on June 8, 2006.

4.     All parties then filed short supplemental memoranda in the fall of 2006 explaining their positions concerning alleged, then-recent developments.

5.     Nothing has changed factually since the full briefing of the motions. Nor have there been any recent developments in the law that would affect the pending motions. In fact, the most recent case cited in Formula Telecom's supplemental memorandum was issued in 2003. It appears that Formula Telecom filed its supplemental memorandum simply because it wanted to. There is no good cause for its filing. The defendants' motions (without the most recent supplementation) have been fully briefed and are awaiting this Court's ruling.

WHEREFORE, the Court should strike the January 30, 2007 supplemental memorandum, rule on the defendants' pending motions and hold the Rule 16 conference.

GREEN JACOBSON & BUTSCH, P.C.


By:   /s/ Fernando Bermudez_____
     Martin M. Green, 3265
     Fernando Bermudez, 79964
     James J. Simeri, 102201
     Attorneys for Plaintiffs
     7733 Forsyth Boulevard, Suite 700
     Clayton, Missouri 63105
     Phone: (314) 862-6800
     Fax:   (314) 862-1606
     green@stlouislaw.com
     bermudez@stlouislaw.com
     simeri@stlouislaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 2, 2007, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system, upon the following named counsel of record:  Michael A. Clithero, Christopher A. Perrin, and Charles A. Weiss.


/s/ Fernando Bermudez_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| GORDON QUICK, WILLIAM MCCAUSLAND and JOHN TRECKER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 06CV-00637 SNL |
| VIZIQOR SOLUTIONS, INC., WOODMONT HOLDINGS, INC., MICHAEL HUBER, and QUADRANGLE GROUP, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

**MOTION FOR LEAVE TO FILE SUPPLEMENT TO DEFENDANT FORMULA TELECOM SOLUTIONS, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO MOTION TO STRIKE.**

COMES NOW Defendant Formula Telecom Solutions, Inc. ("FTS") and, pursuant to Rule 4.01(c) of the Local Rules, moves this court to grant leave to file the Supplement to Defendant Formula Telecom Solutions, Inc.'s Reply Memorandum in Further Support of Motion to Dismiss lodged herein on January 30, 2007. In support of its motion and in opposition to Plaintiffs' Motion to Strike filed on February 2, 2007, FTS states as follows:

1.      FTS filed its Motion to Dismiss for failure to join parties needed for a just adjudication on May 3, 2006. Plaintiffs allege that FTS is the alter ego of Woodmont Holdings and liable for its debts. In response, FTS contends that this matter should be heard by the bankruptcy court before whom the Woodmont Holdings proceedings are being conducted.

2.      Plaintiffs filed their Memorandum in Opposition to Motion to Dismiss Transfer and Stay on May 22, 2006.

3.      FTS filed Defendant Formula Telecom Solutions' Reply Memo in Further Support of Motion to Dismiss on June 8, 2006.

4.      On or about June 24, 2006, plaintiffs filed their proofs of claim in the Woodmont Holdings Bankruptcy.

5.      On August 14, 2006, defendants Huber and Quadrangle filed the proofs of claim from the bankruptcy and one page memorandum with this Court.

6.      On August 16, 2006, plaintiffs filed a response to the memorandum asserting that their choice of forum should be accepted.

7.      By reason of plaintiffs' filing of the proofs of claim in the Woodmont bankruptcy, plaintiffs have submitted to the substantive jurisdiction of the Bankruptcy Court.  Plaintiffs should not be permitted to pursue a claim clearly related to a bankruptcy proceeding—*i.e.*, one against an alleged alter ego of the debtor—outside of that proceeding, potentially in violation of the automatic stay.  Rather, such related claims should be resolved as part of the proceeding before the Bankruptcy Court.

8.      FTS had not made a filing responding to the filing of the proofs of claim and addressing the impact plaintiffs' proof of claim has on plaintiffs' claims before this Court and, therefore, the pending motion to dismiss.

9.      FTS desires to do so at this time.

WHEREFORE, FTS prays this Court grant leave to file the Supplement to  Defendant Formula Telecom Solutions, Inc.'s Reply Memorandum in Further Support of Motion to Dismissed lodged herein on January 30, 2007 and grant such other and further relief as is just and proper under the circumstances of this case.

BLACKWELL SANDERS PEPER MARTIN LLP

By     /s/ Michael A. Clithero
        Michael A. Clithero, #2829
        Christopher A. Perrin, # 502086
        720 Olive Street, 24th Floor
        St. Louis, MO 63101
        (314) 345-6000
        (314) 345-6060 (facsimile)


## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007, I electronically filed a copy of the foregoing MOTION FOR LEAVE TO FILE SUPPLEMENT TO REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS to be served by operation of the Court's electronic filing system upon the participants on the electronic filing system list.


       /s/ Michael A. Clithero

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **GORDON QUICK, ET. AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV637SNL** |
| | ) | |
| **VIZIQOR SOLUTIONS, INC., ET. AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

In accordance with the memorandum filed herein this date,

**IT IS HEREBY ORDERED** that defendants Huber and Quadrangle Group's motion to dismiss (#16) be and is **DENIED.**

**IT IS FURTHER ORDERED** that defendants Huber and Quadrangle Group's motion to transfer venue or stay (#16) be and is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Formula Telecom Solutions f/k/a Viziqor Solutions' motion to dismiss (#14) be and is **DENIED.**

**IT IS FINALLY ORDERED** that this cause of action, in its entirety, shall be transferred to the United States District Court for the District of Delaware for reference to the Delaware Bankruptcy Court for further adjudication.  No more action shall be taken in this case.

Dated this ___12th___ day of February, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE

<div align="center">

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

</div>

| | | |
|---|---|---|
| **GORDON QUICK, ET. AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV637SNL** |
| | ) | |
| **VIZIQOR SOLUTIONS, INC., ET. AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<div align="center">

**MEMORANDUM**

</div>

Plaintiffs originally filed this action in state court alleging that defendants Viziqor and Woodmont Holdings breached the plaintiffs' employment contracts, including their retention bonus agreements, by failing to pay them the promised severance pay.  Although defendant Woodmont Holdings was the signatory on the agreements, plaintiffs are holding defendant Viziqor liable under an alter ego theory; i.e. Woodmont Holdings was just a holding company for the stock of its operating company Viziqor.  Plaintiffs further allege that defendants Huber and Quadrangle breached a separate contract with them that guaranteed payment of the subject severance and bonuses (if defendants Viziqor and Woodmont Holdings failed to pay).  Finally, in the alternative, plaintiffs allege that defendants Huber and Quadrangle fraudulently misrepresented to them that they would guarantee the subject payments.  Subsequent to the filing of this cause of action, defendant Woodmont Holdings filed for bankruptcy protection in Delaware. The defendants removed this case to federal court wherein it was assigned to this Court.  Plaintiffs filed a motion to dismiss defendant Woodmont Holdings which the Court granted. *See*, Court Order #10, filed April 24, 2006.  This matter is before the Court on defendant Viziqor's motion

to dismiss (#14), filed May 3, 2006[1] and defendants Huber and Quadrangle Group's motion to dismiss, or in the alternative, to transfer or stay (#16), filed May 3, 2006.  Responsive pleadings have been filed.

Defendant Viziqor seeks to dismiss this cause of action because (former) defendant Woodmont Holdings is a necessary and indispensable party pursuant to Rule 19 Federal Rules of Civil Procedure.  Since defendant Woodmont Holdings is in bankruptcy and all causes of action against it are subject to the standard bankruptcy stay, defendant Viziqor argues that this lawsuit cannot proceed in the absence of defendant Woodmont Holdings.[2]  Defendants Huber and Quadrangle concur with defendant Viziqor's Rule 19 dismissal argument, but in the alternative, argue that if this Court should decide not to dismiss this case, then it should either stay any further action until the bankruptcy matter in Delaware is concluded or transfer this case to the District of Delaware for reference to the Bankruptcy Court.  Plaintiffs contend that defendant Woodmont Holdings is not a necessary and indispensable party under Rule 19 and that this case can proceed in its absence since they have sued defendant Viziqor under an alter ego theory of liability.  They further contend that this case is not transferable pursuant to 28 U.S.C. §1404.

During the filing of the parties' briefs, two (2) significant events occurred.  Firstly, a Chapter 7 trustee has now been appointed in the Woodmont Holdings bankruptcy case.  Secondly, plaintiffs have each filed a Proof of Claims in the Delaware Bankruptcy Court asserting

---

[1]This motion was actually filed by defendant Formula Telecom Solutions f//k/a Viziqor Solutions.  Evidently, there has been some type of corporate merger, sale, etc.  However, since there has been no substitution of defendant party and Viziqor Solutions is still the defendant of record, the Court will continue to use the name "Viziqor Solutions" or "Viziqor" to identify this defendant.  Any substantive ruling concerning Viziqor will be equally applicable to Formula Telecom Solutions.

[2]Defendant Viziqor in a footnote does request, in the alternative, that this Court could consider transferring venue of this cause of action to the Delaware Bankruptcy Court.

claims against Woodmont Holdings in connection with the alleged breaches of the plaintiffs' employment contracts, including the retention bonus agreements.

Upon review of the parties' pleadings, and relevant caselaw, the Court believes that the first issue it needs to address is the question of transfer. If the Court should decide to transfer this case to the Delaware District Court for reference to the Bankruptcy Court, then the issue of a Rule 19 dismissal is moot. If the Court should decide not to transfer the case, then it will address the issue of application of Rule 19, and if necessary, application of the automatic stay.

District courts have subject matter jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11". 28 U.S.C. §1334(b). Under 28 U.S.C. §157(a), district courts may "provide that any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . shall be referred to the bankruptcy judges for the district." Thus, the first question is whether the present action is a "related to" action subject to transfer by this Court.

"For subject matter jurisdiction to exist in a `related to' action, there must be some nexus between the civil proceeding and the Title 11 case." Integrated Health Services of Cliff Manor, Inc. v. THCI Co., L.L.C., 417 F.3d 953, 958 (8th Cir. 2005) *quoting* Specialty Mills, Inc. v. Citizens State Bank, 51 F.3d 770, 774 (8th Cir. 1995). In order for courts to assert jurisdiction over a proceeding "related to" a bankruptcy case, the proceeding must `have some effect on the administration of the debtor's estate." Specialty Mills, at 774 *quoting* In re Dogpatch U.S.A., Inc., 810 F.2d 782, 786 (8th Cir. 1987); *see also*, Abramowitz v. Palmer, 999 F.2d 1274, 1277 (8th Cir. 1993) *quoting* In re Dogpatch, at 786. The Eighth Circuit Court of Appeals has adopted the "conceivable effect" test for determining whether a civil proceeding is related to a bankruptcy case:

3

> "[T]he test for determining whether a civil proceeding is
> related to bankruptcy is whether the outcome of that
> proceeding could conceivably have any effect on the estate
> being administered in the bankruptcy . . . An action is
> related to bankruptcy if the outcome could alter the debtor's
> rights, liabilities, options, or freedom or action . . . and which
> in any way impacts upon the handling and administration of
> the bankrupt estate."

Specialty Mills, at 774 *quoting* In re Dogpatch, at 786 (*quoting* Pacor v. Higgins, 743 F.2d. 984,

994 (3rd Cir. 1984)); Abramowitz, at 1277 *quoting* In re Dogpatch, *supra.*; *see also*, Integrated

Health Services of Cliff Manor, at 958; In re Farmland Industries, 296 B.R. 793, 803-04 (8th Cir.

BAP 2003); In re Powell, 224 B.R. 409, 412 (8th Cir. BAP 1998); Commerce Bank, N.A. v.

Tifton Aluminum Co., Inc., 217 B.R. 798, 800-01 (W.D.Mo. 1997).  Such a test "implements a

fairly broad interpretation of the scope of a bankruptcy court's `related to' jurisdiction",

Abramowitz, at 1277, and even a proceeding "which portends a mere contingent or tangential

effect on a debtor's estate" meets the broad jurisdictional test adopted by the Eighth Circuit, In re

Titan Energy, Inc., 837 F.2d. 325, 330 (8th Cir. 1988).  This "breadth" of the scope of "related

to" jurisdiction signifies that "Congress intended to grant comprehensive jurisdiction to the

bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected

with the bankruptcy estate."  Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) *quoting*

Pacor, at 994 (internal citations omitted).  Furthermore, "the `related to' language of §1334(b)

must be read to give district courts (and bankruptcy courts under §157(a)) jurisdiction over more

than simple proceedings involving the property of the debtor or the estate.  Celotex Corp., 514

U.S. at 308.

Applying the "conceivable test" as established by the Eighth Circuit, this Court finds that

the present matter clearly "relates to" the ongoing Delaware bankruptcy case.  Plaintiffs concede

that the real issues in this case are two-fold: can plaintiffs hold defendant Viziqor liable (ostensibly

in place of Woodmont Holdings) on an alter ego theory and/or can plaintiffs hold defendants Huber and Quadrangle liable on a separate breach of contract claim or fraud claim?  The reality is that to hold Viziqor liable under an alter ego theory is to have both entities treated as one; thus, the assets of Viziqor are the assets of Woodmont Holdings bankruptcy estate.  *See*, In re Estate of Graven, 64 F.3d. 453, 455 (8th Cir. 1995)(affirming district court ruling for alter egos to turn their assets over to bankruptcy estate).  To allow plaintiffs to recover against Viziqor would interfere with the ability of other similarly-situated creditors of Woodmont Holdings to recover their fair share of the bankruptcy estate.  Furthermore, the fact that plaintiffs have filed Proofs of Claim (based upon the same allegations) in the Delaware bankruptcy action buttresses this Court's finding that this action is "related to" the bankruptcy court action.  Such a move appears to demonstrate the plaintiffs' belief that their claims are also ones that should be addressed by the Delaware bankruptcy court.[3]

The transfer of this lawsuit is a point of dispute.  Defendants argue that 28 U.S.C. §1412 governs the transfer; plaintiffs argue that 28 U.S.C. §1404 governs the transfer.  The Court notes that there is a split of authority on this issue.  *See*, The City of Liberal, Kansas v. Trailmobile Corp., et. al., 316 B.R. 358, 361-62 (D.Kan. 2004)(providing an exhaustive list of the courts that favor transfer pursuant to §1412 and the courts favoring transfer pursuant to §1404); *see also*, Dunlap v. Friedman's, Inc., 331 B.R. 674, 677 (S.D.W.Va. 2005)(*quoting* with analysis Trailmobile Corp., *supra.*); In re Bruno's, Inc., 227 B.R. 311, 323 (Bankr.N.D.Ala. 1998).  Having reviewed the relevant caselaw, this Court finds that §1412 governs the issue of venue

---

[3]As for the plaintiffs' claims against defendants Huber and Quadrangle, it is clear that any liability against them is predicated on finding liability against Viziqor/Woodmont Holdings.  Any decision by this Court regarding those claims would unequivocally impact upon the handling and administration of Woodmont Holdings bankruptcy estate.

transfer in this "related to" action for the excellent reasons set forth in Dunlap, at 677-678;

Frelin, et. al. v. Oakwood Homes Corp., 292 B.R. 369, 387 n.11 (Bankr.E.D.Ark. 2003); In re

Bruno's, at 322-323; *see also,* In re Vital Link Lodi, Inc., 240 B.R. 15, 19 (Bankr.W.D.Mo.

1999)(deciding that transfer of an adversary proceeding to another district court was governed by

28 U.S.C. §1412 and Bankruptcy Rule 7087).

     Section 1412 provides that "[A] district court may transfer a case or proceeding under

Title 11 to a district court for another district, in the interest of justice or for the convenience of

the parties." 28 U.S.C. §1412. Thus, a district court may transfer under §1412 upon a sufficient

showing of either the interest of justice or for the convenience of the parties. The granting or

denial of a motion to transfer venue is discretionary with the court. In re Vital Link Lodi, at 19

*citing* United States v. Phillips, 433 F.2d. 1364, 1368 (8th Cir. 1970); *see also*, Frelin, at 387

(*citing* In re Vital Link Lodi, *supra.*); In re Bruno's, at 324 (citations omitted). The party wishing

to transfer venue has the burden to prove by a preponderance of the evidence that the transfer is

appropriate. Frelin, at 387; In re Vital Link Lodi, at 19 *citing* Wittes v. Interco, 139 B.R. 718,

720 (Bankr.E.D.Mo. 1992) In re Bruno's, at 324. There is a strong presumption in favor of

placing venue in the district court where the bankruptcy case is pending. In re Vital Link Lodi, at

19 *citing* Windsor Communications Group, Inc. v. Five Towns Stationery, Inc., 53 B.R. 293, 296

(Bankr.E.D.Pa. 1985). However, wherein the debtor is a non-movant in the motion to transfer

venue to the "home court" (i.e., the bankruptcy court in which the debtor's case is pending),

consideration of the home court presumption is less important than if the debtor was the movant

or had joined in the motion. In re Harnischfeger Industries, 246 B.R. 421, 440 (Bankr.N.D.Ala.

2000).

"The `interest of justice' prong is 'a broad and flexible standard which must be applied on a case-by-case basis.  Some courts have held that the most important factor to be considered in determining whether to transfer venue of a bankruptcy proceeding under the interest of justice prong is whether transfer would promote the economic and efficient administration of the bankruptcy estate."  In re Bruno's, at 324 (internal citations omitted).  Different courts have applied different factors, *see* In re Bruno's, at 324-25 n.44-56 (listing various factors and respective applicable cases); however, this Court agrees with the Frelin Court that the factors set forth in In re Bruno's, *supra.*, should be applied.  These factors are:

**"Interest of Justice" prong of §1412**

1) economics of estate administration
2) presumption in favor of "home court"
3) judicial efficiency
4) ability to receive a fair trial
5) the state's interest in having local controversies decided
    within its borders by those familiar with its laws
6) enforceablity of any judgment rendered
7) plaintiff's original choice of forum

**"Convenience of Parties" prong of §1412**

1) Location of plaintiff and defendant
2) Ease of access to necessary proof
3) Convenience of witnesses
4) Availability of subpoena power for the unwilling witnesses
5) Expense related to obtaining witnesses

Frelin, at 388 *citing* In re Bruno's, at 324-25.

Upon review of the factors applicable to the "interest of justice" prong of §1412, the Court finds that venue of this proceeding should be transferred to the District Court of Delaware for reference to the Delaware Bankruptcy Court.[4]

---

[4]The Court notes that the parties concentrated their efforts on a §1404 transfer as opposed to a §1412 transfer.  However, many of the arguments made in support of a §1404 transfer can be

7

All of the plaintiffs are Missouri residents. Defendants Viziqor and Woodmont Holdings are Delaware corporations with Woodmont Holdings having its principal place of business in Maryland. Defendant Huber is a resident of New York and defendant Quadrangle is a New York limited liability corporation with its principal place of business in New York. Woodmont Holdings filed its bankruptcy petition in the Delaware Bankruptcy Court and a Chapter 7 trustee has been appointed. Unless the case is transferred, this Court lacks subpoena power over the Chapter 7 trustee.

Since the plaintiffs have filed proofs of claims based upon the allegations that they have set forth in their complaint here, it appears to this Court that one consolidated proceeding in Delaware would be more judicially efficient that having two separate courts in two separate venues looking at the same claims. Furthermore, since plaintiffs have filed their proofs of claim in the Delaware Bankruptcy Court, any decision regarding Woodmont Holdings bankruptcy estate would be applicable to the plaintiffs; thus, their interests are protected. Finally, although the Court is mindful that plaintiffs chose Missouri as their forum to litigate their claims; the fact that they have now filed said claims with the Delaware Bankruptcy Court reaffirms the presumption in favor of the home court. Furthermore, this Court has no reason to believe that the Delaware Bankruptcy Court cannot fairly adjudicate the plaintiffs' claims. Finally, it would be significantly detrimental to the efficient administration of Woodmont Holdings bankruptcy estate, and patently unfair to any other creditor of Woodmont Holdings, if a cause of action such as the one presently before this Court relating to contractual and fraudulent conduct of these parties (including Woodmont Holdings) is not controlled by the Delaware Bankruptcy Court as the home court.

---

considered here.

After careful consideration of the matter, the Court determines that in the interest of justice, this cause of action will be transferred to the United States District Court for the District of Delaware for reference to the Delaware Bankruptcy Court.

In light of the above findings, the Court sees no reason to address the "convenience of parties" prong of §1412, nor address the parties' briefs as to Rule 19 application or application of the bankruptcy stay provision.

Dated this __12th__ day of February, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE

# United States District Court

Eastern District of Missouri
111 South 10th Street
St. Louis, Missouri 63102

James G. Woodward                                                                            314-244-7900
  Clerk of Court

February 13, 2007

United States District Court
District of Delaware
844 N. King Street
Lockbox 18
Wilmington, DE  19801

RE:          Quick, et al v. Viziqor Solutions, Inc., et al
Case #      4:06CV637 SNL

Dear Mr. Dalleo, Clerk:

Enclosed is a certified copy of the order dated February 12, 2007  by the Honorable Stephen N. Limbaugh, and docket sheet transferring the above styled case to the U.S. District Court for Delaware.

It is our understanding that your court is also utilizing Electronic Case Filing, therefore, we are including a login and password so you may access documents.

       Login:
       Password:

In order to assist you in accessing our electronic file go to https://ecf.moed.circ8.dcn or for help call the help line at 866-883-7749 (toll free) or 314-244-7650.  If you need further assistance, you may call the St. Louis Office at (314) 244-7800.

Sincerely,
JAMES G. WOODWARD, CLERK

By:      /s/ Andrea Luisetti
        Andrea Luisetti
        Deputy Clerk

Enclosures